IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DELBERT E. ROLLISON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-158 SLR |
| | ) | |
| NEAL SHOEMAKER, an individual, | ) | TRIAL BY JURY DEMANDED |
| BLUE DIAMOND, LLC, a Delaware | ) | |
| corporation, HOUGHTONS | ) | |
| AMUSEMENT PARK, LLC, a | ) | |
| Delaware corporation JACK | ) | |
| BRADY, individually and d/b/a | ) | |
| KSR MOTOR SPORTS, BENCHMARK | ) | |
| BUILDERS, INC. a Delaware | ) | |
| corporation, and PARKWAY | ) | |
| GRAVEL, a Delaware | ) | |
| corporation, | ) | |
| | ) | |
| Defendants. | ) | |

**APPENDIX TO OPENING BRIEF OF DEFENDANTS
BLUE DIAMOND, LLC AND PARKWAY GRAVEL, INC.
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

| | Tab A |
|---|---|
| Defendants' November 20, 2006 letter to Judge Robinson | A-1-3 |
| Deposition Excerpts of Delbert E. Rollison | A-4-6 |
| Release and Waiver of Liability | A-7 |
| Deposition Excerpts of Delbert E. Rollison | A-8-24 |
| Deposition Excerpts of Delbert E. Rollison | A-25-26 |
| Deposition Excerpts of Delbert E. Rollison | A-27-28 |
| Deposition Excerpts of Delbert E. Rollison | A-29 |
| Deposition Excerpts of Delbert E. Rollison | A-30 |

Deposition Excerpts of Delbert E. Rollison          A-31-32

                                                    Tab B

Unreported Cases                                    A-33


Tucker v. Albun, Inc., Del. Super., C.A. 97C-04-025 (9/27/99)

Hallman v. Dover Downs, Inc., D.Del., C.A. No. 85-618-CMW
(12/31/86)

Egan & Sons Air Conditioning Co. v. General Motors Corp., Del.
Super., C.A. Nos. 88L-MY-18 and 88L-MY-28 (4/27/88)

Judge Trucking Co. v. Estate of Cooper, C.A. No. 92C-03-041
(4/19/94)


**AKIN & HERRON, P.A.**
/s/Roger A. Akin
Roger A. Akin, Esquire
Bar No. 395
1220 N. Market Street, Suite 300
P.O. Box 25047
Wilmington, DE 19899
(302) 427-6987
Attorney for Defendants
Blue Diamond, LLC and
Parkway Gravel, Inc.

Dated: November 27, 2006

# AKIN & HERRON, P.A.
### ATTORNEYS AT LAW

ROGER A. AKIN

BRUCE C. HERRON

_____

DEBORAH C. SELLIS

1220 N. MARKET STREET
SUITE 300
P. O. BOX 25047
WILMINGTON, DELAWARE 19899
(302) 655-5552
(302) 655-3697 FAX

Writer's Direct Dial
(302) 427-6989

www.rabhlaw.com

E-Mail
raa@rabhlaw.com

November 20, 2006

**VIA ELECTRONIC FILING & HAND DELIVERY**
Honorable Sue L. Robinson
U. S. District Judge
United States District Court
Lockbox 31
844 King Street
Wilmington, DE 19801

     RE:  **Rollison v. Shoemaker, et al.**
           **C. A. No. 06-159-SLR**

Dear Judge Robinson:

    This is a personal injury case assigned to Your Honor. This firm represents defendants Blue Diamond, LLC and Parkway Gravel. I am writing to the Court with the consent of all counsel of record in the case.

    At the present time the extant Scheduling Order in this litigation reflects that dispositive motions are due on or before November 25, 2006, with a discovery cut-off of today.

    As the Court is aware, though properly served, co-defendant Jack Brady, individually and d/b/a KSR Motor Sports, remains *pro se* in the litigation. Mr. Brady has persistently avoided his obligations to the Court. Indeed, the Court has scheduled a default hearing with respect to Mr. Brady's status for 8:30 a.m., December 14, 2006.

    Mr. Brady and his business were the promoters of the race car event in which plaintiff sustained his personal injuries. My office has made repeated efforts to seek discovery from and to take the deposition *ad testificandum* and *duces tecum* of Mr. Brady. Mr. Brady has not been cooperative with those efforts.

A-1

Honorable Sue L. Robinson
U. S. District Judge
United States District Court
November 20, 2006
Page 2

Mr. Brady finally confirmed his attendance for his deposition in Wilmington on November 16, 2006. At the 11th hour, Mr. Brady informed my staff that he was traveling and unavailable to be deposed on that date. He then confirmed that he would be present for his deposition on November 17, 2006, at the conclusion of another deposition in the case.

At 12:39 a.m. on November 17, 2006, Mr. Brady again cancelled his deposition, alleging that he was in Pittsburgh and was unavailable. For the information of the Court, I am attaching the e-mail reflecting Mr. Brady's last minute cancellation as Exhibit 1 to this letter.

All counsel in the litigation agree that Mr. Brady's testimony has significance in this case. Our clients intend to file a motion for summary judgment which is partially dependent on information which Mr. Brady may provide.

As a result of these circumstances, all parties are in agreement that, if the Court concurs, the discovery deadline and date for the filing of dispositive motions should be postponed for a relatively brief period to secure Mr. Brady's testimony. We are presently circulating a stipulation among counsel which would reflect a 45-day continuance of certain dates in the amended Scheduling Order in the case.

As soon as the original of that stipulation is returned to me, we will promptly provide it to the Court for consideration by Your Honor.

I am of course available if there are any questions.

Thank you.

                              Respectfully submitted,
                              /s/ Roger A. Akin
                              Roger A. Akin

RAA:tad
cc:  Clerk of the Court
     Matthew R. Fogg, Esquire (via fax only)
     Colin M. Shalk, Esquire (via fax only)
     Sherry Ruggiero Fallon, Esquire (via fax only)
     Jack Brady (First Class Mail)

A-2

**Roger Akin**

| | |
|---|---|
| **From:** | "Tracy Dietel" <tad@rabhlaw.com> |
| **To:** | "Roger Akin" <raa@rabhlaw.com> |
| **Sent:** | Friday, November 17, 2006 7:48 AM |
| **Subject:** | Fw: Rollison v. Blue Diamond |

Please see below my message to Jack Brady and his response.  Sorry, I tried to get him here...
----- Original Message -----
**From:** JACK Brady
**To:** tad@rabhlaw.com
**Sent:** Friday, November 17, 2006 12:39 AM
**Subject:** RE: Rollison v. Blue Diamond

Sorry Trace,I wont be able to make it today I am stuck in Pittsburgh....tell ALan he should call me back.......

Jack


# *KSR MOTORSPORTS*

From: "Tracy Dietel" <tad@rabhlaw.com>
To: <jackbrady440@hotmail.com>
Subject: Rollison v. Blue Diamond
Date: Thu, 16 Nov 2006 10:26:27 -0500

Good Morning Mr. Brady,

Attached please find Mr. Akin's (attorney for Blue Diamond & Parkway Gravel) Re-notice of your Deposition **rescheduled for tomorrow, November 17, 2006 at 11:00 a.m.** Please call me with any questions or problems.  I'll touch base with you later on this afternoon.  Thank you.

Tracy A. Dietel
Paralegal
Akin & Herron, P.A.
P.O. Box 25047
Wilmington, DE 19899
VOICE (302)427-6990
FAX (302) 655-3697

<< 6017.wpd >>

Share your latest news with your friends with the Windows Live Spaces friends module.

A-3
Exhibit 1

11/17/2006

Delbert E.  Rollison

Page 24

1  motor vehicle accidents?   Car accidents?

2        A.    No.

3        Q.    Were you involved in any worker's compensation

4  claims other than the one you told us about that occurred

5  in 1982 or 1983 involving the low back?

6        A.    No.

7        Q.    Were you involved in any kind of accidents

8  whatsoever -- slip and falls, falling down, falling off

9  ladders, falling off a roof, any mishaps at home -- any

10  accident of any nature whatsoever prior to July of 2004?

11       A.    No.

12       Q.    Since July of 2004, have you had any kind of

13  accidents whatsoever?

14       A.    No.

15       Q.    Prior to July of 2004, had you ever visited

16  the Blue Diamond racetrack?

17       A.    No.

18       Q.    What brought you there on July 3rd of 2004?

19       A.    My brother was a participant in the activities

20  there, and he invited me to go with him.

21       Q.    Your brother is Randy Rollison?

22       A.    Correct.

23       Q.    Randy with a Y?

24       A.    Right.

A-4

Delbert E.   Rollison

Page 25

1     Q.    What is his address presently?

2     A.    I'm not sure of his address.  It's Bluemont,

3 Virginia.  I'm not sure of his street address.

4     Q.    Do you have a telephone number for him?

5     A.    (540) 554-2629.

6     Q.    Now, what specifically did your brother Randy

7 Rollison invite you to do on July 3rd, 2004?

8     A.    To join him in the race that he was

9 participating in.

10    Q.    What type of race was that?

11    A.    I call it mud drag racing.  I'm not sure if

12 that's the technical word for it, but...

13    Q.    Is your brother older or younger than you?

14    A.    Younger.

15    Q.    What's his age?

16    A.    He is now 44.

17    Q.    Okay.  Had you ever participated with him in

18 other mud drag racing events?

19    A.    No.

20    Q.    Did you yourself personally engage in mud drag

21 racing as a hobby or entertainment?

22    A.    No.

23    Q.    What caused you to participate on this

24 particular occasion?

A-5

Delbert E.   Rollison

Page 26

1      A.    I just transferred from San Antonio to pretty

2 much home, which is Virginia, and he was excited about me

3 coming up and going to watch him race.  I had never seen

4 it before, so...

5                MS. FALLON:  Let's go off the record for

6 one minute.

7                (A brief recess was taken.)

8                    - - - - -

9                DELBERT EUGENE ROLLISON, resumes

10 BY MS. FALLON:

11     Q.    To your knowledge, if you know, Mr. Rollison,

12 how long has your brother Randy Rollison been involved in

13 mud drag racing?

14     A.    Two to three years.

15     Q.    Prior to July 3 of 2004, you had never gone to

16 any of these events either on your own or with your

17 brother; is that accurate?

18     A.    The event entitles monster trucks, mud drag

19 racing, some other activities of -- I've never seen

20 before.  So mud drag racing is just one of --

21     Q.    Okay.

22     A.    -- the participating activities in the event

23 for that evening.

24     Q.    Prior to July 3 of 2004, had you ever

*A-6*

EXHIBIT

*Rollison-3*
*RWWR 8.6.06*

# RELEASE AND WAIVER OF LIABILITY, ASSUMPTION OF RISK AND INDEMNITY AGREEMENT

*BLUE DIAMOND*

**DESCRIPTION AND LOCATION OF SCHEDULED EVENT(S)**

*July 3rd 2004*

**DATE RELEASE SIGNED**

IN CONSIDERATION of being permitted to compete, officiate, observe, work for, or participate in any way in the EVENT(S) or being permitted to enter for any purpose any RESTRICTED AREA (defined as any area requiring special authorization, credentials, or permission to enter or any area to which admission by the general public is restricted or prohibited), I, THE UNDERSIGNED, for myself, my personal representatives, heirs, and next of kin:

1. Am a driver, mechanic, pitcrew or other team member, or other participant engaged in racing, and I am not participating in the EVENT(S) or entering the RESTRICTED AREA for recreational purposes.

2. Acknowledge, agree, and represent that I have or will immediately upon entering any of such RESTRICTED AREAS, and will continuously thereafter, inspect the RESTRICTED AREAS which I enter, and I further agree and warrant that, if at any time, I am in or about RESTRICTED AREAS and I feel anything to be unsafe, I will immediately advise the officials of such and if necessary will leave that RESTRICTED AREA.

3. HEREBY RELEASE, WAIVE, DISCHARGE AND COVENANT NOT TO SUE the promoters, participants, racing associations, sanctioning organizations or any subdivision thereof, track operators, track owners, officials, car owners, drivers, pit crews, rescue personnel, any persons in any RESTRICTED AREA, promoters, sponsors, advertisers, owners and lessees of premises used to conduct the EVENT(S), premises and event inspectors, surveyors, underwriters, consultants and others who give recommendations, directions, or instructions or engage in risk evaluation or loss control activities regarding the premises or EVENT(S) and each of them, their directors, officers, agents and employees, all for the purposes herein referred to as "Releasees," FROM ALL LIABILITY TO THE UNDERSIGNED, my personal representatives, assigns, heirs, and next of kin FOR ANY AND ALL LOSS OR DAMAGE, AND ANY CLAIM OR DEMANDS THEREFOR ON ACCOUNT OF INJURY TO THE PERSON OR PROPERTY OR RESULTING IN DEATH OF THE UNDERSIGNED ARISING OUT OF OR RELATED TO THE EVENT(S), WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE.

4. HEREBY AGREE TO INDEMNIFY AND SAVE AND HOLD HARMLESS the Releasees and each of them FROM ANY LOSS, LIABILITY, DAMAGE, OR COST they may incur arising out of or related to the EVENT(S) WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE.

5. HEREBY ASSUME FULL RESPONSIBILITY FOR ANY RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE arising out of or related to the EVENT(S) whether caused by the NEGLIGENCE OF RELEASEES or otherwise.

6. HEREBY acknowledge that THE ACTIVITIES OF THE EVENT(S) ARE VERY DANGEROUS and involve the risk of serious injury and/or death and/or property damage. I, THE UNDERSIGNED, also expressly acknowledge that INJURIES RECEIVED MAY BE COMPOUNDED OR INCREASED BY NEGLIGENT RESCUE OPERATIONS OR PROCEDURES OF THE RELEASEES.

7. HEREBY agree that this Release and Waiver of Liability, Assumption of Risk and Indemnity Agreement extends to all acts of negligence by the Releasees, INCLUDING NEGLIGENT RESCUE OPERATIONS and is intended to be as broad and inclusive as is permitted by the laws of the Province or State in which the Event(s) is/are conducted and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full legal force and effect.

I HAVE READ THIS RELEASE AND WAIVER OF LIABILITY, ASSUMPTION OF RISK AND INDEMNITY AGREEMENT, FULLY UNDERSTAND ITS TERMS, UNDERSTAND THAT I HAVE GIVEN UP SUBSTANTIAL RIGHTS BY SIGNING IT, AND HAVE SIGNED IT FREELY AND VOLUNTARILY WITHOUT ANY INDUCEMENT, ASSURANCE OR GUARANTEE BEING MADE TO ME AND INTEND MY SIGNATURE TO BE A COMPLETE AND UNCONDITIONAL RELEASE OF ALL LIABILITY TO THE GREATEST EXTENT ALLOWED BY LAW.

**ALL SECTIONS MUST BE COMPLETED.**

| PRINT NAME HERE | SIGN NAME HERE | | DUTIES |
|---|---|---|---|
| *Randy Rollison* | I HAVE READ THIS RELEASE | 265 | *Sand Drag* |
| *Mark Wansberg* | I HAVE READ THIS RELEASE | 266 | *Sand Drag* |
| *Stephen Sullivan* | I HAVE READ THIS RELEASE | 267 | *Car Prep* |
| *Gene Rollison* | I HAVE READ THIS RELEASE | 268 | |
| | I HAVE READ THIS RELEASE | 269 | *Sand Drag* |

**SIGNATURE AND TITLE OF WITNESS**

**ADDRESS OF WITNESS**

CL-29NY (4/96)

A-7

Delbert E.   Rollison

Page 94

1  course, I was -- he was behind me, so I can't see him

2  veering.  But he would have to do that to get to where I

3  was at -- my position.

4      Q.   In terms of feet, approximately how far off of

5  the path was the Shoemaker vehicle when it hit you?

6      A.   I was between eight and ten feet off the

7  track, and the center of the vehicle hit me dead center

8  in the back of my legs between the two front wheels.  So

9  if you go by his right tire, he was probably six feet

10  from the edge of the left-hand side of the road.

11      Q.   At any time before you were struck, did anyone

12  cry out to warn you that a vehicle was approaching you

13  from the rear?

14      A.   No.  I never was pushed, warned.  Nothing.

15      Q.   Let me ask you some questions about a document

16  and ask the reporter to mark this as the next exhibit in

17  sequence.  I guess that's Rollison 3.

18              (Rollison Deposition Exhibit No. 3 was

19  marked for identification.)

20  BY MR. AKIN:

21      Q.   I'll ask you to just take a look for a minute

22  or two at this document, sir.  I'm going to ask you some

23  questions about it.

24      A.   (The witness complied with counsel's request.)

A-8

Delbert E.  Rollison

Page 95

1    Q.    First of all, do you recognize this document?

2    A.    I recognize my signature.

3    Q.    Is that your signature at the bottom of the
4 page?

5    A.    Yes.

6    Q.    Do you go by the name "Gene Rollison"
7 occasionally?

8    A.    That's my name that people call me in public.
9 My real name is Delbert -- my first name.

10    Q.    But to your friends you are called "Gene."  Is
11 that correct?

12    A.    Correct.

13    Q.    Let's go to the bottom of this form.

14            There are three columns at the bottom of
15 the form.  One is Print Name Here.  And there are four
16 names.  Then it appears that Gene Rollison is printed on
17 the last line.  Is that correct?

18    A.    Yes.

19    Q.    Did you print your name on that form at that
20 place?

21    A.    It doesn't look like my handwriting -- the
22 printed part -- but it does in the handwritten -- the
23 center column looks like my signature.  But on the left
24 the printed doesn't look like the way I would print my

**A-9**

Delbert E.  Rollison

Page 96

1 name.

2      Q.    Is it your testimony that someone else printed

3 your name on this form?

4      A.    I could have done it, but it doesn't generally

5 look like my -- the way I sign my name.

6      Q.    Okay.

7      A.    I could have.  I'm just not saying for sure I

8 did it.

9      Q.    Down the center column, the form asks the same

10 person to sign his name.  Does that appear to be your

11 signature in the center column on the last line?

12      A.    Yes, it does.

13      Q.    All right.  Then just to the right of the

14 signatures there appear to be numbers.  There appears to

15 be the number 269 after your signature.  Do you know what

16 those numbers represent?

17      A.    No, I do not.

18      Q.    Were you given an identification badge or tag

19 with such a number on it to your recollection?

20      A.    Not that I remember.

21      Q.    Okay.  The third column is Duties.

22            What words are written there?

23      A.    I never wrote those --

24      Q.    Okay.

**A-10**

Delbert E.   Rollison

1      A.   -- words there.

2      Q.   Can you read those words?

3      A.   Sand drags?  And it's d-r-a-y-s.

4      Q.   Just for the record, would you read the other

5 three printed names in the left column?

6      A.   Randy Rollison --

7      Q.   If you can.

8      A.   -- Mark -- I can't really make that one out.

9      Q.   All right.  There's been some testimony today

10 about a Mark McCaughey.  Is it possible at least that

11 that's Mr. McCaughey's name?

12      A.   It looks like a Mark W.

13      Q.   All right.  Your attorneys have filed answers

14 to Mr. Shoemaker's interrogatories, and in response to

15 Interrogatory 2 you identify a Mark McCaughey of

16 Bluemont, Virginia as a person who may have knowledge of

17 how the accident occurred.  Is that Mr. McCaughey's

18 printed name in that left column in the second line?

19      A.   I couldn't say whether it is or isn't one way

20 or the other.

21      Q.   Okay.

22      A.   I'm not sure.

23      Q.   Can you read the third name in that list?

24      A.   Stephen Littleton.

A-11

Corbett & Wilcox

Delbert E.   Rollison

Page 98

1      Q.    All right.   Now, if we assume for the moment

2 that this is a form that you and some other members of

3 your crew were provided, do you recall at what time of

4 the day you were given this form?

5      A.    I'm thinking it was prior to the staging of

6 the vehicles.   5:00, 5:30, 6:00.   Something like that.

7      Q.    Okay.

8      A.    It was later in the evening --

9      Q.    All right.

10      A.    -- or afternoon.

11      Q.    Your recollection is that a woman gave you

12 this form to sign.   Is that correct?

13      A.    Yes.

14      Q.    What is your recollection of her name?

15      A.    I think her name was Ann.

16      Q.    Okay.   But you don't recall her last name?

17      A.    I'm not sure if that's her first name.   I

18 just -- for some reason I think it's Ann, but I could be

19 wrong.

20      Q.    Could you describe her for the record?

21      A.    Thin, medium, shoulder length dark brown hair.

22      Q.    Would you identify her again if you saw her?

23      A.    No.

24      Q.    All right.   When she approached you and the

A-12

Corbett & Wilcox

Delbert E.  Rollison

Page 99

1 others and asked for your signatures on this form, did

2 she identify who she was representing in asking you to do

3 that?

4        A.    No.

5        Q.    What words did she state when she presented

6 this form to you and the crew?

7        A.    She didn't really present it to me.  She

8 handed it to my -- the people I was with that day.  And

9 one of the people handed it to me.  And I just -- I saw

10 the legal title and I just signed it.  It was a basic

11 waiver -- basic coverage.

12       Q.    Okay.  Do you have any understanding as to

13 whether you and the rest of the crew was required to sign

14 this form?

15       A.    I don't remember it being said you had to.  I

16 don't remember.

17       Q.    There's been some other testimony in this case

18 that people participating in the event were required to

19 sign this and that that was a condition of their

20 participation.  Do you have any recollection as to

21 whether that's correct?

22       A.    I don't -- I'm not for sure.

23       Q.    What did you understand would have occurred if

24 you had refused to sign it, if anything?

A-13

Delbert E.  Rollison

Page 100

1      A.   I don't -- like I said, it was handed to by

2 one of my teammates.  Then when I signed it, it was given

3 back to the lady which was -- in my opinion, she's

4 organizing the drag racers, not as a representative of

5 the producer of the event.  She was just acting as a

6 helper organizing a small group of racers.

7      Q.   Do you know who was the producer or promoter

8 of this event?

9      A.   I understand Jack was the one that was

10 promoting the show.  I'm not for sure, but it's what I

11 heard from people talking.

12      Q.   Do you know his last name?

13      A.   You guys were just talking about him just this

14 morning -- or this afternoon.  I'm not sure.  I can't

15 remember his name.  But...

16      Q.   Okay.

17      A.   Brierly (phonetic)?  Jack Brierly?

18      Q.   All right.  I think there's been some

19 testimony in the case that the promoter of the event was

20 Jack Brady.

21      A.   Brady, yes.

22      Q.   Okay.  Did you meet Mr. Brady on July 3, 2004?

23      A.   Not that I'm aware of.

24      Q.   Do you know if he was present at the site?

A-14

Delbert E.   Rollison

Page 101

1      A.    I have no idea.

2      Q.    Okay.  Now, the form was apparently signed by

3 several people before you, and then it was given to you.

4 Is that correct?

5      A.    As far as I remember.  It was one of the -- my

6 teammates handed it to me.

7      Q.    All right.  What did your teammate say when he

8 handed it to you?

9      A.    Just a -- I don't remember their verbiage.  I

10 don't remember.  Just somebody handing it to me and -- I

11 assume it was just a waiver to -- you had to sign, which

12 is pretty normal for some kind of sporting event like

13 that.

14     Q.    Okay.  Do you remember which one of your

15 teammates or which one of the crew gave it to you to

16 sign?

17     A.    I'm guessing it was the person prior to me

18 signing it.  I'm not sure.

19     Q.    That would be Mr. Littleton?

20     A.    (The witness indicated.)

21           THE REPORTER:  I'm sorry.  Was that a

22 yes?

23           THE WITNESS:  I'm not sure.

24

A-15

Corbett & Wilcox

Delbert E.   Rollison

Page 102

1 BY MR. AKIN:

2    Q.   All right.  You said a minute ago that you

3 assumed that it was a certain kind of form.  What did you

4 assume that the form was?

5    A.   Just -- it's a waiver that -- in case

6 something that was -- happened.  People -- if they were

7 following the rules and something happened -- an engine

8 blew up and shrapnel would hit you -- you -- they're not

9 responsible for that.  Something that's out of the -- out

10 of their control.

11    Q.   Okay.  In case something happened, what would

12 be the effect of this form, if you know?

13             MR. FOGG:  I object.  It calls for a

14 legal conclusion.

15 BY MR. AKIN:

16    Q.   All right.  You can answer the question, if

17 you have an answer.

18    A.   Can you say the question again, please?

19    Q.   Yeah.

20             If you sign this form, what did you

21 understand the effect of the form to be?

22    A.   Like I say, if a vehicle went out of control

23 while it was being operated by a racer or the engine blew

24 up or somebody fell on you or somebody hit you over the

A-16

Corbett & Wilcox

Delbert E.  Rollison

1 head with a beer bottle or something like that.  Not

2 necessarily a beer bottle.  But if somebody tripped you

3 or something like that.  An accident.  I'm not really

4 sure.

5      Q.   All right.  But if one of those things

6 happened, what would this form do?

7                MR. FOGG:  Same objection.  He can

8 answer.

9 BY MR. AKIN:

10     Q.   You can answer.

11     A.   I'm not sure.

12     Q.   Okay.  But you just stated several things that

13 could occur -- a beer bottle hit someone on the head, a

14 car goes out of control, some shrapnel flies through the

15 air from a blown engine -- something like that.  If

16 anything, what did you understand this form would do if

17 you were, for instance, to receive injuries from one of

18 those sorts of incidents?

19     A.   I don't know.  I'm not a lawyer or didn't read

20 it --

21     Q.   Okay.

22     A.   -- in detail.

23                So I'm not for sure.

24     Q.   So it's your testimony that you did not read

A-17

Corbett & Wilcox

Delbert E.   Rollison

Page 104

1 the form before you signed it?

2      A.    Correct.

3      Q.    Did you read any of it before you signed it?

4      A.    No.

5      Q.    Did you ask any of your crew what it was that

6 you were signing?

7      A.    No.

8      Q.    Okay.  Now, going back to the bottom of the

9 form, there's a typed statement in the second column that

10 says "I have read this release."  Do you see that sort of

11 superimposed under or over the signatures in the middle

12 column?

13      A.    I see it, yes.

14      Q.    All right.  But it's your testimony that in

15 fact you did not read it before you signed it.  Correct?

16      A.    Correct.

17      Q.    Did you have time to read it before you signed

18 it?

19      A.    Yes.  I could have.

20      Q.    Okay.  So was anyone suggesting that you sign

21 it but not read it?

22      A.    No.

23      Q.    You testified earlier that you in the past

24 have had some involvement in some bracket races.  Is that

A-18

Delbert E.   Rollison

Page 105

1  correct?

2       A.   Yes.

3       Q.   Was that as a crew member or a racer?

4       A.   It was a -- as a friend and a crew member

5  helping a person out that was -- that had the race car

6  that was driving it.

7       Q.   All right.  In regard to those prior bracket

8  races or drag races, were you asked to sign a form in

9  order to participate in those activities?

10      A.   No.

11      Q.   So is this the first time you had ever signed

12 such a form to your knowledge in conjunction with a

13 sporting event or a racing activity?

14      A.   I've been to a lot of air shows.  I'm sure

15 I've -- I might have signed something like that, because

16 I've been out on the flight lines with aircraft

17 retrieving them and launching them.  I'm sure I've --

18 maybe have or maybe haven't.  I can't remember for sure,

19 but...

20      Q.   Do you remember where you have worked around

21 aircraft where you may have been asked to sign some sort

22 of waiver form?

23      A.   Sun in the Fun Air Show.

24      Q.   Where did that occur?

A-19

Delbert E.   Rollison

Page 106

1      A.    That's in Lakeland, Florida.

2      Q.    Were you involved in working on aircraft at an

3 air show in Florida?

4      A.    I was there as a spectator, but I was allowed

5 to enter the prepared area for the aircraft to come and

6 go as a -- somebody with experience was allowed in there.

7      Q.    All right.

8      A.    Not -- a regular spectator is not allowed.

9      Q.    Okay.  Is it your recollection that you may

10 have signed a waiver form before you were allowed into

11 that area?

12      A.    I can't say if I did or didn't.  But chances

13 are I've signed some in my history, yes.

14      Q.    On your way up to Delaware back in July of

15 '04, did you and the members of the crew discuss the fact

16 that you would be asked to sign a form?

17      A.    I was riding with my brother Randy, and it

18 never came to conversation.

19      Q.    Okay.  Did you have any understanding as to

20 whether being in proximity to race cars in an event like

21 this involved certain danger to people in the immediate

22 vicinity?

23      A.    There's always a danger in any kind of

24 activity like this.

A-20

Corbett & Wilcox

Delbert E.  Rollison

Page 107

1      Q.   All right.  What sorts of dangers are present

2 in mud racing activities to your knowledge?

3      A.   They're traveling at a high speed in a

4 straight line which can go out of control in a short

5 distance with spectators, crew people surrounding --

6 concession stands and things like that.

7      Q.   Let me ask you to take a minute to read to

8 yourself paragraph 3 of this form.  I've got a couple of

9 questions for you.

10     A.   (The witness complied with counsel's request.)

11     Q.   Have you had a chance to read paragraph 3,

12 sir?

13     A.   Yes.

14     Q.   All right.  Realizing you're not an attorney,

15 I don't believe, nonetheless, what do you believe that

16 you were agreeing to in regard to paragraph 3?

17     A.   It was a basic liability of some of the

18 dangers you might be involved in in a racing arena like

19 that --

20     Q.   All right.

21     A.   -- in general.

22     Q.   Okay.  You say "basic liability."

23          But in regard to paragraph 3, what is it

24 that you were promising to do or not to do as a result of

A-21

Delbert E.   Rollison

Page 108

1 the language in paragraph 3?

2      A.   I don't hold the person responsible for their

3 actions or -- I'm not sure.

4      Q.   All right.

5      A.   I have to read it and try to memorize it.

6 But, in general, they're not responsible for somebody

7 that's doing something they shouldn't be doing.

8 They're -- but something happened that -- they're not --

9 out of their control.

10      Q.   Isn't it true in paragraph 3 by signing this

11 document you're agreeing to assume personal

12 responsibility for injuries that may have occurred in

13 conjunction with race activities that day?

14      A.   That's what the waiver says, yes.

15      Q.   Paragraph 6 states -- and I'll quote -- the

16 activities of the event are very dangerous and involve

17 the risk of serious injury or death or property damage.

18 Do you agree or disagree with that statement in regard to

19 mud racing?

20      A.   I agree.

21      Q.   By the way, there's one final signature at the

22 bottom of this release form.  Do you know whose signature

23 that is on the line that says Signature and Title of

24 Witness?

A-22

Delbert E.   Rollison

Page 109

1      A.   No, I do not.

2      Q.   In regard to answers to interrogatories that

3 have been proposed to you by Mr. Shoemaker's attorney, in

4 Interrogatory No. 2 you list a number of people who have

5 knowledge of the accident.  Going through that list of

6 people -- do you have it in front of you now, sir?

7      A.   Yes, I do.

8      Q.   Which of those people, to your knowledge,

9 actually saw the impact between the mud racer and your

10 legs?

11     A.   To the best of my knowledge, none of them.

12     Q.   All right.  Obviously, since you were the

13 injured person, you were a witness to the incident.

14 Correct?

15     A.   Yes.

16     Q.   Is it your testimony that the Shoemakers were

17 not witnesses to the event?

18               THE WITNESS:  We're talking about this

19 column right here, aren't we?

20               MR. FOGG:  Mm-hmm.

21               THE WITNESS:  It's my understanding that

22 the Shoemakers are witnesses.  They were the ones that

23 were -- hit me.  If they saw me, they wouldn't have --

24 they could have avoided me.  So as far as being a witness

A-23

Corbett & Wilcox

Delbert E.   Rollison

Page 30

1 though you were not a participant?

2      A.    Correct.  My vehicle was pulling my brother's

3 trailer which had the mud dragster on it.

4      Q.    What type of trailer were you pulling with

5 your vehicle?

6      A.    Just an 18-foot car carrier.  It was open.

7      Q.    What type of vehicle were you driving?

8      A.    My personal Dodge pickup.

9      Q.    And the mud racer was carried in the trailer?

10     A.    Correct.

11     Q.    When you got there and parked, did you take

12 the mud racer off the trailer?  Did you assist your

13 brother in doing that?

14     A.    We did unload it.

15     Q.    Okay.  How soon before the race did you get

16 there, the intended race, that is?

17     A.    About six, seven hours.

18     Q.    Okay.  What did you do when you got there?

19 For instance, did you go looking at any other of the

20 entertainment that was going on there or did you

21 basically stay with your brother and get preparations

22 ready for the race with the mud racer?

23     A.    I helped prepare the vehicle.  A lot of the

24 people that were participating were walking by talking to

A-24

Corbett & Wilcox

Delbert E.  Rollison

Page 31

1 my brother, and they were just talking racing.  And I was

2 pretty much stuck there to the time that the race

3 started.  I didn't leave the area.

4       Q.   Okay.  Was the vehicle itself, the mud racer,

5 removed from the trailer area where it was parked at any

6 time until just prior that the race was set to begin?

7       A.   No.

8       Q.   You did not go into any of the other areas of

9 Blue Diamond Park?  You stayed with your vehicle and with

10 the mud racer near the trailer?

11      A.   That's correct.

12      Q.   What did you do during that time period?  Was

13 it like a tailgate?  Did you have anything to eat?

14      A.   We had refreshments, coolers and lunches

15 with -- that we had packed.

16      Q.   Did you have any alcoholic beverages during

17 that time?

18      A.   No.

19      Q.   Were you taking any prescription medication?

20      A.   No.

21      Q.   As the time approached for the race to begin,

22 what did you do?

23      A.   There was nothing really to do.  Just stand

24 there waiting for them to call the vehicles to be taken

A-25

Delbert E.  Rollison

Page 44

1 area, or is that dirt?

2        A.    It was dirt and grass.

3        Q.    Okay.  You've also drawn a line with arrows.

4                    Why don't you tell me what that line

5 represents?

6        A.    That's the route that the racers take to the

7 staging area.

8        Q.    Okay.  You've also drawn a line that kind of

9 bisects the diagram called "paved road."  Was that the

10 only paved road in this area that you've drawn on your

11 diagram?

12        A.    To my best knowledge, yes.

13        Q.    Okay.  How was it paved?  Was it blacktopped?

14        A.    Blacktopped, yes.

15        Q.    So to get from the parking lot to the staging

16 area and across the paved road, was that path at all

17 paved?

18        A.    No.

19        Q.    Was it a recognizable path in the sense that

20 it had tire markings in it or was dirt with grass on

21 either side so that you can really tell that it was some

22 kind of a trail or path?

23        A.    It was distinguished enough that you could see

24 that it was grass -- partially grass on either side and a

A-26

Delbert E.  Rollison

Page 45

1 little grass path in the middle where the two tires had

2 been traveling.

3     Q.   Okay.  Now, when you exited the parking lot,

4 were you on foot or were you on some type of vehicle?

5     A.   I was walking.

6     Q.   Where was your brother?

7     A.   My brother and the rest of the vehicles were

8 getting hooked up.  I think -- I'm not sure about where I

9 was as far as if I was in the back of the crowd or ahead

10 of the crowd, but I know my brother had already left.

11 Randy had already left before I started walking.  He was

12 ahead of me.

13    Q.   Was your brother in some type of a procession

14 of these vehicles?

15    A.   They weren't back to back going.  They were

16 kind of like spotted -- whenever they got ready, they

17 were headed in that direction.

18    Q.   Was it a single line as opposed to two or

19 three abreast of one another traveling to this staging

20 area?

21    A.   Single line.

22    Q.   Where was your brother in that line?  Was he

23 the first vehicle, if you recall?

24    A.   I don't recall.

A-27

Delbert E.  Rollison

Page 49

1 safety fence that I think went around the grandstands.

2　　Q.　Okay.  Where you've marked "grandstand

3 seating."  Correct?

4　　A.　Correct.

5　　Q.　The trucks that you've marked 4-by-4 trucks,

6 do we also refer to them as monster trucks?  Are you

7 comfortable with that?

8　　A.　Correct.

9　　Q.　Okay.  All right.  Now, you started to tell us

10 the path that you took from the parking lot just before

11 the incident occurred.  Show us that path.

12　　A.　Randy, my brother, and Wayne and the rest of

13 the racing people were being towed, pushed, pulled or

14 drive their vehicles around this road here.

15　　Q.　The line that you've shown with arrows?

16　　A.　Arrows.

17　　Q.　Okay.

18　　A.　And the remaining people, myself and a few

19 other spectators or pit crew, what have you, crossed

20 through this gentle ditch area up over the guardrail,

21 crossed over the single lane paved road and up to the --

22 I guess it's a temporary walkway between the -- to the

23 staging area.

24　　Q.　Okay.  It wasn't designated as a walkway in

A-28

Corbett & Wilcox

Delbert E.   Rollison

Page 57

1     A.    Of course, I had never been there before.  But

2  I was under the impression they were going to be parking

3  to the left-hand side of the racetrack.

4     Q.    Okay.

5     A.    There was a staging area.  They would make

6  sure they had their belts on, their helmets on, preparing

7  for their turn to race.

8     Q.    Okay.  Again, you were not intending to then

9  go back to the grandstand seating for this event?

10    A.    Correct.

11    Q.    Okay.  What happened as you walked in between

12  the 4-by-4 monster trucks and the procession of the mud

13  racers?

14    A.    I was walking along with this gentleman,

15  which -- he was on my left-hand side.  And we were just

16  talking about racing or something like that.  Just

17  ordinary stuff.  And then that's when I was struck by the

18  vehicle from behind.

19    Q.    Okay.  The vehicle that you later found was

20  owned by my client, Mr. Shoemaker?

21    A.    Yes.

22    Q.    What part of your body was struck from behind?

23    A.    It was in the back of my thighs.  It just felt

24  like a really heavy weight just slamming me.  It was

A-29

Delbert E.  Rollison

Page 61

1 was the one that went to get the ambulance.  Of course,

2 the ambulance was within sight.  It was only a few

3 hundred feet away.  It wasn't very far away.  After that

4 I don't remember where he went to.  I don't remember

5 seeing him.

6                    Of course, some people -- spectators

7 came around.  I do remember Mr. Shoemaker coming to me.

8 I remember the lady that took our names on the waiver.

9 And the lady I thought was organizing this mud drag, she

10 was there also later on.  Of course, my brother and some

11 of his friends showed up later on too.

12        Q.    Do you remember what Mr. Shoemaker said to

13 you?

14        A.    Yes.

15        Q.    What did he say?

16        A.    He said, "I'm sorry, man."  He said, "I didn't

17 see you."

18        Q.    Did he say anything else?

19        A.    That's the only thing that stuck in my mind.

20 It could have been "Are you all right?" or "How bad are

21 you hurt?"  I don't remember those kind of words.  I

22 remember him saying, you know, "I didn't see you."  I was

23 like really shocked by that.

24        Q.    Who was behind the steering wheel of this

A-30

Corbett & Wilcox

Delbert E.   Rollison

Page 62

1  vehicle that you described as having struck you?

2        A.    I found out later it was Mr. Shoemaker's son.

3        Q.    Did you see the driver at the time, or you

4  just don't have a recollection of even seeing him?

5        A.    I don't recollect seeing him.

6        Q.    Do you know if that vehicle was being pushed

7  or pulled or how it was getting across the path to the

8  stadium?

9        A.    It was being pushed.

10       Q.    What was it being pushed by?

11       A.    A 4-wheel sport vehicle -- ATV.

12       Q.    When did you observe that?  Was that after you

13  had been injured?

14       A.    I noticed it prior to the incident when I was

15  in the parking lot.  I thought it was kind of odd because

16  everybody was being pulled from the front using bungy

17  straps and this was being pushed by an ATV with a steel

18  pipe in between the vehicle and the drag machine --

19  racer.

20       Q.    Prior to the incident as you were walking

21  towards the staging area engaged in conversation with

22  this unknown person, how much of a distance did you keep

23  between your body and the vehicles that were in this

24  procession to your right?

A-31

Delbert E.  Rollison

Page 25

1  Q. What is his address presently?

2  A. I'm not sure of his address.  It's Bluemont,

3 Virginia.  I'm not sure of his street address.

4  Q. Do you have a telephone number for him?

5  A. (540) 554-2629.

6  Q. Now, what specifically did your brother Randy

7 Rollison invite you to do on July 3rd, 2004?

8  A. To join him in the race that he was

9 participating in.

10  Q. What type of race was that?

11  A. I call it mud drag racing.  I'm not sure if

12 that's the technical word for it, but...

13  Q. Is your brother older or younger than you?

14  A. Younger.

15  Q. What's his age?

16  A. He is now 44.

17  Q. Okay.  Had you ever participated with him in

18 other mud drag racing events?

19  A. No.

20  Q. Did you yourself personally engage in mud drag

21 racing as a hobby or entertainment?

22  A. No.

23  Q. What caused you to participate on this

24 particular occasion?

A-32

Not Reported in A.2d, 1999 WL 1241073 (Del.Super.)

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.
Charles W. **TUCKER**, Plaintiff,
v.
**ALBUN, INC.**, trading as Seacoast Speedway, a Delaware Corporation, Defendant.
No. Civ.A. 97C-04-025.
Sept. 27, 1999.

Bruce A. Rogers, Rogers & Mooney, P.A., Georgetown, Delaware, for the Plaintiff.
Marla L. Tocker, Marshall, Dennehey, Warner, Coleman & Goggin, Wilmington, Delaware, for Defendants.

MEMORANDUM OPINION

LEE, J.

Motion for Summary Judgment-Denied

***1** Charles W. Tucker ("Plaintiff") filed this suit against the Defendant, Albun Inc., trading as Seacoast Speedway ("Defendant"), seeking damages for injuries that he incurred when he fell on the Defendant's property. The Defendant's moved for summary judgment arguing that the Plaintiff's claims are barred under either of two theories. The Defendant first urges that the Release the Plaintiff signed is a complete bar to suit. Second, the Defendant argues that if the Release does not bar suit, then, in the alternative, the Plaintiff, in light of his "equal knowledge" of the risks involved, assumed the risk of the presence of holes and ruts in the infield of the racetrack. Moreover, they urge, Seacoast had no duty to warn the Plaintiff of these "obvious inherent risks." This is the Court's decision on the motion.

*STATEMENT OF FACTS* [FN1]

FN1. As this matter is before the Court on the Defendant's Motion for Summary Judgment, the facts recited below are those most favorable to the non-moving party, the Plaintiff.

The Defendant, Albun, Inc., owns Seacoast Speedway ("Speedway") near Georgetown, Delaware. The stock of Albun, Inc. is, in turn, owned by Mrs. Loretta G. Williams and her husband. The Plaintiff, Charles W. Tucker, was a frequent visitor to the racetrack. He attended most Saturday evening races for a number of years as either a race driver, a member of a pit crew, or a spectator.

On September 9, 1995, the Plaintiff went to the Speedway to attend the races as a spectator. Upon arrival, Mrs. Williams asked if he would work on a "wrecker" in return for free admission to the Speedway. The Plaintiff agreed to help out and signed the Release from liability required of all persons entering the pit or infield areas. This was the same release he had signed on prior occasions when entering the pit area. [FN2]

FN2. The text of the Release states:

IN CONSIDERATION of being permitted to compete, officiate, observe, work for, or

**A-33**

participate in any way in the EVENT(S) or being permitted to enter for any purpose any RESTRICTED AREA (defined as any area requiring special authorization, credentials, or permission to enter or any area to which admission by the general public is restricted or prohibited), EACH OF THE UNDERSIGNED, for himself, his personal representatives, heirs, and next of kin:

1. Acknowledges, agrees, and represents that he has or will immediately upon entering such RESTRICTED AREAS, and will continuously thereafter, inspect the RESTRICTED AREAS which he enters and he further agrees and warrants that, if at any time, he is in or about RESTRICTED AREAS and he feels anything to be unsafe, he will immediately advise the officials of such and will leave the RESTRICTED AREAS and/or refuse to participate further in the EVENT(S).

2. HEREBY RELEASES, WAIVES, DISCHARGES AND COVENANTS NOT TO SUE the promoters, participants, racing associations, sanctioning organizations or any subdivision thereof, track operators, track owners, officials, car owners, drivers, pit crews, rescue personnel, any persons in any RESTRICTED AREA, promoters, sponsors, advertisers, owners and lessees of premises used to conduct the EVENT(S), premises and event inspectors, surveyors, underwriters, consultants and other who give recommendations, directions, or instructions or engage in risk evaluation or loss control activities regarding the premises or EVENT(S) and each of them, their directors, officers, agents and employees, all for the purposes herein referred to as "Releasees," FROM ALL LIABILITY TO THE UNDERSIGNED, his personal representatives, assigns, heirs, and next of kin FOR ANY AND ALL LOSS OR DAMAGE, AND ANY CLAIM OR DEMANDS THEREFOR ON ACCOUNT OF INJURY TO THE PERSON OR PROPERTY OR RESULTING IN DEATH OF THE UNDERSIGNED ARISING OUT OF OR RELATED TO THE EVENT(S), WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE.

3. HEREBY AGREES TO INDEMNIFY AND SAVE AND HOLD HARMLESS the Releasees and each of them FROM ANY LOSS, LIABILITY, DAMAGE, OR COST they may incur arising out of or related to the EVENT(S) WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE.

4. HEREBY ASSUMES FULL RESPONSIBILITY FOR ANY RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE arising out of or related to the EVENT(S) whether caused by the NEGLIGENCE OF RELEASEES or otherwise.

5. HEREBY acknowledges that THE ACTIVITIES OF THE EVENT(S) ARE VERY DANGEROUS and involve the risk of serious injury and/or death and/or property damage. Each of THE UNDERSIGNED also expressly acknowledges that INJURIES RECEIVED MAY BE COMPOUNDED OR INCREASED BY NEGLIGENT RESCUE OPERATIONS OR PROCEDURES OF THE RELEASEES.

6. HEREBY agrees that this Release and Waiver of Liability, Assumption of Risk and Indemnity Agreement extends to all acts of negligence by the Releasees, INCLUDING NEGLIGENT RESCUE OPERATIONS and is intended to be as broad and inclusive as is permitted by the laws of the Province or State in which the Event(s) is/are conducted and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full legal force and effect.

I HAVE READ THIS RELEASE AND WAIVER OF LIABILITY, ASSUMPTION OF RISK AND INDEMNITY AGREEMENT, FULLY UNDERSTAND ITS TERMS, UNDERSTAND THAT I HAVE GIVEN UP SUBSTANTIAL RIGHTS BY SIGNING IT, AND HAVE SIGNED IT FREELY AND VOLUNTARILY WITHOUT INDUCEMENT, ASSURANCE OR GUARANTEE BEING MADE TO ME AND INTEND MY SIGNATURE TO BE A COMPLETE AND UNCONDITIONAL RELEASE OF ALL LIABILITY TO THE GREATEST EXTENT ALLOWED BY LAW.

His duties that evening, while on the wrecker, were to assist in the removal of wrecked or disabled

race cars and any debris from the racing surface. He was to be stationed with the other wreckers in the infield area. During the race, one of the participating race cars lost its rear bumper. Before the cars could come around the track again, the Plaintiff and his partner on the wrecker that evening ran from their truck in the infield to the track so that they could retrieve the bumper from the racing surface.

The infield at the Speedway has a grassy surface that extends to the clay race track. While running to retrieve the bumper, the Plaintiff stepped in a hole and fell down. This fall injured his shoulder giving rise to the present litigation.

### DISCUSSION

#### I. Standard of Review.

In acting on a motion for summary judgment, "the Court's function is to examine the record and determine whether there is a genuine issue of fact." *Battista v. Chrysler Corp.,* Del.Super., 454 A.2d 286, 290 (1982). Summary judgment is appropriate where, after viewing the record in a light most favorable to the non-moving party, the Court finds there are no genuine issues of material fact. *Camac v. Hall,* Del.Super., 698 A.2d 394, 396 (1996). A material factual dispute exists where the parties to the action disagree on the factual predicates for the legal principles they advance. *Merrill v. Crothall-American, Inc.,* Del.Supr., 606 A.2d 96, 99 (1992). Moreover, the "Court's decision must be based only on the record presented, including all pleadings, affidavits, depositions, admissions, and answers to interrogatories, not on what evidence is 'potentially possible.' ' *Id.* (quoting *Rochester v. Katalan,* Del.Supr., 320 A.2d 704, 708, fn. 7 (1974)). "Summary judgment will not be granted if the record indicates that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of the law to the circumstances." *Camac* at 396; *Ebersole v. Lowengrub,* Del.Supr., 180 A.2d 467, 470 (1962).

#### II. Application of the Law to the Facts of the Case.

**\*2** In applying the summary judgment standard to this case, summary judgment should only be granted if there are no material issues of fact in dispute regarding both the validity and the application of the release and the potential liability of the Defendant to the Plaintiff under a negligence theory.

A. *The Release.* Delaware Courts recognize the validity of a general release of a party from liability. *Chakov v. Outboard Marine Corp.,* Del.Supr., 429 A.2d 984, 985 (1981); *see also* Hollerman v. Hicks, Del.Super., C.A. 95C-06-027, Terry, J. (April 8, 1997)(Opinion). A release is valid if it meets three requirements. First, the release must not be ambiguous. Second, the release must not be unconscionable. Finally, the release must not be against public policy. *Hallman v. Dover Downs, Inc.,* D. Del., C.A. No. 85-618-CMW, Wright, J. (Dec. 31, 1986). *See also* Egan & Sons Air Conditioning Co. v. General Motors Corp., Del.Super., C.A. Nos. 88L-MY-18 and 88L-MY-28, Gebelein, J. (April 27, 1988) (Mem.Op.) at 6 ( [T]he Court first scrutinizes the releases for their validity, secondly for their clarity, and finally, for their scope.).

In determining whether a release is clear or ambiguous, the Delaware courts have developed an often used standard.

In construing a release, the intent of the parties as to its scope and effect are [sic] controlling, and the court will attempt to ascertain the intent from the overall language of the document. And where the language of the release is clear and unambiguous, it will not lightly be set aside. Where, however, the language of the release is ambiguous, it must be construed most strongly against the party who drafted it. (Internal citations omitted) *Judge Trucking Co. v. Estate of Cooper,* C.A. No. 92C-03-041, Graves, J. (Sept. 29, 1994) (Mem.Op.) at 8. *See also,* Hollerman at 7.

Moreover, through a release, a person may assume all risks, known or unknown, inherent in a particular situation. "However, for the release to be effective, it must appear that the plaintiff understood the terms of the agreement, or that a reasonable person in his position would have understood the terms···· The evidence must establish that the parties intended the release to apply to the particular conduct of the defendant which has caused the harm." *McDonough v. National Off-Road Bicycle Ass.,* D. Del., C.A. No. 95-504-SLR, Robinson, J. (June 2, 1997) (Mem.Op.)(Summary judgment denied where the Court found there was a material issue of fact whether a cyclist competing in a race contemplated harm occurring from a source other than the normal hazards of bicycle racing before executing a release, normal hazards being collision or rough roads and trails not necessarily death from heat stroke allegedly caused by negligent event management).

In a case relied upon by both parties in the present action, *Hallman v. Dover Downs, Inc., supra,* the United States District Court for the District of Delaware denied a motion for summary judgment in a case with facts that are almost on "all fours" with those of the current dispute. In *Hallman,* a newspaper reporter was assigned by the paper to cover a stock car race at Dover Downs International Speedway. Before he was allowed onto the premises, he was required to sign a release. *Hallman* at 2. Moreover, the reporter's press badge contained a liability release for personal injury or property damage. *Id.* at 3. While reporting on the races, the reporter leaned against a wooden railing that gave way and caused him to fall to the ground below. The Court denied Dover Downs' motion for summary judgment after finding that material issues of fact existed as to whether the release was ambiguous, unconscionable, or violated public policy. *Id.* at 5.

*\*3* Judge Wright, in *Hallman,* found the release was ambiguous after evaluating the pre-trial statements of both the reporter and the track's representatives concerning their perceptions of the release. The track representative stated that: "I am not a lawyer, and you are asking questions of me that I am not qualified to ask or answer····If you don't understand it, then I certainly am not the one to try and tell you what it says." *Id.* at 6. The reporter, when asked about his understanding of the release, stated:

A. Well, without having thought about it very much, I assumed that it was a, it indicated that I knew there was a race going on, there were some risks involved with fast cars on a race track. And that the dangers inherent with that risk, it would be my, would be reasonable for me to expect to be careful about those dangers.

Q: What, if anything, did you think it had to do with the grounds and building?

A: I wouldn't have thought it had anything to do with the grounds. *Id.* at 7.

Because these statements by the parties indicated a fundamental lack of understanding by both on the nature of the release, Judge Wright ruled that the release could not be clear and unambiguous as a matter of law. *Id.* The Court also found that the release was not clear and unambiguous because most of the release was in small print with only certain portions in bold type and the reporters may not have had adequate opportunity to digest the full import of the release at the time of execution. *Id.* at 8.

Judge Wright, in *Hallman,* also found there was an issue of fact whether the release was unconscionable. *Id.* at 9. Two issues drove this finding by the court. First, the Court found the reporter had no choice; he had to sign the release in order to do his job as a reporter. *Id.* at 9. Second, the Court found the release did not necessarily relate to the harm involved. "An uncontrollable car may be a foreseeable risk, but a defective structure is not." *Id.* at 10.

Finally, Judge Wright found that summary judgment was not appropriate because the record was not sufficiently developed to rule as a matter of law that the release did not violate public policy. The Court based this finding on two different theories. First, the law does not favor provisions relieving one from liability for harm caused by his own fault or wrong. *Id.* at 11. For such a provision to be upheld, it must be "crystal clear" in its language evincing the clear intent of the parties to absolve the protected party of liability created by that party's own actions. *Id.* at 12 (citing <u>J.A. Jones Const. Co. v. City of Dover,</u> Del.Super., 372 A.2d 540, 553 (1977)). As noted above, the Court found the scope

of the release was not certain, thus, summary judgment was not appropriate. As an alternative, Judge Wright looked to see if the release violated public policy because the person seeking the release owed a duty to the other. *Id.* at 13. On this issue, the court did not possess sufficient facts to determine whether the race track owed a duty to reporters covering the races. *Id.* at 14.

**\*4** In the present case, the motion for summary judgment is denied with regard to the issue of the release Mr. Tucker executed prior to his admittance to the Speedway. The motion is denied because under current Delaware law, including the *Hallman* case, there is a material issue of fact as to the nature of the terms of the release. Thus, the release is ambiguous and the legal effects of the release can only be evaluated after a full airing of the facts.

Mr. Tucker would have a difficult time arguing that he did not know he was signing a release. In his statements, he repeatedly acknowledges that a signed release was a prerequisite to admittance to the pit and infield areas. For this reason, Mr. Tucker's situation is somewhat different from that of the reporter in *Hallman* where there was some question of whether he even knew he was signing a release.

In this case, the release does not clearly define the scope of the Release's coverage. In addressing the potential harms or injuries covered by the Release, it states that it covers those harms "ARISING OUT OF OR RELATED TO THE EVENT(S)····" This language is repeated several times in the release and is used consistently. This language, however, is subject to two interpretations. A very broad interpretation could find that as soon as a person came to the track and signed the release, everything that could happen to him arises out of the events. The argument would be that but for the event, the person would not be in attendance and thus subject to harm. A narrower interpretation would be that the contract language refers to only those potential harms with causes directly related to the events at the Speedway-car racing. In *Hallman,* Judge Wright appears to have subscribed to the narrower interpretation because the language in that release more clearly attempts to cover more activities. The *Hallman* release addresses harms "ARISING OUT OF OR RELATED TO ANY LOSS ··· THAT MAY BE SUSTAINED ··· WHILE IN, ON, ENROUTE TO, FROM, OR OUT OF SAID PREMISES FROM ANY CAUSE WHATSOEVER····" *Hallman* at 3.

This ambiguity in the language of the Release appears to have caused the parties to differ in their understanding of the Release. Like in *Hallman,* in the instant case, the statements of the parties indicate there may be some question concerning the parties' intent or understanding as to the scope and coverage of the release Tucker signed. Illustrative of this conflict is the testimony of both the Plaintiff and the Defendant at arbitration. The following indicates the Defendant's view of the release:

Q: What is your understanding of the release? What is your understanding of what the purpose of it is and what does it do?

A: That in return for being allowed to be in the pit area as a participant, you sign that you will not-you sign a release waiver. You waive your right to-I don't know how to put it in words. All the words are there. It says, "Release and Waiver of Liability." That is what you're saying. You are releasing the track and anyone associated with it; that you know that racing is a dangerous sport and you are willing to give up your rights in order to get in there.

**\*5** Q: And would you consider that as your understanding, that you would give up all rights no matter what happened?

A: Right. You do-you have rules. We have rules. A lot of safety rules. We're very safety conscious. And so, you know, you have rules. And the driver, when he signs in, he agrees to abide by the rules and that he will keep order in his pit, things like that. (Arbitration Transcript at 20-21, Cross-examination of Loretta G. Williams (Aug. 21, 1997)).

The plaintiff, in his testimony at arbitration states:

Q: What did you think you were signing when you signed [the release]?

A: The outtake that I have gotten off of the release forms is if you're negligent to the point where something happens and it's your fault, then they are not liable. But if you're employed by them, it's just like workmen's compensation. (Arbitration Transcript at 51, Direct Examination of Charles W. Tucker (Aug. 21, 1997)).

While both parties appear to have a general idea of the intended effect of the release signed by the Plaintiff, before the Court can rule as a matter of law that the release bars the Plaintiff's claim, several other factual issues must be developed and resolved. The most important issue would be the scope of the release. Did the parties intend that the release cover every conceivable harm- including those not related to racing? The Defendant's testimony above seems to give the impression that the release is meant to cover only those potential harms caused by racing related actions. Further evidence of this is that only persons who were in close proximity to the cars and the racing action were required to sign a release. General spectators, in the grandstand, do not have to sign a release. Judge Wright took note of a similar fact in *Hallman*. There, Dover Downs required a release for auto racing events but not for horse racing. *Hallman* at 3.

The Defendant tries to link the Plaintiff's injury to racing activities by arguing that "it is logical that ruts or grooves in the grassy area adjacent to a race track are an inherent risk and that they could pose a potential tripping hazard for one 'working' in the racing infield." *Defendants Opening Brief in Support of Its Motion for Summary Judgment* at 10. The Defendant's theory is that ruts and grooves are caused by the emergency vehicles driving over the infield surface and debris thrown from the track. *Defendant's Opening Brief* at 10 and 13. If this theory is accepted, then holes, grooves, and ruts in the infield may be risks associated with racing and thus within the scope of the Release even under the narrow interpretation of the Release language. The question of whether those types of risks are inherent in racing activities is a question of fact and should be reserved for a trier of fact. Because there is some question concerning the scope of this release, its terms are ambiguous.

While the discussion above, concerning the ambiguities of the release, is somewhat lengthy, the remaining questions concerning unconscionability and public policy are less complex and can be dealt with summarily. In *Hallman*, Judge Wright found that the release in issue may have been unconscionable because there was an absence of meaningful choice. The reporter had no choice but to sign the release, otherwise he could not complete his assigned tasks. *Hallman* at 8-9. Judge Wright also found the release was unconscionable because the release did not "bear a reasonable relation to the risk involved." *Hallman* at 10. In the present case, the Plaintiff did have a meaningful choice. He could have paid for general admission and watched the races from the grandstand with the rest of the spectators. Thus, the Release cannot be unconscionable for that reason. However, as discussed above, there may be a question of whether the Release covers the harm that occurred to the Plaintiff. Thus, the Release may be unconscionable if it bears no relation to the risk involved.

**\*6** Finally, a release may be invalid if it violates public policy. A release may violate public policy if the language exempting the benefitted party from his own negligence is not "crystal clear." *Hallman* at 12 (citing *J.A. Jones Const. Co. v. City of Dover*, Del.Super., 372 A.2d 540, 553 (1977)). Moreover, "a term exempting a party from tort liability for harm negligently caused is unenforceable on grounds of public policy if the term exempts one charged with the duty of public service from liability to one whom that duty is owed." *Hallman* at 13. The language of this Release, "WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE," is fairly clear that even negligence of the Speedway is to be included within the purview of the release. However, to fall within this clause, the negligent acts or omissions of the Defendant must fall within the scope of activities covered by the Release. Moreover, the issue of whether the defendant owes the Plaintiff any duty, and the nature of such duty depends on the Plaintiff's classification and is discussed in the next section of this Opinion.

Ultimately, this Court finds that there are material issues of fact that must be addressed before the validity and legal effect of the Release may be evaluated. The Release may be invalid because it is ambiguous, unconscionable, or violates public policy. To properly rule on these issues, this Court needs additional facts that are either in dispute or are not in the record before the Court. Most importantly, the Court would need facts tending to show the intended scope of the Release. Once those facts are settled, the validity and effect of the release can be evaluated. For these reasons, summary judgment is not appropriate for the issue of the release.

*Defendant's Duty to the Plaintiff and Assumption of Risk.* The Defendant's Opening Brief presents a second argument for Summary Judgment. The Defendant argues that it owed the Plaintiff no duty and that the Plaintiff assumed the risk upon entering the infield area. Summary judgment is not appropriate on either issue.

In this case, the Defendant is the possessor of land upon which the Plaintiff was injured. The duty of care a possessor of land owes to one injured on the property will depend on the classification of the one injured. At any given time, a person may fall into any number of classifications designed by our society. A person may be a mother or a father or teacher or a doctor. The law also classifies people. Under the law, a person may be a master, a servant, or an independent contractor. Moreover, a person on the property of another may be either a trespasser, a licensee, or an invitee. A person's classification under the law often determines the rights and duties of that person.

In the present case, the issue of whether the Plaintiff was an employee or servant of the Defendant at the time of the injury has been decided in the negative. *Tucker v. Seacoast Speedway,* Del.Super., C.A. No. 99A-02-002, Lee, J. (July 1, 1999)(Mem.Op.). Thus, any duty the Defendant, as the possessor of the land, owed to the Plaintiff will be defined by the Plaintiff's status at the time he was on the property. In determining the Plaintiff's status, "the Courts of Delaware employ the classifications set forth in the Restatement (Second) of Torts (1965)." *Absalom v. Mason-Dixon Post No. 7234,* Del.Super., C.A. No. 95C-09-022, Lee, J. (Sept. 18, 1996) (Mem.Op.) at 5. *See also, DiOSSI v. Maroney,* Del.Supr., 548 A.2d 1361, 1365 (1988).

**\*7** The Restatement (Second) of Torts (1965) ("Restatement") classifies persons as either Possessors, Trespassers, Licensees, or Invitees.

A Possessor of land is defined by the Restatement as:

(a) a person who is in occupation of the land with intent to control it or

(b) a person who has been in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it, or

(c) a person who is entitled to immediate occupation of the land, if no other person is in possession under Clauses (a) and (b). Restatement (Second) of Torts § 328E (1965).

A trespasser is "a person who enters or remains upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise." Restatement (Second) of Torts § 329 (1965). The Restatement defines a Licensee as "a person who is privileged to enter or remain on land only by virtue of possessor's consent." Restatement (Second) of Torts § 330 (1965). Three types of people are licensees:

1. One whose presence on the land is solely for his own purposes, in which the possessor has no interest, and to whom the privilege of entering is extended as a mere personal favor to the individual.

2. The members of the possessor's household, and

3. Social guests of the possessor. Restatement (Second) of Torts § 330 cmt. h (1965).

Also, in the context of licensees, "consent" and "permission" means that the person in possession of the premises is "willing that the [licensee] shall enter or remain on the land, or that his conduct is such as to give the [licensee] reason to believe that he is willing that he shall enter, if he so desires." Restatement (Second) of Torts § 330 cmt. c (1965).

Finally, the Restatement uses the following definition for an Invitee:

§ 332. Invitee Defined

(1) An invitee is either a public invitee or a business visitor.

(2) A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public.

(3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land. Restatement (Second) of Torts § 332 (1965).

The comments to this section on invitees are particularly helpful in fleshing out how one becomes an invitee of a landowner or possessor. For instance, "[a]n invitation differs from mere permission in this: an invitation is conduct which justifies others in believing that the possessor desires them to enter the land; permission is conduct justifying others in believing that the possessor is willing that they shall enter if they desire to do so." Restatement (Second) of Torts § 332 cmt. b (1965). Moreover, "the nature of the use to which the possessor puts his land is often sufficient to express to the reasonable understanding of the public, or classes or members of it, a willingness or unwillingness to receive them." Restatement (Second) of Torts § 332 cmt. c (1965).

**\*8** [T]he visitor has the status of an invitee only while he is on the part of the land to which his invitation extends-or in other words, the part of the land upon which the possessor gives him reason to believe that his presence is desired for the purpose for which he has come. In determining the area included within the invitation, the purpose for which the land is held open, or the particular business purpose for which the invitation is extended, is of great importance. Restatement (Second) of Torts § 332 cmt. l (1965).

Finally, if the invitee exceeds the scope of the invitation, the invitee becomes either a trespasser or a licensee, depending on whether he goes on that portion of the property without or with the consent of the possessor. *Id.*

While the parties in the present action seem to assume that the Plaintiff was a business invitee at the time of the injury, there seems to be some argument that he is something other than an invitee. For instance, the Plaintiff would not have been an invitee if by going into the infield of the track he exceeded the scope of his original invitation. The facts in the record before this Court show a discrepancy in the scope of the Plaintiff's invitation to the track. The Defendant testified that the Plaintiff was given a "pit pass" as a favor. He had no duties and could freely enter the pit area. He would not have access to the infield area. (Arbitration Transcript pp. 9-10.) The Defendant, however, states that when he arrived at the track that night, he was given free admission in exchange for working as a "wrecker" in the infield. *Id.* at 45-46. From this, the Court can discern that there exists material factual disputes concerning those facts necessary for an accurate determination of the Plaintiff's status at the time of the injury. To make this determination, the following facts would need to be developed. First, what was the scope of his invitation into the Speedway that evening? Was he supposed to be in the pits or on a wrecker? If the Plaintiff was not to be in the infield initially, did the Defendant see him there during the evening and not tell him to leave? These facts would help determine if he was an invitee, licensee, or a trespasser at the time of the injury. Because there are material issues of fact in dispute on the issue of the Plaintiff's status, I am denying summary judgment in favor of a full and complete development of the salient facts. As summary judgment is denied for this reason, this Opinion will not address the duties a landowner owes to each of the classifications of persons.

In addition to the duty issue addressed above, the Defendant, in its Opening Brief in Support of its Motion for Summary Judgment, argues that the "PLAINTIFF ASSUMED THE RISK OF HIS INJURY SINCE HE WAS EQUAL IN KNOWLEDGE TO SEACOAST OF THE RISK OF THE PRESENCE OF HOLES AND RUTS IN THE INFIELD⋯." Defendant's Opening Brief at 11. The affirmative defense of "assumption of risk" is "fact intensive and not susceptible to disposition, as a matter of law, through summary judgment." *DiOSSI* at 1368. *See also Morris v. Hitchens,* Del.Super., C.A. No. 91C-05-045, Lee, J.(March 18, 1993)(Mem.Op.) at 4-5.

*CONCLUSION*

**\*9** There are material issues of fact to be developed and decided concerning several matters. First, the release is ambiguous. Second, the factual predicate for determining the Plaintiff's status while on the Defendant's land is disputed. Finally, the issue of any assumption of risk by the Plaintiff is not subject to a motion for summary judgment. Thus, the Defendant's Motion for Summary Judgment is denied.

IT IS SO ORDERED.

Copr. (C) West 2006 No Claim to Orig. U.S. Govt. Works Del.Super.,1999.
Tucker v. Albun, Inc.
Not Reported in A.2d, 1999 WL 1241073 (Del.Super.)

END OF DOCUMENT

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1986 WL 535 (D.Del.)

Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Randolph and Mildred Stuart **HALLMAN**, Plaintiffs,
v.
**DOVER DOWNS, INC.**, a corporation of the State of Delaware, Defendant.
Civ. A. No. 85-618 CMW.
Dec. 31, 1986.

A. Richard Barros, of Barros, McNamara & Scanlon, Dover, Delaware, for plaintiffs.
B. Wilson Redfearn, of Tybout, Redfearn, Casarino & Pell, Wilmington, Delaware, for defendant.

OPINION

CALEB M. WRIGHT, Senior District Judge.
**\*1** This is a tort action brought by a newsman against a race track corporation for injuries he sustained while reporting on a stock car race. Defendant moves for summary judgment, arguing that a signed release bars any recovery. The motion is denied.

*I. FACTS*

Plaintiff, Randolph Hallman, was a *Richmond Newspapers* reporter assigned to cover the "Budweiser 500" stock car races at Dover Downs International Speedway in Dover, Delaware. While covering the race from a photographers' platform, Hallman leaned against a wooden railing encircling the scaffolding. The inclosure buckled and Hallman tumbled to the concrete below, suffering a mild cerebral concussion and an open leg wound exposing a protruding, fractured femur. Hallman's principal contention is that the release form he signed before entering the race track is invalid.

Before the stock car race, plaintiff received a "credential request" from the Director of Public Relations for the Dover Downs International Speedway, Brian T. Buchauer. The request noted that insurance regulations, and National Association for Stock & Car Racing, Inc. ("NASCAR") restrictions, prohibited persons from entering the pit area. The letter did not mention any waiver of liability. (Plaintiff's Exhibit A).<u>FN1</u>

When plaintiff arrived at the Speedway on Saturday, May 19, 1984, he reported to a "media trailer". He waited in line with other reporters and was given two form releases purporting to relieve defendant, Dover Downs, Inc. from all liability. All reporters were required to sign the NASCAR release form before entering defendant's premises. (PX-B).<u>FN2</u> Plaintiff's press badge contained a liability release for personal injury or property damage "while preparing, practicing, or participating in this race meet." (PX-C).<u>FN3</u> General admission tickets contained no liability waivers.<u>FN4</u>

After the fall, plaintiff filed a complaint on October 22, 1985. Defendant filed a Motion for Summary Judgment on July 21, 1986.

After considering the briefs prepared by both parties, this Court denies the motion.

*II. DISCUSSION*

*A. The Summary Judgment Standard*

The Court will grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Any doubts as to the existence of genuine issues of fact will be resolved against the moving party and any reasonable inferences from the facts will be resolved in favor of the party against whom the judgment may be entered. *Continental Insurance Co. v. Bodie,* 682 F.2d 436, 438 (3d Cir.1982); *Peterson v. Lehigh Valley Dist. Council, United Bhd. of Carpenters and Joinders,* 676 F.2d 81, 84 (3d Cir.1982); *Devex v. General Motors Corp.,* 579 F.Supp. 690, 693 n. 3 (D.Del.1984). See *Goodman v. Mead Johnson & Co.,* 534 F.2d 566 (3d Cir.1976), cert. denied, 429 U.S. 1038 (1977).

**\*2** As a practical matter, "[if] the parties disagree about material facts and if the non-moving party would be entitled to relief if the jury believed its version of the facts, then summary judgment is inappropriate." *Landtect Corp. v. State Mutual Life Assur. Co.,* 605 F.2d 75, 79 (3d Cir.1979); *Adickes v. Kress & Co.,* 398 U.S. 144, 157 (1970); see e.g., *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); 6 J. Moore, *Federal Practice* ¶ 56.13[3] (2d ed. 1966).

### B. The Release May Be Ambiguous

Defendant's summary judgment motion raises three questions under Delaware law. First, is the release ambiguous so that it is not a valid and binding contact? Second, is the release unconscionable? Third, is the release void as against public policy? Construing the evidence before the Court in favor of the non-moving party, the Court finds that there are genuine issues of fact with respect to all three questions.

In construing a release, if the language is clear and unambiguous it will not be set aside. *Chakov v. Outboard Marine Corp.,* 429 A.2d 984, 985 (Del.Supr.1981); *Adams v. Jankouskas,* 452 A.2d 148, 156 (Del.Supr.1981). In deciding whether release language is clear and unambiguous, the understanding of the parties is paramount. "The scope of a release is determined by the intention of the parties as expressed in the terms of the particular instrument, considered in light of all the facts and circumstances.", notes the *Second Restatement on Releases.* "In interpreting a release to determine whether a particular claim has been discharged, the primary rule of construction is that the intention of the parties shall govern, and this intention is to be determined with a consideration of what was within the contemplation of the parties when the release was executed." 66 Am.Jur.2d *Release* § 30 (1973).

Doubt about the clarity of the release is raised by the Deposition of Brian Buchauer, the former Director of Public Relations of Dover Downs International Speedway. Mr. Buchauer perceived the release in the following manner: "I am not a lawyer, and you are asking questions of me that I am not qualified to ask or answer···· If you don't understand it, then I certainly am not the one to try and tell you what it says." (Buchauer Affidavit, p. 15).[FN5]

Neither did plaintiff Randolph Hallman have a clear understanding of the release he signed:

Q. What did you understand that release to pertain to?

A. Well, without having thought about it very much, I assumed that it was a, it indicated that I knew there was a race going on, there were some risks involved with fast cars on a race track. And that the dangers inherent with that risk, it would be my, would be reasonable for me to expect to be careful about those dangers.

Q. What, if anything, did you think it had to do with the grounds and building?

A. I wouldn't have thought it had anything to do with the grounds.

Hallman Affidavit, p. 89.

This statement indicates that Mr. Hallman also had an understanding different from that of total immunity from liability which is asserted by defendant. "Where ··· the language of the release is ambiguous, it must be construed most strongly against the party who drafted it." *Adams,* 452 A.2d at

156. As a matter of law, the release cannot be found to be clear and unambiguous.

**\*3** A presumption is created against an intention to contract for immunity from the consequence of one's own negligence and a contract will not be given that meaning unless so expressed in unequivocal language. *State v. Interstate Amiesite Corp.,* 297 A.2d 41 (Del.Supr.1972); *Powell v. Interstate Vendaway Inc.,* 300 A.2d 241 (Del.Super.1972); *Warburton v. Phoenix Steel Corporation,* 321 A.2d 345 (Del.Super.1974), aff'd, *Nobel J. Dick, Inc. v. Warburton,* 334 A.2d 225 (Del.Supr.1975); *J.A. Jones Const. Co. v. City of Dover,* 372 A.2d 540, 552 (Del.Super.1977), *appeal dismissed,* 377 A.2d 1 (Del.Supr.1977). Courts will not enforce provisions in contracts of adhesion which limit the duties or liability of the stronger party unless such provisions are "conspicuous, plain and clear" and will not operate to defeat the reasonable expectations of the parties. *Madden v. Kaiser Foundation Hospitals,* 552 P.2d 1178 (1976).

The single page NASCAR release of liability, which all media representatives signed before receiving press credentials, is not conspicuous, plain and clear. Most of the release is written in tiny print. Reporters, waiting in line to enter the track, were pressured to sign, grab their credentials and move on as quickly as possible. (PX-H). The release could have been mistaken as a media sign in sheet, given that there were no explanations of the releases' meaning. (PX-G; PX-B).

*C. The Release May Be Unconscionable*

The release signed by Hallman may also be unconscionable. To find unconscionability, there must be an absence of meaningful choice and contract terms must be unreasonably favorable to one of the parties. *Tulowitzki v. Atlantic Richfield Co.,* 396 A.2d 956 (Del.Supr.1978).

Plaintiff had no choice in this action. He was required to sign liability releases prior to entering the defendant's race track. The release includes a statement that "we have each inspected the track premises, know the risks and dangers inherent in⋯⋯" But plaintiff could not enter the race track to perform his job as a reporter before signing the waiver. Nor could he enter the premises for purposes of inspection and "know the risks and dangers" until signing the release. Plaintiff was in a classic "Catch-22" situation because he had no choice but to sign the release to perform his job, even though he could not first inspect the race premises.

Plaintiff's lack of choice emanated from contract terms that unreasonably favored one party. Dover Downs, Inc. sought press coverage of their event, as evidenced by their solicitation of the news media. (PX-E). At the same time, however, the release forms purport to relieve defendant from any liability while the reporters report on racing events that defendant badly wanted publicized.

The unconscionability test also involves the question of whether a contractual provision amounts to the taking of an unfair advantage by one party over the other. *J.A. Jones Const. Co. v. City of Dover,* 372 A.2d at 552 (discussing 6 Del.C. § 2-719(3) which defines unconscionability in the sale of consumer goods context as one party taking unfair advantage over the other party.).

**\*4** The releases take unfair advantage of the media that defendant wants to have at their track. The terms of the waiver were not explained by defendant to the media, (PX-G), and the waivers are signed as a routine manner after waiting in line to enter the track. (PX-H).

Nor does the release bear a reasonable relation to the risk involved. *See Tulowitzki,* 396 A.2d at 960. A rotted railing on an observation deck is not "a risk or danger inherent in racing." An uncontrollable car may be a foreseeable risk, but a defective structure is not. Defendant, moreover, does not require releases of liability for horse racing-indicating that even they believe the risks contemplated by the release involved the dangers of auto racing, not the dangers posed by defendant's structures. (PX-I). Waiving liability before something unanticipated happens to injure a person may well be unconscionable.[FN6]

Delaware law permits a court, as a matter of law, to refuse to enforce any contract found to have been unconscionable at the time it was made. 6 Del.C. § 2-302(1). Defendant's only argument that the release is not unconscionable is that the "business-practices-of-the-community" test used in

*Tulowitzki* should be applied. This test asks whether contract terms are so extreme as to appear unconscionable according to the business practices of the time and place. *Tulowitzki*, 396 A.2d at 960. The Court does not have sufficient facts before it to make factual determinations that the release was or was not in line with the business practices of the community. Facts must be developed at a later stage in the proceedings, making summary judgment inappropriate at this time.

## D. The Release May Be Void As Against Public Policy

A release given before liability arises may be void as contrary to public policy. This includes anticipatory releases from liability for injuries to the person of the releasor or to his property or business. 66 Am.Jur.2d *Release* § 14 (1973). Parties may agree to waive contract, statutory, or other rights, but only if public policy is not involved. 17 Am.Jur.2d *Contracts* § 188 (1964). The law does not look with favor on provisions which relieve one from liability for his own fault or wrong. *Boll v. Sharp & Dohme, Inc.*, 121 N.Y.S.2d 20, 22 (N.Y.App.Div.1953) ("Contracts breaking down common-law liability and relieving persons from just penalties for their negligent and improper conduct are not to be favored, and should not be given an enforcement beyond that demanded by their strict construction⋯⋯").[FN7]

In Delaware, "contract language will not suffice to relieve a contracting party of its failure to satisfy legal obligations unless the contract language makes it crystal clear and unequivocal that the parties specifically contemplated that the contracting party would be relieved of its own defaults." *J.A. Jones*, 372 A.2d at 553.[FN8] As indicated in the analysis, *supra*, it is not at all clear from the release that the parties "contemplated" a release of liability for a negligently maintained railing. Delaware cases which have found contractual language sufficiently clear to protect a party against a claim based on its own negligence have all specifically referred to the negligence of the protected party. *Warburton v. Phoenix Steel Corporation*, 321 A.2d 345 (Del.Super.1974), *aff'd.*, *Noble J. Dick, Inc. v. Warburton*, 334 A.2d 225 (Del.Supr.1975); *All-State Inv. & Sec. Agcy., Inc. v. Turner Const. Co.*, 301 A.2d at 273. Conversely, contractual provisions which purport to give protection generally against liability or which even protect against negligence generally have been held not to meet the test for protection from a claim based on one's own negligence. *State v. Interstate Amiesite Corp.*, 297 A.2d 41 (Del.Supr.1972); *Blum v. Kaufman*, 297 A.2d 48 (Del.Supr.1972); *Powell v. Interstate Vendaway, Inc.*, 300 A.2d 241 (Del.Super.1972).

**\*5** The release in the instant case appears to protect against negligence generally. But the Court does not have before it sufficient facts to determine whether the release specifically refers to the negligence involved, and therefore should be upheld, or whether the language is so broad that the release should be voided as contrary to public policy. The absence of clear language and manifest intent renders summary judgment inappropriate.

Some courts answer the question of whether a release is void as against public policy by examining, not the language of the release, but whether a duty is owed by the person who seeks release. A term exempting a party from tort liability for harm negligently caused is unenforceable on grounds of public policy if the term exempts one charged with the duty of public service from liability to one to whom that duty is owed.

An important factor in determining a duty of public service is whether a party holds himself out as willing to perform a service for any member of the public who seeks it. If this is true, and another party is confronted with a standardized adhesion contract of exculpation, the contract will be void as against public policy. In *Tunkl v. Regents of University of California*, 383 P.2d 441 (1963), the court voided a release signed by a patient in a medical center. The ruling was that because the medical treatment was considered *essential*, defendant had an advantage in bargaining power over plaintiff and plaintiff had little or no choice but to accept the terms.

A later decision held, however, that "purely recreational activities such as sport parachuting can hardly be considered 'essential'." *Hulsey v. Elsinore Parachute Center*, 168 Cal.App.3d 333, 343 (1985). But in the case at bar, plaintiff reporter was not engaging in a "purely recreational activity". Entering the race track was part of his job and he had no choice but to accept the terms dictated by

the race track.[FN9] At this stage in the proceedings, the Court does not possess sufficient facts to determine whether a duty is owed by the race track to reporters. Summary judgment is inappropriate.

In conclusion, the release signed by plaintiff may be void because it is ambiguous, unconscionable or against public policy.

For the foregoing reasons, defendant's motion for summary judgment is denied.

An Order will enter in conformity with this Opinion.

FN1. Hereinafter references to exhibits will take the form PX-letter e.g.: "PX-A".

FN2. The Release reads:

Each of the undersigned hereby request permission to enter upon the premises above described and observe or participate in qualifying practice and motor racing events sanctioned by the National Association of Stock Car Auto Racing, Inc., hereinafter called NASCAR and any of the other sanctioning bodies listed below, respectively, at said track on this date and race dates succeeding the event scheduled for this date, in accordance with and subject to NASCAR Rules and Regulations, as a driver, mechanic, owner, attendant, or otherwise.

We each have inspected the track premises, know the risks and dangers inherent in entering the premises and participating in, observing the qualifying, and practicing for motor racing events held on Race premises, realize that conditions may become more hazardous while each of us are on the premises, that unanticipated and unexpected dangers may arise during said events. We each enter the premises voluntarily and assume every risk for loss, damage or injury (including death) that any of the undersigned or our respective property brought on the above premises, may sustain while in or enroute to, from, into or out of said premises, from any cause whatsoever.

In consideration of receiving permission to enter the premises, being permitted and privileged to participate or assist others participating in said event, as evidenced by the Permit colored coded and numbered as shown on this form, each of the undersigned, for himself, his heirs, next of kin, personal representatives and assigns, hereby RELEASES, REMISES AND FOREVER DISCHARGES AND AGREES TO SAVE AND HOLD HARMLESS AND INDEMNIFY NASCAR AND SANCTIONING BODY AND THE PROMOTERS PRESENTING SAID EVENT, THE OWNERS, AND LESSEES OF THE PREMISES, THE PARTICIPANTS THEREIN, THE OWNERS, SPONSORS AND MANUFACTURERS OF ALL RACING EQUIPMENT USED IN SAID EVENT AND THE OFFICERS, OFFICIALS, DIRECTORS, AGENTS, EMPLOYEES AND SERVANTS OF ALL OF THEM, OR AND FROM ALL LIABILITY CLAIMS, DEMANDS, CAUSES OF ACTION AND POSSIBLE CAUSES OF ACTION WHATSOEVER, ARISING OUT OF OR RELATED TO ANY LOSS, DAMAGE OR INJURY (INCLUDING DEATH) THAT MAY BE SUSTAINED BY OUR RESPECTIVE PERSONS OR PROPERTY, THAT MAY OTHERWISE ACCRUE TO ANY OF US OR TO OUR RESPECTIVE HEIRS, NEXT OF KIN OR PERSONAL REPRESENTATIVES WHILE IN, ON, ENROUTE TO, FROM, OR OUT OF SAID PREMISES FROM ANY CAUSE WHATSOEVER INCLUDING NEGLIGENCE OF ANY OF THE FOREGOING. NASCAR, or sanctioning body, and their assigns may use any of our names and photographs including pictures of our cars and photographs taken during said event for publicity purposes including endorsements, in any media before, during and after the above event.

This RELEASE shall be binding upon each of the undersigned and their respective distributees, heirs, next of kin and personal representatives.

In signing this REQUEST AND RELEASE each of the undersigned presents that he:

(a) Is not the agent, servant or employee of NASCAR, or sanctioning body, the promoter or any of their agents, officers, servants or employees.

(b) Is a participant and an independent contractor, subject to NASCAR, or sanctioning body, Rules and Regulations, and assumes and takes all responsibility for all charges, premiums and taxes, if any, payable on any funds that he may receive as a result of his activities, including, without limiting the generality of the foregoing, social security taxes, unemployment insurance taxes, compensation insurance, income taxes and withholding taxes.

(c) Possesses a valid driver's license from his home state;

(d) Has read this REQUEST AND RELEASE of Liability, understands it and signs it voluntarily and is of sound mind.

IN WITNESS WHEREOF, each of the undersigned has hereunto set his hand and seal the day and year above written.

All reporters were required to sign below this form.

FN3. The Press Badge reads: "I hereby release Speedway operator, promoter NASCAR and any other person or persons connected with this race from all liability for personal injury or property damage while preparing, practicing or participating in this race meet. This permit issued to the terms and conditions of "release" executed by me to whom this permit is issued. This permit is not assignable and is a mere license revocable without notice at the pleasure of NASCAR or promoter.

DOVER DOWNS INTERNATIONAL SPEEDWAY

(Signature)

NO. 584

Date

PRESS

FN4. Plaintiff also received a form letter to the media noting the location of the photo platforms (Exhibit E).

FN5. Mr. Buchauer also discussed the release with the President of Dover Downs Corporation, Dennis McGlynn:

Q. Did you discuss the releases that Mr. Hallman signed?

A. Yes. But I thank I brought that up, asking does the release-you know, what significance does the release have involving liability. Dennis [the President] didn't really know. I mean he couldn't give an answer based on any kind of a legal expertise or anything.

Q. So, in fact, you were asking him what that release meant, that my client had signed?

A. No, not what it meant. I was asking if the release had any bearing on it; just out of curiosity, what protection does that release afford to the Speedway?

Q. You didn't really know then?

A. I didn't know.

Buchauer's Deposition, pp. 607.

FN6. Plaintiff Hallman signed a second release. But this release, by its terms, only releases defendant from liability for injury incurred "while preparing, practicing or participating in this track meet." Because plaintiff was a media spectator and not a race participant, and was not involved in preparing or practicing for the race, this release is inapplicable to him.

FN7. See also *McCarthy v. National Association for Stock Car Auto Racing Inc., 226 A.2d 713, 715 (N.J.Supr.1967)* (holding that releases signed by a racer absolving a racing association from liability for injury were invalid as against public policy because they purported to contract away safety requirements prescribed by motor racing statutes). See also *Wilmington Housing Authority v. Williamson, 228 A.2d 782, 785 (Del.Supr.1967)* (contracts to relieve one from the consequences of his own negligence are not favored in the law, and, if possible, will be construed not to confer immunity from liability).

FN8. *Pennsylvania R.R. Co. v. Gulf Oil Corp., 223 A.2d 79, 81 (Del.Super.1966)*. *All-State Inv. & Sec. Ag., Inc. v. Turner Const. Co., 301 A.2d 273 (Del.Supr.1972)* (exculpatory clauses in certain construction contracts are void and unenforceable as against public policy).

FN9. Public policy differs from state to state. In Delaware, however, "the principle has long been established ⋯ that contractual provisions which purport to relieve a party from liability for matters resulting from its own fault are not favored." *Marshall v. Maryland D. & V.R. Co., 112 A. 526 (Del.Super.1921)*; *Pan American World Airways v. United Aircraft Corp., 163 A.2d 582 (Del.Supr.1960)*, cited in *J.A. Jones Const. Co. v. City of Dover, 372 A.2d 540, 546 (Del.Super.1977)*.

Copr. (C) West 2006 No Claim to Orig. U.S. Govt. Works D.Del.,1986.
Hallman v. Dover Downs, Inc.
Not Reported in F.Supp., 1986 WL 535 (D.Del.)

END OF DOCUMENT

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1988 WL 47314 (Del.Super.)

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware, New Castle County.
**EGAN & SONS AIR CONDITIONING** CO., a Minnesota corporation, Plaintiff,
v.
GENERAL MOTORS CORPORATION, a Delaware corporation, Daniel Construction Co., a Tennessee corporation, and Haden Management Corporation, a Michigan corporation, Egan & Sons Co., a Minnesota corporation, Plaintiff,
v.
GENERAL MOTORS CORPORATION, a Delaware corporation, Daniel Construction Co., a Tennessee corporation, and Haden Management Corporation, a Michigan corporation, Defendants.
Submitted: April 22, 1988.
Decided: April 27, 1988.

Upon defendants General Motors, Daniel Construction and Haden Management's motions for summary judgment. DENIED.
James S. Green, of Connolly, Bove, Lodge & Hutz, Wilmington, for plaintiff.
William H. Sudell, Jr., and Matthew B. Lehr, of Morris, Nichols, Arsht & Tunnell, Wilmington, for defendants General Motors Corporation and Daniel Construction Company.
Stuart B. Young, of Young, Conaway, Stargatt & Taylor, Wilmington, for defendant Haden Management Corporation.

### MEMORANDUM OPINION

GEBELEIN, Judge.
**\*1** This matter is before the Court on a joint motion for summary judgment by defendants General Motors (hereinafter "GM") and Daniel Construction (hereinafter "Daniel") and a separate motion by defendant Haden Management (hereinafter "Haden"). The defendants seek relief on the following bases: 1) plaintiffs Egan & Sons Co. (hereinafter "Egan") and Egan and Sons Air Conditioning (hereinafter "Egan Air") executed general releases in favor of defendants, which bar all claims by Egan and virtually all claims by Egan Air; 2) plaintiffs failed to comply with contractual notice requirements, constituting a waiver of any claim for damages; and 3) plaintiffs' execution of the general releases and their failure to comply with contractual notice requirements also bars any claims based on fraud or negligence.

This action arises out of the construction of a car paint building (hereinafter "facility") at the GM Assembly Plant near Wilmington, Delaware. Daniel was the construction manager for the entire building. Haden was the manager for and engineer of that portion of the project that included the two Egan contracts-one to install a paint spray booth and sludge piping system used to paint cars (Egan) and the other to install pain spray booths and related duct work (Egan Air).

Plaintiffs bid competitively on the job, based on defendants' representations. There are material issues of fact as to whether the job site conditions were completely different than represented, as plaintiffs allege. In any event, plaintiffs assert that extensive owner interference and disruptions, interferences by about 19 other contractors on the floor (as opposed to the one promised), ankle deep water and other problems increased the cost of the project to plaintiffs, beyond their competitive bid.

Plaintiffs entered into separate contracts with Daniel in April and began work in June 1985. They concluded the projects around February 1986. Periodically, Egan and Egan Air invoiced Daniel and GM for work performed. Plaintiffs were required to submit contemporaneously with each invoice a

"Contractor's Partial Release of Lien and General Release". Egan Air submitted eight such releases over 12 months; Egan executed 12. Egan noted no exceptions to the releases; Egan Air noted an exception on June 24, 1986. Pertinent release language is as follows:

[C]ontractor does hereby:

1. Certify to CM and Owner that all persons, firms, associations, corporations, or other entities furnishing labor, materials, equipment, or supplies to Contractor with respect to the Contract have been paid in full as of Release Date, including any and all applicable federal, state, and local sales, use, excise, or similar taxes or import duties, licenses and royalties, except the following (none unless noted): _____

and

2. Release and waive any and all manner of liens whatsoever which Contractor, its affiliates, successors or assigns may have upon any portion of the lands of Owner or buildings thereon standing, for labor, material or equipment furnished under the Contract as of Release Date, and

3. Further _____ release and forever discharge CM and Owner, their affiliates, successors and assigns of and from any and all manner of claims, demands, and causes of action whatsoever against CM and Owner which Contractor, its successors or assigns may have for, upon or by reason of any matter, cause or thing whatsoever arising under or out of the Contract, as of Release Date, except the following (none, unless noted): _____

**\*2** and

4. Agree to indemnify and save harmless CM and Owner, their affiliates, successors or assigns, against all loss, cost, damage or expense (including but not limited to attorney's fees) by reason of any and all manner of liens, claims or demands which anyone may have for labor performed, for material or equipment furnished under the Contract or for, upon or by reason of any matter, cause or thing whatsoever arising under or out of the Contract, as of Release Date.

Plaintiffs' contracts also required them to notify the project manager (Haden) of any conditions entitling them to payment for the increased cost of work, and to state the amount of their claim as a condition precedent to the consideration or prosecution of claims. Pertinent sections of the General Conditions to the contract read as follows:

If the [Plaintiff] shall contend during the performance of the Work, that the [Plaintiff] is entitled to payment from [GM] and [Haden] for increase in the cost of the Work, damage or loss because of any action or omission of [GM, Haden] or others engaged by [GM]; [Plaintiff] shall not delay its work on account thereof and *shall, within seven days after the first observance of the occurrence, [sic] project manager [Haden] in writing, of the amount of its claim and all details in connection with its contention (§ 70.4)* (emphasis added).

\* \* \*

It is a *condition precedent* to the consideration or prosecution of claims by [Plaintiff] that the foregoing provisions be *strictly observed* in each instance, and *if [Plaintiff] fails to comply, [Plaintiff] shall be deemed to have waived the claim* ⋯ (§ 70.6) (emphasis added).

The parties dispute whether notice was given and whether it was waived as a condition precedent to the prosecution of claims.

In addition to relying on paragraphs 70.4 and 70.6, Haden moves for summary judgment on the basis that plaintiffs failed to notify Haden's purchasing department, in writing, that the directions of the manager resulted in increased work. The pertinent contractual provision is as follows:

70.3

*If the Contractor shall contend that such directions will result in an increase of the cost of the Work, damage or loss;* the Contractor shall, except in the situation of an emergency, *notify the Project Manager's* Purchasing Department *in writing within four (4) days of the receipt of such directions. Contractor shall not proceed with the directions or with the Work affected thereby until the Contractor has received in writing, acknowledgement of the claim and instructions from the Project Manager's Purchasing Department* ⋯ (emphasis added).

Haden also points to paragraphs 78 and 89, Section III, where the contractor agrees that whether or not any delay is the basis for an extension of time, he will have no claim against the project manager for an increase in price or for any other reason.

**\*3** Paragraph 78 provides:

The Contractor agrees that whether or not any delay shall be the basis for an extension of time, *he shall have no claim against the Owner, Tenant, and the Project Manager for an increase in the contract price, nor a claim against the Owner, Tenant or Project Manager for a payment or allowance of any kind for damage, loss or expense resulting from delays:* Nor shall the Contractor have any claim for damage, loss or expense resulting from interruptions to, or suspension of, his work to enable other Contractors to perform their work. *The only remedy available to the Contractor shall be an extension of time.* (emphasis added).

Paragraph 79 states:

No claim for Contractor interference, direction or acceleration shall arise from the Project Manager's performance of the function of project coordination and/or on-site implementation of the Contractor's schedule of activities.

There is a dispute as to whether plaintiffs met the provisions of the foregoing general conditions.

At the completion of the job, plaintiffs submitted claims for additional pay. Defendants allegedly asked to audit plaintiffs' books to confirm plaintiffs' loss of money. Plaintiffs filed suit for a mechanic's lien and for other relief in May of 1986, to preserve their rights when the audit was delayed.

At the outset, the Court notes that the facts of this case will be read in a light most favorable to the plaintiffs, as will any inferences to be drawn from those facts. *Sweetman v. Strescon, Ind., Inc., Del.Super., 389 A.2d 1319, 1324 (1978).* Defendants bear the initial burden of proof that there is no material issue of fact and that they are entitled to judgment as a matter of law. Del.Super.Ct.Civ.R. 56(c); *Moore v. Sizemore, Del.Supr., 405 A.2d 679 (1979).*

## I. The General Release

Delaware law recognizes the validity of a general release. *Adams v. Jankouskas, Del.Supr., 452 A.2d 148, 155 (1982); Chakov v. Outboard Marine Corp., Del.Supr., 429 A.2d 984, 985 (1981).* However, public policy abhors relief of a party from its legal obligations unless contractual language makes it crystal clear and unequivocal that the contracting party would be relieved of its own defaults. *Hallman v. Dover Downs,* D.Del., C.A. 85-618 S.J. Wright, (Jan. 6, 1987); *J.A. Jones Construction Co. v. City of Dover, 372 A.2d 540 at 553 (1977).* Thus, the Court first scrutinizes the releases for their validity, secondly for their clarity, and finally, for their scope.

Under the general law of contracts, a release is valid and binding where the minds of the parties have met; where the release is supported by consideration; and where there has been no fraud, misrepresentation, mistake, duress or undue influence. 76 C.J.S. *Releases* § 21. In general, a voluntary release obtained without semblance of imposition, for valuable consideration, from one capable of fully appreciating its full force and effect, is valid. *Id.*

## A. *Consideration*

Looking first to consideration, it has been held that a waiver of lien may be by separate agreement or by incorporation with other undertakings. *G.R. Sponaugle & Sons, Inc. v. McKnight Const. Co., Del.Super., 304 A.2d 339, 344 (1973).* If it is by separate agreement, it must be supported by separate consideration. *Id.* However, if it is incorporated as part of a more comprehensive agreement, the consideration requirement runs to the contract as a whole. *Id. See also, Equitable Trust Co. v. Gallagher, Del.Supr., 99 A.2d 490, 493 (1953)* (consideration for an agreement can be inquired into and found if it is present anywhere in the entire transaction surrounding the agreement, regardless of whether any label has been put on it or whether it was spelled out in writing).

**\*4** In the instant case, plaintiffs signed and submitted the form releases contemporaneously with each invoice as a prerequisite to getting paid for their work. Plaintiffs argue that payment of a sum owed is insufficient consideration for the release of plaintiffs' claims for further amounts owed (i.e., it was a pre-existing duty). In other words, as separate contracts, there was no benefit to plaintiffs or detriment to defendants because of the releases, and consideration was lacking.

However true the foregoing may be, the argument fails because the releases were not solely separate contracts. Rather, they were executed pursuant to the general conditions of the basic contracts, as follows:

72.12 *Contractor's applications for payment shall be accompanied by the Contractor's sworn statement indicating the status of payments* to laborers to the date of the invoice, *and setting for (sic) the amounts due each* Subcontractor and Materialman as of the date of the Contractor's invoice.

With the next application for a payment or within fifteen days after the date of each payment to the Contractor, the *Contractor shall submit waivers of lien* signed by each Subcontractor and Materialman acknowledging payment to the amounts set forth on the sworn statement which accompanied the Contractor's invoice.

*Subsequent applications for payment will not be paid until all necessary waivers of lien,* in satisfactory form, *have been received covering each previously paid invoice.*

The Contractor's *final invoice* shall be accompanied by the Contractor's sworn statement, the Contractor's *final waiver of lien* and *final waivers of lien* from all Subcontractors and Materialmen who have not previously submitted a final waiver of lien. (emphasis added.)

Because the waivers were called for in the general conditions to the contracts, the consideration was award of the contracts and payments thereunder to plaintiffs. The undertakings of both parties in entering the contracts, in their totality, constituted consideration for the waivers.

Where the consideration agreed upon for a release is something of value, courts generally will not avoid the release on the ground of inadequacy of consideration. 76 C.J.S. *Releases* § 19. Absence of motivation or desire to insert a clause should not be equated with absence of consideration for a contract. *G.R. Sponaugle & Sons, Inc., Del.Super., 304 A.2d 339, 344 (1973).*

Based on the foregoing, this Court finds that that award of the contracts to plaintiffs constituted consideration for the general releases. The Court cannot question the prudence of the releases, or the value of the consideration.

## B. *Economic Duress*

**\*5** Plaintiffs argue that the releases are void because they were obtained by defendants through economic duress, since plaintiffs would not be timely paid if the general releases were not submitted as part of plaintiffs' periodic progress pay vouchers.

Under Delaware law, duress will defeat a general release only when it was executed by physical force, threat of force, or by unlawful threats destroying the victim's free will. *Vassallo v. Haber Electric Co., Del.Super., 435 A.2d 1046, 1050 (1981).* "[T]he general test which applies is whether or not any unlawful threats found to have occurred destroyed the victim's free will and compelled him to comply with a demand for the release." *Id.*

Plaintiffs have failed to plead that defendants made unlawful threats or destroyed their free will. Plaintiffs were free to enter the contract, requiring the releases, or not to do so. Further, under the contract they could have noted exceptions on the releases. Plaintiffs, on the other hand, contend that economic duress compelled them to do neither. It is true that noting exceptions on the releases could have resulted in delayed payment. It is possible that plaintiffs may be able to establish a form of economic duress so as to vitiate their releases.

### C. Ambiguity

Defendants argue that because the general releases are valid and clear and unambiguous on their face, they are entitled to summary judgment as to all claims by Egan, and as to all claims by Egan Air arising prior to December 19, 1985.

In the absence of ambiguity, there is no room for construction of an agreement. *Nepa v. Marta, Del.Supr., 415 A.2d 470, 473 (1980).* Ambiguity is defined as unclear or uncertain, or susceptible of more than one interpretation. *Black's Law Dictionary,* p. 73 (1979). Where language of a contract is ambiguous, it must be strongly construed against the drafter. *Adams,* 452 A.2d at 156.

In the instant case, there are twenty identical release forms entitled, "Contractor's Partial Release of Lien and General Release." The release states the following: 1) the contractor has been paid in full *as of the release date,* 2) liens are released for labor, material and equipment furnished *as of the release date,* 3) the contractor releases and discharges defendants from claims, demands and causes of action arising under the contract *as of the release date.*

Since the specific release language states that it is a partial release of lien and since the release was executed twenty times between the two plaintiffs, it is far from clear that any single release covers claims to the entire contract. Further, since liens and claims literally are waived "as of the release date," it is uncertain that any release waives claims or liens that arose *after* the release date. The claims or liens may have arisen when defendants refused to pay for additional work, after the date of each final release. Thus, the releases are ambiguous. Further, since the releases are required by the general contract, and only are supported by consideration for entering the general contract, they must be looked at in the context of pertinent contractual language. Recall that paragraph 72.12 forbids payment "until *all necessary waivers of lien,* in satisfactory form, have been received *covering each previously paid invoice.* (emphasis added)." The contractual language does not refer to a general release of claims, and arguably requires release of lien only for the *previously paid invoice.*

### D. *Construction*

The primary rule of construction of ambiguous releases is that the intent of the parties as to effect and scope must govern. The Court must ascertain intent by first looking to the overall language of the document. *76 C.J.S. Release § 38; DuPont v. Wilmington Trust Co.,* Del.Ch., 45 A.2d 510 (1946); *Adams,* 452 A.2d at 156. In construing a release and determining the parties' intent, the entire instrument, and not detached sections of it, must be examined. *76 C.J.S. Release § 38* and *E.I. duPont de Nemours & Co., Inc.,* Del.Supr., 498 A.2d 1108 (1985).

**\*6** "A release should be construed from the standpoint of the parties at the time of its execution, and in the light of their relations, and their situation, at the time when it was formulated, and of circumstances which surrounded the transaction, and extrinsic evidence is admissible to show the surrounding circumstances and the nature of the transaction to which the release was designed to

apply (citations omitted)." 76 C.J.S. *Releases* § 38 at p. 670. A release ordinarily operates on the matters expressed in the contract which already are in existence at the time of the release. 76 C.J.S. *Release* at § 53. Demands arising subsequently or subsequently maturing are not as a rule discharged by the release unless expressly embraced therein or falling within the fair import of the terms employed. *Id.; See* e.g., *Levitt v. Bouvier,* Del.Supr., 287 A.2d 671 (1972).

Recall that the release in question waives all liens "furnished under the contract as of release date" and discharges "any and all manner of claims, demands and causes of action whatsoever ⋯ arising under or out of the contract as of the release date ⋯". Thus, under a literal reading, the release may not cover claims arising after the release date or beyond payment of the last voucher. Further, the release may not cover claims for work outside the contemplation of the original contract.

In *Sponaugle,* 304 A.2d 339 at 345, the court ruled that a clause similar to the release language in question did not expressly apply to work which was not "covered" by the contract. It held that a waiver of a statutory right (mechanics lien) should be given no broader coverage than what results from a reasonable application of contract language. *Id.* "Therefore, the waiver clause will be held not to apply to extra work which was not contemplated by the contract as executed." *Id.* The phrase "for any other ground, reasons or cause whatsoever," was held by the court to refer to rights and obligations existing at the time of the execution of the contract, and not to the rights and obligations arising thereafter. *Id.*

Extra work has been defined in Delaware as work not foreseen at the time of entrance in the contract. *W.R. Ferguson v. William A. Berbusse, Jr., Inc.,* Del.Supr., 216 A.2d 876 at 879 (1966). The court in *W.R. Ferguson* found plaintiff's claim for extras, necessitated by some negligence of defendant in providing plaintiff with adequate specifications or by reason of poor workmanship by defendant and subcontractors, to constitute "extra work". This holding supports the general rule that although contractually required labor and materials cannot be regarded as extras for which the builder or owner is liable, the owner is liable for extra work agreed to or ordered by himself, or made necessary by his or his agents or employees' own negligence, carelessness or wrongful act. 17A C.J.S. *Contracts* § 370(3).

Here, the thrust of plaintiffs' entire argument is that they incurred extra expenses because of job site conditions unforeseen at the time of the bid and contract. Both plaintiffs, in fact, seek remuneration for both change orders and cost overruns resulting from loss of efficiency due to disruptive influences at the jobsite. Haden, in its brief, admits that certain contract modifications were paid after execution of the final releases, but asserts that they were beyond the scope of the original contracts, and different from the claims being asserted. (Haden's brief, pp. 14-15). It, thus, impliedly admits that some work fell outside of the contemplation of the contract.

**\*7** Construing the release as part of the entire contract, other contractual language on the subject is pertinent. An applicable clause is as follows:

*Section 98. Extent of Contract*

No verbal agreement either before or after execution of this contract shall affect or modify any of the terms or obligations of the contract and this contract shall be conclusively considered as containing and expressing all of the terms and conditions agreed upon by the parties. No changes, amendments or modifications of such terms or conditions shall be valid or of any effect unless reduced to writing and signed by each party.

A similar provision was listed in the contract cited in *Sponaugle,* 304 A.2d 339, 343, n. 1. The court there held that the provision applied to rights and obligations existing at the time of execution of the contract, *id.* at 345, and that the record did not disclose what significance, if any, the clause may have regarding "extra work". The parties have offered no proofs of "extra work" versus work contracted for at this point.

Looking again to the contract, section 75 of the General Conditions, *Bills for Extras,* impliedly acknowledges that there may be a *final* settlement or a different release of lien, beyond payment of

the monthly invoices, for additional work. It states that unless otherwise agreed, bills for extras or additional work will not be paid until *final settlement*. Section 72.12 provides that the contracts' *final invoice* shall be accompanied by a *final waiver* of lien. Section 72.17 states that the owner or project manager, because of subsequently discovered evidence, may withhold or nullify whole or part of the payment. This language indicates that the contract drafter recognized that there may be circumstances where the contract may not be concluded, despite payment of invoices and waiver of lien. Thus, it is possible that waiver of claims to date may be read not to include claims arising after the date of execution, or a *final* waiver of lien.

Defendants assert that even if the releases are not deemed to be general releases, but partial waivers, the plaintiffs (with one exception) executed releases for time periods which together constitute the entire duration of the job. This fails to address the questions of whether the releases applied to extras, if applicable; whether they amounted to a "final settlement" per contract language; whether the claims or liens arose after the releases were executed, and so on. In Delaware, the meaning of a contract and the intent of the parties thereto is usually a question of law to be determined from contract language. *McCabe v. Baltimore Trust Co.*, Del.Super., 180 A. 780 (1935). However, in cases where the intent of parties to the contract cannot be fairly ascertained from the contract itself, the conduct of the parties, showing their interpretation, may be considered. *Id.* at 781. Because of the ambiguities and lack of proofs on them, this Court may not grant summary judgment for defendants on this issue.

## E. *Applicability to Haden*

The Court, likewise, may not grant summary judgment on the issue of whether Haden is included in the release language discharging "the CM, and owner, their affiliates and assigns." There is a question of fact as to whether Haden is an assignee. Haden argues that plaintiffs in their interrogatories stated that at that point in their discovery, it was their position that GM and Daniel assigned some of their responsibilities under the contract to Haden; thus, Haden argues, plaintiffs have admitted that Haden was an assignee of GM and Daniels within the meaning of the release. The qualified assertion does not rise to the level of admission of the applicability of the contract to Haden. The issue is a question of material fact, precluding summary judgment on that basis.

## F. *Course of Conduct*

***8** The final question regarding the releases is whether they were modified by a course of conduct. Like any other contract, a release can be modified, rescinded or waived by the parties' agreements, acts or conduct. *See,* e.g., *W.R. Ferguson, supra* at 878. Consent and consideration are needed to modify an agreement.

Plaintiffs contend that they were assured by defendants that their claims were valid and would be paid. Their supporting affidavit states that Haden and its representatives made such statements, and that Haden employees promised to "support" Egan's claims. (Aff. of J. Egan §§ 8, 10; Depo. J. LeClair pp. 60-63). Haden admits that certain contract modifications were paid after execution of the general releases. Nonetheless, it asserts that pay was for work not set forth in the original contracts, and different from the claims being asserted. (Haden's brief, pp. 14-15). As to the foregoing, the proofs are not available as to which work is "extra" and as to the agency relationship, or its scope, between the defendants.

An illustrative case is *S & S Builders v. DiMondi*, Del.Supr., 126 A.2d 826 (1956). There, a materialman brought suit against a general contractor on the basis of the contractor's alleged verbal guarantee to pay the sub-contractor's debt to the materialman so the materialman would not put a lien on the job. The materialman signed general releases based upon those representations. *Id.* at 828, 830. The court ruled that the releases were signed under such misapprehension as not to amount to a release of liability. If Haden did accept claims after the release, and if defendants promised to pay plaintiffs' claims despite the releases, plaintiffs may argue reliance on this conduct as motivation for continuing to sign the releases and to continue to perform.

The final proof in support of modification is the January 9 Haden letter written in response to Egan Air's December 30th letter (stating that wordage regarding release of claims on the contract with modification was unacceptable since Egan Air intended to submit a claim for impacts). The Haden letter provided that the modification would "in no way disallow your right to file claim on the original contract amount." Defendants assert that the letter clearly was merely informing Fischer that the release applied only to modification work, not that the original releases had become invalid. This is not clear to the Court. However, the letter is irrelevant to releases prior to January 9, as it could not constitute an agreement or course of conduct prior to that time. Thus, Egan Air's releases through December 19, 1985 are unaffected. Defendants do not seek summary judgment for general releases by Egan Air after that date. Defendants correctly assert that the letter is irrelevant as to Egan & Sons.

Summary judgment is precluded due to the ambiguity of the releases and due to the factual question regarding the modification of the releases, their scope, and whether remuneration is sought for extras.

## II. *The Notice Requirements*

**\*9** Defendants' next asserted ground for summary judgment is that plaintiffs' failure to comply with the contract's notification requirements (§ 70.4-70.6, General Conditions) precludes their right to file a claim. The provisions basically require plaintiffs to notify Haden in writing within 7 days of first observing any condition entitling them to payment from the owner and project manager for the increased cost of work, and to state the amount of their claim. Notification is a condition precedent to the consideration or prosecution of claims; if plaintiffs fail to comply, they are deemed to have waived the claims. The Project Manager's (Haden's) Purchasing Department must acknowledge receipt of the notice, in writing, within 7 days (§ 70.5).

Defendants in their brief and Egan's project manager both acknowledge that the purpose of the notice provisions was to inform GM and Daniel of problems rather than to surprise them at a later date. (Defendants' opening brief, p. 24; Depo. of J. Egan at p. 185).

A provision that any claim for extra work ordered shall be made before or within a specified time after the work is performed is binding on the contractor, as is a provision that such claim shall be in writing. 17A C.J.S. *Contracts* § 371(4). The provision may, however, be waived by the conduct of the parties. *Id.* The facts showing a waiver must be clear and convincing and the question of whether there has been a waiver usually is one of fact. *Id.* at § 371(5). A further provision that no specification shall be waived by either party, unless in writing and duly signed, also may be waived. *Id.* The provisions here will, therefore, be valid and binding if clear and unambiguous, and if not waived by a course of conduct.

Plaintiffs argue that the provisions are ambiguous on several grounds. First, they assert that the absence of the word "notify" in § 70.4's clause, "the contractor shall, within seven (7) days after the first observance of the occurrence, Project Manager, in writing, of the amount of the claim ···" means that the clause places no affirmative duty on plaintiffs whatsoever. However, even if this clause were found to be ambiguous, Egan's president testified at deposition that he understood "notify" was the word omitted.

Next, plaintiffs assert that Haden does not have a Purchasing Department to respond to the claim. Even if this is so, it does not excuse the notification requirement. Plaintiffs also assert that the amount of the claims was impossible to calculate until well after the first observance of problems. Regardless, this does not excuse plaintiffs from giving the most precise notice possible; if plaintiffs were found to give notice, it is a factual issue as to whether plaintiffs could state the amount of claims with reasonable certainty.

Finally, plaintiffs assert that § 70.4 is unclear because it applies only to situations where plaintiffs claim they are entitled to increased payment from the owner and project manager, and that they were in fact paid by the general contractor, Daniel. Paragraph 72 of the General Conditions states

that *unless otherwise provided in the contract,* the project manager shall make partial payments as the work progresses. *See also,* para. 72.14 (project manager will make payment to contractor ⋯). The Court does not have in its possession the entire contract to determine whether the terms were altered. However, it does possess a copy of a check to plaintiffs from Daniel. Without the pertinent information, the Court is unable to rule on this point. In any event, the notice requirement is clear on its face in that it only applies to entitlement to pay from GM and Haden; therefore, plaintiffs are not required to notify the project manager if it claims entitlement to increased pay from Daniel.

**\*10** In the event the notice provisions are found to be valid and binding, the Court next must examine the "notice" given by plaintiffs.

The following correspondence is pertinent to the foregoing provisions.

*Egan Air*

June 14, 1985-

Letter to Haden's field project manager, Brian Smither, from Egan Air's William Partch pointing out field site problems and consequent need to reschedule. He also stated that crew size beyond that estimated would increase his cost of operation due to the need for additional supervision, tools and equipment.

December 30, 1985-

Egan Air Vice-President, John A. Fischer, wrote Haden's Nick Bailey requesting contract modifications. He stated the additional price of each.

December 30, 1985-

Fischer wrote Wendy Blanchard of Daniel that he was returning copies of the contract modifications unsigned as the wording concerning release of claims was unacceptable to them. He stated he would be submitting a claim for impacts on the project.

January 9, 1986-

Letter to Fischer from Blanchard, stating that signing of the modification "will in no way disallow your right to file claim on the original contract amount."

*Egan*

June 11, 1985-

Letter to Haden's Smithers from Egan's Elliott A. Sirota noting that the project site was not available and that as a result, the schedule would need to be revamped, with concomitant cost implications. "Assessment of these costs cannot be accurately itemized until the areas for our work are made available to us."

June 19, 1985-

Egan's Joe Egan wrote to Haden's Smithers about problems with water in the work area.

### July 18, 1985-

Egan wrote to Haden's Nick Bailey referencing a job site conversation and confirming a delay in the completion date of installation due to the activities of others.

### July 26, 1985-

Letter from Egan project manager, "Butch" LeClair, to Haden's Smithers pointing out job site safety problems and probable job delays due to water in the basement.

### August 9, 1985-

Letter to Haden's Nick Bailey disputing criticism of Egan's recent contract performances and reiterating that site conditions beyond their control had delayed work.

### August 16, 1985-

*11 Letter from Haden's Nick Bailey to Egan's Sirota acknowledging the delay caused at the beginning of the job and the consequent extension, which Haden understood would cause no cost to the owner, and stressing an intent to stick to agreed upon completion dates.

### November 5, 1985-

Letter from Egan's Vice-President Elliott Sirota to Haden's Nick Bailey stating that unanticipated job conditions would result in a request for an equitable adjustment to the contract price for increased costs for labor, material, equipment, extended supervision and overhead.

It is evident that both plaintiffs notified the project manager within days of arrival at the site that they had encountered problems there. Egan corresponded frequently with the project manager concerning job problems and increased costs. On June 11, 1985, Egan wrote the project manager regarding problems encountered and that an assessment of costs could not be accurately estimated at that time. On November 5, Egan wrote Haden specifying the changed conditions prompting increased costs and the amount of the costs. (See Aff. of Joseph K. Egan, Attachment). Because Egan promptly and again periodically notified the project manager of the incurrence of increased costs, it met the acknowledged purpose of the notice provisions to inform defendants of problems, rather than to surprise them at a later date. It is a question of material fact as to whether Egan notified the project manager of the "amount" of claim as soon as was possible. Egan Air on June 14 wrote the project manager that increased crew size would increase costs; on December 30, it wrote the project manager that in addition to requested contract modifications, it would, "as you know, ⋯ be submitting a claim on the project ⋯" (Aff. of John Fischer, attachment). It is less clear that Egan Air notified the project manager of problems within seven days of observation of the first occurrence. Again, it is a question of fact as to what constituted the "occurrence" and as to whether the amount of damages was forwarded as soon as possible.

Plaintiffs assert that even if they were required to and failed to forward proper notice to defendants, defendants' course of conduct nullified the requirement.

In Delaware, the consent of both parties and some consideration are required to support a modification. *DeCecchis v. Evers*, Del.Super., 174 A.2d 463 (1961). The allegation is that both parties by their conduct consented to forego the written notice provisions, and that plaintiffs relied on their conduct. A written agreement, despite its terms, is not necessarily only to be amended by another

formal written agreement. *Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.,* Del.Supr., 297 A.2d 28 (1972). Thus, a new agreement may be formed, based on the parties' course of conduct. *Id.*

Plaintiffs state that Haden's failure to respond in writing to plaintiffs' letters concerning job site problems and increased costs, as required by paragraph 70.5, or to inform plaintiffs that the notices were not in accordance with ¶ 70.4, constituted a waiver of the requirements of ¶ 70.4 and an acknowledgement that a bill for increased costs would be accepted. Defendants state that they were not required to respond because the notices were not in proper format. Plaintiffs further argue that Haden modified the contract orally, that defendants paid a number of plaintiffs' claims despite lack of prior notice, and that defendants represented that they may settle the claims. These contentions must await their proofs at trial.

**\*12** Defendants next point to various contract provisions providing that: 1) no verbal agreement shall modify any of the terms or obligations of the contract. (General Conditions ¶ 98); and 2) that the project manager's failure to insist upon performance of any condition shall not waive it (¶ 96).

It has been held that notwithstanding an agreement prohibiting a contract's alteration except in a particular manner, a written contract may be modified thereto in any manner the parties choose. 17A C.J.S. Contracts § 377(c); *Pepsi Cola,* 297 A.2d at 33; *Reeder v. Sanford School, Inc.,* Del.Super., 397 A.2d 139 at 141 (1979).

On a final note, defendant Haden asserts that plaintiffs are not entitled to a claim against any of the defendants for delay unless plaintiffs complied with the notice provisions of ¶ 73 and ¶ 78 (plaintiffs must set forth the cause of delay, description of the work affected, and all pertinent details if directions result in an increased cost of work; contractor agrees he has no claim for damage or loss resulting from delays). First, it is unclear which of plaintiffs' claims are attributed to delay. Second, the same questions of whether plaintiffs complied with notice or were excused from it due to a waiver must be answered. Third, the language is in the nature of a covenant, rather than a condition precedent, thus entitling defendants only to damages for breach, rather than preclusion of claims, if plaintiffs are found to have failed to comply with the provision. The same reasoning applies to ¶ 79.

### III. *Survival of Claims*

Finally, defendants contend that plaintiffs claims of fraud and negligence cannot survive their execution of the releases and their failure to give notice as required by the contracts. Because summary judgment has been denied regarding the releases and notice provisions, we need not reach the question of their scope at this time.

Summary judgment is DENIED.

IT IS SO ORDERED.

Copr. (C) West 2006 No Claim to Orig. U.S. Govt. Works Del.Super.,1988.
Egan & Sons Air Conditioning Co. v. General Motors Corp.
Not Reported in A.2d, 1988 WL 47314 (Del.Super.)

END OF DOCUMENT

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1994 WL 680029 (Del.Super.)

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware, Sussex County.
**JUDGE TRUCKING CO**., INC., Plaintiff,

v.

The **ESTATE** OF John F. **COOPER** and Mark M. **Cooper**, personal representative of the **Estate** of
John F. **Cooper**, Defendants.
Danny L. **MESSICK** and Janet E. Messick, Plaintiffs,

v.

JUDGE TRUCKING COMPANY, INC. and Nathaniel Turner, Defendants and Third-Party Plaintiffs,

v.

Mark M. COOPER, as Personal Representative of the **Estate** of John F. **Cooper**, Third-Party
Defendant.
April T. COOPER, as Personal Representative of the **Estate** of John F. **Cooper**, Plaintiff,

v.

JUDGE TRUCKING COMPANY, INC. and Nathaniel Turner, Defendants and Third-Party Plaintiffs,

v.

Mark M. **COOPER**, Personal Representative of the **ESTATE** of John F. **Cooper**, Third-Party Defendant.
Civ. A. Nos. 92C-03-041, 93C-04-023 and 93C-07-025.
Submitted: Sept. 1, 1994.
Decided: Sept. 19, 1994.

Rodney Don Sweet, Seaford, for plaintiffs Mark M. Cooper, Personal Representative of the Estate of
John F. Cooper, and Wayne Cooper.
Ronald H. Jarashow, Annapolis, MD, George G. Strott, Jr., Salisbury, MD, for plaintiffs Danny L.
Messick and Janet E. Messick.
Alan Boyd and Daniel P. Bennett, Wilmington, for defendants and third-party plaintiffs Judge Trucking
Co., Inc. and Nathaniel Turner.
Jeffrey M. Austin, Wilmington, for third-party defendant John F. Cooper.

MEMORANDUM OPINION

GRAVES, Judge.
**\*1** These are three tort actions arising from an automobile/tractor trailer truck collision. Pending
before the Court is a summary judgment motion seeking resolution of a conflicts of law issue on
damages. This is the Court's decision thereon.

FACTS

This Court previously issued a decision in this matter, and that decision is captioned *Judge Trucking
Co., Inc. v. The Estate of John F. Cooper,* Del.Super., C.A. Nos. 92C-03-041 and 93C-04-023, Graves,
J. (April 14, 1994) ("April 14, 1994 decision"). I refer the parties to that case for a detailed recitation
of the facts of the case. Set forth below are the facts necessary for the Court's determination of the
motion at hand.

On July 22, 1991, a collision occurred at the intersection of U.S. Route 13 ("Route 13") and Route 54.
Route 13 runs north/south while Route 54 runs east/west. The Delaware/Maryland border also runs
east/west with Route 54. However, that border's exact location at the point of the collision is in
dispute.

The collision involved a car which John F. Cooper was driving and a truck which Nathaniel Turner was driving. Judge Trucking Co., Inc. ("Judge Trucking") owned the truck. In Mr. Cooper's car were his grandson, Wayne F. Cooper ("Wayne"), and Danny L. Messick. Mr. Cooper, Wayne, and Mr. Messick were Delaware residents. Mr. Turner is a Virginia resident, and Judge Trucking is a Virginia corporation.

Earlier in the day, Mr. Cooper and his passengers had departed from Laurel, Delaware and had travelled to the Dutch Kitchen Restaurant in Delmar, Delaware. They travelled south on Route 13 to the shopping center where the restaurant was located. The restaurant was located in Delaware at a point near the Delaware/Maryland border to the north of Route 54 and to the west of Route 13.

After eating lunch, Mr. Cooper, Wayne and Mr. Messick got back into Mr. Cooper's car to return to Laurel, Delaware. They left the restaurant's parking lot, and Mr. Cooper drove out the exit onto route 54 heading east in order to make a left turn to go north on Route 13. At this point, Mr. Cooper's car was travelling in Maryland. At the intersection of Routes 13 and 54, Mr. Cooper's car and Mr. Turner's truck collided. Who was at fault is disputed.

Also disputed is in which state the impact occurred. As held at page 6 of the Court's April 14, 1994 decision, the point at which the two cars collided ("the impact") is where the negligent conduct *and* the injury are deemed to have occurred. At the time of the impact, Mr. Cooper was in the left turn lane of Route 54 at a point where it intersects with the right-hand lane of southbound Route 13. The trier of fact will have to determine the boundary's location and thus, whether the impact occurred in Delaware or Maryland. *Judge Trucking Co., Inc. v. The Estate of John F. Cooper, supra* at 4-5.

If the impact occurred in Delaware, no conflicts of law issues will exist. However, if it occurred in Maryland, then they will exist. Where an issue would be resolved differently under Maryland's law than under Delaware's law, then this Court must apply a conflicts of law analysis to that issue. *Judge Trucking Co., Inc. v. The Estate of John F. Cooper, supra* at 9. *See McBride v. Whiting-Turner Contracting Company,* Del.Supr., No. 234, 1992, Moore, J. (April 27, 1993) at 6-7. An issue requiring a conflicts of law analysis is that which Mr. Messick has brought before the Court: whether Maryland or Delaware's law on damages will apply. Delaware's law on damages differs from Maryland's because Delaware does not have a cap on the amount of non-economic damages which a party may recover from a non-governmental entity while Maryland does.[FN1]

> FN1. This cap constitutes substantive, not procedural, law. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 171 cmt. a (1971). *See Black v. Leatherwood,* Md.Ct.Spec.App., 606 A.2d 295, 300-01 (1992).

### DISCUSSION

**\*2** Summary judgment may be granted when no material issues of fact exist, and the moving party bears the burden of establishing the non-existence of material issues of fact. *Moore v. Sizemore,* Del.Supr., 405 A.2d 679, 680 (1979). If, however, material issues of fact exist or if the Court determines that it does not have sufficient facts to enable it to apply the law to the facts before it, then summary judgment is inappropriate. *Ebersole v. Lowengrub,* Del.Supr., 180 A.2d 467, 470 (1962).

In Md.Code Ann., Courts and Judicial Proceedings § 11-108, the legislature placed a cap of $350,000 on the amount of non-economic damages a plaintiff can recover.[FN2] The reason Maryland enacted the cap was examined in detail as follows in *Edmonds v. Murphy,* Md.Ct.Spec.App., 573 A.2d 853, 867-68 (1990), *aff'd,* Md., 601 A.2d 102 (1992):

> FN2. The version of Md.Code Ann., Courts and Judicial Proceedings § 11-108 in effect on the date of the accident provided in pertinent part:
>
> (a) Noneconomic damages.-In this section:

(1) "Noneconomic damages" means pain, suffering, inconvenience, physical impairment, disfigurement, loss of consortium, or other nonpecuniary injury; and

(2) "Noneconomic damages" does not include punitive damages.

(b) Limitation of $350,000 established.-In any action for damages for personal injury in which the cause of action arises on or after July 1, 1986, an award for noneconomic damages may not exceed $350,000.

The "object" of § 11-108(b) is the increase in availability and affordability of liability insurance in Maryland.

The Legislature had before it a report by the Governor's Task Force to Study Liability Insurance, a group established in August 1985 "to develop ⋯ recommendations to help ensure the availability of adequate liability insurance coverage at an affordable cost in the state." Report of the Governor's Task Force to Study Liability Insurance 2 (Dec. 1985). Following two and a half months of weekly meetings, the task force produced eight recommendations, the first of which was a cap of no more than $250,000 on noneconomic damages. *Id.* at 10. According to the task force,

The ceiling on noneconomic damages will help contain awards within realistic limits, reduce the exposure of defendants to unlimited damages for pain and suffering, lead to more settlements, and enable insurance carriers to set more accurate rates because of greater predictability of the size of judgments. The limitation is designed to lend greater stability to the insurance market and make it more attractive to underwriters.

A substantial portion of the verdicts being returned in liability cases are for noneconomic losses. The translation of these losses into dollar amounts is an extremely subjective process as these claims are not easily amenable to accurate, or even approximate, monetary valuation. There is a common belief that these awards are the primary source of overly generous and arbitrary liability claim payments. They vary substantially from person to person, even when applied to similar cases or similar injuries, and can be fabricated with relative ease.

A cap on allowable pain and suffering awards will help reduce the incidents of unrealistically high liability jury awards, yet at the same time protect the right of the injured party to recover the full amount of economic losses, including all lost wages and medical expenses.

*Id.* at 10-11.

In July, 1985, Governor Harry Hughes appointed the 28-member Joint Executive/Legislative Task Force on Medical Malpractice Insurance. Report of the Joint Executive/Legislative Task Force on Medical Malpractice Insurance 1 (Dec. 1985). During its fifteen meetings, that group received presentations and reports from its members and heard oral testimony from many people representing the insurance industry, the health care field, and the legal system. *Id.* at iii. The joint task force noted that "[s]everity of awards ha[d] been cited as a primary factor causing escalating premiums." *Id.* at 26. One witness

**\*3** indicated that states which have imposed a ceiling on health care practice awards, either on the total award or on noneconomic damages, have experienced a reduction in the severity of the awards.

*Id.* at 28. According to the joint task force, "It has been estimated that a $250,000 ceiling on noneconomic damages would have a moderate impact on medical malpractice insurance premiums." *Id.* at 28-29. The group then went on to recommend, *inter alia,* that the Legislature impose a $250,000 cap on noneconomic damages. *Id.* at 29.

The legislators also had before them a report by the Tort Policy Working Group on the Causes, Extent and Policy Implications of the Current Crisis in Insurance Availability, released in February 1986. That group consisted of representatives of ten federal agencies and the White House. The working group

identified and discussed four problem areas, including "[t]he explosive growth in the damages awarded in tort lawsuits, particularly with regard to noneconomic awards such as pain and suffering or punitive damages." Report of the Tort Policy Working Group at Introduction, p. 2. The group noted that "the increase in the number of tort lawsuits and the level of awarded damages (or settlements) in and of itself has an obvious inflating effect on insurance premiums." *Id.* at Chapter 2, p. 21. Among the working group's eight recommendations was a suggestion that noneconomic damages be limited to $100,000. *Id.* at Chapter 4, p. 8.

Based upon this legislative history, we have little difficulty concluding that the classifications created by § 11-108(b) ··· have a "fair and substantial relation to the object of the legislation"-increasing the availability and affordability of liability insurance.

Also, in *Murphy v. Edmonds,* Md., 601 A.2d 102, 115 (1992), the Maryland Court of Appeals stated:

The General Assembly's objective in enacting the cap was to assure the availability of sufficient liability insurance, at a reasonable cost, in order to cover claims for personal injuries to members of the public. This is obviously a legitimate legislative objective. A cap on noneconomic damages may lead to greater ease in calculating premiums, thus making the market more attractive to insurers, and ultimately may lead to reduced premiums, making insurance more affordable for individuals and organizations performing needed services.

Delaware has no such cap, and its legislature has refused to adopt such. I note that Judge Trucking and Mr. Turner argue that Delaware has adopted caps on damages recoveries in enacting 2 *Del.C.* § 1329 [FN3] and 10 *Del.C.* § 4013.[FN4] These are caps on damages assessed against governmental entities. Different policies underlie such caps, and their existence is irrelevant to the issue of whether Delaware has a policy against placing caps on damages awarded against non-governmental entities.

FN3. In 2 *Del.C.* § 1329, it is provided in pertinent part:

In the event that insurance has been provided, such claim, including any award for damages or costs assessed against the [Delaware Transportation] Authority, its administrations, subsidiaries, officers or employees either individually or on behalf of their employer shall not exceed the amount of said insurance covering the risk or loss or the amount of $300,000, whichever amount shall be the lesser for any and all claims arising out of a single occurrence.

FN4. In 10 *Del.C.* § 4013(a), it is provided:

In any action for damages permitted by this subchapter, the claim for an award of damages, including costs, against both a political subdivision and its employees, shall not exceed $300,000 for any and all claims arising out of a single occurrence, except insofar as the political subdivision elects to purchase liability insurance in excess of $300,000 in which event the limit of recovery shall not exceed the amount of the insurance coverage.

In determining which state's law on damages will apply to Mr. Messick's case, this Court applies the "most significant relationship" test of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS (1971) ("RESTATEMENT"). *Travelers Indem. Co. v. Lake,* Del.Supr., 594 A.2d 38 (1991). In RESTATEMENT § 171, the method for determining choice of law regarding damages in a tort action is set forth as follows:

**\*4** The law selected by application of the rule of § 145 determines the measure of damages.

In RESTATEMENT § 145, it is provided:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

In RESTATEMENT § 6, it is provided:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

First I will analyze the facts in light of the § 145 factors.

(a) The place where the injury occurred.

In this scenario, the Court is assuming that the injury occurred in Maryland.

(b) The place where the conduct causing the injury occurred. This place, again, is Maryland.

(c) The domicil, residence, nationality, place of incorporation and place of business of the parties.

Mr. Messick is domiciled in Delaware. Judge Trucking and Mr. Turner are domiciled in Virginia.

(d) The place where the relationship, if any, between the parties is centered.

The only relationship between the parties is as litigants in this Delaware court.

Thus, the analysis above shows that Maryland's only contact is that the accident occurred there. And, such occurrence was fortuitous.

Now I examine the RESTATEMENT § 6 factors. Since no Delaware statutory directive exists on this

issue concerning which state's law to apply on damages, the Court turns to the factors set forth in § 6 (2).

(a) The needs of the interstate and international systems. Choice of law decisions should make the interstate systems work well. RESTATEMENT § 6 cmt. d. In this case, the Court will have to pick which system to follow since the systems differ. Thus, due to the nature of the case, there can be no furtherance of harmony here. To the extent the decision here has any impact at all on the interstate system, it will not be in furtherance of harmony.

**\*5** (b) The relevant policies of the forum, and

(c) The relevant policies of other interested states and the relative interests of those states in the determination of the particular issue.

Tort reform is a battle which has been fought for many years. Delaware has refused to adopt any tort reform efforts which limit the amounts individuals can recover from non-governmental entities. Maryland, however, determined the insurance industry in Maryland was suffering such a crisis that the state had to act to limit recoveries in personal injury cases against non-governmental entities in order to insure that its citizens were able to procure insurance at all and to insure they could procure it at an affordable rate.

To not apply the cap here would have no impact on the state of insurance in Maryland since none of the parties are Maryland residents. However, to apply the cap would have impact in Delaware in that its citizen would not receive the full recovery to which the trier of fact finds he is entitled.

(d) The protection of justified expectations.

This factor is of little importance to a personal injury case. *Judge Trucking Co., Inc. v. John F. Cooper, supra* at 9-10.

(e) The basic policies underlying the particular field of law.

The basic policies underlying the field of torts is deterrence of tortious conduct and compensation of a victim. *Id.* at 10. Maryland has a greater interest in deterring tortious conduct occurring on its roads while Delaware has a greater interest in compensating injured victims who are Delaware residents. The non-economic cap would be contrary to Delaware's interest, and it may work against the policy of deterring tortious conduct.

(f) Certainty, predictability, and uniformity of result.

This is an insignificant factor in the field of torts. *Id.*

(g) Ease in the determination and application of the law to be applied.

Both Maryland and Delaware's laws are easy to apply.

The factors of qualitative importance here are the policies of each state regarding this issue, each state's interest in the determination of this issue, and the policies underlying the field of torts. Tort reform is a significant public policy issue which Maryland has accepted but Delaware has rejected. Whether the cap is applied here would have no impact on Maryland's citizens or the state of its insurance industry, and thus, Maryland's interest in the resolution of this issue is minimal. *See Black v. Leatherwood,* Md.Ct.Spec.App., 606 A.2d 295, 305 (1992). On the other hand, Delaware has an interest in seeing that its citizens recover all that a jury awards them. Delaware's interest is greater, qualitatively, than is Maryland's.

Thus, based on the foregoing, this Court determines that Delaware's law on damages applies so that no cap will be applied to any non-economic damages which Mr. Messick might be awarded.

IT IS SO ORDERED.

Copr. (C) West 2006 No Claim to Orig. U.S. Govt. Works Del.Super.,1994.
Judge Trucking Co., Inc. v. Estate of Cooper
Not Reported in A.2d, 1994 WL 680029 (Del.Super.)

END OF DOCUMENT

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DELBERT E. ROLLISON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-158 SLR |
| | ) | |
| NEAL SHOEMAKER, an individual, | ) | TRIAL BY JURY DEMANDED |
| BLUE DIAMOND, LLC, a Delaware | ) | |
| corporation, HOUGHTONS | ) | |
| AMUSEMENT PARK, LLC, a | ) | |
| Delaware corporation JACK | ) | |
| BRADY, individually and d/b/a | ) | |
| KSR MOTOR SPORTS, BENCHMARK | ) | |
| BUILDERS, INC. a Delaware | ) | |
| corporation, and PARKWAY | ) | |
| GRAVEL, a Delaware | ) | |
| corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I, **HEREBY CERTIFY** that on this 27<u>th</u> day of November, 2006, a copy of **APPENDIX TO OPENING BRIEF OF DEFENDANTS BLUE DIAMOND, LLC AND PARKWAY GRAVEL, INC. IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** was mailed first class to the following party:

Jack Brady
P.O. Box 1701
Paoli, PA 19301

and was electronically filed with the Clerk of the Court using CM/ECF which will send notifications of such filing(s) to counsel listed below: served via Lexis/Nexis File upon the following counsel:

Arthur M. Krawitz, Esquire
Matthew R. Fogg, Esquire
Doroshow, Pasquale,
Krawitz & Bhaya
1202 Kirkwood Highway
Wilmington, DE 19805

Colin M. Shalk, Esquire
Casarino, Christman & Shalk
800 North King Street
Suite 200
P.O. Box 1276
Wilmington, DE 19899

Sherry R. Fallon, Esquire
Tybout, Redfearn & Pell
750 South Madison Street
Suite 400
Wilmington, DE 19801

**AKIN & HEBRON, P.A.**
/s/Roger A. Akin
Roger A. Akin, Esquire
Bar No. 395
1220 N. Market Street, Suite 300
P.O. Box 25047
Wilmington, DE 19899
(302) 427-6987
Attorney for Defendants
Blue Diamond, LLC and
Parkway Gravel, Inc.