IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DELBERT E. ROLLISON, | ) | C.A. No.: 06-159 SLR |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| NEAL SHOEMAKER, as parent and | ) | |
| legal guardian of TRAVIS SHOEMAKER, | ) | |
| NEAL SHOEMAKER, individually, | ) | |
| TRAVIS SHOEMAKER, individually, | ) | |
| BLUE DIAMOND, LLC, a Delaware | ) | JURY TRIAL DEMANDED |
| corporation; HOUGHTONS AMUSEMENT | ) | |
| PARK, LLC, a Delaware corporation; | ) | |
| JACK BRADY, individually and | ) | |
| d/b/a KSR MOTOR SPORTS; | ) | |
| and PARKWAY GRAVEL, | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| Defendants. | ) | |

APPENDIX TO ANSWERING BRIEF OF DEFENDANTS NEAL AND TRAVIS
SHOEMAKER IN SUPPORT OF THEIR JOINDER IN, OR IN THE ALTERNATIVE,
IN LIMITED OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OF
CO-DEFENDANTS, BLUE DIAMOND, LLC AND PARKWAY GRAVEL, INC.

TYBOUT, REDFEARN & PELL

Sherry Ruggiero Fallon
Bar ID # 2464
300 Delaware Avenue #1100
P.O. Box 2092
Wilmington, DE 19899-2092
(302)658-6901
Attorneys for Defendant

Dated:   December 11, 2006

## TABLE OF CONTENTS

Exhibit                                                          Page

1  – Blue Diamond. LLC and Parkway Gravel, Inc.'s
     Answer to the Complaint ¶ 17 ..................... B-1

2  – Deposition transcript of  Delbert Eugene
     Rollison........................................ B-3

3  – Deposition transcript of
     Neal Robert Shoemaker. .......................... B-36

4  – Blue Diamond, LLC and Parkway Gravel, Inc.'s
     Answers to Plaintiff's Interrogatory at No. 8......B-51

5  – Exhibit 1 from deposition transcript of
     Delbert E. Rollison .............................B-54

6  – Exhibit 1 from deposition transcript of
     Neal Robert Shoemaker .......................... B-55

7  – Exhibit 2 from deposition transcript of
     Delbert E. Rollison..............................B-56

8  – Exhibit 3 from deposition transcript of
     Delbert E. Rollison .............................B-57

## CERTIFICATE OF SERVICE

I, Sherry Ruggiero Fallon, hereby certify that, on this _11th_ day of _December_, 2006, I have caused to be served upon the following, in the manner indicated below, two (2) true and correct copies of the attached document:

**Electronic Service Via**
**Lexis-Nexis File and Serve**

Matthew R. Fogg #4254
Doroshow Pasquale, Krawitz & Bhaya
1202 Kirkwood Highway
Wilmington, DE 19805
Attorneys for Plaintiff

Colin M. Shalk #99
Casarino, Christman & Shalk, P.A.
800 North King Street
P.O. Box 1276
Wilmington, DE 19899
Attorneys for Benchmark Builders,
Inc.

Roger A. Akin #395
Bruce C. Herron #2315
Akin & Herron, P.A.
1220 N. Market Street, #300
P.O. Box 25047
Wilmington, DE 19899
Attorneys for Blue Diamond, LLC and
Parkway Gravel, Inc.

**First Class U.S. Mail**

Jack Brady
P.O. Box 1701
Paoli, PA  19301

**TYBOUT, REDFEARN & PELL**

SHERRY RUGGIERO FALLON
(BAR ID# 2464)
750 S. Madison St., Suite 400
P.O. Box 2092
Wilmington, DE   19899-2092
(302)658-6901
Attorneys for Defendants,
Neal Shoemaker and Travis Shoemaker

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DELBERT E. ROLLISON,　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　　)　　C.A. No. 06-159
　　　　　　　　　　　　　　　　　　)
NEAL SHOEMAKER, an individual,)
BLUE DIAMOND, LLC, a Delaware )
corporation, HOUGHTONS　　　　　)
AMUSEMENT PARK, LLC, a　　　　　)
Delaware corporation JACK　　　)
BRADY, individually and d/b/a )
KSR MOTOR SPORTS, BENCHMARK　　)
BUILDERS, INC. a Delaware　　　)
corporation, and PARKWAY　　　　)
GRAVEL, a Delaware　　　　　　　)
corporation,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　Defendants.　　　　　　　　　)

## ANSWER, AFFIRMATIVE DEFENSES AND CROSS-CLAIMS OF DEFENDANTS BLUE DIAMOND, LLC AND PARKWAY GRAVEL

1.-2. Answering defendants are without knowledge or information sufficient to admit or deny the allegations in paragraphs 1-2.

4. Admitted.

5.-8. Answering defendants are without knowledge or information sufficient to admit or deny the allegations in paragraphs 5-8.

9. Admitted.

10. Answering defendants reallege and incorporate herein their responses to paragraphs 1-9.

B-1

11. The averments in paragraph 11 state conclusions of law to which no response is required.

12.-14. Answering defendants are without knowledge or information sufficient to admit or deny the allegations in paragraphs 12-14.

15. Denied that defendant Blue Diamond owned the property at Blue Diamond Park. Denied that at all times relevant Blue Diamond maintained, managed and/or controlled the property at Blue Diamond Park or which a Monster Truck show was held on July 3, 2004.

16. No response is required because no allegations are against answering defendants.

17. Admitted that on July 3, 2004 defendant Parkway Gravel, Inc. owned the property at Blue Diamond Park on which a Monster Truck Show was held. Denied that defendant Parkway Gravel, Inc. maintained, managed and/or controlled the property at all relevant times.

18.-19. No response is required because no allegations are made against answering defendants.

20. Answering defendants reallege and incorporate herein their responses to paragraphs 1-19.

21.-28. No responses are required because no allegations are made against answering defendants.

29. Answering defendants reallege and incorporate herein their responses to paragraphs 1-28.

B-2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DELBERT E. ROLLISON,       )
                         )
      Plaintiff,       )
                         )
v.                      )
                         )
NEAL SHOEMAKER, an individual, )
BLUE DIAMOND, LLC, a Delaware  )
corporation, HOUGHTONS       )
AMUSEMENT PARK, LLC, a        )  C.A. NO: 06-159 SLR
Delaware corporation, JACK    )
BRADY, individually and d/b/a )
KSR MOTOR SPORTS, BENCHMARK   )
BUILDERS, INC., a Delaware    )
corporation, and PARKWAY      )
GRAVEL, a Delaware          )
Corporation.              )
                         )
      Defendants.      )

    Deposition of DELBERT EUGENE ROLLISON taken
pursuant to notice at the law offices of Doroshow,
Pasquale, Krawitz & Bhaya, 1202 Kirkwood Highway,
Wilmington, Delaware, beginning at 10:20 a.m. on Friday,
August 4, 2006, before Robert Wayne Wilcox, Jr.,
Registered Professional Reporter and Notary Public.

APPEARANCES:

       MATTHEW R. FOGG, ESQ.
       DOROSHOW, PASQUALE, KRAWITZ & BHAYA
        1202 Kirkwood Highway
        Wilmington, Delaware  19805
        for the Plaintiff,

CORBETT & WILCOX
Registered Professional Reporters
230 North Market Street     Wilmington, DE 19801
(302) 571-0510
www.corbettreporting.com

B-3

Delbert E. Rollison

2 (Pages 2 to 5)

Page 2

1  APPEARANCES (CONT'D):
2    SHERRY RUGGIERO FALLON, ESQ.
     TYBOUT, REDFEARN & PELL
3    750 South Madison Street - Suite 400
     Wilmington, Delaware 19801
4    for the Defendant Shoemaker,
5    ROGER A. AKIN, ESQ.
     AKIN & HERRON, P.A.
6    1220 North Market Street - Suite 300
     Wilmington, Delaware 19801
7    for the Defendants Blue Diamond, LLC,
     and Parkway Gravel,
8
     COLIN M. SHALK, ESQ.
9    CASARINO, CHRISTMAN & SHALK, P.A.
     800 North King Street - Suite 200
10   Wilmington, Delaware 19801
     for the Defendant Houghton's Amusement
11   Park, LLC.
12        - - - - -
13        DELBERT EUGENE ROLLISON,
14   the witness herein, having first been
15   duly sworn on oath, was examined and
16   testified as follows:
17  BY MS. FALLON:
18   Q.  Good morning, Mr. Rollison.
19   A.  Good morning.
20        How are you?
21   Q.  Fine.  Thank you.
22        I'm Sherry Fallon.  I represent Neal
23  Shoemaker in this matter.  I'm going to ask you some
24  questions today about the lawsuit, about the incident and

Page 3

1  about your injuries.  If you don't understand a question,
2  please let me know.  If you need it rephrased or
3  repeated, please speak up.  If you feel you need to take
4  a break, not to tour our offices again but for any other
5  reason, just speak up.
6        First of all, I'm going to start with
7  some background information.  I need your full name,
8  current address and date of birth.
9   A.  Delbert Eugene Rollison --
10  Q.  Okay.
11  A.  -- Jr.
12        My address is P.O. Box 272, Waterford,
13  Virginia 20197.  My birth date is 7/4/60.
14  Q.  Do you live off a particular street or road in
15 Waterford, Virginia?
16  A.  Actually, I have an apartment in Martinsburg,
17 Virginia, and my mail goes to the Waterford address.
18 It's a temporary address until I buy a house.  So it's
19 a -- the apartment I have is a temporary address.
20  Q.  Okay.  In July of 2002 where did you reside?
21  A.  I just transferred from San Antonio, Texas to
22 Martinsburg with the same company, and I was staying with
23 a friend of mine until I found a permanent address.
24  Q.  Who were you staying with in July of 2002?

Page 4

1   A.  A relative, Tony Rollison.
2   Q.  What was Mr. Tony Rollison's address?
3   A.  I'm not sure of the address.  It was Charles
4  Town, West Virginia.
5        MR. AKIN:  Ms. Ruggiero, did you mean to
6  be asking about July of '04?
7        MS. FALLON:  I'm sorry.  July of '04.
8  That's correct.
9  BY MS. FALLON:
10  Q.  I asked you about July of '02.  Let's go back
11 to July of '04.  Where were you residing at that time?
12  A.  That's the answer I gave you -- '04.
13  Q.  With Tony Rollison in Charles Town --
14  A.  Charles Town.
15  Q.  -- West Virginia?
16        You don't know the street address; is
17 that correct?
18  A.  No, I don't.
19  Q.  How long did you reside with Tony Rollison in
20 July of 2004?
21  A.  Approximately 90 days.  Something like that.
22  Q.  Where did you move from there?
23  A.  To where my residence is now in Martinsburg,
24 West Virginia.

Page 5

1   Q.  You told me that that was a temporary
2  residence.  It's been temporary since 2004?
3   A.  Yes.
4   Q.  What is the full address of that temporary
5  residence?
6   A.  It's 95 Burgess Way, Spring Mills,
7  Apartment 8.
8   Q.  What is the ZIP code?
9   A.  25401.
10  Q.  Now, when you go home after today, is that the
11 residence that you'll be going home to?
12  A.  Yes.
13  Q.  How did you get here today?  Did you drive?
14  A.  I drove yesterday.  I spent the night in town.
15  Q.  Now, your post office box where your mail is
16 sent is in Virginia, not West Virginia.  Correct?
17  A.  Correct.
18  Q.  How is it that you obtain your mail if your
19 primary residence, albeit temporary, is in West Virginia?
20  A.  I grew up and resided in Virginia --
21 Waterford -- for many years.  I just kept that address as
22 a temporary address until I had a more stable address --
23 residence.
24  Q.  How far is that from Martinsburg -- Waterford?

B-4

Delbert E. Rollison

3 (Pages 6 to 9)

---

Page 6

1    A. It's 40 miles.
2    Q. Are you presently looking for a permanent
3 residence?
4    A. I was until the market -- the real estate has
5 really skyrocketed. It's starting to come down, so it's
6 looking more attractive now. And my move from
7 San Antonio to Martinsburg was -- it could be just a
8 temporary situation. So I didn't really want to jump
9 into something. I might be returning to San Antonio.
10    Q. Where did you live when you resided in
11 San Antonio?
12    A. I don't have the address, but it's in the town
13 of San Antonio.
14    Q. How long did you reside in San Antonio? From
15 what year to what year?
16    A. 2000 to just prior to the accident.
17    Q. Where did you live before that?
18    A. Lake Charles, Louisiana.
19    Q. Did you own a residence or rent a residence?
20    A. Rent.
21    Q. Do you remember the address?
22    A. No, I don't.
23    Q. How long did you live in Lake Charles,
24 Louisiana?

---

Page 7

1    A. Four and a half years.
2    Q. What's your marital status presently?
3    A. Single.
4    Q. What was your marital status in July of 2004?
5    A. Single.
6    Q. Have you ever been married?
7    A. Yes.
8    Q. Over what period of time were you married?
9 What year to what year?
10    A. I'm not sure of the dates. But 1994 to '96.
11 Something like that.
12    Q. Do you have any children?
13    A. No.
14    Q. Have you ever served in the military?
15    A. No.
16    Q. Can you give me some information concerning
17 your educational background beginning with where you
18 attended high school?
19    A. I went to Loudoun Valley High School.
20    Q. Where is that located?
21    A. It's in Percyville, Virginia.
22    Q. What year did you graduate?
23    A. 1979.
24    Q. Did you go on for any higher education beyond

---

Page 8

1 high school?
2    A. I went to Rice Aviation, which is a technical
3 school.
4    Q. Where was that located?
5    A. In Chesapeake, Virginia.
6    Q. What period did you attend Rice Aviation?
7    A. '91 through the beginning of '93, I believe.
8    Q. Did you receive any kind of degrees or a
9 certification from that institution?
10    A. Yes.
11    Q. What did you receive?
12    A. Airframe and power plant certification. In
13 short they call it A&P.
14    Q. Have you had any other training, certification
15 or education beyond Rice Aviation?
16    A. Not really formally. I've been through a lot
17 of different training with my company I work for.
18    Q. By whom are you employed currently?
19    A. Sino Swearingen Aircraft Corporation.
20    Q. What is your current position?
21    A. I'm an instructor/coordinator.
22    Q. What do you do?
23    A. I instruct new hires on the techniques we use
24 to build aircraft, and I do some refresher training for

---

Page 9

1 our employees -- on-the-job training.
2    Q. Do you have a pilot's license?
3    A. Yes.
4    Q. When did you obtain your pilot's license?
5    A. 1986.
6    Q. Is it current? In good standing?
7    A. Yes.
8    Q. Do you own any aircraft?
9    A. No.
10    Q. Where did you work in July of 2004?
11    A. At Sino Swearingen.
12    Q. What was your position back then?
13    A. I was a process planner.
14    Q. What does a process planner do?
15    A. They type up the verbal letters to the
16 mechanics to follow step by step on how to build an
17 aircraft.
18    Q. How long had you held that position as of the
19 time of the accident?
20    A. One year.
21    Q. What had you done prior to that?
22    A. I was a supervisor on a maintenance floor
23 supervising mechanics.
24    Q. How long did you hold that position?

---

B-5

Delbert E. Rollison

4 (Pages 10 to 13)

Page 10

1   A.   Five years.
2   Q.   Overall, what is your total time with this
3   employer? How much time have you been employed by this
4   company in different positions?
5   A.   Close to seven years, I believe.
6   Q.   Where did you work prior to that time?
7   A.   Northrop-Grumman.
8   Q.   I'm sorry. Say it again.
9   A.   Northrop-Grumman Aircraft Corporation.
10   Q.   What did you do for that company?
11   A.   I started out as an aircraft mechanic and then
12   progressed to an area lead.
13   Q.   Over what period did you work for
14   Northrop-Grumman?
15   A.   1995 to nineteen -- the end of 1999.
16   Q.   What is the address of your current employer?
17   A.   In Martinsburg?
18   Q.   Yes.
19   A.   731 Novec Drive.
20   Q.   Same ZIP code as your --
21   A.   Yes.
22   Q.   -- residence?
23       Who is your immediate supervisor there?
24   A.   Then? At the time of the accident?

Page 11

1   Q.   Presently. And then I'll ask you at the time
2   of the accident. But presently, who is your immediate
3   supervisor?
4   A.   Deb Sibler.
5   Q.   Can you spell the last name?
6   A.   S-i-b-l-e-r.
7   Q.   Deb -- I take it she's a female.
8   A.   Yes.
9   Q.   Who was your immediate supervisor at the time
10   of the accident?
11   A.   Don Block.
12   Q.   At the same location?
13   A.   Yes.
14   Q.   On 731 Novec Drive?
15   A.   (The witness indicated.)
16   Q.   Yes?
17   A.   Yes.
18   Q.   Your current position as an instructor/
19   coordinator, is that a position above the process planner
20   position you held at the time of the incident?
21   A.   I wouldn't call it a promotion.
22   Q.   Is the pay rate different?
23   A.   Yes.
24   Q.   Is it more or less than what you earned in

Page 12

1   July of 2004?
2   A.   It's more.
3   Q.   Are you currently employed full-time?
4   A.   Yes.
5   Q.   Were you employed full-time at the time of the
6   incident in July of 2004?
7   A.   Yes.
8   Q.   Can you generally describe your health prior
9   to the incident at Blue Diamond Park in July of 2004?
10   A.   Very good health. I have a cholesterol
11   problem. It's not that drastic. But I have no illnesses
12   or diseases or allergies.
13   Q.   Were you required to go for annual physicals
14   or physicals on some other regular basis in connection
15   with your employment?
16   A.   Yes.
17   Q.   How frequent did you go for physical exams?
18   A.   Once a year.
19   Q.   Who would perform the physical exams?
20   A.   It's a clinic in Martinsburg that was hired by
21   our corporation.
22   Q.   What is the name of that clinic?
23   A.   I'm not sure.
24   Q.   What is the name of the physician or other

Page 13

1   health care provider who would perform the examination at
2   the clinic?
3   A.   I'm not sure.
4   Q.   When was the last time you had such an
5   examination in connection with your employment?
6   A.   2002.
7   Q.   Okay. I thought you said you went annually.
8   A.   It's just -- I'm not sure. I'm trying to give
9   you the best answer I can. It's -- 2002 is the last I
10   remember. But I don't recall going back after that.
11   Q.   Well, what about in connection with keeping
12   your pilot's license in good standing? Do you have to go
13   for physicals on a regular basis?
14   A.   Yes, I do.
15   Q.   How frequently?
16   A.   Every two years.
17   Q.   When was the last time you had a physical in
18   connection with maintenance of your pilot's license?
19   A.   2003, I believe.
20   Q.   Okay. Where was that performed?
21   A.   Leesburg, Virginia.
22   Q.   By whom?
23   A.   Dr. Hoocker.
24   Q.   Can you spell that?

B-6

Delbert E.  Rollison

5 (Pages 14 to 17)

## Page 14

1    A.  No, I can't.

2    Q.  Was Dr. Hoocker your primary care physician in

3  2003?

4    A.  No.

5    Q.  Is it a male or a female?

6    A.  Male.

7    Q.  Do you know the first name of Dr. Hoocker?

8    A.  No.

9    Q.  Did you see Dr. Hoocker on more than one

10  occasion?

11    A.  No.

12    Q.  You told me you had to get physicals every two

13  years for your pilot's license.  So if your last one was

14  in 2003, I'm presuming, based on your answer, that you

15  would have been due in 2005 for a physical.  Did you have

16  a physical in 2005?

17    A.  No, I did not.

18    Q.  Then how do you keep your license in good

19  standing if you haven't been examined?

20    A.  Your license and your medical are two

21  different certifications.

22    Q.  Who issued your license?

23    A.  My examiner.

24    Q.  What type of license?  What facility did it

## Page 15

1  come from?  Do you have it with you, by any chance, so I

2  can make a photocopy of it?

3    A.  No, I don't.

4    Q.  Who is it from?  Is it an FAA license?  What

5  type of license is it?  What organization licenses you as

6  a pilot?

7    A.  FAA.

8    Q.  Is there a particular facility or location

9  that you go to when you want to renew your license or

10  keep it in good standing or whatever?

11    A.  It doesn't require you to renew your pilot's

12  license.  You just need to renew your medical.

13    Q.  How do you do that?  Is it through the mail?

14  Do you report to a facility?  How do you do that?

15    A.  You go to a doctor that is recognized by the

16  FAA.  They have a generic physical they give you.

17    Q.  And the last time you did this was with a

18  Dr. Hoocker in Leesburg, Virginia.  Is that correct?

19    A.  Yes.

20    Q.  When was the last time you piloted an

21  aircraft?

22    A.  As pilot in command?  2002.

23    Q.  Who has been your family physician or primary

24  care physician in the past ten years?  And if there have

## Page 16

1  been more than one, let's go through them and the periods

2  of time you've treated with them.

3    A.  I've never really had a family physician.  I

4  had a doctor, Dr. Hoocker, which was my family doctor I

5  went to until I was in my early 20s.  But since then I've

6  never really had a family doctor that I went to

7  routinely.

8    Q.  Is Dr. Hoocker still in practice as far as you

9  know?

10    A.  The doctor retired, but I think his son, which

11  has the same name, has taken over his practice.

12    Q.  And you saw the son of the doctor who has been

13  your primary care practitioner in 2003?  Is he the one

14  who did your medical for the pilot's license?

15    A.  No.

16    Q.  Who did it?  The original Dr. Hoocker?  The

17  senior?

18    A.  Senior.

19    Q.  Okay.  Let's start with the current year.

20       You currently don't have a primary care

21  physician; is that correct?

22    A.  I do now.

23    Q.  Okay.  Who is your primary care physician now?

24    A.  Jessica Byrd.

## Page 17

1    Q.  Can you spell the last name, please?

2    A.  B-y-r-d.

3    Q.  Where does Dr. Byrd practice?  Her address?

4    A.  Winchester, Virginia.

5    Q.  Do you know the street or road upon which her

6  office practice is located?

7    A.  It's called Apple Valley Family Practices.

8  It's a...

9    Q.  But you can't tell me the street other than

10  it's in Winchester, Virginia?

11    A.  No, I can't.

12    Q.  How long has Dr. Byrd been your primary care

13  physician?  Since what year?

14    A.  One year.

15    Q.  Who --

16    A.  I take that back.  It's almost two years now.

17    Q.  Okay.  Did you become a patient of Dr. Byrd

18  after this incident at Blue Diamond?

19    A.  Yes.

20    Q.  Prior to that who did you see when you needed

21  to be examined for colds or any type of condition?

22    A.  I never really required a doctor.  I have

23  always been really healthy.  I don't have any allergies.

24  I had no real reason to go to a family doctor.

B-7

Delbert E. Rollison

6 (Pages 18 to 21)

## Page 18

1    Q.  When was your high cholesterol diagnosed?
2    A.  After the accident I went to the doctor.
3    Q.  It's my understanding you had previous
4  problems concerning your low back.  Is that correct?
5    A.  Yes.
6    Q.  When did your low back problems start?
7    A.  In my mid 20s.
8    Q.  Was there a particular incident, accident or
9  event that precipitated them?
10    A.  From what I remember, I was trimming my
11  parents' hedges.  And just a sharp pain in my back, which
12  ever since then was kind of like a once-a-year-type
13  thing.  I had to -- it just kind of comes and goes.  It
14  wasn't a real big deal.
15    Q.  What did you do for it when you began to get
16  the pain that you said comes and goes?  What type of
17  treatment would you get?
18    A.  I basically just -- in bed for a day or two
19  with my legs elevated.
20    Q.  You wouldn't treat with a health care
21  provider?
22    A.  Not until later on.
23    Q.  When did you first treat with a health care
24  provider for your low back?

## Page 19

1    A.  19 -- it was early '80s.  '82-83.
2    Q.  Who did you treat with?
3    A.  I believe the doctor's name was Abdul.
4    Q.  Is that a first or last name?
5    A.  That's a last name.
6    Q.  Where was Dr. Abdul's practice located?
7    A.  It's in Hagerstown, Maryland.
8    Q.  What prompted you to see Dr. Abdul?  Was there
9  a work-related incident?  An accident?  What happened?
10    A.  At the time I was in construction running
11  heavy equipment, and the jarring of the equipment
12  aggravated my back to the point where I never had that
13  much pain before.
14    Q.  Where was your pain?
15    A.  It was in a lower disc.
16    Q.  Was it on one side more that the other?
17    A.  I don't recall.
18    Q.  Did it radiate into either of your legs?
19    A.  No.
20    Q.  Did you make a worker's compensation claim for
21  that injury?
22    A.  Yeah.
23    Q.  I'm sorry?
24    A.  Yes.

## Page 20

1    Q.  That claim was presented in the State of
2  Maryland?
3    A.  Virginia.
4    Q.  Okay.  Were you represented by counsel with
5  regard to that comp claim?
6    A.  No.
7    Q.  What was the name of your employer at the time
8  you made the worker's comp claim?
9    A.  A.L. Nance.
10    Q.  What type of a company was it?
11    A.  A small excavating company.
12    Q.  How long had you been employed by that
13  company?
14    A.  I don't remember exactly how long it was.
15    Q.  What type of treatment did Dr. Abdul provide?
16    A.  I'm not sure of the technical words, but he
17  did some trimming on the vertebrae to relieve some of the
18  pressure from off of one of the discs in layman's terms.
19    Q.  Okay.  You had surgery on your back?
20    A.  Yes.
21    Q.  When was the date of your surgery?
22    A.  It was 1983, '82.  I'm not sure exactly.  In
23  that area.
24    Q.  Okay.  Did you ever return to employment for

## Page 21

1  A.L. Nance after your lower back injury with the heavy
2  equipment use?
3    A.  Yes.
4    Q.  Until what period of time did you work for
5  them?  When did you last work for them?  Do you remember
6  the year?
7    A.  I don't remember.
8    Q.  What relief, if any, did you get from the
9  surgery performed by Dr. Abdul?
10    A.  None.
11    Q.  Do you still continue to have low back pain to
12  this day?
13    A.  It comes and goes.  Once a year I have a small
14  episode with it.  It puts me down for a week or two.  A
15  week, not two.  A week.  And usually in a couple days I'm
16  pretty much back to normal.
17    Q.  Are you currently under the care of any health
18  care provider for low back complaints?
19    A.  No.
20    Q.  Were you under the care of any health care
21  provider for low back complaints in July of 2004?
22    A.  No.
23    Q.  Were you having the same experience, that is,
24  low back pain coming and going, in or around July of 2004

Corbett & Wilcox

B-8

Delbert E.  Rollison

Page 22

1  before this accident happened?
2     A.  No.
3     Q.  When was the last time you had any low back
4  pain prior to the July 2004 incident?
5     A.  I can't give you an honest answer.  I don't
6  remember.
7     Q.  Was it activity-related?  If you would, for
8  example, exert yourself with strenuous activity, would
9  you feel it in your back prior to July of 2004?
10    A.  It could be something as simple as washing
11 dishes or brushing my teeth or picking up 300 pounds.
12 One or the other could do it.
13    Q.  Other than your lower back, have you ever had
14 any types of complaints whatsoever in any other parts of
15 your body prior to the incident in July of 2004?
16    A.  I broke my arm twice when I was a kid riding a
17 bicycle.
18    Q.  Which arm was broken?
19    A.  The right arm.
20    Q.  How old were you each time?
21    A.  Twelve, thirteen, possibly.
22    Q.  Have you ever had any other types of worker's
23 comp claims other than the one you discussed in 1982 or
24 1983 at any time up until the present?

Page 23

1     A.  Not that I can recall.
2     Q.  Have you ever been involved in any motor
3  vehicle accidents at any time prior to July of 2004?
4     A.  I don't understand the -- from --
5     Q.  Were you involved in any car accidents before
6  July of 2004?
7     A.  Yes.
8     Q.  Okay.  Why don't you tell me about them?  How
9  many?
10    A.  One.
11    Q.  When did it happen?
12    A.  1978.
13    Q.  Were you a driver?  A passenger?  A
14 pedestrian?
15    A.  A passenger.
16    Q.  Where did it happen?
17    A.  Near Percyville, Virginia.
18    Q.  Did you sustain any kind of personal injuries
19 in the accident?
20    A.  No.
21    Q.  Did you make any type of claim for personal
22 injuries as a result of the accident?
23    A.  No.
24    Q.  From 1978 to 2004, were you involved in any

Page 24

1  motor vehicle accidents?  Car accidents?
2     A.  No.
3     Q.  Were you involved in any worker's compensation
4  claims other than the one you told us about that occurred
5  in 1982 or 1983 involving the low back?
6     A.  No.
7     Q.  Were you involved in any kind of accidents
8  whatsoever -- slip and falls, falling down, falling off
9  ladders, falling off a roof, any mishaps at home -- any
10 accident of any nature whatsoever prior to July of 2004?
11    A.  No.
12    Q.  Since July of 2004, have you had any kind of
13 accidents whatsoever?
14    A.  No.
15    Q.  Prior to July of 2004, had you ever visited
16 the Blue Diamond racetrack?
17    A.  No.
18    Q.  What brought you there on July 3rd of 2004?
19    A.  My brother was a participant in the activities
20 there, and he invited me to go with him.
21    Q.  Your brother is Randy Rollison?
22    A.  Correct.
23    Q.  Randy with a Y?
24    A.  Right.

Page 25

1     Q.  What is his address presently?
2     A.  I'm not sure of his address.  It's Bluemont,
3  Virginia.  I'm not sure of his street address.
4     Q.  Do you have a telephone number for him?
5     A.  (540) 554-2629.
6     Q.  Now, what specifically did your brother Randy
7  Rollison invite you to do on July 3rd, 2004?
8     A.  To join him in the race that he was
9  participating in.
10    Q.  What type of race was that?
11    A.  I call it mud drag racing.  I'm not sure if
12 that's the technical word for it, but...
13    Q.  Is your brother older or younger than you?
14    A.  Younger.
15    Q.  What's his age?
16    A.  He is now 44.
17    Q.  Okay.  Had you ever participated with him in
18 other mud drag racing events?
19    A.  No.
20    Q.  Did you yourself personally engage in mud drag
21 racing as a hobby or entertainment?
22    A.  No.
23    Q.  What caused you to participate on this
24 particular occasion?

B-9

Delbert E.  Rollison

8  (Pages 26 to 29)

Page 26

1      A.  I just transferred from San Antonio to pretty
2   much home, which is Virginia, and he was excited about me
3   coming up and going to watch him race.  I had never seen
4   it before, so...
5          MS. FALLON:  Let's go off the record for
6   one minute.
7          (A brief recess was taken.)
8          - - - - -
9          DELBERT EUGENE ROLLISON, resumes
10  BY MS. FALLON:
11     Q.  To your knowledge, if you know, Mr. Rollison,
12  how long has your brother Randy Rollison been involved in
13  mud drag racing?
14     A.  Two to three years.
15     Q.  Prior to July 3 of 2004, you had never gone to
16  any of these events either on your own or with your
17  brother; is that accurate?
18     A.  The event entitles monster trucks, mud drag
19  racing, some other activities of -- I've never seen
20  before.  So mud drag racing is just one of --
21     Q.  Okay.
22     A.  -- the participating activities in the event
23  for that evening.
24     Q.  Prior to July 3 of 2004, had you ever

Page 27

1   personally participated as a spectator or a participant
2   in a mud drag racing event solely?
3      A.  No.
4      Q.  Prior to July 3 of 2004, had you ever
5   attended, either as a spectator or as a participant, a
6   mud drag racing only event with your brother?
7      A.  No.
8      Q.  So this was your first time to see a race like
9   this involving mud drag racers.  Is that accurate?
10     A.  And last.
11     Q.  Okay.  I can appreciate that.
12         Did you go with anyone other than your
13  brother?  Was there like an entourage or a contingent
14  with you?
15     A.  Yes.
16         MS. FALLON:  We'll go off the record.
17         (A brief discussion was held off the
18  record.)
19  BY MS. FALLON:
20     Q.  Who was with you on July 3 of 2004?
21     A.  My brother Randy Rollison, Wayne Tapscott.
22     Q.  Go ahead.
23     A.  The other names I'm not familiar with.
24  They're not friends of mine.  They're friends of my

Page 28

1   brother's.
2      Q.  Okay.  Would that be Stephen Littleton?
3      A.  Yes.
4      Q.  And Mark McCaughey?
5      A.  Yes.
6      Q.  Was there anyone else that was with you?
7      A.  I believe that's it.
8      Q.  When had you arrived in Delaware for the mud
9   racing?
10     A.  Approximately between ten- and eleven o'clock
11  a.m.
12     Q.  Okay.  So this wasn't a situation where you
13  had stayed overnight at your brother's house and then
14  gone with him to the event.  Is that right?
15     A.  Correct.
16     Q.  So you had driven from your residence, your
17  apartment, in Martinsburg, West Virginia on the day of
18  the event, July 3?
19     A.  I left my relative's house where I was
20  staying.
21     Q.  Okay.  Who were you staying with?
22     A.  Tony Rollison.
23     Q.  Okay.
24     A.  I drove from his house to my brother's

Page 29

1   house --
2      Q.  All right.
3      A.  -- Randy's house.
4      Q.  How did you get to Blue Diamond Park?
5      A.  My vehicle.
6      Q.  Did you follow anyone or did you have a set of
7   directions to get there?  How did you get there?
8      A.  We followed Wayne Tapscott.
9      Q.  Had you known Mr. Tapscott before July 3 of
10  2004?
11     A.  Just in passing.
12     Q.  How about Mr. Mark McCaughey?  Had you known
13  him before July of 2004?
14     A.  The same with all of them.
15     Q.  Stephen Littleton as well?
16     A.  Right.
17     Q.  When you arrived at Blue Diamond Park, was
18  there a general parking lot where you could park your
19  vehicle?
20     A.  We parked in the area where it was -- the drag
21  races -- vehicles were parked.  It wasn't a general
22  parking area.  It was an area, I guess, reserved for the
23  people that were participating in the race.
24     Q.  Okay.  So you were allowed to park there even

B-10

Delbert E.  Rollison

Page 30

1  though you were not a participant?
2      A.  Correct.  My vehicle was pulling my brother's
3  trailer which had the mud dragster on it.
4      Q.  What type of trailer were you pulling with
5  your vehicle?
6      A.  Just an 18-foot car carrier.  It was open.
7      Q.  What type of vehicle were you driving?
8      A.  My personal Dodge pickup.
9      Q.  And the mud racer was carried in the trailer?
10      A.  Correct.
11      Q.  When you got there and parked, did you take
12  the mud racer off the trailer?  Did you assist your
13  brother in doing that?
14      A.  We did unload it.
15      Q.  Okay.  How soon before the race did you get
16  there, the intended race, that is?
17      A.  About six, seven hours.
18      Q.  Okay.  What did you do when you got there?
19  For instance, did you go looking at any other of the
20  entertainment that was going on there or did you
21  basically stay with your brother and get preparations
22  ready for the race with the mud racer?
23      A.  I helped prepare the vehicle.  A lot of the
24  people that were participating were walking by talking to

Page 31

1  my brother, and they were just talking racing.  And I was
2  pretty much stuck there to the time that the race
3  started.  I didn't leave the area.
4      Q.  Okay.  Was the vehicle itself, the mud racer,
5  removed from the trailer area where it was parked at any
6  time until just prior that the race was set to begin?
7      A.  No.
8      Q.  You did not go into any of the other areas of
9  Blue Diamond Park?  You stayed with your vehicle and with
10  the mud racer near the trailer?
11      A.  That's correct.
12      Q.  What did you do during that time period?  Was
13  it like a tailgate?  Did you have anything to eat?
14      A.  We had refreshments, coolers and lunches
15  with -- that we had packed.
16      Q.  Did you have any alcoholic beverages during
17  that time?
18      A.  No.
19      Q.  Were you taking any prescription medication?
20      A.  No.
21      Q.  As the time approached for the race to begin,
22  what did you do?
23      A.  There was nothing really to do.  Just stand
24  there waiting for them to call the vehicles to be taken

Page 32

1  to the staging area, I think is the proper verbiage of
2  that area.
3      Q.  Was there an area for spectators to stand or
4  sit in that was either gated off or fenced off from the
5  area where the cars would be racing?
6      A.  Yes.
7      Q.  Was it your intention to go into that area
8  which was designated for spectators or was it your
9  intention to be, for lack of a better term, part of the
10  pit crew for your brother and his vehicle at the time of
11  the race?
12      A.  My intentions were to stay with my brother.
13      Q.  Okay.  Were you going to assist him in any way
14  for the race?
15      A.  Kind of the -- the term is, I guess, to stage
16  somebody -- to have them pull up to the starting line, to
17  kind of motion to how far they could come to the starting
18  line without going over it, assisting him putting the
19  seatbelts on.  You know, things like that.
20      Q.  Okay.  But you had never done that sort of
21  thing before; correct?
22      A.  I have before, yes --
23      Q.  Okay.
24      A.  -- with drag racing cars.

Page 33

1      Q.  On how many occasions have you participated in
2  car drag races before this incident in July of 2004?
3      A.  Five or six times.
4      Q.  Have you raced cars yourself?
5      A.  No.
6      Q.  To the extent you've been a participant in
7  five to six drag races, what was the extent of your
8  participation?
9      A.  Helping unload the car, loading the car,
10  preparing the car for the race, minor adjustments.
11      Q.  What type of cars?
12      A.  It's called a bracket race.  It's not a street
13  legal car.  It's a modified --
14      MR. AKIN:  I'm sorry.  What was the word
15  you used, sir?
16      THE WITNESS:  It's a not street legal.
17  It was a modified car.
18      MR. AKIN:  Before that.  The kind of
19  race.
20      THE WITNESS:  Drag racing.
21      MR. AKIN:  Oh.
22      THE WITNESS:  It's on asphalt.
23      MR. SHALK:  I thought you used the word
24  "bracket."

B-11

Delbert E.  Rollison

10 (Pages 34 to 37)

Page 34

1          MS. FALLON: Yeah. I thought you
2 used --
3          THE WITNESS: It's bracket racing.
4 It's --
5          MR. AKIN: That's the word.
6          THE WITNESS: It's a term they use for a
7 fast car that's going to run with a slow car. It's all
8 gauged by how the light is coming on, depending on your
9 speeds. So the fast car would take off way behind the
10 slower car.
11 BY MS. FALLON:
12     Q.  Did you have a relative or a friend that had
13 this as a recreational hobby?
14     A.  It was a relative.
15     Q.  Who was it?
16     A.  Mike Rollison.
17     Q.  Is he another brother?
18     A.  He's a cousin.
19     Q.  At what locations did you go with Mike
20 Rollison for these types of drag racing events?
21     A.  75 and 80 Drag Way.
22     Q.  Where was that?
23     A.  It's in Hagerstown. Either Hagerstown or
24 Boonsboro. It's in between the two.

Page 35

1     Q.  In Maryland?
2     A.  Yes, ma'am.
3     Q.  Were all five to six times that you
4 participated at that location?
5     A.  Yes.
6     Q.  When you arrived at Blue Diamond in your
7 vehicle trailing the mud racer, was there any type of an
8 entrance fee that you had to pay to get into the
9 facility?
10     A.  As I recall, my brother paid the fee. I'm not
11 sure if it's a personal entry fee or an entry fee to
12 bring the vehicle in to race the vehicle -- if it's a
13 charge over and beyond what a person would pay for
14 just --
15     Q.  For admission.
16     A.  -- himself to get in.
17          Right.
18     Q.  You did not personally pay any admission fee
19 to get in; is that correct?
20     A.  To the best of my knowledge, he paid my way
21 in.
22     Q.  Did he pay at the door before you entered?
23     A.  I'm not sure.
24     Q.  Did he pay the fee on the day of the event?

Page 36

1     A.  Yes.
2     Q.  Were you with him when he paid the fee?
3     A.  I can't remember exactly. I'm thinking it
4 was -- we were in the parking area. We had already
5 parked the vehicle. I think somebody came along and took
6 our -- his money. I'm not a hundred percent, but I think
7 that's what happened.
8     Q.  Did you have to sign any documents or fill out
9 any paperwork in order for you to be present and
10 participate with him in the mud drag race?
11     A.  In the later evening of that same day, a lady
12 did come by and ask us to sign a waiver.
13     Q.  Prior to the mud race starting. Is that
14 correct?
15     A.  Just before it started.
16     Q.  Okay. Who came around? Do you remember the
17 name of the person or what organization that person said
18 they were with?
19     A.  To the best of my knowledge, it was a lady. I
20 believe her name was Ann. And I believe she was the wife
21 of one of the drag racers. I believe.
22     Q.  What form did Ann present to you? You've
23 referred to it as a waiver. Can you be more specific as
24 to what it was? How many pages? What you signed? Did

Page 37

1 you keep a copy?
2     A.  I couldn't describe it. It was just a legal
3 form. And it was passed around from person to person.
4 And I was, I think, the last one to sign it.
5     Q.  What did you do with it after you signed it?
6     A.  I don't know if I gave it back to her or gave
7 it to one of the guys. I'm not sure.
8     Q.  Did you read it before you signed it?
9     A.  No, I did not.
10     Q.  Well, how did you know what you were signing?
11     A.  The top of it was titled with a legal form. I
12 was sure it was just a waiver that you would sign if you
13 went to any type of a sporting event or something like
14 that.
15     Q.  Had you been --
16     A.  It's pretty generic.
17     Q.  Had you been presented with a similar type of
18 waiver form at other events that you had participated in,
19 for instance, these other five to six drag races with
20 Mike Rollison?
21     A.  No.
22     Q.  Was this the first time you were ever
23 presented with a waiver form to sign?
24     A.  In a sporting vehicle-type issue, yes, first

B-12

Delbert E.  Rollison

Page 38

1  time.
2    Q.  How about in other types of recreational
3  activities that you participated in?  Did you ever have
4  to sign a waiver to participate in a particular type of
5  recreation or hobby?
6    A.  I rode an elephant in a parade one time.  I
7  had to sign a waiver.
8    Q.  Maybe some of the other attorneys will have
9  more about that.  I'm thinking I'm not going to
10 go there.
11        The document that you signed -- you did
12 not retain a copy.  Is that correct?
13   A.  I was not offered one.
14   Q.  Okay.  Were you given any type of wristband or
15 pass or badge to wear or carry with you to identify you
16 and distinguish you as a participant versus just a
17 spectator on site for the event?
18   A.  I might have, but I don't remember recalling
19 one.  I might have but I don't recall one.
20   Q.  At any time while you were present on Blue
21 Diamond's facility, either before or after this incident
22 that we're getting to talk about, did you ever see any
23 kind of signs or posters or handouts of any nature with
24 warnings or directions or instructions to participants in

Page 39

1  the events there at the facility?
2    A.  Yes.
3    Q.  What did you see and where was it located?
4    A.  I'm not sure how I obtained it, but it was
5  rules refraining from speeding of the vehicles in the
6  parking lots.  No alcohol consumption while operating the
7  vehicles.  You had to be a licensed driver to operate the
8  vehicles.  There was a couple other things.  I don't know
9  if I was given one or it was handed out to us.  I don't
10 remember.  I remember it was a white sheet with a logo on
11 the front with four, five, six --
12   Q.  Okay.
13   A.  -- some of the ground rules, I think.
14   Q.  So it was in the nature of a handout rather
15 than something being poster-sized or otherwise
16 permanently affixed to like a wall of the facility.  Is
17 that correct?
18   A.  Correct.
19   Q.  You said there was a logo on it.  Do you
20 remember whose logo was on the document?
21   A.  No, I don't.
22   Q.  Did you retain possession of that document and
23 hand it over to your attorney or anyone?
24   A.  I don't remember if I gave it to him or not.

Page 40

1  I'm not sure.
2    Q.  Do you think you still have it?
3    A.  It could be possible, yes.
4    Q.  Would you look for it?  If you have it, just
5  give it to Mr. Fogg so he can produce it to the rest of
6  us.
7    A.  Yes.
8        MR. FOGG:  I can represent that I do not
9  have it at this point.
10 BY MS. FALLON:
11   Q.  Do you remember how many pages it was?
12   A.  Just one.
13   Q.  You didn't have to sign it.  It was just given
14 to you for your information.  Is that correct?
15   A.  I think it could have been handed out as you
16 come in the gate.  I'm not sure.  Somebody could have
17 passed them around.  I'm not sure.
18   Q.  Okay.  Was there any inspection that the
19 vehicle had to go through before you entered the staging
20 area?
21   A.  I believe there is, but I'm not -- I don't
22 remember them inspecting it.
23   Q.  What makes you think that there was some type
24 of an inspection, and who do you think conducted it?

Page 41

1    A.  I remember people talking about inspection,
2  but I don't know if it was done in the parking lot or if
3  it was done at the staging area prior to the lineup for
4  the race.
5    Q.  Okay.  While you were waiting for the race to
6  start, were there any representatives that you recall
7  meeting from the facility -- Blue Diamond Park?
8    A.  No.
9    Q.  Before the incident occurred, were you ever
10 introduced or did you meet an individual by the name of
11 Jack Brady?
12   A.  I heard his name mentioned in some
13 conversations in the parking lot.
14   Q.  But you never met him personally or talked to
15 him; is that correct?
16   A.  Not that I know of.
17   Q.  I take it you didn't know my client, Neal
18 Shoemaker, prior to the race.  Or is that an incorrect
19 assumption on my part?
20   A.  I never met the gentleman till that day.
21   Q.  Had you seen him in or around the parking area
22 while you were spending time waiting for the race to
23 begin, if you recall?
24   A.  I'm sure I did, but I don't remember exactly

B-13

Delbert E.  Rollison

12  (Pages 42 to 45)

## Page 42

1  introducing myself to him or talking to him.  I just -- I
2  might have seen him walking by or something like that.
3      Q.   Okay.  How were the participants in the race
4  alerted that it was time to get their vehicles moving
5  towards the staging area?
6      A.   I believe the lady that was kind of
7  coordinating the drag race participants in the -- she's
8  the one who came and told us to prepare and get ready to
9  go to the staging area.
10     Q.   Was this the same person that sent around the
11 waiver form for everyone to sign?  The woman you referred
12 to as Ann?
13     A.   Yes.
14     Q.   So the same woman came by and started
15 informing everyone that they should be getting ready to
16 go to the staging area.  Is that correct?
17     A.   Yes.
18     Q.   Are you able to draw a diagram that shows your
19 path from the trailer area where you were waiting for the
20 race to begin up to the point where the incident
21 occurred?
22     A.   Yes.
23     Q.   Okay.  I'm going to give you some paper.
24         MS. FALLON:  Off the record.

## Page 43

1          (A brief discussion was held off the
2  record.)
3          MS. FALLON:  I've asked the witness to
4  draw a diagram taking us from the parking area for the
5  truck and trailer where you entered up to the point where
6  you were located when the injury you claim occurred.
7          MR. FOGG:  Off the record while he's
8  drawing that.
9          (A brief recess was taken.)
10         -    -    -    -    -
11         DELBERT EUGENE ROLLISON, resumes
12 BY MS. FALLON:
13     Q.   Mr. Rollison, thank you for drawing your
14 diagram.  We're going to have the court reporter mark
15 that as Rollison Exhibit No. 1, and then we'll go on.
16         (Rollison Deposition Exhibit No. 1 was
17 marked for identification.)
18 BY MS. FALLON:
19     Q.   In the rectangle that you've labeled on the
20 right of that diagram "parking lot for racers," I'm
21 presuming that's the area where you parked your truck
22 that was trailing the mud racer.  Is that correct?
23     A.   Correct.
24     Q.   Was that a blacktop area or otherwise paved

## Page 44

1  area, or is that dirt?
2      A.   It was dirt and grass.
3      Q.   Okay.  You've also drawn a line with arrows.
4          Why don't you tell me what that line
5  represents?
6      A.   That's the route that the racers take to the
7  staging area.
8      Q.   Okay.  You've drawn a line that kind of
9  bisects the diagram called "paved road."  Was that the
10 only paved road in this area that you've drawn on your
11 diagram?
12     A.   To my best knowledge, yes.
13     Q.   Okay.  How was it paved?  Was it blacktopped?
14     A.   Blacktopped, yes.
15     Q.   So to get from the parking lot to the staging
16 area and across the paved road, was that path at all
17 paved?
18     A.   No.
19     Q.   Was it a recognizable path in the sense that
20 it had tire markings in it or was dirt with grass on
21 either side so that you can really tell that it was some
22 kind of a trail or path?
23     A.   It was distinguished enough that you could see
24 that it was grass -- partially grass on either side and a

## Page 45

1  little grass path in the middle where the two tires had
2  been traveling.
3      Q.   Okay.  Now, when you exited the parking lot,
4  were you on foot or were you on some type of vehicle?
5      A.   I was walking.
6      Q.   Where was your brother?
7      A.   My brother and the rest of the vehicles were
8  getting hooked up.  I think -- I'm not sure about where I
9  was as far as if I was in the back of the crowd or ahead
10 of the crowd, but I know my brother had already left.
11 Randy had already left before I started walking.  He was
12 ahead of me.
13     Q.   Was your brother in some type of a procession
14 of these vehicles?
15     A.   They weren't back to back going.  They were
16 kind of like spotted -- whenever they got ready, they
17 were headed in that direction.
18     Q.   Was it a single line as opposed to two or
19 three abreast of one another traveling to this staging
20 area?
21     A.   Single line.
22     Q.   Where was your brother in that line?  Was he
23 the first vehicle, if you recall?
24     A.   I don't recall.

B-14

Delbert E. Rollison

## Page 46

1    Q.  Did he actually have his mud racer in
2  operation, or was it being towed or pulled by another
3  vehicle?
4    A.  It was being pulled by another vehicle.
5    Q.  What type of vehicle was pulling it?
6    A.  It was an ATV recreational vehicle.
7    Q.  3-wheel?  4-wheel?
8    A.  4-wheel.
9    Q.  Who was operating the ATV?
10    A.  I believe it was a gentleman by the name of
11  Steve -- Stephen.
12    Q.  Okay.  The Steve Littleton that we've
13  discussed previously?
14    A.  Yes.
15    Q.  Where was Mark McCaughey?  Was he on foot like
16  you?
17    A.  Mark is a close friend of Wayne Tapscott's --
18    Q.  Okay.
19    A.  -- which had his own race vehicle there too.
20    Q.  Okay.
21    A.  So I'm assuming he was near by Wayne --
22    Q.  Okay.
23    A.  -- but not sure.
24    Q.  You did not take Wayne's vehicle on your

## Page 47

1  trailer, though, did you?  Just your brother's?
2    A.  Just my brother's.
3    Q.  Okay.  How did you know where to walk or where
4  to go?  Were you given any instruction?
5    A.  No.
6    Q.  You just followed the crowd?
7    A.  It wasn't the crowd.  It was just a -- you're
8  sitting right in front of it.  All day you could see the
9  people walking in this same area back and forth all day
10  long with different activities going on.  It was kind of
11  obvious where you needed to walk.  You have a small road
12  parallel to a racetrack.  There was a small grassy --
13  partially grass/dirt area between the monster trucks and
14  the path to the staging area.  And that's where people
15  were walking.
16    Q.  All right.  So tell us the path that you took
17  on foot?  Does it follow this line with the arrows that
18  you drew?
19    A.  No, it does not.
20    Q.  All right.  Can you tell us the path that you
21  took on foot?  Show it to us on the diagram.
22    A.  There's a parking lot area here.
23    Q.  Okay.
24    A.  There's a guardrail which runs parallel to the

## Page 48

1  paved area which is like a single road.  It's not very
2  wide.
3    Q.  Could you write "guardrail" on that line
4  you've drawn so we know what that is.
5    A.  And throughout the day people were going from
6  the parking lot walking down this gentle ditched area up
7  to this road and crossing the road and going straight
8  over to this walk area here.
9    Q.  What type of guardrail was it?  Like a metal
10  type of guardrail that you would see on a highway?
11    A.  Yes.
12    Q.  It was low so you could cross over it?
13    A.  Step over it.
14    Q.  Step over it?
15    A.  Mm-hmm.
16    Q.  Were there any other kind of fencing or other
17  barriers in between the parking lot area and the paved
18  road area that you've shown?
19    A.  No.
20    Q.  Were there any kind of fences or barriers
21  between the paved road area that you've shown and the
22  racing area that you've drawn to the right of the
23  diagram?
24    A.  The only fencing that I remember is an orange

## Page 49

1  safety fence that I think went around the grandstands.
2    Q.  Okay.  Where you've marked "grandstand
3  seating."  Correct?
4    A.  Correct.
5    Q.  The trucks that you've marked 4-by-4 trucks,
6  do we also refer to them as monster trucks?  Are you
7  comfortable with that?
8    A.  Correct.
9    Q.  Okay.  All right.  Now, you started to tell us
10  the path that you took from the parking lot just before
11  the incident occurred.  Show us that path.
12    A.  Randy, my brother, and Wayne and the rest of
13  the racing people were being towed, pushed, pulled or
14  drive their vehicles around this road here.
15    Q.  The line that you've shown with arrows?
16    A.  Arrows.
17    Q.  Okay.
18    A.  And the remaining people, myself and a few
19  other spectators or pit crew, what have you, crossed
20  through this gentle ditch area up over the guardrail,
21  crossed over the single lane paved road and up to the --
22  I guess it's a temporary walkway between the -- to the
23  staging area.
24    Q.  Okay.  It wasn't designated as a walkway in

B-15

Page 50

1   the sense that it wasn't paved over.  Correct?
2       A.   Correct.
3       Q.   It was just kind of a mixture of grass and
4   dirt.  Correct?
5       A.   Correct.
6       Q.   As you took that path, was there any activity
7   in the area where you've drawn 4-by-4 trucks?
8       A.   There were trucks sitting there, I guess, as a
9   presentation there for some kind of show they were
10  putting on.  There was a show.  There was no activity as
11  far as I know.  Just people standing around looking at
12  them and things like that.  But there was no racing of
13  them that I know of.
14      Q.   How much of an area of separation was there
15  between the area where the 4-by-4 trucks were situated
16  and the road that the mud racers were on traveling
17  towards the staging area?
18      A.   Sixty feet, I believe.
19      Q.   Okay.  Were --
20      A.   That's a guess.
21      Q.   Were there any signs or markings warning
22  people to stay clear of the monster truck area?
23      A.   There was no caution signs, warning signs at
24  all on the whole property that I remember.

Page 51

1       Q.   Okay.  Going into this on the day of the
2   event, did you and your brother have any discussions
3   about what other events might be going on in addition to
4   the mud racing at Blue Diamond Park?
5       A.   I was aware of the monster trucks being there.
6   I had never seen them before.  And I remember him telling
7   me about the lawn mower races, which I remember laughing
8   at that they would race lawn mowers.  So I remember
9   joking about that.  I remember seeing that.
10      Q.   Before your brother was in the procession or
11  line of racers going towards the staging area, did anyone
12  come around and talk about the timing of these events --
13  what would happen first or anything like that?
14      A.   Officially, no.  But I think somebody found
15  out that our particular race wouldn't happen until early
16  evening, because I remember I was upset with my brother
17  that we got there so early and the race was so late in
18  the evening.  Officially, somebody didn't tell us that
19  I remember.
20      Q.   What was your understanding of when the
21  monster truck event was going to start, if you had one?
22      A.   I wasn't told.
23      Q.   Okay.  All right.  Were there other people
24  around you on foot as you walked from the parking lot

Page 52

1   across the guardrail through the ditch and across the
2   paved road to this staging area?  Were there other people
3   walking along with you?
4       A.   Yes.
5       Q.   You were not in particular walking with any
6   one of your brother's friends.  You were by yourself at
7   that point; is that correct?
8       A.   I had walked with a gentleman.  I don't know
9   him.  I never seen him before.  We just kind of happened
10  to be walking the same direction, the same speed, and we
11  just kind of talked as we walked towards the staging
12  area.
13      Q.   He wasn't with your brother --
14      A.   No.
15      Q.   -- or Mr. Tapscott's racing group -- what I'll
16  call your racing group loosely -- was he?
17      A.   No.
18      Q.   Did you get that gentleman's name?  Or no?
19      A.   No.
20      Q.   How many people would you say were walking in
21  the same path or direction as you prior to the incident?
22      A.   There was quite a few people lined up behind
23  the 4-by-4s -- people -- I guess pit crews working on the
24  trucks.  People had kids down there taking pictures with

Page 53

1   the trucks or standing beside it.  There was a lot of
2   activity along beside the trucks there.
3       Q.   How about coming from the parking lot in the
4   direction you were headed?  How many people from the
5   parking lot were going across this area perhaps to assist
6   with the mud racers or be spectators or whatever?
7       A.   I don't know.
8       Q.   Okay.
9       A.   It wasn't very many.
10      Q.   Okay.  Were you on your cell phone at any time
11  prior to the incident occurring?
12      A.   No, I was not.
13      Q.   Did you have any kind of like iPods or any
14  reason to have any kind of earplugs or headphones in your
15  ear just prior to the incident occurring?
16      A.   No, I did not.
17      Q.   Did your brother give you any instructions
18  about wearing earplugs because of the loudness of the
19  vehicles at this event?
20      A.   No, he did not.
21      Q.   You did not have any on you or in your pocket
22  or anything like that?
23      A.   No.
24      Q.   I notice you're wearing glasses today.

B-16

Page 54

1         Were you wearing glasses at the time?
2     A.  I'm sure I was.  I can't remember for sure I
3 had them on, but I usually wear them all the time.
4     Q.  What type of vision problem do you have that
5 requires you wearing glasses?
6     A.  I really just need them for reading.  But
7 during my day I have to take them on and off because I
8 have to read blueprints and things like that.
9     Q.  Okay.
10     A.  So I pretty much wear them all the time.
11     Q.  Are they prescription?
12     A.  Yes.
13     Q.  Who writes your prescription for your glasses?
14     A.  It's an eye doctor in Martinsburg,
15 West Virginia.  I'm not sure of his name.  It's in the
16 Martinsburg Mall.  An Eye Masters-type thing that we use
17 through our company.
18     Q.  The glasses that you were wearing at the time
19 of the incident, were they sunglasses?
20     A.  No.
21     Q.  Were they the type that you're wearing today?
22     A.  Correct.
23     Q.  Same prescription?
24     A.  Yes.

Page 55

1     Q.  Were you carrying anything?
2     A.  Yes.
3     Q.  What were you carrying?
4     A.  My brother's helmet, which he wears in the
5 race, and a disposable camera.
6     Q.  Okay.  Did you have each of those items
7 separately in each hand, or were you carrying both in one
8 hand?
9     A.  I believe I had the camera in the helmet.  I
10 was carrying it from the strap.
11     Q.  Okay.  In your right hand?
12     A.  I don't remember.
13     Q.  Are you right-handed or left-handed?
14     A.  Right-handed.
15     Q.  What kind of footwear were you wearing?
16     A.  Hiking-type boots.
17     Q.  Were you carrying any kind of beverages?
18 Water or anything like that?
19     A.  No.
20     Q.  Tell us the path that you took after you
21 crossed the paved road.
22     A.  I crossed the paved road.  I walked up towards
23 the -- just temporary road they used to go to the staging
24 area.  I crossed that.  And I walked with the other

Page 56

1 gentleman behind the 4-by-4s.  They were pointing in this
2 direction towards the grandstands.  So I was walking
3 behind the trucks between the trucks and the road they
4 used to travel to the staging area.
5     Q.  Okay.  So to your left would have been the
6 back end of the monster trucks.  Is that correct?
7     A.  Correct.
8     Q.  And to your right, can I call it a procession
9 of the mud racers that were either being driven, pushed
10 or towed to the staging area?
11     A.  Correct.
12     Q.  Do you know how many mud racers or vehicles
13 total were in that procession to your right?
14     A.  I would think between five and six, seven.
15 Somewhere in that general number.
16     Q.  Did you see any that were being actively in
17 operation, in other words, driven to the staging area as
18 opposed to being pulled or towed by some other vehicle?
19     A.  I think so but I'm not for sure.  I think
20 somebody did drive but I'm not for sure.
21     Q.  Okay.  If this incident had not occurred,
22 where was it your attention to go to by reference to your
23 diagram?  Where did you expect to go and remain for
24 purposes of the race?

Page 57

1     A.  Of course, I had never been there before.  But
2 I was under the impression they were going to be parking
3 to the left-hand side of the racetrack.
4     Q.  Okay.
5     A.  There was a staging area.  They would make
6 sure they had their belts on, their helmets on, preparing
7 for their turn to race.
8     Q.  Okay.  Again, you were not intending to then
9 go back to the grandstand seating for this event?
10     A.  Correct.
11     Q.  Okay.  What happened as you walked in between
12 the 4-by-4 monster trucks and the procession of the mud
13 racers?
14     A.  I was walking along with this gentleman,
15 which -- he was on my left-hand side.  And we were just
16 talking about racing or something like that.  Just
17 ordinary stuff.  And then that's when I was struck by the
18 vehicle from behind.
19     Q.  Okay.  The vehicle that you later found was
20 owned by my client, Mr. Shoemaker?
21     A.  Yes.
22     Q.  What part of your body was struck from behind?
23     A.  It was in the back of my thighs.  It just felt
24 like a really heavy weight just slamming me.  It was

B-17

Delbert E. Rollison

16 (Pages 58 to 61)

---

Page 58

1  nothing like a small push or some kind of inkling. It
2  was just like all of a sudden -- I was there, and all of
3  a sudden this heavy force drug me to the ground face
4  first.
5      Q.  I was going to ask that.
6          Where were you positioned after you felt
7  this force from the rear?
8      A.  It knocked me so quickly to the ground I
9  didn't have time to put my hands in front of me.  That's
10 how fast it happened.  It knocked me down.  I turned
11 around.  I could see the center of the axle of his
12 vehicle.  And then --
13     Q.  Which vehicle was it, by the way?
14     A.  I mean --
15     Q.  Describe the vehicle itself.
16         Was it the mud racer or the ATV?
17     A.  Yes.  The mud racer.  The mud racer.
18     Q.  Okay.
19     A.  Once I was knocked down, I tried to crawl or
20 get out of the way of the vehicle.  And I went to try to
21 roll out of the direction of it.  And that's when the
22 right-hand wheel of the vehicle hit my leg.
23     Q.  Okay.  Which leg?
24     A.  The right leg.

---

Page 59

1      Q.  How did you determine that it was the mud
2  racer vehicle that was the force that knocked you from
3  behind?
4      A.  As soon as I was slammed to the ground, I
5  could turn.  And it was -- my legs were underneath of the
6  axle.  I could see the axle right in front of my face --
7  two feet from my face.
8      Q.  Okay.  You're looking to your right.  It was
9  to your right side?
10     A.  I was looking to my right.  I could see the
11 center of the vehicle.  There's a -- I could see the axle
12 of the vehicle right there in front of my face.
13     Q.  Do you recall there being any monster trucks
14 in the vicinity of where this occurred at the time it
15 occurred, that is, monster trucks in operation?
16     A.  As far as moving?
17     Q.  Moving or engines revving or anything like
18 that.
19     A.  I don't recall one moving, but it could have
20 been running.  I would -- I don't remember that.  I
21 didn't see anything move.
22     Q.  What was the noise level like just before this
23 incident happened?
24     A.  It was noisy, but it wasn't like deafening

---

Page 60

1  where you couldn't hear.  I could hear the people beside
2  me talk in normal tone.
3      Q.  Were the engines of the monster trucks or any
4  of them -- could you hear any engine noise from the
5  monster trucks?
6      A.  I don't recall.
7      Q.  Do you recall seeing any monster trucks in
8  close proximity to you either before this incident or
9  right after you had struck the ground?
10     A.  I said earlier I was walking between the
11 trucks and the road, and I was somewhere in the middle.
12 I never saw anything move.  It could have been running.
13 There was nothing else around that area that was
14 traveling my direction or the opposite direction.
15     Q.  Did any spectators push you or bump you just
16 prior to you hitting the ground?
17     A.  No.
18     Q.  Do you recall hearing anyone yell to you to
19 get out of the way or make any other comment to you just
20 before you fell to the ground?
21     A.  No.
22     Q.  Who came to your assistance once you hit the
23 ground, if anyone?
24     A.  The gentleman I was walking by.  I believe he

---

Page 61

1  was the one that went to get the ambulance.  Of course,
2  the ambulance was within sight.  It was only a few
3  hundred feet away.  It wasn't very far away.  After that
4  I don't remember where he went to.  I don't remember
5  seeing him.
6          Of course, some people -- spectators
7  came around.  I do remember Mr. Shoemaker coming to me.
8  I remember the lady that took our names on the waiver.
9  And the lady I thought was organizing this mud drag, she
10 was there also later on.  Of course, my brother and some
11 of his friends showed up later on too.
12     Q.  Do you remember what Mr. Shoemaker said to
13 you?
14     A.  Yes.
15     Q.  What did he say?
16     A.  He said, "I'm sorry, man."  He said, "I didn't
17 see you."
18     Q.  Did he say anything else?
19     A.  That's the only thing that stuck in my mind.
20 It could have been "Are you all right?" or "How bad are
21 you hurt?"  I don't remember those kind of words.  I
22 remember him saying, you know, "I didn't see you."  I was
23 like really shocked by that.
24     Q.  Who was behind the steering wheel of this

---

B-18

Delbert E. Rollison

Page 62

1  vehicle that you described as having struck you?
2      A.  I found out later it was Mr. Shoemaker's son.
3      Q.  Did you see the driver at the time, or you
4  just don't have a recollection of even seeing him?
5      A.  I don't recollect seeing him.
6      Q.  Do you know if that vehicle was being pushed
7  or pulled or how it was getting across the path to the
8  stadium?
9      A.  It was being pushed.
10     Q.  What was it being pushed by?
11     A.  A 4-wheel sport vehicle -- ATV.
12     Q.  When did you observe that?  Was that after you
13  had been injured?
14     A.  I noticed it prior to the incident when I was
15  in the parking lot.  I thought it was kind of odd because
16  everybody was being pulled from the front using bungy
17  straps and this was being pushed by an ATV with a steel
18  pipe in between the vehicle and the drag machine --
19  racer.
20     Q.  Prior to the incident as you were walking
21  towards the staging area engaged in conversation with
22  this unknown person, how much of a distance did you keep
23  between your body and the vehicles that were in this
24  procession to your right?

Page 63

1      A.  Between 8 and 10 feet.  Maybe 12.  I would
2  think around maybe 8 to 10 feet.
3      Q.  When was the last time in terms of seconds or
4  minutes or however you want to describe it that you had
5  turned to your right to look to see how close you were to
6  this procession of vehicles before this incident
7  occurred?
8      A.  There was no procession of vehicles.  Only a
9  few went.  And it was like -- it's not like they were
10  coming one after another.  It was just like one, and then
11  maybe a few minutes later a straggler would come.  So
12  it's not like they were coming right after each other.
13  It's -- is that the answer you're looking for?
14     Q.  Well, prior to feeling this force behind you,
15  were you aware that there was a vehicle approaching at
16  whatever distance from behind?  Were you aware of
17  that?
18     A.  No, I was not.
19     Q.  You were aware, however, that the vehicles
20  were using this path to get to the staging area; correct?
21     A.  Yes.
22     Q.  You were aware that you were walking in an
23  area where you were bounded on the left by monster trucks
24  and on the right by the vehicles that were taking that

Page 64

1  path either being operated, pushed or pulled towards the
2  staging area; correct?
3      A.  Correct.
4      Q.  When you were engaged in conversation with
5  this unknown gentleman who was walking along your left
6  side -- is that right?
7      A.  My left.
8      Q.  Did you ever glance from time to time over
9  toward your right to see if there was anything to your
10  right that you needed to be concerned about?
11     A.  I don't recall, but I'm sure I viewed my
12  surroundings.  I've spent most of my professional life
13  around large aircraft -- dangerous areas.  So it's a
14  little tidbit of mine to keep myself informed with my
15  surroundings.  I'm sure I had a pretty good visual of
16  what was going on around me.
17     Q.  At the time you felt this force from behind,
18  did you observe any mud racers being operated, pushed or
19  pulled ahead of you at some distance just before this
20  incident involving your injury occurred?
21     A.  I believe most of the vehicles were already at
22  the staging area when I was walking in that direction.
23     Q.  Were there any vehicles that you could see in
24  the distance ahead of you going in that direction?

Page 65

1      A.  I don't remember seeing any in motion.
2      Q.  Were you walking behind, albeit a distance,
3  whatever that distance was -- were you walking behind
4  your brother's vehicle that was being pulled towards the
5  staging area?
6      A.  My brother was already at the staging area
7  when I was in the accident.
8      Q.  How far away was that from you at the spot
9  where the accident occurred?
10     A.  I never made it to the staging area.  So I'm
11  guessing it's probably 3- or 400 feet.
12     Q.  Had your brother passed you as you were
13  walking towards the staging areas, or was he already
14  ahead of you as you walked?
15     A.  I believe he was already ahead of me.
16     Q.  Did any vehicles pass you on your right just
17  prior to this incident occurring?
18     A.  Yes.
19     Q.  How many vehicles passed you, would you say?
20     A.  I remember just one.
21     Q.  How close to your right side did that vehicle
22  pass you in terms of feet?
23     A.  Ten feet.  Something like that.  Eight to ten
24  feet.

B-19

Delbert E.    Rollison

18 (Pages 66 to 69)

| Page 66 | Page 68 |
|---|---|
| 1  Q.   Where were you when that vehicle passed you? | 1  But nothing bruised or cut or abrasions. |
| 2  Was it right before this happened or -- | 2  Q.   Did your glasses break? |
| 3  A.   This vehicle had passed me.  And then it was | 3  A.   No. |
| 4  no more than a minute or, at the most, two minutes before | 4  Q.   Did they come off when you fell? |
| 5  I was struck.  I'm guessing at that time.  But I'm not | 5  A.   Yes. |
| 6  for sure.  It only took five minutes to walk from this | 6  Q.   Were you able to retrieve them, or did someone |
| 7  area to maybe this area.  It was not a very long | 7  retrieve them for you? |
| 8  distance.  So you could walk the whole thing in three | 8  A.   Yes. |
| 9  minutes in front of the grandstands. | 9  Q.   Who retrieved them? |
| 10  Q.   Where were you taken after the accident? | 10  A.   Somebody had picked up my helmet, the |
| 11  A.   The ambulance took myself and my brother to | 11  disposable camera.  Something else -- my cigarettes came |
| 12  Christian Hospital or Wilmington.  Christian Hospital, I | 12  out of my pocket and the glasses.  And they put all of |
| 13  believe it was. | 13  that in the helmet.  And then when my brother came to my |
| 14  Q.   Christiana Hospital? | 14  aid once he heard -- he's the one who took those items |
| 15  A.   Yes. | 15  with him. |
| 16  Q.   Your interrogatory answers say that you were | 16  Q.   Had you taken any pictures on that disposable |
| 17  treated by the Wilmington Hospital Emergency Room.  Do | 17  camera up to this point? |
| 18  you recall what hospital you were treated at right after | 18  A.   No. |
| 19  the accident? | 19  Q.   Now, what is your parents' names? |
| 20  A.   I probably said Wilmington, but I'm sure it | 20  A.   Delbert Eugene Rollison, my father. |
| 21  was called Christian or another -- | 21  Q.   Where did they live at the time? |
| 22  Q.   You believe it was the Christiana Hospital | 22  A.   In Leesburg, Virginia -- 206 Stratford Place |
| 23  where you received treatment? | 23  Southeast. |
| 24  A.   I'm pretty sure it was. | 24  Q.   What's the ZIP code there, if you know? |

| Page 67 | Page 69 |
|---|---|
| 1  Q.   Were you admitted to Christiana Hospital for | 1  A.   I'd be -- I'm not sure. |
| 2  any length of time or were you treated and released? | 2  Q.   Do they still live there? |
| 3  A.   I didn't stay overnight. | 3  A.   Yes. |
| 4  Q.   Okay. | 4  Q.   Both of your parents are still alive? |
| 5  A.   They asked me to but I did not. | 5  A.   Yes. |
| 6  Q.   Where did you go after being released from the | 6  Q.   How did you get from Christiana Hospital to |
| 7  hospital? | 7  Leesburg, Virginia? |
| 8  A.   To my parents' house in Leesburg, Virginia. | 8  A.   Wayne Tapscott -- after the race they came to |
| 9  Q.   Tell me all of the injuries that you | 9  the hospital.  They were there when I was released early |
| 10  complained of to the hospital staff at Christiana when | 10  in the morning.  And I rode in the back of his king cab |
| 11  you were treated there? | 11  truck lying on the back seat. |
| 12  A.   Of course, it was the right knee, kneecap, | 12  Q.   Did anyone else go with you on that trip?  Did |
| 13  which was dislocated about eight inches up on my thigh. | 13  your brother, for example? |
| 14  Of course, I had some soreness in my buttocks and the | 14  A.   My brother was -- I believe was in the truck |
| 15  back of my legs and my arms.  But the initial pain was my | 15  with me going back to my parents' house.  One of the |
| 16  right kneecap. | 16  guys -- Mark -- drove my truck home. |
| 17  Q.   Did you lose consciousness at any point? | 17  Q.   How long of a ride was it from Christiana |
| 18  A.   Not that I know of.  I don't think so. | 18  Hospital? |
| 19  Q.   When you say you fell flat on your face and | 19  A.   Three and a half, four hours. |
| 20  couldn't brace yourself with your hands, did you injure | 20  Q.   When was the next time you received any |
| 21  any part of your face?  Your nose?  Any bruises or | 21  medical care after being released from Christiana |
| 22  anything like that? | 22  Hospital? |
| 23  A.   Just a soreness the next day from the, I | 23  A.   The 4th of July is my birthday.  The day after |
| 24  guess, initial, you know, being slammed to the ground. | 24  my birthday I went to Dr. Cook, which is -- employs my |

B-20

Delbert E. Rollison

Page 70

1  sister. She works there as a billing -- she recommended
2  going to him.
3      Q. What specialty is Dr. Cook?
4      A. Yes.
5      Q. What's Dr. Cook's specialty? Is it like
6  orthopaedics or --
7      A. Yes.
8      Q. What's Dr. Cook's first name? Is it Randolph?
9      A. Randolph.
10     Q. What type of treatment did Dr. Cook provide
11 for you?
12     A. The day of the first visit?
13     Q. Yeah.
14         Overall, what did he do for you? Did he
15 take x-rays or MRIs and then perform a surgical procedure
16 at some point?
17     A. The first day he saw me he viewed the x-rays
18 that were taken by the hospital in Wilmington. He
19 suggested immediate surgery. I believe the surgery was
20 the next day by Dr. Cook. My prior postop operations
21 were done by him, and my second operation was done by him
22 too. And the follow-up.
23     Q. When was the second operation? Approximately
24 when, if you remember. I could look at your medical

Page 71

1  records.
2      A. December 1st, 2nd, 3rd. Something like that.
3  Early December.
4      Q. Of 2004?
5      A. Yes.
6      Q. When were you treated at the Winchester
7  Medical Center?
8      A. As far as my family practice doctor?
9      Q. Well, they're listed as among the providers
10 that have knowledge of the accident or have treated you
11 for the accident. So when did you treat at Winchester
12 Medical Center? Is that where Dr. Byrd's practice is or
13 is that a different facility?
14     A. I went to Dr. Byrd as a family doctor. I
15 started going to her. I got my cholesterol -- and she
16 recommended me going to the hospital for chest rays.
17 Something else I went there for. Just a routine
18 examination. A physical is what I was really looking
19 for -- to have somebody like Dr. Byrd to be my family
20 doctor from then on.
21     Q. Did Dr. Cook refer you for any physical
22 therapy?
23     A. Yes, he did.
24     Q. Where did you take physical therapy? At what

Page 72

1  facility?
2      A. At his office. He has a therapist facility
3  there.
4      Q. How long did you take physical therapy?
5      A. It was quite a few months. I'm not sure
6  exactly how many months, but it was quite a while.
7      Q. Why was a second operative procedure required
8  for your right knee?
9      A. During my therapy I noticed my leg was
10 swelling and turning a reddish color.
11     Q. Your knee?
12     A. My right knee.
13     Q. Where on the knee was it swelling?
14     A. Above the kneecap.
15     Q. So it was swelling and turning a reddish
16 color. Any other symptoms?
17     A. You could see an oozing of some kind of matter
18 coming out.
19     Q. How would you describe it? Like pus or --
20     A. Pus, yeah.
21     Q. So Dr. Cook took you back in the operating
22 room for that condition?
23     A. Once I -- I went to the doctor. He looked --
24 he was on vacation. His nurse looked at it and excused

Page 73

1  me to go back home and come back the following week once
2  Dr. Cook came in from vacation. He saw my knee. He
3  literally pushed me back in the chair and took his hands
4  and just pulled the incision back open and dug it out
5  with Q-Tips because it was --
6      Q. Infected?
7      A. Very bad, yeah. He seemed to be pretty upset
8  about it.
9      Q. Are you still under Dr. Cook's care?
10     A. No.
11     Q. Are you seeing anyone with regard to your
12 right knee?
13     A. To my what? Excuse me?
14     Q. With regard to your right knee, are you seeing
15 any other health care provider presently?
16     A. No.
17     Q. When did your treatment end for that
18 particular injury? How long ago?
19     A. I'm not sure of a date.
20     Q. More than a year?
21     A. It was less than a year.
22     Q. Do you still have problems with your right
23 knee?
24     A. Yes.

B-21

Page 74

1    Q. Describe for me what type of complaints you
2  still have today.
3    A. At work. I can walk on level ground pretty
4  well, but at the end of the day my leg is aggravated. I
5  can barely pick it up off the ground. My personal
6  life -- it's constant -- it's always a fear of stepping
7  up on curbs, stepping off of curbs, up and down steps. I
8  have to use the handrail sometimes. Towards the end of
9  the day when my leg is fatigued from standing, which I
10  have to do in my class sometimes -- that really irritates
11  it. A lot of activities I used to do I can't do now.
12    Q. Like what activities? You have to give us
13  examples of what you did before that you don't do now or
14  do less frequently.
15    A. I used to ride bike. I rode bike. I could
16  still ride, but I can't do the hills. When I push down
17  on the pedal, it hurts -- the pain. Kayaking -- I can't
18  do it at all.
19    Q. Why is that? What prevents you from kayaking?
20  Just your positioning?
21    A. Because you have to slide yourself down into
22  the whole. Trying to get back out, it's -- I can't put
23  any weight on my right leg to push myself up. I have to
24  use my left leg all the time to favor myself. Steps -- I

Page 75

1  have to go left leg first. Going down steps or off a
2  curb you have to go left leg. It's kind of a constant
3  reminder of don't go right leg first because it will
4  collapse on you -- on me.
5    Q. Any other activities other than kayaking or
6  biking?
7    A. I cannot run.
8    Q. Did you run in races before this accident or
9  did you just do recreational jogging?
10    A. Recreational.
11      MR. SHALK: I have to go.
12      MS. FALLON: Do you want to ask any
13  questions before you go?
14      MR. SHALK: He answered them about an
15  hour ago. I don't need a copy.
16      (Mr. Shalk exited the conference room.)
17  BY MS. FALLON:
18    Q. Any other activities that you can think of
19  that have been affected by your injuries from this
20  incident?
21    A. Everything I do is -- hiking, fly fishing I
22  do. It's all related to uneven ground. Things like that
23  I have to really watch how I move. And even getting in
24  and out of cars. Driving for more than 45 minutes, my

Page 76

1  leg starts aching. I have some pain patches I've used to
2  put on to keep the pain down.
3    Q. Who prescribes the pain patches?
4    A. They're just over-the-counter things. I used
5  to --
6    Q. What are they?
7      I'm sorry. Go ahead.
8    A. My doctor did give me prescription pain
9  patches. I use those for long trips. But now either I
10  take a Tylenol or just small patches I can put on we have
11  at work in our medicine cabinet. So over-the-counter.
12    Q. Were there any other injuries you suffered in
13  this accident other than the right knee injury?
14    A. No.
15    Q. Was your back at all affected by this
16  incident -- your low back?
17    A. At that time, no. Later it was.
18    Q. Okay. How much later?
19    A. After I started walking more. It's -- the
20  doctor said my gait -- the way I walk now is favoring
21  my -- taking the weight on my left leg, which is throwing
22  my hips out, and my back is -- before it was going out
23  once a year or so, but now it's aggravating all day long.
24  It's sometimes better; sometimes worse. But it depends

Page 77

1  on my activities that day. Especially my hips are
2  getting sore. Limping.
3    Q. I'm sorry. You're limping sometimes. Is that
4  what you started --
5    A. Towards the end of my day if I'm on my feet
6  doing normal daily things that -- at the end of the day,
7  I'm using my hand to pull myself up the steps.
8    Q. Are you being treated for any of these
9  complaints at present?
10    A. No.
11    Q. Have you previously been treated for anything
12  related to your low back subsequent or after this
13  accident occurred?
14    A. Yes.
15    Q. Who treated you for your low back aches and
16  pains?
17    A. It's Dr. Cook's partner. I can't remember his
18  name. He's a pain management. Dr. Cook recommended to
19  see him. He recommended some x-rays, which I did. Then
20  he brought me back to his office, and they gave me the
21  injections in the back.
22    Q. How many injections have you had in your back?
23    A. I had four one day, and he told me to come
24  back the following week and have the other four. I guess

B-22

Delbert E.  Rollison

21 (Pages 78 to 81)

Page 78

1  he had to do it in sessions.
2      Q.  How long ago was that?
3      A.  I would say March/April of this year.
4      Q.  Have you had any plans for further injections
5  to your back?
6      A.  Yes.  If it's -- if it comes back -- which he
7  says it will probably be three to four months they're
8  good for.  So far it's done pretty well.  It's kept the
9  pain down.  But the stiffness is still there.  But
10  bearable pain.
11      Q.  Have you ever had any psychological or
12  psychiatric counseling before July of 2004?
13      A.  No.
14      Q.  Have you had any since July of 2004?
15      A.  No.
16      Q.  Other than your low back aggravation and the
17  right knee injury, are there any other complaints or
18  injuries that you believe you suffered in this incident?
19      A.  Financially, mentally.  Financially, of
20  course, the sick leave and the vacation time I had to
21  take, plus the bills that have accumulated that I have to
22  keep up with.  The traveling from my home to the family
23  doctor.  Cook's office is an hour one way.  So I had to
24  spend an hour both ways, plus the time left.  My vacation

Page 79

1  is taken from going back and forth missing work.  I think
2  I counted 20-some, 30-some times I went to the therapist.
3  And at nights my leg is -- at the end of the day, it's --
4  I have to put pillows under it.  It's hard to sleep
5  sometimes.
6      Q.  Your right leg?
7      A.  Right leg.  It's just a general aggravation
8  of, you know, constantly being -- worrying about it --
9  how to walk, how to step off of things, you know, afraid
10  to go up ladders.  Or when I pick up something, I have to
11  keep my leg locked so it doesn't fold on me.  Of course,
12  I'm not a very vain person, but, you know, wearing shorts
13  is -- people say, "What happened?"  You have to go over
14  and over again.  There's this huge scar on my knee.
15      Q.  Are you able to show us the scar?  If you're
16  not, that's fine.  Are you able to show us the scar with
17  the pants you're wearing today?
18      A.  I'll try.  It starts about right here.
19      Q.  Okay.
20      A.  Like that far and runs down to here.
21      Q.  Let's talk about work.
22          How much time, if any, did you miss
23  immediately after the incident occurred from that date
24  forward?  Consecutive days.

Page 80

1      A.  I'm just guessing.  A month and a half.
2      Q.  When you returned to employment, did you
3  return at your full-time duty level?
4      A.  No.
5      Q.  Did you return on some lesser level?
6  Part-time or --
7      A.  I was in a wheelchair and crutches.
8      Q.  For how long?
9      A.  I'm guessing three weeks.  Maybe a month.
10      Q.  Were you trying to do some level of work at
11  your place of employment?  A couple hours a day?
12      A.  They pretty much restricted me to my desk.  I
13  normally would be on the aircraft crawling around doing
14  some of the tooling, but I was told not to do that.
15      Q.  When you were out of the wheelchair on the
16  crutches, did you resume your full-time duties at work?
17      A.  Yes.  But limited.  The way I had to
18  accomplish it, I was always -- I had to sit down instead
19  of kneel.  I cannot kneel on one knee.  My knee is still
20  numb.  I can't kneel or move around or crawl like I used
21  to.  I have to find other ways of getting a job done.
22      Q.  How long were you out of work with the second
23  procedure on December 2, 2004?
24      A.  It wasn't as long.  I think at the max three

Page 81

1  weeks.  I think two is -- two to three weeks, I believe.
2      Q.  Have there been other periods where you've
3  missed consecutive days from your employment other than
4  just missing time to go to doctors' appointments or
5  therapy appointments or whatever?  I'm talking about a
6  period of consecutive days missed.
7      A.  There was, I think, three or four days I
8  missed when I was going from the parking lot where I work
9  to my vehicle.  I -- my knee just gave out, and it folded
10  on me.  It sort of like bent back.  I hyperextended it.
11  There was nothing the doctor could do.  Just wear my
12  brace.  I was advised I was trying to do too much, and I
13  was going too fast and pushing myself.
14      Q.  When did that happen?
15      A.  January/February.
16      Q.  Of this year?
17      A.  Last year.
18      Q.  2005?
19      A.  Yes.  It was right after the second surgery.
20      Q.  Have you missed any consecutive days from work
21  this year?
22      A.  No.
23      Q.  When did you change your position from --
24  well, if I'm mistaken, you can correct me -- from process

B-23

Delbert E.   Rollison

22 (Pages 82 to 85)

| Page 82 |
| --- |

1 planner -- was that it? --
2     A.   Mm-hmm.
3     Q.   -- to instructor coordinator?
4          When did you get that position -- the
5 instructor coordinator position?
6     A.   It was April or May of 2005.
7     Q.   That's the position you've been working ever
8 since?
9     A.   Mm-hmm.
10    Q.   Yes?
11    A.   Yes.
12    Q.   I want to go back and just ask you another
13 question about the incident itself.  I have here in front
14 of me your answers to the questions called
15 interrogatories that my client had submitted.
16         At question No. 3 you were asked to
17 describe how the accident occurred.  Maybe your attorney
18 can put that response in front of you.  Okay.  Your first
19 part of your answer indicates that at approximately
20 6:30 p.m. you were walking from the parking area to the
21 staging area with other pit crew members both in front of
22 you and behind you.  Who were the pit crew members in
23 front of you?
24    A.   I don't know who they were.  Just people who

| Page 83 |
| --- |

1 were walking along the same direction.
2     Q.   Okay.  They weren't members of your brother's
3 pit crew, in other words?
4     A.   No.
5     Q.   Would that answer be the same for the pit crew
6 members walking behind you?  They were just people that
7 you thought in general were belonging to pit crews for
8 the other racers.  Is that correct?
9     A.   It could be for the racers or it could be
10 people walking along behind the monster trucks.  Not
11 particular just being pit crew members.  It could be
12 anybody walking in that direction.
13    Q.   Well, I'm just going by what you referred to
14 in the interrogatory answer.  You said other pit crew
15 members both in front of you and behind you.  Is that an
16 accurate description of the people that were walking
17 behind you and in front of you?
18    A.   I can't say for sure people behind me.  I know
19 there was people in front of me and behind me.  But as
20 far as being a pit crew, I would think people in that
21 area should be there for some reason other than
22 spectators, so...
23    Q.   Okay.  And the time is correct?  6:30 p.m. is
24 approximately when the incident occurred?

| Page 84 |
| --- |

1     A.   Early evening. 6:30, 7:00.  Something like
2 that.
3     Q.   Okay.  You say the defendant, my client,
4 Mr. Shoemaker was operating a 4-wheeler pushing a truck
5 that was steered by his son Travis Shoemaker.  Is that
6 your understanding?
7     A.   It was a race vehicle.
8     Q.   Okay.  It's called a truck in this
9 interrogatory.  Was that your word or --
10    A.   No.
11    Q.   Did you describe it as a truck when you --
12    A.   It's a mud racer.
13    Q.   Okay.  So you would agree that Mr. Shoemaker's
14 son was not steering a truck.  He was steering a mud
15 racer.  Is that your answer?
16    A.   Correct.
17    Q.   You say while being pushed by the 4-wheeler
18 the monster truck struck the plaintiff, running over his
19 knee and causing severe injuries.  Is that your testimony
20 under oath as to how this accident occurred?
21    A.   It wasn't a monster truck.  It was a mud
22 racer.  Somebody has got their verbiage wrong here.  But
23 it was a mud racer of -- Shoemaker ran the mud racer, not
24 the monster truck.

| Page 85 |
| --- |

1     Q.   Do you recall answering these questions?  Did
2 you actually prepare any answers to these?
3     A.   I could have.  I'm not sure -- aware of --
4 remember exactly.  But maybe the verbiage is not correct
5 here as far as what you call the vehicle.
6     Q.   At any time before or after this incident
7 occurred, do you recall the monster truck show starting
8 up and that event taking place in and around where you
9 had fallen?
10    A.   No.
11    Q.   You don't recall one way or the other?
12    A.   I'm guessing.  But usually something like that
13 is the premier of the show, and they always have it last.
14    Q.   Well, I'm not talking about the usual course.
15 I'm talking about on the day of the incident.
16    A.   I never saw them move.
17    Q.   Do you recall seeing any of the logos or names
18 of any of the monster trucks in the vicinity where you
19 fell?
20    A.   No.
21    Q.   Do you happen to recall a monster truck with
22 the logo "Thrasher" painted on its side anywhere near the
23 area where the incident occurred?
24    A.   I don't recall.

B-24

Page 86

1          MS. FALLON: That's all I have for right
2  now.
3          MR. AKIN: I don't have a lot of
4  questions, but can we take a five- or ten-minute break?
5          MS. FALLON: Okay.
6          (A brief recess taken.)
7              - - - - -
8          DELBERT EUGENE ROLLISON, resumes
9          MR. FOGG: Right after we took this
10  break, Mr. Rollison leaned over to me and said he thinks
11  he may have given the wrong name as to his family doctor,
12  which I think he would like to clarify.
13          MS. FALLON: Sure.
14          THE WITNESS: The doctor that gave me my
15  medical for my pilot's license was Dr. Hoocker. The
16  doctor of my childhood and early 20s -- I'm trying to
17  remember his name. I remembered it and now I forgot it.
18  His office is in Percyville, but I can't remember his
19  name right off the --
20          MS. FALLON: Okay.
21          THE WITNESS: I can't remember his name
22  right now.
23          MS. FALLON: If you remember it, either
24  after we're off the record or whatever, just so long as

Page 87

1  you supply it to your attorney --
2          THE WITNESS: Okay.
3          MS. FALLON: -- Mr. Fogg can then
4  provide it to counsel.
5  BY MR. AKIN:
6      Q. Okay. Good afternoon, sir. My name is Roger
7  Akin. I represent Blue Diamond and Parkway Gravel in
8  this lawsuit, and I have some questions. Ms. Fallon
9  covered a lot of the areas that I wanted to question you
10  about, but I had some additional questions.
11          First of all, just for clarification, on
12  the drawing which you prepared, which is now Rollison
13  Exhibit 1, you placed a bold X on the line called "Road
14  to the Staging Area." I think I missed it. Was that the
15  point where you believe that the accident occurred?
16      A. Yes.
17      Q. Okay. Since this accident occurred, have you
18  given any statements to anyone other than your attorneys
19  in this case?
20      A. No, I have not.
21      Q. Okay. Have you been contacted by any
22  insurance representatives or anyone else involved in the
23  racing that day to give a verbal or a written statement
24  about what you believe occurred?

Page 88

1      A. The only person that has contacted me other
2  than my attorney is Neal Shoemaker. He called me
3  twice -- the day after the accident and --
4      Q. What did you discuss?
5      A. He was concerned about my health. He asked me
6  how I was doing.
7      Q. He contacted you on the telephone?
8      A. Yes.
9      Q. Did you and he discuss the accident itself at
10  all?
11      A. I don't recall. I think he just called out of
12  concern for my health. It wasn't who did what or who --
13  whatever. It was just a matter of my well-being.
14      Q. Okay.
15      A. The second call was more or less towards the
16  legal thing.
17      Q. The second call from --
18      A. Neal Shoemaker.
19      Q. Okay. About the legal thing?
20      A. Well, I hired an attorney prior to Matt, and
21  her name was Karen Harris. And she sent him a letter in
22  the mail saying she was representing me. And when he
23  received the letter, he called me and asked me what was
24  the deal and why I was -- he was being sued.

Page 89

1      Q. Okay. Ms. Harris, is she a Delaware attorney?
2      A. She's a Virginia attorney.
3      Q. You retained her regarding this incident?
4      A. Yes.
5      Q. Did she contact Mr. Shoemaker to your
6  knowledge?
7      A. She contacted -- I'm sure it was him and his
8  insurance company. She started the basic -- a ball
9  rolling on this. As far as I know, she did.
10      Q. All right. Did she file any legal claims on
11  your behalf before you retained Mr. Fogg's law firm?
12      A. I think she just -- she wrote a letter to the
13  insurance company stating basics of what happened. I
14  don't think it was anything that went any further than
15  that.
16      Q. What insurance company did she communicate
17  with?
18      A. I have no idea.
19      Q. Do you know whose insurance company it was
20  that she contacted?
21      A. Neal Shoemaker's.
22          MR. AKIN: Okay. Let me ask the court
23  reporter to mark this as the next exhibit.
24          (Rollison Deposition Exhibit No. 2 was

Delbert E.  Rollison

24 (Pages 90 to 93)

Page 90

1  marked for identification.)
2  BY MR. AKIN:
3      Q.  I've handed you, sir, what appears to be a
4  document captioned Delaware Basic Life Support which
5  appears to be a document that may have been filled out by
6  the company that provided the ambulance service to the
7  race that day.  Have you ever seen this form before
8  today, sir?
9      A.  No, sir.
10     Q.  All right.  It appears about a third of the
11  way down the page that the person who prepared this
12  document wrote a narrative of what that person understood
13  to have occurred.
14         Let me read a couple of sentences from
15  that.  Quote, at standby for a monster truck race, PT,
16  which I think is patient, was struck by a mid-sized car
17  at a low speed.  Bystander pushed patient to the ground
18  as car approached patient.  Patient's right leg was still
19  in the path of the car.
20         Do you remember having a conversation
21  with any of the ambulance crew on the date of the
22  incident in which you described what occurred?
23     A.  No.  There was never any kind of comments or
24  anything made of what happened in the accident.

Page 91

1      Q.  All right.  This particular document states at
2  least, according to the author of the document, that a
3  bystander pushed patient, which I assume is you, to the
4  ground as a car approached you.  Do you remember making
5  such a statement to any individual on or after the date
6  of this accident?
7      A.  This is the first I've ever heard anything
8  like this before.  I never heard of it or...
9      Q.  Do you know whether a witness to the incident
10  provided that information to the ambulance crew?
11     A.  I have no idea.
12         MR. AKIN:  Let me ask the reporter what
13  we've marked this as.
14         THE REPORTER:  This would be Rollison 2.
15  BY MR. AKIN:
16     Q.  Is it your testimony today that that is an
17  incorrect description of what occurred in this accident?
18     A.  Yes, it is.
19     Q.  Do you recall whether anyone tried to push you
20  out of the way of the mud racer just before you were hit?
21     A.  I was never touched.  I was -- there was no
22  warning at all that the vehicle was coming behind me.
23  Once I was knocked to the ground, I could hear Neal's son
24  telling his dad, "Dad, stop, stop."  I could hear him

Page 92

1  yelling while I was trying to get my footing to roll out
2  of the way, but, of course, this happened in split
3  seconds.  But I could hear his son yelling at his dad to
4  tell him to stop.
5      Q.  Do you recall his specific words?
6      A.  "Dad, stop, stop."
7         And that's when his father came around
8  to me and says, "Man, are you all right?  I didn't even
9  see you" or "didn't see you."
10     Q.  Let me ask you a couple questions about the
11  accident itself.  I think you testified that you crossed
12  from the parking lot over the guardrail across the paved
13  road and then you were walking in an area generally
14  between the racetrack and where the monster trucks were
15  lined up.  Is that an accurate --
16     A.  It was between --
17     Q.  -- summary of your testimony?
18     A.  It was between the monster trucks and the
19  little service road to the staging area.  It's not next
20  to the racetrack.  There was the racetrack and then a
21  little approach track to the stage -- approach to the
22  staging area for the monster trucks.
23     Q.  Okay.  Did it appear to you that all of the
24  mud racers were going along the same route to get to the

Page 93

1  staging area?
2      A.  I assume so, yes.
3      Q.  Was that a worn path in the dirt or the grass?
4      A.  Yes.
5      Q.  All right.  Did all the mud racers, to your
6  recollection, generally stay on that path as they went
7  over to the staging area?
8      A.  I don't know if they all stayed there.  I
9  didn't see all of them travel that area, but I'm sure
10  they took the same general route.  But I can't say for
11  sure.  I wasn't watching each one of them.
12     Q.  Did you make an effort to stay off of that
13  path as the mud racers were going to the staging area?
14     A.  Yes.
15     Q.  Is it your testimony, then, that
16  Mr. Shoemaker had left the path at the time when it hit
17  you, or was it on that path?
18     A.  I'm assuming he had to have left the path to
19  hit me where I was standing or walking.
20     Q.  Okay.  You say you assume that.
21         Do you know for a fact whether
22  Mr. Shoemaker's mud racer had left the path or was still
23  on the path when it struck you?
24     A.  He was off the path when he hit me.  Of

B-26

Delbert E. Rollison

Page 94

1  course, I was -- he was behind me, so I can't see him
2  veering. But he would have to do that to get to where I
3  was at -- my position.
4     Q. In terms of feet, approximately how far off of
5  the path was the Shoemaker vehicle when it hit you?
6     A. I was between eight and ten feet off the
7  track, and the center of the vehicle hit me dead center
8  in the back of my legs between the two front wheels. So
9  if you go by his right tire, he was probably six feet
10 from the edge of the left-hand side of the road.
11    Q. At any time before you were struck, did anyone
12 cry out to warn you that a vehicle was approaching you
13 from the rear?
14    A. No. I never was pushed, warned. Nothing.
15    Q. Let me ask you some questions about a document
16 and ask the reporter to mark this as the next exhibit in
17 sequence. I guess that's Rollison 3.
18        (Rollison Deposition Exhibit No. 3 was
19    marked for identification.)
20 BY MR. AKIN:
21    Q. I'll ask you to just take a look for a minute
22 or two at this document, sir. I'm going to ask you some
23 questions about it.
24    A. (The witness complied with counsel's request.)

Page 95

1     Q. First of all, do you recognize this document?
2     A. I recognize my signature.
3     Q. Is that your signature at the bottom of the
4  page?
5     A. Yes.
6     Q. Do you go by the name "Gene Rollison"
7  occasionally?
8     A. That's my name that people call me in public.
9  My real name is Delbert -- my first name.
10    Q. But to your friends you are called "Gene." Is
11 that correct?
12    A. Correct.
13    Q. Let's go to the bottom of this form.
14        There are three columns at the bottom of
15 the form. One is Print Name Here. And there are four
16 names. Then it appears that Gene Rollison is printed on
17 the last line. Is that correct?
18    A. Yes.
19    Q. Did you print your name on that form at that
20 place?
21    A. It doesn't look like my handwriting -- the
22 printed part -- but it does in the handwritten -- the
23 center column looks like my signature. But on the left
24 the printed doesn't look like the way I would print my

Page 96

1  name.
2     Q. Is it your testimony that someone else printed
3  your name on this form?
4     A. I could have done it, but it doesn't generally
5  look like my -- the way I sign my name.
6     Q. Okay.
7     A. I could have. I'm just not saying for sure I
8  did it.
9     Q. Down the center column, the form asks the same
10 person to sign his name. Does that appear to be your
11 signature in the center column on the last line?
12    A. Yes, it does.
13    Q. All right. Then just to the right of the
14 signatures there appear to be numbers. There appears to
15 be the number 269 after your signature. Do you know what
16 those numbers represent?
17    A. No, I do not.
18    Q. Were you given an identification badge or tag
19 with such a number on it to your recollection?
20    A. Not that I remember.
21    Q. Okay. The third column is Duties.
22        What words are written there?
23    A. I never wrote those --
24    Q. Okay.

Page 97

1     A. -- words there.
2     Q. Can you read those words?
3     A. Sand drags? And it's d-r-a-y-s.
4     Q. Just for the record, would you read the other
5  three printed names in the left column?
6     A. Randy Rollison --
7     Q. If you can.
8     A. -- Mark -- I can't really make that one out.
9     Q. All right. There's been some testimony today
10 about a Mark McCaughey. Is it possible at least that
11 that's Mr. McCaughey's name?
12    A. It looks like a Mark W.
13    Q. All right. Your attorneys have filed answers
14 to Mr. Shoemaker's interrogatories, and in response to
15 Interrogatory 2 you identify a Mark McCaughey of
16 Bluemont, Virginia as a person who may have knowledge of
17 how the accident occurred. Is that Mr. McCaughey's
18 printed name in that left column in the second line?
19    A. I couldn't say whether it is or isn't one way
20 or the other.
21    Q. Okay.
22    A. I'm not sure.
23    Q. Can you read the third name in that list?
24    A. Stephen Littleton.

B-27

Delbert E.  Rollison

26 (Pages 98 to 101)

Page 98

1    Q.  All right.  Now, if we assume for the moment
2  that this is a form that you and some other members of
3  your crew were provided, do you recall at what time of
4  the day you were given this form?
5    A.  I'm thinking it was prior to the staging of
6  the vehicles. 5:00, 5:30, 6:00.  Something like that.
7    Q.  Okay.
8    A.  It was later in the evening --
9    Q.  All right.
10    A.  -- or afternoon.
11    Q.  Your recollection is that a woman gave you
12  this form to sign.  Is that correct?
13    A.  Yes.
14    Q.  What is your recollection of her name?
15    A.  I think her name was Ann.
16    Q.  Okay.  But you don't recall her last name?
17    A.  I'm not sure if that's her first name.  I
18  just -- for some reason I think it's Ann, but I could be
19  wrong.
20    Q.  Could you describe her for the record?
21    A.  Thin, medium, shoulder length dark brown hair.
22    Q.  Would you identify her again if you saw her?
23    A.  No.
24    Q.  All right.  When she approached you and the

Page 99

1  others and asked for your signatures on this form, did
2  she identify who she was representing in asking you to do
3  that?
4    A.  No.
5    Q.  What words did she state when she presented
6  this form to you and the crew?
7    A.  She didn't really present it to me.  She
8  handed it to my -- the people I was with that day.  And
9  one of the people handed it to me.  And I just -- I saw
10  the legal title and I just signed it.  It was a basic
11  waiver -- basic coverage.
12    Q.  Okay.  Do you have any understanding as to
13  whether you and the rest of the crew was required to sign
14  this form?
15    A.  I don't remember it being said you had to.  I
16  don't remember.
17    Q.  There's been some other testimony in this case
18  that people participating in the event were required to
19  sign this and that that was a condition of their
20  participation.  Do you have any recollection as to
21  whether that's correct?
22    A.  I don't -- I'm not for sure.
23    Q.  What did you understand would have occurred if
24  you had refused to sign it, if anything?

Page 100

1    A.  I don't -- like I said, it was handed to by
2  one of my teammates.  Then when I signed it, it was given
3  back to the lady which was -- in my opinion, she's
4  organizing the drag racers, not as a representative of
5  the producer of the event.  She was just acting as a
6  helper organizing a small group of racers.
7    Q.  Do you know who was the producer or promoter
8  of this event?
9    A.  I understand Jack was the one that was
10  promoting the show.  I'm not for sure, but it's what I
11  heard from people talking.
12    Q.  Do you know his last name?
13    A.  You guys were just talking about him just this
14  morning -- or this afternoon.  I'm not sure.  I can't
15  remember his name.  But...
16    Q.  Okay.
17    A.  Brierly (phonetic)?  Jack Brierly?
18    Q.  All right.  I think there's been some
19  testimony in the case that the promoter of the event was
20  Jack Brady.
21    A.  Brady, yes.
22    Q.  Okay.  Did you meet Mr. Brady on July 3, 2004?
23    A.  Not that I'm aware of.
24    Q.  Do you know if he was present at the site?

Page 101

1    A.  I have no idea.
2    Q.  Okay.  Now, the form was apparently signed by
3  several people before you, and then it was given to you.
4  Is that correct?
5    A.  As far as I remember.  It was one of the -- my
6  teammates handed it to me.
7    Q.  All right.  What did your teammate say when he
8  handed it to you?
9    A.  Just a -- I don't remember their verbiage.  I
10  don't remember.  Just somebody handing it to me and -- I
11  assume it was just a waiver to -- you had to sign, which
12  is pretty normal for some kind of sporting event like
13  that.
14    Q.  Okay.  Do you remember which one of your
15  teammates or which one of the crew gave it to you to
16  sign?
17    A.  I'm guessing it was the person prior to me
18  signing it.  I'm not sure.
19    Q.  That would be Mr. Littleton?
20    A.  (The witness indicated.)
21        THE REPORTER:  I'm sorry.  Was that a
22  yes?
23        THE WITNESS:  I'm not sure.
24

B-28

Delbert E.  Rollison

Page 102

1 BY MR. AKIN:
2    Q.  All right.  You said a minute ago that you
3 assumed that it was a certain kind of form.  What did you
4 assume that the form was?
5    A.  Just -- it's a waiver that -- in case
6 something that was -- happened.  People -- if they were
7 following the rules and something happened -- an engine
8 blew up and shrapnel would hit you -- you -- they're not
9 responsible for that.  Something that's out of the -- out
10 of their control.
11    Q.  Okay.  In case something happened, what would
12 be the effect of this form, if you know?
13        MR. FOGG:  I object.  It calls for a
14 legal conclusion.
15 BY MR. AKIN:
16    Q.  All right.  You can answer the question, if
17 you have an answer.
18    A.  Can you say the question again, please?
19    Q.  Yeah.
20        If you sign this form, what did you
21 understand the effect of the form to be?
22    A.  Like I say, if a vehicle went out of control
23 while it was being operated by a racer or the engine blew
24 up or somebody fell on you or somebody hit you over the

Page 103

1 head with a beer bottle or something like that.  Not
2 necessarily a beer bottle.  But if somebody tripped you
3 or something like that.  An accident.  I'm not really
4 sure.
5    Q.  All right.  But if one of those things
6 happened, what would this form do?
7        MR. FOGG:  Same objection.  He can
8 answer.
9 BY MR. AKIN:
10    Q.  You can answer.
11    A.  I'm not sure.
12    Q.  Okay.  But you just stated several things that
13 could occur -- a beer bottle hit someone on the head, a
14 car goes out of control, some shrapnel flies through the
15 air from a blown engine -- something like that.  If
16 anything, what did you understand this form would do if
17 you were, for instance, to receive injuries from one of
18 those sorts of incidents?
19    A.  I don't know.  I'm not a lawyer or didn't read
20 it --
21    Q.  Okay.
22    A.  -- in detail.
23        So I'm not for sure.
24    Q.  So it's your testimony that you did not read

Page 104

1 the form before you signed it?
2    A.  Correct.
3    Q.  Did you read any of it before you signed it?
4    A.  No.
5    Q.  Did you ask any of your crew what it was that
6 you were signing?
7    A.  No.
8    Q.  Okay.  Now, going back to the bottom of the
9 form, there's a typed statement in the second column that
10 says "I have read this release."  Do you see that sort of
11 superimposed under or over the signatures in the middle
12 column?
13    A.  I see it, yes.
14    Q.  All right.  But it's your testimony that in
15 fact you did not read it before you signed it.  Correct?
16    A.  Correct.
17    Q.  Did you have time to read it before you signed
18 it?
19    A.  Yes.  I could have.
20    Q.  Okay.  So was anyone suggesting that you sign
21 it but not read it?
22    A.  No.
23    Q.  You testified earlier that you in the past
24 have had some involvement in some bracket races.  Is that

Page 105

1 correct?
2    A.  Yes.
3    Q.  Was that as a crew member or a racer?
4    A.  It was a -- as a friend and a crew member
5 helping a person out that was -- that had the race car
6 that was driving it.
7    Q.  All right.  In regard to those prior bracket
8 races or drag races, were you asked to sign a form in
9 order to participate in those activities?
10    A.  No.
11    Q.  So is this the first time you had ever signed
12 such a form to your knowledge in conjunction with a
13 sporting event or a racing activity?
14    A.  I've been to a lot of air shows.  I'm sure
15 I've -- I might have signed something like that, because
16 I've been out on the flight lines with aircraft
17 retrieving them and launching them.  I'm sure I've --
18 maybe have or maybe haven't.  I can't remember for sure,
19 but...
20    Q.  Do you remember where you have worked around
21 aircraft where you may have been asked to sign some sort
22 of waiver form?
23    A.  Sun in the Fun Air Show.
24    Q.  Where did that occur?

Corbett & Wilcox

B-29

Delbert E.  Rollison

28 (Pages 106 to 109)

Page 106

1    A.  That's in Lakeland, Florida.
2    Q.  Were you involved in working on aircraft at an
3  air show in Florida?
4    A.  I was there as a spectator, but I was allowed
5  to enter the prepared area for the aircraft to come and
6  go as a -- somebody with experience was allowed in there.
7    Q.  All right.
8    A.  Not -- a regular spectator is not allowed.
9    Q.  Okay.  Is it your recollection that you may
10  have signed a waiver form before you were allowed into
11  that area?
12    A.  I can't say if I did or didn't.  But chances
13  are I've signed some in my history, yes.
14    Q.  On your way up to Delaware back in July of
15  '04, did you and the members of the crew discuss the fact
16  that you would be asked to sign a form?
17    A.  I was riding with my brother Randy, and it
18  never came to conversation.
19    Q.  Okay.  Did you have any understanding as to
20  whether being in proximity to race cars in an event like
21  this involved certain danger to people in the immediate
22  vicinity?
23    A.  There's always a danger in any kind of
24  activity like this.

Page 107

1    Q.  All right.  What sorts of dangers are present
2  in mud racing activities to your knowledge?
3    A.  They're traveling at a high speed in a
4  straight line which can go out of control in a short
5  distance with spectators, crew people surrounding --
6  concession stands and things like that.
7    Q.  Let me ask you to take a minute to read to
8  yourself paragraph 3 of this form.  I've got a couple of
9  questions for you.
10    A.  (The witness complied with counsel's request.)
11    Q.  Have you had a chance to read paragraph 3,
12  sir?
13    A.  Yes.
14    Q.  All right.  Realizing you're not an attorney,
15  I don't believe, nonetheless, what do you believe that
16  you were agreeing to in regard to paragraph 3?
17    A.  It was a basic liability of some of the
18  dangers you might be involved in in a racing arena like
19  that --
20    Q.  All right.
21    A.  -- in general.
22    Q.  Okay.  You say "basic liability."
23      But in regard to paragraph 3, what is it
24  that you were promising to do or not to do as a result of

Page 108

1  the language in paragraph 3?
2    A.  I don't hold the person responsible for their
3  actions or -- I'm not sure.
4    Q.  All right.
5    A.  I have to read it and try to memorize it.
6  But, in general, they're not responsible for somebody
7  that's doing something they shouldn't be doing.
8  They're -- but something happened that -- they're not --
9  out of their control.
10    Q.  Isn't it true in paragraph 3 by signing this
11  document you're agreeing to assume personal
12  responsibility for injuries that may have occurred in
13  conjunction with race activities that day?
14    A.  That's what the waiver says, yes.
15    Q.  Paragraph 6 states -- and I'll quote -- the
16  activities of the event are very dangerous and involve
17  the risk of serious injury or death or property damage.
18  Do you agree or disagree with that statement in regard to
19  mud racing?
20    A.  I agree.
21    Q.  By the way, there's one final signature at the
22  bottom of this release form.  Do you know whose signature
23  that is on the line that says Signature and Title of
24  Witness?

Page 109

1    A.  No, I do not.
2    Q.  In regard to answers to interrogatories that
3  have been proposed to you by Mr. Shoemaker's attorney, in
4  Interrogatory No. 2 you list a number of people who have
5  knowledge of the accident.  Going through that list of
6  people -- do you have it in front of you now, sir?
7    A.  Yes, I do.
8    Q.  Which of those people, to your knowledge,
9  actually saw the impact between the mud racer and your
10  legs?
11    A.  To the best of my knowledge, none of them.
12    Q.  All right.  Obviously, since you were the
13  injured person, you were a witness to the incident.
14  Correct?
15    A.  Yes.
16    Q.  Is it your testimony that the Shoemakers were
17  not witnesses to the event?
18      THE WITNESS:  We're talking about this
19  column right here, aren't we?
20      MR. FOGG:  Mm-hmm.
21      THE WITNESS:  It's my understanding that
22  the Shoemakers are witnesses.  They were the ones that
23  were -- hit me.  If they saw me, they wouldn't have --
24  they could have avoided me.  So as far as being a witness

B-30

Page 110

1  at the scene where the accident happened, they could have
2  avoided me.
3  BY MR. AKIN:
4      Q.  Mr. McCaughey, did he tell you afterwards that
5  he saw what happened?
6      A.  Nobody throughout the whole event said they
7  saw what happened.
8      Q.  All right.  The same question for
9  Mr. Tapscott.  Did he come to you at any time after the
10  accident and tell you that he observed what happened?
11      A.  No.
12      Q.  Same question for Mr. Littleton.
13      A.  No.
14      Q.  Same question for Randy Rollison.
15      A.  No.
16      Q.  Is it your testimony that your brother's
17  vehicle had already reached the staging area and had come
18  to a halt when you were injured, or was it still moving
19  toward the staging area?
20      A.  I knew he was ahead of me.  Whether he was
21  still in transition to get to there or he already
22  stopped, I don't know.  But he was, I'm sure, ahead of
23  me.
24      Q.  Were you in a hurry to get over to the staging

Page 111

1  area because your brother had gotten there or had almost
2  gotten to that point?
3      A.  No, sir.
4      Q.  Okay.  Were you walking in a normal stride?
5      A.  Yes, sir.
6      Q.  You were walking at least with another person,
7  I believe was your testimony.  Is that correct?
8      A.  Yes.  We were not together.  We were not team
9  members.  We were just somebody that happened to be
10  walking at the same time --
11      Q.  All right.
12      A.  -- same speed.
13      Q.  Were you talking with each other as you moved
14  toward the staging area?
15      A.  Just in general.  What did you think of that?
16  Or whatever -- it wasn't like an in-depth conversation.
17  It was just, "Hi.  How are you?"  You know, things like
18  that.
19      Q.  At any time on the date of this accident, did
20  you remember having any discussions or seeing anyone at
21  the site who was a representative of the owner of the
22  land where the race occurred?
23      A.  I never saw anybody really in charge or
24  directing anybody on what to do or where to go.  The only

Page 112

1  person I really saw as coordinating was this lady.  I
2  believe her name was Ann.
3      Q.  All right.  She instructed the crews to move
4  their vehicles to the staging area.  Is that correct?
5      A.  Yes, sir.
6      Q.  Do you recall her giving any other
7  instructions that day to the racers or their crews?
8      A.  Not that I'm aware of.
9      Q.  Had your brother participated in prior races
10  at Blue Diamond Park, that is, races prior to July 3,
11  2004?
12      A.  I don't think so.  But I'm not sure.
13      Q.  Has your brother participated in any races at
14  Blue Diamond since July of 2004 to your knowledge?
15      A.  I don't think so.  But I'm not sure.
16      Q.  Okay.  Have you been back to Blue Diamond Park
17  since this accident occurred?
18      A.  No, sir.
19      Q.  Do you know, as you sit here today, who owns
20  the Blue Diamond Park?  What person or company or other
21  entity owns the facility?
22      A.  I guess it's owned by some gravel corporation.
23      Q.  Do you know the name of that company?
24      A.  Not right off the top of my head, no.  It was

Page 113

1  a partnership.
2      Q.  After the accident occurred, did you or any
3  lawyer on your behalf contact or attempt to contact the
4  owners of the facility to your knowledge?
5      A.  No, sir.
6      Q.  Ms. Fallon asked you a couple of questions
7  earlier about another form that may have been handed out
8  which gave people some general instructions or rules
9  regarding the event such as only licensed drivers can
10  participate and people shouldn't consume alcohol before
11  operating vehicles and those sorts of things.  Your
12  recollection is those instructions were on a one-page
13  form.  Is that correct?
14      A.  Yes.  It was a regular-size paper.  It was
15  bold letters.  It was maybe five or six different items
16  to read.  And at the top there was some kind of logo -- a
17  company logo.  It was flags of -- you know, checkered
18  flags or something like that.  I'm not sure.
19      Q.  Okay.  Was that piece of paper given to all
20  people who were signing these release forms to your
21  knowledge?
22      A.  I have no idea how -- I don't know if it was
23  given to us when we came in the gate --
24      Q.  Okay.

B-31

Delbert E.   Rollison

30 (Pages 114 to 117)

Page 114

1  A.  -- or -- I'm not sure.
2  Q.  Did each one of your crew receive a separate
3  copy of that document, or was it one per crew?
4  A.  I have no idea.
5  Q.  All right.  You don't recollect as you sit
6  here today as to whether you kept the form; is that
7  correct?
8  A.  I could have it.  I'm not sure.  But I'll...
9  Q.  Ms. Fallon has asked you to look in your
10  personal records and produce to your attorney a copy of
11  that paper.  We'll be deposing other witnesses in this
12  case.  But if your brother kept a copy of that form, I
13  would ask you to please have him forward a copy to your
14  lawyers so that it can be produced in this case.
15       Will you comply with that, sir?
16  A.  I will.
17  Q.  All right.  Thank you.
18       There's been some testimony in this case
19  that some people may or may not have been distracted as
20  the vehicles moved to the staging area by an operator of
21  a vehicle who may have been operating it in an erratic
22  fashion.  Do you recall any sort of activity as you moved
23  to the staging area where people's attention were drawn
24  to another vehicle whose operator may have been showing

Page 115

1  off with that vehicle?
2  A.  A race vehicle you're referring to?
3  Q.  A race vehicle or any other vehicle within
4  the --
5  A.  Not that I'm aware of.
6  Q.  All right.
7  A.  No.
8  Q.  One more question about the release, which is
9  Rollison 3.  When you were provided this form to sign by,
10  apparently, another member of your crew, was there any
11  coercion or threats regarding the signing of the
12  document, or did you sign it of your own free will?
13  A.  Own free will.
14  Q.  Okay.  So no one said you better sign it or,
15  you know, you'll have to leave or you're in trouble or
16  anything like that?  There was no sort of coercive
17  statement at the time you were given the form to sign.
18  Is that correct?
19  A.  I was not pushed to sign it, no.
20  Q.  Okay.  Again, did you understand that you were
21  required to sign it in order to participate with the crew
22  that day?
23  A.  No.  I didn't think that.  I think maybe
24  everybody who came to that had to sign something like

Page 116

1  that.  I don't know if it was for the drivers, the
2  spectators, the pit crew people, people in other parts of
3  the show.  I'm not sure.  I just --
4  Q.  Do you understand that spectators were also
5  required to sign waiver forms that day?
6  A.  I have no idea whether they were or not.
7  Q.  Okay.  This spectator area -- and I think
8  you've identified the area where, I guess, general
9  members of the public could be.  You have identified that
10  on your drawing as grandstands and seating; correct?
11  A.  Yes.
12  Q.  Were there actual bleachers in that area or
13  was it just a grassy area where people could sit?
14  A.  I think it was just a grassy hill --
15  Q.  Okay.
16  A.  -- that people put blankets down.
17  Q.  All right.
18  A.  There might have been some bleachers
19  someplace, but what I remember is just mostly a hillside
20  people were sitting on.
21  Q.  Was that seating area separated from the area
22  where the participants were by anything?
23  A.  I remember an orange safety fence that you see
24  at construction sites.  I think it was kind of roped off

Page 117

1  between the monster trucks and the grandstands.
2  Q.  Okay.  So I'm clear on your testimony, you
3  don't have any understanding as to whether spectators --
4  just general members of the public -- whether they were
5  required to sign waiver forms, do you?
6  A.  I'm not familiar if they are or not.
7  Q.  When you walked across from the parking lot
8  and then across the guardrail and paved road, was there
9  anyone on site who was checking people's identification
10  or asking people to identify themselves before they
11  allowed people to enter the area where the participating
12  vehicles were going?
13  A.  There was nobody there.  There was people
14  sitting on the guardrail.  There was some people with
15  their little lawn mowers they were racing.  There was
16  kids riding their bikes up and down this area here.
17  There was a lot of activities.  Like it wasn't a
18  restricted area or marked off for a pedestrian crossing.
19  It was just -- people were coming back from this lawn
20  mower race -- coming back in that area.  And they were
21  sitting along the guardrail kind of talking to other
22  people.  Kids were walking up and down that area.  It was
23  kind of like a thoroughfare.  It was just an asphalt
24  road.  People were using it to go from one end of the

B-32

Delbert E. Rollison

Page 118

1 parking lot to the other or to -- from one side of the
2 event to the other. A lot of pedestrian walking.
3      Q. I'm trying to understand how --
4      A. There was no --
5      Q. -- they were keeping members of the general
6 public out of the area where the monster trucks were and
7 where the mud races were being staged.
8      A. There wasn't. There was a lot of activity.
9 Prior to this in the early afternoon, there was what I
10 would think would be somebody performing -- driving cars
11 up on two wheels. They were using this road right here,
12 the paved road, as a practice area. They were driving
13 back and forth -- which people were walking across in
14 front of them. And the car actually -- of course, it was
15 going like 15 miles an hour. But the car actually rolled
16 over on its roof and glass fell out of the windshield.
17 The driver had no helmet. The guys rolled it -- even
18 some spectators -- not spectators, but people in the
19 general area helped the car guy roll the car back up on
20 its wheels. And he drove it off as -- I was remembering
21 this was a pretty shady operation the way things were
22 being -- because this guy could have ran off the road and
23 taken out anybody in this general area.
24      Q. Where did that vehicle roll over? Was it on

Page 119

1 the racetrack?
2      A. It was right in front of where I marked
3 "guardrail." Right in front of the middle of the parking
4 lot area.
5      Q. Okay. One or two more questions.
6           When you went up with your brother, you
7 actually had duties in regard to getting the car over to
8 the staging area and assisting in getting it ready to
9 race; is that correct?
10      A. There was no set duties. I'm a little
11 familiar with race vehicles. You know, make sure the
12 seatbelts -- make sure the engine is running properly. A
13 basic check before he heads to the starting line.
14 Something like that. Make sure nothing is hanging loose.
15 Make sure the safety switch is in the brake position. In
16 case it does have an accident, it automatically cuts off.
17      Q. So you were involved in providing some of
18 those services with regard to your brother's vehicle; is
19 that correct?
20      A. I was going to.
21      Q. Okay. Did your brother actually race that
22 day?
23      A. No, he did not.
24      Q. Okay. Why did he not race? Was it because of

Page 120

1 your injuries?
2      A. Yes, sir.
3           MR. AKIN: All right. That's all I
4 have. Thank you.
5           MR. FOGG: Mr. Rollison, I have a few
6 questions.
7 BY MR. FOGG:
8      Q. Back to this one page list of rules that
9 you've been questioned about today. At any time after
10 you crossed the paved road in the area where these events
11 were taking place, did you see anyone enforcing any of
12 those rules?
13      A. I saw no one with any kind of authority
14 monitoring traffic -- foot traffic or anything. The only
15 person I saw with any kind of authority was the lady who
16 had gave us the times when to go to race.
17      Q. Mr. Rollison, I think you testified that you
18 recalled one of those rules stating you had to be a
19 licensed driver to operate the vehicle. Is that correct?
20      A. I'm not for sure, but I remember reading
21 something saying if you were caught drinking you would be
22 thrown from the race. If you were using your vehicle in
23 a -- if you were racing it like between the staging area
24 and the parking lot, if you were going too fast or

Page 121

1 taxiing it too fast or spinning wheels recklessly, you
2 would be thrown out. I'm thinking there was something in
3 there saying if you were -- you had to be a licensed
4 driver or someone over 16. I think it was in the same
5 paragraph.
6      Q. With respect to the rule you said about
7 people, for lack of a better word, driving improperly,
8 they could be thrown out. You had testified earlier that
9 you saw a car actually flip over on the paved road in
10 front of the parking lot. Do you have any knowledge as
11 to whether the individual operating that vehicle was
12 removed from the park as a result of that incident?
13      A. As far as I know, no. The car was pushed back
14 over by some local people. Then the guy got in the car
15 and drove off. I never saw him again.
16      Q. Other than the rule that you talked about
17 being 16 or a licensed driver in order to operate one of
18 the vehicles, do you recall seeing any other rules on
19 that page that were age specific or talked about being a
20 certain age to do anything at the event?
21      A. I can't say for sure, but I think it was 16.
22      Q. Okay.
23      A. Sixteen or licensed -- or you had to be both.
24 I can't remember. Something of that nature.

B-33

Delbert E.  Rollison

32 (Pages 122 to 125)

Page 122

1    Q.  In the area after you crossed the paved road
2 where the events were taking place, do you recall seeing
3 any children or people that you believed to be under the
4 age of 18 walking around in that area?
5    A.  Definitely.  All day long.  Between the
6 parking lot and the monster trucks, they had a lot of
7 young people being carried by their parents in their arms
8 and people being led along by their parents supervised.
9    Q.  At any time while you were there, did you
10 observe any children or people that you believed to be
11 under the age of 18 operating any of the ATV or 4-wheeler
12 vehicles that were pushing and/or pulling any mud
13 dragsters?
14    A.  No.
15    Q.  At any time while you were there, did you
16 observe any children or people that you believed to be
17 under the age of 18 behind the steering wheel of any mud
18 dragsters either operating on their own or being pushed
19 or pulled by another vehicle?
20    A.  I can't be for sure, but there's a lot of
21 4-wheelers that had been ridden back and forth around the
22 general area by young people.  Whether they were under 18
23 or not, I'm not sure.  But there was a lot of
24 traveling -- they're very common in race areas where they

Page 123

1 go from concession stands.  They use them just to travel
2 around instead of walk.
3    Q.  Okay.  At any time did you see any children or
4 people you believe under the age of 18 behind the
5 steering wheel of any of the mud dragsters?
6    A.  The only thing I would know of is Neal
7 Shoemaker's son, which I never saw him actually sitting
8 behind the wheel.  I was told by other people that he was
9 the one that was steering the vehicle.  I never actually
10 saw him in the vehicle.
11    MR. FOGG:  I have no further questions.
12 Thanks.
13    MS. FALLON:  Just to follow up on some
14 of the last questions of your attorney.
15 BY MS. FALLON:
16    Q.  As you walked in this area in between the
17 monster trucks to your left and the mud racers being
18 pushed or towed or moved to the staging area, were there
19 any other vehicles in and around the area where you were
20 walking?  Bicycles?  ATVs?  Any kind of other vehicles
21 other than people on foot in between that area?
22    A.  There was some people going by with these lawn
23 mowers going from this race area, which is the -- it had
24 a circle track in this area.  There were some people

Page 124

1 coming back from that -- one or two.  Not a whole lot.
2 Maybe one or two.
3    Q.  They were sit-down mowers?
4    A.  Yes.
5    Q.  Rider mowers --
6    A.  Yes.
7    Q.  -- in other words?
8       They were like traveling on those rider
9 mowers through the pedestrian crowd that you were a part
10 of moving toward this staging area?
11    A.  Yes.
12    Q.  Do you know if the force that you felt from
13 behind was due to one of those ride-on lawn mowers that
14 was moving through that area?
15    A.  I've never been hit by a lawn mower so I
16 couldn't compare it to anything.  But whatever hit me was
17 a lot of heavy weight and force.  It wasn't like it gave
18 when it hit me.  It was just like I was slammed.
19    Q.  You never saw what hit you?
20    A.  No.
21    Q.  Your next observance was of seeing
22 Mr. Shoemaker's mud racer; correct?
23    A.  Yes.
24    Q.  So you made an assumption that that's what

Page 125

1 struck you; correct?
2    A.  Correct.
3       MS. FALLON:  That's all I have.
4       MR. FOGG:  That does prompt one
5 follow-up.
6 BY MR. FOGG:
7    Q.  With respect to the lawn mowers, were they
8 coming towards you or were they traveling behind you?
9    A.  They were coming towards me.
10       MR. FOGG:  Thank you.  That's it.
11       MR. AKIN:  I have no further questions.
12       (The deposition concluded at 1:35 p.m.
13 this same day.)
14
15       - - - - -
16
17       (I HAVE READ THE FOREGOING DEPOSITION,
18 AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.)
19
20
21
22 _____
23    WITNESS NAME
24

B-34

Delbert E. Rollison

33 (Pages 126 to 127)

Page 126

1          INDEX TO TESTIMONY
2
DELBERT EUGENE ROLLISON                    PAGE
3
       Examination by Ms. Fallon        2
4      Examination by Mr. Akin          87
       Examination by Mr. Fogg          120
5      Examination by Ms. Fallon        123
       Examination by Mr. Fogg          125
6
7                - - - - -
8
           INDEX TO EXHIBITS
9
10  ROLLISON DEPOSITION EXHIBIT NO.          PAGE
11  1    Sketch                        43
12  2    Delaware Basic Life Support: Patient    90
        Care Report
13
    3    Release and Waiver of Liability,      94
14       Assumption of Risk and Indemnity
         Agreement
15
16               - - - - -
17
18
19
20
21
22
23
24

Page 127

1          C E R T I F I C A T E
2    STATE OF DELAWARE:
                      :
3    NEW CASTLE COUNTY:
4          I, Robert Wayne Wilcox, Jr., a Registered
5    Professional Reporter and Notary Public, within and for
6    the County and State aforesaid, do hereby certify that
7    the foregoing deposition of DELBERT EUGENE ROLLISON, was
8    taken before me, pursuant to notice, at the time and
9    place indicated; that said deponent was by me duly sworn
10   to tell the truth, the whole truth, and nothing but the
11   truth; that the testimony of said deponent was correctly
12   recorded in machine shorthand by me and thereafter
13   transcribed under my supervision with computer-aided
14   transcription; that the deposition is a true record of
15   the testimony given by the witness; and that I am neither
16   of counsel nor kin to any party in said action, nor
17   interested in the outcome thereof.
18         WITNESS my hand and official seal this 17th day
19   of August A.D. 2006.
20
21        _____
22        ROBERT WAYNE WILCOX, JR.
          REGISTERED PROFESSIONAL REPORTER
          CERTIFICATION NO. 101-RPR
23        (Expires January 31, 2008)
24

B-35

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DELBERT E. ROLLISON,                )
                                    )
          Plaintiff,                )
                                    )
v.                                  )
                                    )
NEAL SHOEMAKER, an individual,      )
BLUE DIAMOND, LLC, a Delaware       )
corporation, HOUGHTONS              )
AMUSEMENT PARK, LLC, a              )    C.A. NO: 06-159 SLR
Delaware corporation, JACK          )
BRADY, individually and d/b/a       )
KSR MOTOR SPORTS, BENCHMARK         )
BUILDERS, INC., a Delaware          )
corporation, and PARKWAY            )
GRAVEL, a Delaware                  )
Corporation.                        )
                                    )
          Defendants.               )

     Deposition of NEAL ROBERT SHOEMAKER taken pursuant
to notice at the law offices of Doroshow, Pasquale,
Krawitz & Bhaya, 1202 Kirkwood Highway, Wilmington,
Delaware, beginning at 10:00 a.m. on Tuesday, August 1,
2006, before Robert Wayne Wilcox, Jr., Registered
Professional Reporter and Notary Public.

APPEARANCES:

          MATTHEW R. FOGG, ESQ.
          DOROSHOW, PASQUALE, KRAWITZ & BHAYA
            1202 Kirkwood Highway
            Wilmington, Delaware  19805
            for the Plaintiff,


                    CORBETT & WILCOX
               Registered Professional Reporters
          230 North Market Street      Wilmington, DE 19801
                       (302) 571-0510
                    www.corbettreporting.com

B-34

2 (Pages 2 to 5)

**Page 2**

1  APPEARANCES (CONT'D):
2      SHERRY RUGGERIO FALLON, ESQ.
       TYBOUT, REDFEARN & PELL
3      750 South Madison Street - Suite 400
       Wilmington, Delaware  19801
4      for the Defendant Shoemaker,
5   ROGER A. AKIN, ESQ.
    AKIN & HERRON, P.A.
6      1220 North Market Street - Suite 300
       Wilmington, Delaware  19801
7      for the Defendants Blue Diamond, LLC,
       and Parkway Gravel,
8
    CHANETA G. MONTOBAN, ESQ.
9   CASARINO, CHRISTMAN & SHALK, P.A.
       800 North King Street - Suite 200
10     Wilmington, Delaware  19801
       for the Defendant Houghton's Amusement
11     Park, LLC.
12          - - - - -
13      NEAL ROBERT SHOEMAKER,
14      the witness herein, having first been
15      duly sworn on oath, was examined and
16      testified as follows:
17      (Shoemaker Deposition Exhibit No. 1 was
18  marked for identification.)
19  BY MR. FOGG:
20      Q.  Good morning, Mr. Shoemaker.  My name is
21  Matthew Fogg, and I represent Delbert Rollison with
22  respect to an incident that occurred at Blue Diamond Park
23  in New Castle, Delaware on July 3rd of 2004.
24      I'm going to be asking you a series of

**Page 3**

1  questions today.  As there's a court reporter here, I'd
2  ask that you wait to answer any question till I've
3  completed asking the question, because he can't take both
4  of us down at the same time.  I'd also that you answer
5  every question verbally, saying yes or no, instead of
6  uh-huh or uh-uh or shaking your head so he can take down
7  everything you're saying.
8      If at any point you don't understand a
9  question or you don't hear a question that I ask you,
10  just let me know.  I'm happy to rephrase it or repeat it
11  for you.  If at any time you need to take a break, just
12  let me know.  I'm happy to stop so you can take a break.
13  Okay?
14      A.  Yes.
15      Q.  Mr. Shoemaker, how old are you?
16      A.  Forty-three.
17      Q.  What's your current address?
18      A.  1215 North Mink Road, Danielsville,
19  Pennsylvania 18038.
20      Q.  Who do you live with at that address?
21      A.  My family.  My wife and two sons.
22      Q.  What is your wife's name?
23      A.  Lori.
24      Q.  What are your son's names?

**Page 4**

1      A.  Calvin and Travis.
2      Q.  How old are Calvin and Travis?
3      A.  Calvin is 16.  Travis is now 14.
4      Q.  Are you employed, sir?
5      A.  Self-employed.
6      Q.  What kind of business do you run?
7      A.  A trucking company.  Basically, owner/
8  operator.
9      Q.  What is the name of that company?
10      A.  Just Neal Shoemaker.
11      Q.  Okay.  How long have you been doing that?
12      A.  Ten years.  Nine -- nine-and-a-half years.
13      Q.  Mr. Shoemaker, do you participate in off-road
14  vehicle recreational sports?
15      A.  Yes.
16      Q.  How long have you done that?
17      A.  Twenty-two years.
18      Q.  Can you describe the recreational sport or
19  sports involving off-road vehicles that you have
20  participated in the last 22 years?
21      A.  It's basically sand drags, mud drags.
22      Q.  Other than sand drags or mud drags, have you
23  done any other kinds of off-road recreational sports?
24      A.  No.

**Page 5**

1      Q.  Okay.  Can you describe what that is -- sand
2  drags and mud drags?
3      A.  It's like a -- basically a drag race that's on
4  dirt.  The length usually ranges from 120 feet to 200
5  feet long.
6      Q.  Okay.  How often would you participate in
7  these types of events?
8      A.  As in how many events per year?
9      Q.  Mm-hmm.
10      A.  We vary anywhere from 15 to 20, maybe.
11      Q.  Okay.  Are they all fairly local events, or do
12  you travel nationally?
13      A.  Pretty much the East Coast.
14      Q.  Okay.
15      A.  You know, Vermont, clear down to Virginia,
16  Carolinas.
17      Q.  Mr. Shoemaker, I'm going to hand you a picture
18  I've had marked as Shoemaker 1.  Can you describe what
19  that picture is of?
20      A.  A picture of the race car.
21      Q.  Is that the race car that you owned on
22  July 3rd, 2004?
23      A.  Yes.
24      Q.  Is that a sand dragster or mud dragster?  Is

B-37

Neal R. Shoemaker

3 (Pages 6 to 9)

Page 6

1  that what you would call those?
2      A.  Yes.
3      Q.  As of July 3rd, 2004, how long had you had
4  that vehicle?
5      A.  One year.
6      Q.  Did you purchase it or did you build it?
7      A.  Build it.
8      Q.  Did you build it by yourself?
9      A.  No.  I had a -- basically, I had a friend of
10  mine build the framework, and then I did the finishing --
11  the suspension and all that.
12      Q.  When you purchase something or the parts to
13  build something like that, does it come in some kind of
14  model form?  Is there directions on how to build that, or
15  did you just know how to do that?
16      A.  Basically the knowledge over years.  You learn
17  a lot.  Different techniques.
18      Q.  Did you design the frame of this vehicle?
19      A.  No.  A friend of mine did it.  He used a
20  computer graph for the computer to basically figure out
21  where everything needed to be for safety's sake.
22      Q.  The mud dragster that's in the picture in
23  Shoemaker 1, is that basically what all mud dragsters
24  look like as far as the frame?

Page 7

1      A.  Real similar.  This one is a little different
2  than a lot of the others.
3      Q.  Can you explain how it's different?
4      A.  It's a lot lower to the ground, simply for
5  handling.  Pretty much that's the only difference.
6      Q.  The fin that's on the back, I guess, we can --
7  is that what that is?  A fin?  That silver --
8      A.  Yeah.
9      Q.  -- piece at the end?
10          Is that on most other mud dragsters?
11      A.  No, no.  This one is different because I've --
12  it's not like it needs to be there.  I did it for design.
13      Q.  Okay.  Do you know how high it is from the
14  ground up to the top of that fin?
15      A.  I'm not exactly sure of the measurement, no.
16      Q.  Do you still have that vehicle in your
17  possession today?
18      A.  Yes.
19      Q.  Do you have any intentions of selling it in
20  the next six months?
21      A.  No.
22      Q.  Where in that mud dragster would you sit to
23  race it?
24      A.  Just in front of the engine.

Page 8

1      Q.  Okay.  There's basically three white --
2      A.  Right.
3      Q.  -- poles above the Roman Numeral IV.
4          Is that where --
5      A.  Yes.
6      Q.  -- you would sit?
7      A.  Yes.  That's where you would sit.
8      Q.  Okay.  Does that vehicle have power steering?
9      A.  No.
10      Q.  Okay.  Now, with respect to that vehicle, can
11  you just drive that vehicle around, or does it just go
12  for short periods of time?
13      A.  Very short periods of time.
14      Q.  Is that all the engine is designed to run for?
15  For very short periods of time?
16      A.  Yes.
17      Q.  When you say "very short periods of time," can
18  you give me an idea as to how long?
19      A.  Well, you got a few minutes of warm-up time.
20  But as far as racing it, basically, you would only be
21  able to run it for maybe 30 seconds tops at full --
22      Q.  Okay.
23      A.  -- capacity.
24      Q.  Can you operate that vehicle on public

Page 9

1  roadways?
2      A.  No.
3      Q.  Do you have to have any kind of special
4  licensing to operate one of those vehicles?
5      A.  No.
6      Q.  Do you store that mud racer at your home?
7      A.  Yes.
8      Q.  How do you get it to events?
9      A.  We trailer it.
10      Q.  Okay.  You said that you had that vehicle for
11  about a year at the time of this incident.  You said that
12  you run an average of 15 to 20 races a year.  Do you have
13  any idea of about how many times you raced that
14  particular vehicle prior to July 3rd of 2004?
15      A.  That would be a lucky guess.  I couldn't
16  really answer exactly how many races.
17      Q.  If you had it for a year, would you think that
18  you were on your average and had run 15 to 20 races with
19  that vehicle?
20      A.  Yes.
21      Q.  Okay.  As of July 3rd, 2004, did you own any
22  other off-road vehicles other than that one?
23      A.  Yes.
24      Q.  What other off-road vehicles did you own?

B-38

Neal R.    Shoemaker

4 (Pages 10 to 13)

Page 10

1    A.  Similar to the same aspect.  We sat behind the
2  engine on that car.
3    Q.  Did you just have one other vehicle?
4    A.  We had two others besides.  And the one before
5  the previous one to this one was basically -- was a full-
6  size truck body vehicle.
7    Q.  Were they all mud dragsters, though?
8    A.  Yes.
9    Q.  Prior to July 3rd, 2004, had you ever attended
10  as a participant an event at Blue Diamond Park in
11  New Castle, Delaware?
12    A.  Yes.
13    Q.  How many times?
14    A.  One other.
15    Q.  In the 22 years that you've been racing
16  dragsters?
17    A.  Yes.
18    Q.  When was that?
19    A.  A few months prior to.
20    Q.  Your interrogatory responses indicate that it
21  was Memorial Day weekend.  Does that sound correct?
22    A.  Yes.
23    Q.  Okay.
24    A.  Yes.

Page 11

1    Q.  Were you racing the same vehicle?
2    MR. AKIN:  Of what year?
3    MR. FOGG:  Of 2004.
4    THE WITNESS:  Of 2004.
5    MR. FOGG:  A few months prior.
6    THE WITNESS:  Right.
7    MR. AKIN:  Thank you.
8  BY MR. FOGG:
9    Q.  Were you racing the same vehicle that is in
10  Shoemaker 1?
11    A.  Yes.
12    Q.  Do you recall the name of the event that was
13  taking place on July 3rd, 2004?
14    A.  No.
15    Q.  Do you recall how you learned that that event
16  was taking place?
17    A.  Word of mouth, friends of friends.
18    Q.  Okay.  Did you have to sign up for that event?
19    A.  No, no.  It was basically an invitation-type
20  thing.
21    Q.  Did you have an invitation?
22    A.  It was a phone call invitation.
23    Q.  Do you know who that phone call invitation was
24  from?

Page 12

1    A.  It was from Ann Schiefly.
2    Q.  Who is Ann Schiefly?
3    A.  Somebody -- a friend of ours that we race
4  with, which this Jack Brady had contacted to call -- I
5  think it was like they needed ten race cars at the time.
6    Q.  Do you know who Jack Brady is?
7    A.  He was the fellow who promoted the event.
8    Q.  Had you ever met Jack Brady before July 3rd,
9  2004?
10    A.  Yes.
11    Q.  When is the first time you met Jack Brady?
12    A.  Sometime in 1999, probably.
13    Q.  Is it your understanding that Mr. Brady
14  operated a company called KSR Motor Sports?
15    A.  Yes.
16    Q.  Did Mr. Brady and/or KSR Motor Sports hold any
17  other events that you participated in prior to July 3rd
18  of 2004 that they sponsored?
19    A.  Yes.
20    Q.  Did KSR Motor Sports or Jack Brady sponsor
21  events pretty regularly that you participated in?
22    A.  Not that we participated in all the time.
23  Occasionally, we would, you know, participate in his
24  events.

Page 13

1    Q.  Okay.  In general, when you're participating
2  in these kinds of events, are there any written
3  guidelines or rules that sponsors may pass out to you?
4    A.  There's -- not that they pass out to us.  Not
5  at this event here.
6    Q.  Okay.  What about in general when you're
7  participating in these kinds of races?  In the 22 years
8  that you've been doing this, do they normally hand out
9  some kind of rules on what type of restrictions there are
10  or any types of rules or guidelines before you
11  participate in these events?
12    A.  Yes.
13    Q.  But you said in this particular instance on
14  July 3rd, 2004 no entity, including KSR Motor Sports or
15  Jack Brady, or --
16    A.  No.
17    Q.  -- any other entity handed you any type of
18  guidelines or rules --
19    A.  No.
20    Q.  -- governing the race.
21    Were there any discussions that took
22  place prior to the race as to guidelines or rules both
23  pre-race, during the race, post-race?
24    MS. FALLON:  Objection to form.

B-39

Neal R. Shoemaker

Page 14

1          MR. FOGG:  Let me rephrase that.
2   BY MR. FOGG:
3       Q.  At any point was there any discussions
4   regarding any rules or guidelines of the events taking
5   place on July 3rd, 2004?
6       A.  No.
7       Q.  Did anyone attend the event with you on
8   July 3rd, 2004?
9       A.  Yes.
10      Q.  Who?
11      A.  My wife Lori and my two sons, Calvin and
12  Travis.
13      Q.  I want to get a real quick understanding of
14  the layout of Blue Diamond Park.  Are there grandstands
15  for spectators to sit in?
16      A.  There's a hill that the spectators were
17  sitting on, basically.
18      Q.  Is that hill roped off or is there a fence?
19      A.  Yes.
20      Q.  Which one?  Fenced or rope?  Do you know?
21      A.  Fenced.
22      Q.  It was a fence?
23      A.  Yeah.  There was an orange safety fence, if I
24  recall.

Page 15

1          MS. FALLON:  Let's go off the record for
2   a minute.
3          (A brief discussion was held off the
4   record.)
5          MR. FOGG:  Let's mark this as
6   Shoemaker 2.
7          (Shoemaker Deposition Exhibit No. 2 was
8   marked for identification.)
9   BY MR. FOGG:
10      Q.  Mr. Shoemaker, I'm going to hand you what I've
11  had marked as Shoemaker 2.  Can you tell me what that
12  document is?
13      A.  This is a diagram of the basic layout of the
14  racetrack.
15      Q.  Did you draw that diagram, sir?
16      A.  Yes.
17      Q.  Okay.  I had been asking you about where the
18  spectators sit.  At the bottom of that page, it says
19  spectator hill.  I'm assuming that's where the spectators
20  sat.
21      A.  Yes.
22      Q.  You said that you believe there's an orange
23  netting fence at the bottom separating the spectators
24  from the racing area.

Page 16

1       A.  Yes.
2       Q.  Is that correct?
3       A.  Yes.
4       Q.  Were your wife and sons sitting on spectator
5   hill or were any and all of them down on the track with
6   you?
7       A.  They were down on the track with us until --
8   well, we never did race it that day.  But they were with
9   us -- my wife and Calvin were on the 4-wheeler with me.
10  And then Travis was steering the race car -- not running.
11      Q.  Got you.
12          You said Travis is 14 years old.  Is
13  that correct?
14      A.  Yes.
15      Q.  So at the time of this accident, he would have
16  been 12?
17      A.  Right.
18      Q.  Did Travis normally attend these events with
19  you?
20      A.  Yes.
21      Q.  Okay.  Did Travis race as well?
22      A.  No.
23      Q.  Did Calvin?
24      A.  No.

Page 17

1       Q.  Has Travis ever raced that vehicle at home or
2   not in an event?
3       A.  No.  Absolutely not.
4       Q.  Are you aware of whether there's any age limit
5   to participate in these kinds of events?
6       A.  No.
7          Let me rephrase that.  To race the
8   vehicle, you must be 18 years of age, unless stated;
9   otherwise, 16, as long as holding a valid driver's
10  license.
11      Q.  Okay.  Let me make sure I have that right.  I
12  think I got what you said.  You said you have to be 18
13  unless it would specifically state otherwise that you
14  could be 16 with a valid license.
15      A.  Right.
16      Q.  No one under the age of 16 could participate
17  in these events.
18      A.  Participate, right.
19      Q.  How did you know that?
20      A.  They're -- well, most rules that we do follow
21  other organizations state that.
22      Q.  Did you have any idea whether those rules were
23  in place for this event?
24      A.  No.  I really didn't.  We just take...

B-40

6 (Pages 18 to 21)

Page 18

1    Q.  Understood.
2        Okay.  I just want to get a better idea
3  of the layout from what's been marked as Shoemaker 2.  We
4  have spectator hill.  Then you have a long roadway that
5  basically goes through here.  Is that road inside the
6  track or outside of the track?
7    A.  That's inside the track.
8    Q.  Okay.  Then there's a place that says trailer
9  parking.  Is that where you would park your trailer?
10   A.  Right.  Yes.
11   Q.  I'm assuming, based on your drawing, you would
12  follow the roadway.
13   A.  Yes.
14   Q.  Okay.  At some point would you come off of the
15  roadway to go to a starting point?
16   A.  Yes.
17   Q.  Okay.  Can you show me where you would do
18  that?  I'll use yours.  If you're following the
19  roadway, can you put an X along the roadway where you
20  would exit the roadway to go where you start the race?
21   A.  (The witness complied with counsel's request.)
22   Q.  Okay.  When you turn off there towards the X,
23  there's a place that you have marked as racer lineup.  Is
24  that where you would go to start the race?

Page 19

1    A.  Yes.
2    Q.  Okay.  Can you tell me what's in the area
3  between where you turn off this roadway to go to the
4  racer lineup?
5    A.  This is like a big open area here.  And we
6  basically followed the road -- there's like a little path
7  you took up through.  And the monster trucks were -- this
8  is a monster truck course and the tough truck course.
9  They follow that -- we follow that up through.  And then
10  we line up right below the spectator hill.  So we would
11  basically be out of the way for them to perform their...
12   Q.  Okay.  Can you use a dotted line to kind of
13  mark the direction that that path would go to get to
14  racer lineup?
15   A.  (The witness complied with counsel's request.)
16   Q.  All right.  Well, we know that's --
17   A.  Okay.
18   Q.  Is this all a path?  What you have marked as
19  "road," is that the same as the path?
20   A.  Yes.
21   Q.  Okay.
22   A.  Yes.
23   Q.  Okay.  Go ahead.  You can just continue the
24  marking.

Page 20

1    A.  (The witness complied with counsel's request.)
2    Q.  Then after you got in line at the racer
3  lineup, would you be called to go up to the drag strip?
4    A.  Yes.
5    Q.  That's where you would start the race?
6    A.  Right.  Yes.
7    Q.  The entire roadway -- what you have marked as
8  "road" -- is it all basically the same kind of path as
9  the dotted line that you drew on here today --
10   A.  No.
11   Q.  -- or is this road different from the path
12  that you dotted today?
13   A.  This road is different.  This one was paved.
14  This one is paved.
15   Q.  Okay.  So what you have marked as "road" --
16  you have two marks of "road" -- one small one coming from
17  the trailer parking and then a long one that goes to the
18  track.  That's all paved roadway?
19   A.  Yes.
20   Q.  Then where you marked an X and drew a dotted
21  line, that's like a dirt path?
22   A.  Yes.
23   Q.  Okay.  When you're driving on the dirt path,
24  is there any markings on either side of the dirt path to

Page 21

1  keep your vehicles?  Any type of fencing or markings?
2    A.  No, no.
3    Q.  The path -- does it have two wheel tracks or
4  is it just like a dirt road?
5    A.  It was all dirt.  Not a real -- not like it
6  was really marked or anything.  Just that's the path
7  everybody took that they wanted us to take.
8    Q.  When you participated in these kinds of
9  events, would your family normally be down in the track
10  area with you?
11   A.  Until race time.  Until we actually raced.
12  Then my sons would have to go up on the hill --
13   Q.  What about --
14   A.  -- as a spectator.
15   Q.  How about your wife?
16   A.  She would be down with me because I need
17  somebody to help me work things -- switches and stuff
18  like that -- on the race car.
19   Q.  Is that how things would normally work?  Your
20  sons would stay when you attended any kind of events
21  involving your mud dragsters?  Your children would be
22  down in the track area with you until the race starts,
23  and then they would go up to the spectator area?
24   A.  Yes.

B-41

Neal R. Shoemaker

Page 22

1    Q.  Okay.  When you participated in these kinds of
2  events, how would you normally get your mud dragster to
3  the starting point?
4    A.  We push it with a 4-wheeler.
5    Q.  Is that how you would always do it?
6    A.  Yes.
7    Q.  Is that how you did it on July 3rd, 2004?
8    A.  Yes.
9    Q.  Is that how all of the mud racers would get to
10  the starting area when you participate in these kind of
11  events?
12    A.  Not all mud racers choose to do this.  Some
13  drive them out.  They -- why they don't?  It's their
14  prerogative.
15    Q.  Okay.
16    A.  But...
17    Q.  Let me ask you this question.
18        Could you have driven your mud dragster
19  to the starting point, or is that not possible?
20    A.  Not possible, I'm going to say.
21    Q.  Why?
22    A.  It would overheat it.
23    Q.  I know you said that you pushed yours.
24        Would any people pull their mud

Page 23

1  dragsters?
2    A.  Yes.
3    Q.  Was it common to see both people pushing and
4  people pulling their mud dragsters or was one more
5  prevalent in what you had observed?
6    A.  Can you rephrase?
7    Q.  If you were not powering your own vehicle to
8  the starting line and people were either pushing or
9  pulling their vehicle with an all-terrain vehicle, based
10  on what you see, what did you see more of:  People
11  pushing the vehicle or people pulling the vehicle?
12    A.  Most people pull.
13    Q.  Why didn't you pull your vehicle?
14    A.  Well, I found that, pushing it with a bar, I
15  cannot only now push it but I can pull it from behind
16  with the ATV without having to push it by hand anywhere,
17  which became more convenient for me as -- at the races.
18    Q.  If you could pull it from behind as well, is
19  there any reason that you wouldn't have pulled your
20  vehicle from behind to the starting line?
21    A.  Well, if I pulled it from behind to the
22  starting line, you would have to drive the race car
23  backwards, if that's what your phrasing is.
24    Q.  Okay.

Page 24

1    A.  I mean, I could have pulled it from the front
2  of the car, yes.
3    Q.  Okay.  You said that you were pushing it with
4  a metal bar.  Is that connected to that mud dragster?
5    A.  Yes.
6    Q.  How long is that metal bar?
7    A.  Approximately 7 feet long.
8    Q.  So if you're pushing the mud dragster, someone
9  would have to sit in the mud dragster to steer it.
10    A.  Yes.
11    Q.  Would that be correct?
12    A.  Yes.
13    Q.  Who was steering the mud dragster on July 3rd,
14  2004?
15    A.  Travis.
16    Q.  Had Travis steered that before while you
17  pushed it?
18    A.  Yes.  Many times.
19    Q.  In the Memorial Day event that you were at
20  Blue Diamond Park, did Travis steer the vehicle while you
21  pushed it to the starting line on that date?
22    A.  Yes.
23    Q.  Was there ever a time where someone other than
24  Travis would steer the mud dragsters that you were

Page 25

1  pushing to the starting line?
2    A.  Occasionally, my wife.  There's reasons behind
3  that too.
4    Q.  How about your other son?  Did he ever do it?
5    A.  Yes.
6    Q.  That's Calvin?
7    A.  Calvin.
8    Q.  Out of the three of them, did Travis do it
9  more often than the others?
10    A.  Yes.  He knew what he was doing.
11    Q.  How did he know what he was doing?
12    A.  Well, it comes natural to him on how to --
13  just how to maneuver the vehicle.  He -- his judgment is
14  a lot better on the steering.  Better so than my wife's.
15    Q.  Okay.  Have you ever steered that vehicle
16  while it was not running?
17    A.  Yes.
18    Q.  Is it difficult to turn the wheel --
19    A.  No.
20    Q.  -- when it is not running?
21    A.  No, no, no.
22    Q.  When this incident happened on July 3rd, 2004,
23  were you on your way to start the event or were you
24  finished with the event?

B-42

Neal R.    Shoemaker

8 (Pages 26 to 29)

Page 26

1    A.  To start the events.  We were on our way out
2  to start it.
3    Q.  As you're pushing the mud racer, can you see
4  in front of the mud racer as you're pushing it from the
5  4-wheeler?
6    A.  Yes.
7    Q.  Do you have any problems seeing over that fin
8  on the back of your mud racer?
9    A.  No.
10    Q.  As Travis is steering the mud racer, was there
11  any method of communication between Travis and yourself
12  seven feet behind the mud racer pushing it?
13    A.  No.
14    Q.  As you were pushing the vehicle to the
15  starting area, were there a lot of other people walking
16  around in the area?
17    A.  Yes.
18    Q.  Mr. Shoemaker -- and feel free to use the
19  diagram that's in Shoemaker 2.  Can you describe what
20  happened on July 3rd, 2004 as you were pushing your mud
21  racer to the racer lineup?
22    A.  We were pushing across.  Once we got off the
23  paved road onto the dirt, there was a bunch of chaos.
24  Monster trucks were running very close by coyboying, and

Page 27

1  we were distracted by that, including, I think,
2  everybody, until we turned around.  It was mad chaos in
3  front of my race car.
4    Q.  You said you were distracted by those monster
5  trucks.  So you had turned your head, and you were
6  looking at those monster trucks when this incident
7  happened?
8    A.  Yes.  They were very close by.
9    Q.  Understood.
10      Let's talk about the monster trucks for
11  a minute and the area that the monster trucks were in.
12  Was there anything separating the area where the monster
13  trucks were and the dirt roadway or pathway that you were
14  riding on to go to the racer lineup?
15    A.  No.
16    Q.  There was no kind of orange fencing or
17  anything like that?
18    A.  No.
19    Q.  Okay.  Where the monster trucks are located,
20  did they have like a specific path?  Is there a specific
21  dirt track or anything that they race on?
22    A.  Yes.
23    Q.  Okay.
24    A.  Which would be where -- in this area right

Page 28

1  here.
2    Q.  Okay.  The dirt pathway that you were riding
3  on to the racer lineup area, is that part of the monster
4  truck course?
5    A.  Yes.
6    Q.  So the monster trucks would actually be riding
7  driving on that pathway --
8    A.  Yes.
9    Q.  -- when they were participating in events?
10    A.  Yes.
11    Q.  How did you know to follow that pathway that
12  you marked to get to the racer lineup?
13    A.  Jack Brady requested that we all went up that
14  way.
15    Q.  Did you observe any racers get to the racer
16  lineup from any other way other than that dirt pathway
17  that you traveled on?
18    A.  No.
19    Q.  Did you hear Jack Brady tell everyone to take
20  that pathway?
21    A.  No.  I didn't hear him himself.
22    Q.  Then how did you know that Jack Brady said
23  that?
24    A.  It was follow the leader.

Page 29

1    Q.  Okay.  Do you have any idea how many vehicles
2  were in front of you while you were pushing yours?
3    A.  I can't really speculate that.
4    Q.  Okay.  Do you recall a vehicle being in front
5  of you being either pushed or pulled -- a mud dragster --
6  to the starting lineup?
7    A.  Yes.
8    Q.  Do you have any idea as to how far in front of
9  you the closest mud dragster was when this incident
10  occurred?
11    A.  A hundred, two hundred feet in front of me.
12    Q.  Okay.  You were describing what had happened,
13  and you testified that you had been distracted by the
14  monster trucks.  You looked over.  When you turned back
15  around, all kind of chaos, I think is how you described
16  it, was happening in front of your vehicle.  Can you
17  elaborate on that and tell me what was happening in front
18  of your vehicle?
19    A.  Well, at the time, you know, it was -- I seen
20  Gene Rollison on the ground.  And I had no idea how he
21  ended up there.
22    Q.  What was Travis doing?
23    A.  He was -- well, he was distracted by the
24  monster trucks also from what he said.  And when he

B-43

Neal R. Shoemaker

Page 30

1  turned around, it was the same thing. He seen him on the
2  ground. And he jumped up out of the seat. And he's
3  yelling to me to stop, but I didn't hear him right away
4  because of the monster truck noise to begin with. And
5  then when I stopped, he was on the ground.
6      Q.  Okay. Prior to July 3rd, 2004, did you know
7  Gene Rollison?
8      A.  No. I never met him before.
9      Q.  Had you ever met his brother Randy?
10     A.  Yes.
11     Q.  How did you know Randy?
12     A.  Through races. Other race events.
13     Q.  Okay. Other than the monster trucks going on
14  that would be to your left-hand side --
15     A.  Mm-hmm.
16     Q.  -- while you're pushing the race car, was
17  there anything obstructing your view in front of you?
18     A.  No.
19     Q.  Can you describe to me what you saw first when
20  you turned around after being distracted by the monster
21  trucks? You turned around. What's the first thing you
22  saw? Did you see Mr. Rollison on the ground or did you
23  see your son standing up in the dragster?
24     A.  My son standing up in the dragster.

Page 31

1      Q.  Is that why you stopped?
2      A.  Yes.
3      Q.  Was it after that that you saw Mr. Rollison on
4  the ground?
5      A.  Yes.
6      Q.  Okay. What did you do then?
7      A.  After my heart was beating a million miles an
8  hour, I mean, I -- it's panic city after that. I went
9  over to him to figure out what happened. And evidently,
10  he got -- well, I don't know that. But he evidently got
11  stuck underneath the tire of my race car.
12     Q.  Did you talk to Mr. Rollison while he was on
13  the ground?
14     A.  Yes.
15     Q.  What did you talk about?
16     A.  You know, what -- you know, because you could
17  see he was in pain. And all I was worried about was what
18  was wrong. And it was pretty obvious that once you
19  looked at his knee that it was pretty well boogered up.
20  And then it was basically get medical care there as soon
21  as we could without moving him.
22     Q.  Okay. At some point after that, did you ask
23  Travis what happened?
24     A.  Yes.

Page 32

1      Q.  What did Travis tell you?
2      A.  He was in panic city too, obviously. But he
3  said, "I don't know where he came from." He wasn't there
4  one minute and the next minute -- next second he was on
5  the ground.
6      Q.  Did Travis also tell you that he was
7  distracted by the monster trucks off to the left?
8      A.  Yes.
9      Q.  In your discovery responses, you contended
10  that a monster truck with the name Thrasher on the side
11  of the truck that was operated by someone with the first
12  name of Pat either caused or contributed to the cause of
13  this accident.
14     A.  Yes.
15     Q.  Can you describe to me what that answer is
16  based on?
17     A.  He was basically showing off, it seemed,
18  really close by to us. I don't know exactly how close.
19  And by that, I think we were all cautious on what was
20  going on. So we were kind of like keeping an eye on him
21  so that he didn't get any closer, basically. And I
22  obviously think that that's when we looked up after and
23  seen what was going on in front of us.
24     Q.  At any time while you were driving past the

Page 33

1  area where the monster trucks were before the incident
2  occurred with Mr. Rollison, did you ever have to maneuver
3  your Vehicle one way or another to avoid any of the
4  monster trucks?
5      A.  No.
6      Q.  You were able to stay on that dirt pathway the
7  entire time until the vehicle struck Mr. Rollison?
8          MS. FALLON: Objection to form.
9      A.  Yeah.
10     Q.  Have you spoken to Mr. Rollison since
11  July 3rd, 2004?
12     A.  Yes. Not recently. The following day I was
13  concerned on his well-being. I called him. And one
14  other time a few months later to see how he was -- well,
15  actually, after I got the letter from his first attorney
16  on the situation.
17     Q.  And you called him after that?
18     A.  Yes.
19     Q.  What did you say to him?
20     A.  I didn't understand what was going on at
21  first. And basically, it was no violent -- verbal --
22  just whatever you want to call it -- confrontation. But
23  just to get a better understanding of what was going on.
24     Q.  Okay. Mr. Shoemaker, your discovery responses

B-44

Neal R. Shoemaker

10 (Pages 34 to 37)

---

Page 34

1 indicate that you wear glasses, and I see that you're
2 wearing them today. How long have you had glasses?
3    A. Since I was 12, 13 years old.
4    Q. Do you wear them when you race?
5    A. Yes.
6    Q. Are you nearsighted or farsighted or something
7 else?
8    A. I am nearsighted. I can't see far.
9    Q. Okay. Were you wearing your glasses at the
10 time you were operating the vehicle pushing your son in
11 the mud racer?
12    A. Yes.
13    Q. Prior to July 3rd, 2004, had you ever been
14 involved in any other type of incident or accident
15 involving a mud racer?
16    A. Yes.
17    Q. When?
18    A. 1998-99.
19    Q. Late 1990s.
20        Can you describe what had happened in
21 that incident?
22    A. We were racing. We were basically doing our
23 drag. A rear axle broke and caused me to veer off the
24 track and roll the car.

---

Page 35

1    Q. Other than that incident, any other incidents
2 involving a mud dragster?
3    A. No.
4    Q. Okay. Do you continue to participate in mud
5 dragster events?
6    A. Yes.
7    Q. Have you had any incidents since --
8    A. No.
9    Q. -- July 3rd, 2004?
10    A. No.
11    Q. As of July 3rd, 2004, were you taking any type
12 of prescription medications?
13    A. No.
14    Q. Do you have any recollection as to whether
15 Travis was taking any type of prescription medications?
16    A. He was not.
17    Q. Does Travis wear eyeglasses?
18    A. Yes.
19    Q. Do you know how long he's been wearing
20 eyeglasses?
21    A. Since he was nine or ten.
22    Q. Okay. Do you have any recollection as to
23 whether he was wearing his eyeglasses while steering the
24 mud dragster on July 3rd, 2004?

---

Page 36

1    A. Yes. He was.
2    Q. Mr. Shoemaker, had you consumed any alcoholic
3 beverages in the 24-hour period before this incident on
4 July 3rd, 2004?
5    A. No.
6    Q. Mr. Shoemaker, have you given any type of
7 recorded statement to any person or entity regarding the
8 circumstances of this accident?
9    A. No.
10    Q. The vehicle that you were operating in your
11 discovery responses you describe as an ATV Polaris. Is
12 that correct?
13    A. Yes.
14    Q. Is that a 4-wheeled vehicle?
15    A. Yes.
16    Q. Okay. How long had you had that vehicle as of
17 July 3rd, 2004?
18    A. Six months.
19    Q. During that six-month period, how many times
20 had you operated that vehicle? A lot? Numerous times?
21    A. Numerous times, yes.
22    Q. You felt comfortable operating that vehicle?
23    A. Yes.
24    Q. Do you have to have any kind of license to

---

Page 37

1 operate that type of vehicle?
2    A. No.
3    Q. Okay. Was that vehicle licensed to operate on
4 a public roadway?
5    A. In Pennsylvania.
6    Q. In Pennsylvania it is?
7    A. Yes.
8    Q. Do you have to have a license plate for it?
9    A. Yes.
10    Q. Do you have a license plate for it?
11    A. Yes.
12    Q. How old do you have to be to operate that type
13 of vehicle on the roadway in Pennsylvania? Do you have
14 any idea?
15    A. I'm not sure of that.
16        MR. FOGG: Thank you, Mr. Shoemaker. I
17 have no further questions.
18        THE WITNESS: Thank you.
19        MS. MONTOBAN: I have a couple questions
20 for you.
21 BY MS. MONTOBAN:
22    Q. My name is Chaneta Monotoban, and I represent
23 Houghton's Amusement Park.
24        I understand that you were participating

---

Corbett & Wilcox

B-45

Neal R.  Shoemaker

Page 38

1 in the mud dragster event --
2    A.  Yes.
3    Q.  -- on July 3rd, 2004.
4        Correct?
5    A.  Yes.
6    Q.  Okay.  In addition to that mud dragster event,
7 was there also any type of amusement rides or ferris
8 wheels or anything of that nature nearby?
9    A.  Yes.
10   Q.  Okay.  Where were they located with respect to
11 this drag strip?
12   A.  They were -- the amusement rides was -- how
13 should I say? -- south of the spectator hill, which is
14 not located on the map.
15   Q.  Okay.  Using what's been marked as Shoemaker
16 Exhibit 2, I see where you have spectator hill.  So it
17 would be basically off the map?
18   A.  Yes.
19   Q.  In the opposite direction of the drag strip?
20   A.  Yes.
21   Q.  Okay.  Other than the rides that are south of
22 spectator hill, are there rides anywhere else in that
23 park --
24   A.  No.

Page 39

1    Q.  -- that you recall as of July 3rd?
2    A.  No.
3    Q.  Okay.  Do you know whether there was any type
4 of fencing between the rear of spectator hill and those
5 amusement rides?
6    A.  Not that I recall.
7    Q.  Okay.  Would you agree with me that the rides,
8 the amusement rides, are a substantial distance from that
9 drag strip and the spectator area?
10   A.  Yes.
11       MS. MONTOBAN:  I don't have any further
12 questions for you.
13 BY MR. AKIN:
14   Q.  Good morning, sir.  My name is Roger Akin, and
15 I represent Parkway Gravel and Blue Diamond, LLC, in this
16 case.  Let me just ask you a few questions.
17       Do you know who owns the land where the
18 drag racing was occurring in July of 2004?
19   A.  No.
20   Q.  All right.  Have you ever heard of a
21 organization or an entity called Blue Diamond, LLC?
22   A.  Yes.
23   Q.  All right.  What is your knowledge of what
24 that entity is?

Page 40

1    A.  That was the track that we were told it was
2 called.  That's basically all the knowledge of that.
3    Q.  What is the actual formal name of the place
4 where the race was occurring in July of '04?
5    A.  Well, we -- everybody called it Blue Diamond.
6    Q.  Have you ever heard of a company called
7 Parkway Gravel?
8    A.  No.
9    Q.  Do you know if Blue Diamond or Parkway Gravel
10 had any agents or employees present on the day of the
11 race to do anything at the site?
12   A.  Not to my knowledge.  I...
13   Q.  Did anyone approach you or the other racers
14 and identify himself or herself as a representative of
15 Blue Diamond?
16   A.  Not to my knowledge.
17   Q.  Okay.  Did anyone come up to you and identify
18 himself as a representative of Parkway Gravel?
19   A.  Not to my knowledge, no.
20   Q.  Okay.  You've described for us the layout of
21 the area where the racing was occurring in July of '04.
22 Do you know if that's a permanent setup, or is it a field
23 that's just set up for race days?
24   A.  Not to my knowledge.  I did -- to my

Page 41

1 understanding, that that was a temporary site for this
2 whole -- and from what I was told, that in years to come
3 they were going to move it somewhere else.  But I was
4 like not really informed up on that, so...
5    Q.  Was the layout of the grounds that you've
6 described in your Exhibit No. 2 the same as the layout
7 back on Memorial Day when you raced here?
8    A.  Yes.
9    Q.  Do you know who installed the orange safety
10 fencing that was in front of spectator hill?
11   A.  No.
12   Q.  Was it there when you got there?
13   A.  Yes.
14   Q.  When did you arrive on that 4th of July
15 weekend in 2004?
16   A.  That afternoon of the date of the incident.
17   Q.  What time were the races supposed to begin?
18   A.  I think seven o'clock.
19   Q.  And you arrived approximately when?
20   A.  Two o'clock.
21   Q.  What did you do between two o'clock and the
22 time when the races start?
23   A.  Just prepare the race car, get ready for the
24 race.

B-46

Neal R. Shoemaker

12 (Pages 42 to 45)

| Page 42 | Page 44 |
|---------|---------|

Page 42

1    Q.  Your whole family arrived at the same time?
2    A.  Yes.
3    Q.  How did you get to this site from Pennsylvania
4 on the day of the race?
5    A.  Drove.
6    Q.  All right. You pulled the mud racer in a
7 trailer.
8    A.  Yes.
9    Q.  Is that correct?
10    A.  Yes.
11    Q.  What kind of vehicle were you using to pull
12 the trailer?
13    A.  We had a '99 F-350.
14    Q.  Is that a pickup truck?
15    A.  Yes. And at the time we had a 24-foot
16 enclosed car trailer that the race car was in.
17    Q.  All right. Does the ATV also go in the same
18 trailer?
19    A.  Yes.
20    Q.  Again, the vehicle that you called a Polaris,
21 describe that vehicle for me.
22    A.  It's an off-road vehicle basically. It's 4-
23 wheel drive. It's a 4-wheeler.
24    Q.  All right. Is this the kind of thing you

Page 43

1 occasionally see people going on trails in the woods?
2    A.  Yes.
3    Q.  Those sorts of things.
4        That has enough power to push the racer?
5    A.  Yes.
6    Q.  Okay. And that's a 4-wheel drive --
7    A.  Yes.
8    Q.  -- vehicle?
9        Okay. Did you ever allow Travis to
10 drive the 4-wheel, off-road vehicle -- the Polaris?
11    A.  Occasionally at home, yes.
12    Q.  All right. Where was he allowed to drive that
13 vehicle?
14    A.  Just around the property.
15    Q.  On your own --
16    A.  Yes.
17    Q.  -- private property?
18    A.  Yes.
19    Q.  Okay. Was he allowed to do that in the State
20 of Pennsylvania to your knowledge?
21    A.  I don't know for sure.
22    Q.  In order to participate in the race of July 3,
23 2004, did you have to sign any forms of any type?
24    A.  We had to sign a waiver to -- I guess it's

Page 44

1 just like a -- how shall I say? -- basically if you get
2 hurt, I guess, form.
3    Q.  Who asked you to sign that form?
4    A.  Jack Brady.
5    Q.  Did you keep a copy of that form?
6    A.  No.
7    Q.  Did you sign it and return it?
8    A.  Yes.
9    Q.  Did you read it before you signed it?
10    A.  No.
11    Q.  But is it true that you would not be allowed
12 to race unless you signed the form?
13    A.  Yes.
14    Q.  Did other members of your family have to sign
15 a form?
16    A.  Yes.
17    Q.  So your wife and your two sons all signed the
18 same form?
19    A.  Yes.
20    Q.  Okay. Since they wouldn't be actually driving
21 the racer, what is your understanding as to why your
22 other family members were asked to sign the form, if you
23 have any understanding?
24    A.  So they wouldn't -- in case they would get

Page 45

1 hurt, I imagine.
2    Q.  Okay.
3    A.  I guess I shouldn't really say that answer.
4    Q.  I'm only asking you for your knowledge. I
5 don't want you to speculate.
6    A.  Yeah. I'm speculating.
7    Q.  If you're speculating, just tell us.
8    A.  Yeah, yeah.
9    Q.  In your earlier testimony, you marked the
10 point where the race vehicles apparently left the paved
11 road and then moved across the monster truck area to the
12 lineup area. Is that correct?
13    A.  Yes.
14    Q.  At the point where you left the paved road to
15 move across the monster truck area, was there a gate
16 there or was there some way that access to the monster
17 truck area was being controlled?
18    A.  No.
19    Q.  Do you know whether the promoters of the race
20 or anyone else had provided security personnel to keep
21 spectators from going into the race area?
22    A.  Not to my knowledge.
23    Q.  Okay. Was it possible for spectators to walk
24 into the race area to your knowledge?

B-47

Neal R. Shoemaker

Page 46

1      A.  I couldn't answer that question.
2      Q.  Were people such as your family members
3  required to wear any sort of badge or other insignia that
4  stated that they were allowed to be in the race area?
5      A.  Yeah.  Not -- I don't recollect that anymore.
6  I'm not sure anymore whether we were -- sometimes we go
7  to these tracks they'll give us a band, an arm band, or
8  stamp your hand.  But I don't recall this happening at
9  this track anymore.  I just don't remember.
10     Q.  So as you sit here today, you don't recall
11  whether your hands were stamped or whether you were given
12  an arm band or some sort of badge that said that this
13  person is allowed to be in the race area.  Correct?
14     A.  I don't recall that right now.  Maybe.
15     Q.  Okay.  All right.  How tall was Travis in July
16  of '04?
17     A.  I couldn't even tell you that, to be honest
18  with you.
19     Q.  Does the driver sit down fairly low in the mud
20  dragster that Travis was steering?
21     A.  Yeah.  You sit fairly low in it, yes.  Not too
22  low that you wouldn't be able to see out there, you know.
23     Q.  Travis was tall enough on the day in question
24  that he could see out through the windshield or the

Page 47

1  opening where the driver looks?
2      A.  Oh, absolutely.  Yes.
3      Q.  Since the date of this accident, have you
4  spoken with any representative of Blue Diamond or Parkway
5  Gravel?
6      A.  No.
7      Q.  Okay.  Did anyone come forward immediately
8  after Mr. Rollison was seen on the ground to identify
9  himself as a witness to the accident?
10     A.  No.  Not to my knowledge.
11     Q.  All right.  What is your understanding, if
12  any, of where Mr. Rollison was or where he was going just
13  before the accident occurred?
14     A.  To my knowledge, he was going out to his
15  brother which was ahead of me in the brigade, if you want
16  to call it.
17     Q.  That's the line of vehicles approaching the
18  lineup area?
19     A.  Yes.
20     Q.  Was his brother operating the vehicle just
21  ahead of you to your knowledge?
22     A.  Yes.
23     Q.  Okay.  So it's your understanding that
24  Mr. Delbert Rollison was walking toward his brother's

Page 48

1  vehicle at the time the accident occurred.  Is that
2  correct?
3      A.  I'm assuming that.  I mean, I shouldn't...
4      Q.  What do you base your assumption on?
5      A.  Only because his brother was ahead of me.
6      Q.  The car ahead of you approaching the lineup
7  you indicated was -- I think your testimony was about 100
8  to 200 feet ahead of you.  Is that correct?
9      A.  Yes.
10     Q.  So approximately one-third to two-thirds the
11  length of a football field.  Is that your estimate?
12     A.  Yes.
13     Q.  Was there some rule that said that vehicles
14  approaching the lineup area had to keep a certain
15  distance?
16     A.  No.
17     Q.  You have testified that the dragster was being
18  steered by Travis; correct?
19     A.  Yes.
20     Q.  But the engine was not on?
21     A.  No.
22     Q.  All right.  Now, the all-terrain vehicle that
23  you were driving, does it have a loud engine, or is it a
24  quiet vehicle?

Page 49

1      A.  It's fairly quiet.
2      Q.  All right.  Does it have a horn on it?
3      A.  No.
4      Q.  Does it have any sort of audible warning
5  signals that you can use?
6      A.  No.
7      Q.  As you were moving toward the racer lineup
8  area, the monster trucks were to your left.  Is that
9  correct?
10     A.  Yes.
11     Q.  Okay.  Do you know if Mr. Rollison was moving
12  toward his brother's vehicle from your right or your
13  left?
14     A.  I don't know.
15     Q.  So it's your testimony that no one came to you
16  immediately after the accident to tell you that they had
17  seen what happened.  Is that correct?
18     A.  No.
19     Q.  Do you know if just prior to the accident
20  Mr. Delbert Rollison was standing talking with a group of
21  individuals?
22     A.  I don't know.
23     Q.  All right.  As you looked up as Travis told
24  you to stop and as you then stopped your vehicle, did you

B-48

Neal R.    Shoemaker

14  (Pages 50 to 53)

| Page 50 |
|---|

1   see any other individual within, say, 10 to 20 feet of
2   the dragster?
3       A.  Well, there was a whole crowd of people once
4   the incident happened.
5       Q.  All right.
6       A.  But not at the time.  I don't recall anybody
7   in particular.
8       Q.  You testified earlier, I think, that the
9   layout of the racing area was pretty much the same
10  Memorial Day as it was 4th of July weekend.  Is that
11  correct?
12      A.  Yes.
13      Q.  Did you race on July 3, 2004?
14      A.  No, I did not.
15      Q.  All right.  Was that because this accident had
16  occurred?
17      A.  Yes.  To my choice.
18      Q.  All right.  So you were not told by Mr. Brady
19  or anyone else not to race?
20      A.  No.
21      Q.  What is your understanding again of
22  Mr. Brady's role with regard to the July 3 race?
23      A.  He was the promoter.
24      Q.  Okay.  In your terms, what does a promoter do

| Page 51 |
|---|

1   with regard to these races?
2       A.  Well, he's the -- he's basically the guy that
3   sets all the rules and regulations and basically calls
4   the shots on what's going on.
5       Q.  Do you know if he's the one that arranges for
6   the use of the facility?
7       A.  Absolutely.  I'm sure of that.
8       Q.  You say he sets the rules and regulations for
9   the race?
10      A.  Well, on basics.  On, you know, what the
11  procedures are, when the procedures are to happen and
12  what not.
13      Q.  Did you know Mr. Brady before July of '04?
14      A.  I had met him once, maybe, two times prior.
15      Q.  Have you talked to Mr. Brady since the
16  accident in this case?
17      A.  No.
18      Q.  Have you participated in any other races that
19  he has promoted since July of '04?
20      A.  No, I have not.
21      Q.  Okay.  Is there a reason for that?
22      A.  Well, years ago there -- he's been known to
23  stick you for money.  And this was a race that I didn't
24  even want to go to, because of that reason.  And this

| Page 52 |
|---|

1   just put the icing on the cake.  So I just on my own
2   decided never again.
3       Q.  So there's an entry fee to race?
4       A.  Yes.
5       Q.  What was the entry fee for this race?
6       A.  I don't recall at this time.  I don't
7   remember.
8       Q.  Has Mr. Brady told you that he doesn't want
9   you in any more of his races because of this accident?
10      A.  No.
11      Q.  Since July of '04, have you participated in
12  any other races at Blue Diamond?
13      A.  No.
14          MR. AKIN:  I think that's all I have.
15  Thank you, sir.
16          THE WITNESS:  Thanks.
17          MS. FALLON:  I have a few just follow-up
18  for clarification, Mr. Shoemaker.
19  BY MS. FALLON:
20      Q.  When you were at Blue Diamond on the Memorial
21  Day holiday before this incident occurred, was there also
22  a monster truck show?
23      A.  Yes.
24      Q.  Was it going on relatively at the same time as

| Page 53 |
|---|

1   the mud racers were lining on up Memorial Day?
2       A.  Yes.
3       Q.  When this incident occurred in July, how loud
4   was this mud racer operated by Thrasher that you said was
5   coyboying nearby?
6       A.  Oh, it was very loud.
7       Q.  Did the loudness startle you?
8       A.  Yes.
9       Q.  Is that what caught your attention?
10      A.  Yes.
11      Q.  How close did it come to your vehicle, if you
12  remember?
13      A.  I'm not exactly sure how close.  It could have
14  been 30 feet.  It could have been 50 feet from us.
15      Q.  In your experience doing this, was it too
16  close for comfort?
17      A.  Yes.
18      Q.  When you say that this vehicle was
19  "cowboying," can you be more specific as to what it was
20  doing?
21      A.  Acting up in a manner that he should have been
22  acting up when it was time to race, not to protrude out
23  to the racetrack without racing.
24          MS. FALLON:  That's all I have.

B-49

Page 54

1          MR. FOGG:  Mr. Shoemaker, I do have a
2   few additional questions for you.
3   BY MR. FOGG:
4       Q.  The race that you were at on Memorial Day
5   weekend of 2004, do you have any knowledge as to whether
6   Jack Brady and/or KSR Motor Sports was the promoter of
7   that event?
8       A.  Yes.  He was also.
9       Q.  It is your testimony, am I correct, that that
10  was the only other time other than July of 2004 that you
11  were at the Blue Diamond Raceway?
12      A.  Yes.
13      Q.  A couple other questions regarding the diagram
14  that you drew.  After you parked your truck and trailer,
15  in order to get into the park, did you have to pass
16  through some kind of gate or fencing to get into the park
17  and the racing area itself?
18      A.  Not to my knowledge, no.
19      Q.  Okay.  At any point while you were there, did
20  you see any security guards or any people dressed in a
21  manner that you thought they were security guards?
22      A.  Not to my knowledge.
23      Q.  All right.  I want to refer you to the
24  photograph.  After you had gotten off of the 4-wheeler

Page 55

1   that you were driving after your son had stood up and
2   alerted you to stop, can you describe where in
3   conjunction with your vehicle you saw Mr. Rollison
4   laying?
5       A.  In front of the right front tire.
6          MR. FOGG:  Thank you, Mr. Shoemaker.  I
7   have no further questions.
8          MR. AKIN:  Nothing further.
9          MS. FALLON:  We'll waive.
10         (The deposition concluded at 11:10 a.m.
11  this same day.)
12         - - - - -
13
14
15
16
17
18
19
20
21
22
23
24

Page 56

1                INDEX TO TESTIMONY
2
3   NEAL ROBERT SHOEMAKER                     PAGE

    Examination by Mr. Fogg        2
4   Examination by Ms. Montoban    37
    Examination by Mr. Akin        39
5   Examination by Ms. Fallon      52
    Examination by Mr. Fogg        54
6
7
                     - - - - -
8
9
                 INDEX TO EXHIBITS
10
11  SHOEMAKER DEPOSITION EXHIBIT NO.          PAGE
12  1  Copy of photograph             2
13  2  Hand-drawn sketch              15
14
15                   - - - - -
16
17
18
19
20
21
22
23
24

Page 57

1             C E R T I F I C A T E
2   STATE OF DELAWARE:
                      :
3   NEW CASTLE COUNTY:
4          I, Robert Wayne Wilcox, Jr., a Registered
5   Professional Reporter and Notary Public, within and for
6   the County and State aforesaid, do hereby certify that
7   the foregoing deposition of NEAL ROBERT SHOEMAKER, was
8   taken before me, pursuant to notice, at the time and
9   place indicated; that said deponent was by me duly sworn
10  to tell the truth, the whole truth, and nothing but the
11  truth; that the testimony of said deponent was correctly
12  recorded in machine shorthand by me and thereafter
13  transcribed under my supervision with computer-aided
14  transcription; that the deposition is a true record of
15  the testimony given by the witness; and that I am neither
16  of counsel nor kin to any party in said action, nor
17  interested in the outcome thereof.
18         WITNESS my hand and official seal this 10th day
19  of August A.D. 2006.
20
21         _____
           ROBERT WAYNE WILCOX, JR.
22         REGISTERED PROFESSIONAL REPORTER
           CERTIFICATION NO. 101-RPR
23         (Expires January 31, 2008)
24

B-50

AUG 2 3 2006

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DELBERT E. ROLLISON, | : | |
| | : | C.A. No.: 06-159 SLR |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **JURY OF SIX DEMANDED** |
| | : | |
| NEAL SHOEMAKER, as parent and legal | : | |
| guardian of TRAVIS SHOEMAKER, | : | |
| NEAL SHOEMAKER, individually, | : | |
| TRAVIS SHOEMAKER, individually, | : | |
| BLUE DIAMOND, LLC, a Delaware | : | |
| corporation, HOUGHTONS AMUSEMENT | : | |
| PARK, LLC, a Delaware corporation, JACK | : | |
| BRADY, individually and d/b/a KSR | : | |
| MOTOR SPORTS, and PARKWAY | : | |
| GRAVEL, a Delaware corporation, | | |
| | | |
| Defendants. | | |

## ANSWERS OF BLUE DIAMOND, LLC AND PARKWAY GRAVEL TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

1.      State the name, address, and job title, if applicable, of the person answering these interrogatories.

**ANSWER:**   Allen DeCarlo, 711 Phillips Avenue, Wilmington, DE 19809 and Undersigned counsel.

2.      Identify all persons who assisted you in the preparation of the responses to these interrogatories.

**ANSWER:**   Same as above.

3.      If the defendants Blue Diamond, LLC and Parkway Gravel are a corporation, state:

(a)      The full and correct name of the corporation;

(b)      The date on which the defendant was incorporated;

B-51

7.     If the defendants, Blue Diamond, LLC and Parkway Gravel or an agent or employee of the defendants, Blue Diamond, LLC and Parkway Gravel have had any conversations with the plaintiff, Delbert E. Rollison, concerning the accident at any time subsequent to the accident, state the substance of each conversation.

**ANSWER:** Neither answering defendants, Blue Diamond, Parkway Gravel nor any agent or employee of said parties has engaged in conversations with plaintiff since the time of the occurrence which is alleged in this litigation.  By way of further answer, undersigned counsel attended and participated in the sworn deposition of plaintiff on or about August 4, 2006. on behalf of said defendants.  Plaintiff's attorney has a copy or may secure a copy of the transcript of that deposition.

8.     State the name, address, place of employment and job classification of each person known to the defendants, Blue Diamond, LLC and Parkway Gravel, or any of its representatives who:

(a)     Observed the accident;

(b)     Was present at the scene of the accident immediately prior to its occurrence and at any time within one hour after the accident occurred;

(c)     Was within sight or hearing of the accident;

(d)     Rendered assistance to the plaintiff at the scene of the accident;

(e)     Removed plaintiff from the scene of the accident;

(f)     Investigated the accident on the defendant, Blue Diamond, LLC's, behalf;

(g)     Has knowledge of any facts concerning the property damaged directly or indirectly as a result of the accident;

(h)     Has knowledge of any facts concerning the injuries suffered by the plaintiff as a result of the accident; and

(i)     Has knowledge of any facts with regard to how the accident occurred.

B-52

**ANSWER:**   Plaintiff;  Neal Shoemaker;  Travis Shoemaker;  an individual walking with plaintiff at the time of the occurrence, but who has not yet been identified;  Certain additional participants in or spectators or promoters of a "mud drag" race scheduled to occur subsequent to the time of the occurrence in this case may have observed the alleged occurrence; Certain additional participants in or spectators or promoters of a "monster truck" exhibition occurring proximate to the location of the alleged occurrence in this case.

Defendants reserve the right to amend this response as further information becomes available during the course of the litigation.

(b) See response to Interrogatory 8(a) hereinabove.  In addition, emergency medical personnel came upon the scene of the alleged occurrence within an hour of the event to render aid to plaintiff.

(c) See response to Interrogatory 8(a) hereinabove.

(d) Wilmington Manor Fire Co., Unit A32

(e) See response to Interrogatory 8(d) hereinabove.

(f) Answering defendants have engaged an adjusting firm but have not commissioned a formal investigation of the occurrence alleged in this case.  Undersigned counsel and insurance representatives have inquired into the facts of the matter.

(g) On information and belief, answering defendants do not believe that any property damage claim is being made in the instant litigation as a result of the alleged occurrence.

(h) Physicians who have treated plaintiff subsequent to the occurrence alleged in this case and who have been identified and are known to plaintiff have knowledge concerning injuries sustained by plaintiff as a result of the alleged occurrence.

(i) See response to Interrogatory 8(a) hereinabove.

9.    If the defendants, Blue Diamond, LLC and Parkway Gravel, or any of its representatives, obtained any statements from any person regarding the events that occurred at

B-53

EXHIBIT

Rollison-1
Kuwitz 8.4.06

Grand stands
Seat's

/ / / / / /
4 x 4 Trucks

Racing stage area
X

Truck

Paved road

good rail

Parking lot
For Races

from Highway

B-54

EXHIBIT

Shoemaker-1
Ruane 8·1·06



B-55



## Delaware Basic Life Support

*Patient Care Report - Priority  3 - BLS - Transport*



07/03/2004    Wilmington Manor Fire Company Unit A32        Incident:    030116
Rollison, Dilbert                              SSN:  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                        DOB:  07/04/1960
Location: 761 Hamberg Road.   Blue Diam  New Castle                        DE   19720

### Summary

    19:28   Unit(s) Dispatched
    19:28   A32 responding.
    19:28   Arrived at Scene
    19:28   Arrived at Patient
    19:35   Transport To CER - Christiana Hospital
    19:35   Pulse: 10 | Resp: 18 | BP: 134 over 88 | SpO2: 99 | GCS: 15
    19:46   Arrived At CER - Christiana Hospital. Total Patient Contact Time - 12 minutes
    19:55   A32 was placed available

Patient Outcome:  No change

Narrative:

    At stand by for a monster truck race. Pt was struck by a mid-size car at a low speed. By-stander pushe
    pt to the ground as car approached pt. Pt 's right leg was still in the path of the car. Car ran over pt's
    knee. Obvious deformity of the knee. Pt placed on long board for movement to the stretcher. Pt's leg
    stabilized in position found in. Secondary survey found no other c/o.  Pt transported to CER. Called
    ahead to DFES with a report. DFES called a trauma alert and the pt was taken to room 10. Report
    given to staff in room 10.

Signature:
                                                              Wilmington Manor Fire Company
        Francis M Donnelly Sr.                                P.O. Box 931   Manor Branch
        NREMT-B                                                New Castle, DE 19720
                                                              (302) 328-3209

*EMS Providers on the call*

    Donnelly, Francis
        NREMT-B

    Reyes, Miguel
        Firefighter

**Street Address**

    P O Box. Unknown.
    Waterford, VA
    20197

Starting Mileage  1
Ending Mileage   6
Total Mileage    5
Case ID          26637



EXHIBIT
Rollison-2
RWWR 8-6-06
B 5b

**EXHIBIT**

Pollison-3

RWLI8   8-6-06

# RELEASE AND WAIVER OF LIABILITY,
## ASSUMPTION OF RISK AND INDEMNITY AGREEMENT

BLUE DIAMOND                                                          July 3rd 2004

DESCRIPTION AND LOCATION OF SCHEDULED EVENT(S)                        DATE RELEASE SIGNED

IN CONSIDERATION of being permitted to compete, officiate, observe, work for, or participate in any way in the EVENT(S) or being permitted to enter for any purpose any RESTRICTED AREA (defined as any area requiring special authorization, credentials, or permission to enter or any area to which admission by the general public is restricted or prohibited), I, THE UNDERSIGNED, for myself, my personal representatives, heirs, and next of kin:

1. Am a driver, mechanic, pitcrew or other team member, or other participant engaged in racing, and I am not participating in the EVENT(S) or entering the RESTRICTED AREA for recreational purposes.

2. Acknowledge, agree, and represent that I have or will immediately upon entering any of such RESTRICTED AREAS, and will continuously thereafter, inspect the RESTRICTED AREAS which I enter, and I further agree and warrant that, if at any time, I am in or about RESTRICTED AREAS and I feel anything to be unsafe, I will immediately advise the officials of such and if necessary will leave that RESTRICTED AREA.

3. HEREBY RELEASE, WAIVE, DISCHARGE AND COVENANT NOT TO SUE the promoters, participants, racing associations, sanctioning organizations or any subdivision thereof, track operators, track owners, officials, car owners, drivers, pit crews, rescue personnel, any persons in any RESTRICTED AREA, promoters, sponsors, advertisers, owners and lessees of premises used to conduct the EVENT(S), premises and event inspectors, surveyors, underwriters, consultants and others who give recommendations, directions, or instructions or engage in risk evaluation or loss control activities regarding the premises or EVENT(S) and each of them, their directors, officers, agents and employees, all for the purposes herein referred to as "Releasees," FROM ALL LIABILITY TO THE UNDERSIGNED, my personal representatives, assigns, heirs, and next of kin FOR ANY AND ALL LOSS OR DAMAGE, AND ANY CLAIM OR DEMANDS THEREFOR ON ACCOUNT OF INJURY TO THE PERSON OR PROPERTY OR RESULTING IN DEATH OF THE UNDERSIGNED ARISING OUT OF OR RELATED TO THE EVENT(S), WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE.

4. HEREBY AGREE TO INDEMNIFY AND SAVE AND HOLD HARMLESS the Releasees and each of them FROM ANY LOSS, LIABILITY, DAMAGE, OR COST they may incur arising out of or related to the EVENT(S) WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE.

5. HEREBY ASSUME FULL RESPONSIBILITY FOR ANY RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE arising out of or related to the EVENT(S) whether caused by the NEGLIGENCE OF RELEASEES or otherwise.

6. HEREBY acknowledge that THE ACTIVITIES OF THE EVENT(S) ARE VERY DANGEROUS and involve the risk of serious injury and/or death and/or property damage. I, THE UNDERSIGNED, also expressly acknowledge that INJURIES RECEIVED MAY BE COMPOUNDED OR INCREASED BY NEGLIGENT RESCUE OPERATIONS OR PROCEDURES OF THE RELEASEES.

7. HEREBY agree that this Release and Waiver of Liability, Assumption of Risk and Indemnity Agreement extends to all acts of negligence by the Releasees, INCLUDING NEGLIGENT RESCUE OPERATIONS and is intended to be as broad and inclusive as is permitted by the laws of the Province or State in which the Event(s) is/are conducted and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full legal force and effect.

I HAVE READ THIS RELEASE AND WAIVER OF LIABILITY, ASSUMPTION OF RISK AND INDEMNITY AGREEMENT, FULLY UNDERSTAND ITS TERMS, UNDERSTAND THAT I HAVE GIVEN UP SUBSTANTIAL RIGHTS BY SIGNING IT, AND HAVE SIGNED IT FREELY AND VOLUNTARILY WITHOUT ANY INDUCEMENT, ASSURANCE OR GUARANTEE BEING MADE TO ME AND INTEND MY SIGNATURE TO BE A COMPLETE AN UNCONDITIONAL RELEASE OF ALL LIABILITY TO THE GREATEST EXTENT ALLOWED BY LAW.

ALL SECTIONS MUST BE COMPLETED.

| PRINT NAME HERE | SIGN NAME HERE | DUTIES |
|---|---|---|
| Randy Pollison | I HAVE READ THIS RELEASE 265 | Sand Drag |
| Chad C. Jensson | I HAVE READ THIS RELEASE 266 | Sand Drag |
| Stephen Littleton | I HAVE READ THIS RELEASE 267 | Car Drag |
| Gene Pollison | I HAVE READ THIS RELEASE 268 | |
| | I HAVE READ THIS RELEASE 269 | Sand Drags |

SIGNATURE AND TITLE OF WITNESS                                       ADDRESS OF WITNESS

CL-29NY (4/00)

B-57

Not Reported in F.Supp.
(Cite as: 1997 WL 309503 (D.Del.))

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.

**Arthur McDONOUGH and Linda McDonough,
in their own right and as Parents of
Bradley Alan McDonough, deceased, and Arthur
McDonough in his own right and as
Administrator of the Estate of Bradley Alan
McDonough, Plaintiffs,
v.
NATIONAL OFF-ROAD BICYCLE ASSN.
(NORBA), U.S. Cycling Fed., and Delaware
Trail
Spinners, Defendants.**

**No. Civ. A. 95-504-SLR.**

June 2, 1997.

Donald Eilhu Evans, Esquire, Wilmington,
Delaware. Counsel for plaintiffs. Of Counsel:
Edwin F. McCoy, Esquire., Philadelphia,
Pennsylvania.

Mason E. Turner, Esquire, of Prickett, Jones,
Elliott, Kristol & Schnee, Wilmington, Delaware.
Counsel for defendants.

MEMORANDUM OPINION

SUE L. ROBINSON, District Judge.

I. INTRODUCTION

*1 This case is a wrongful death/survival action
filed as a result of Bradley McDonough's
("McDonough") death on August 30, 1993.
Plaintiffs are Arthur and Linda McDonough, the
parents of the decedent (collectively referred to as
"plaintiffs"). Defendants are The National Off-
Road Bicycle Association ("NORBA"), United
States Cycling Federation ("Federation"), and the
Delaware Trail Spinners ("Trail Spinners"). The
court has diversity jurisdiction pursuant to 28
U.S.C. § 1332(a). Presently before the court is
defendants' motion for summary judgment.
(D.I.66) For the following reasons, defendants'
motion for summary judgment shall be denied.

II. BACKGROUND

In the summer of 1993, Bradley McDonough
developed an interest in off-road bicycle
competition. In the spring or early summer of
1993, McDonough acquired an off-road bike (also
known as a mountain bike) and rode with his college
friends, Randall Blaker ("Blaker"), Michael
Odenwald ("Odenwald"), and Kenny Steidle
("Steidle"). (D.I. 71 at A51-A52) On August 8,
1993, McDonough, Blaker, Odenwald and Steidle
participated in a NORBA sanctioned event in
Windham, New York ("Windham race"). (D.I. 71
at A51) In all NORBA events, participants are
required to obtain a permanent membership or a
one-day trial membership. The application for the
one-day membership contains a section entitled
"Agreement and Release of Liability" ("release").
(D.I. 68 at A3) On the day of the Windham race,
McDonough, along with his friends, paid for a one-
day trial membership and signed the release. (D.I.
71 at A 54-55; D.I. 68 at A5) In signing the
release, Blaker stated that he did not really read it,
but simply skimmed through it. (D.I. 71 at A54)
Blaker stated that he assumed it was a release "to
some degree and we understood that we were
involved in a sport." (D.I. 71 at A54-A55)

The Windham race course was basically a two lap
course. (D.I. 71 at A56) McDonough and Steidle
quit after one lap because they were tired. (D.I. 71
at A56) Blaker, who was behind McDonough and
Steidle, also stopped after the first lap since his
friends had stopped. (D.I. 71 at A56) Odenwald did
not complete the race either, because his bicycle
broke. (D.I. 71 at A56) All four friends had water
bottles on their bikes during the race. (D.I. 71 at
A54)

On August 15, 1993, McDonough and Blaker
participated in another NORBA sanctioned event in
Delaware, called the C & D Canal Classic ("C & D
race"). (D.I. 84 at A109) The C & D race consisted
of three race levels: (1) Beginners'; (2) Sport; and
(3) Pro/Expert. (D.I. 71 at A22) McDonough and
Blaker both entered the Beginners' level. (D.I. 71
at A23 and A59) The Beginners' course was a 14
mile course "over the local terrain which included
steep and gradual hills, open gravel and dirt roads,
and wooded trails." (D.I. 71 at A23) The Sport and
Pro/Expert courses also used the same 14 miles
designated for the Beginners' course. (D.I. 71 at
A38)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.                                                                                           Page    4
**(Cite as: 1997 WL 309503, \*2 (D.Del.))**

**\*2** The Beginners' course was difficult because of
its layout. (D.I. 71 at A38) The terrain on the
Beginners' course made it difficult for riders to
access their own water without stopping. (D.I. 71
at A38) Some areas on the course were smoothed
out so that riders could stop or ride slowly and
access their water bottles. (D.I. 71 at 38) The
course, however, did not have any neutral area
where water was given out to the race contestants.
(D.I. 71 at A38) The only water the race contestants
could drink was the water that they brought
themselves. (D.I. 71 at A38) No physician was
present at the race. (D.I. 71 at A24) There was
neither an ambulance nor emergency medical
personnel present at the race site. (D.I. 71 at A23)
Denise Dowd ("Dowd"), another participant in the
Beginners' level, stated that the course was "difficult
due to the heat and humidity and layout." (D.I. 71
at A87) Although Dowd is an avid biker and had
participated in approximately 20 mountain bike
races, it took her over an hour and fifteen minutes to
complete the course. (D.I. 71 at A87)

Defendant Trail Spinners, a NORBA club
member, received sanctioning from NORBA to
promote the C & D race. In order to receive
sanctioning, defendant Trail Spinners had to
complete a "Pre-Event Planning Checklist"
("Checklist") provided by NORBA. (D.I. 84 at
A109-A110) The Checklist contains several
questions relating to the safety precautions taken for
the event. Trail Spinners, through its race director
William Bowen ("Bowen"), represented on the
Checklist that there would be, inter alia, emergency
medical assistance on site and adequate water for the
participants and spectators. (D.I. 84 at A110)
Bowen specifically represented that there would be
an ambulance on site and adequate water or fluids
for participants and spectators before, during, and
after the race. (D.I. 84 at A110) The Checklist also
provided that: "A NORBA Official must be present
at your event. The NORBA Official will complete
their portion of the checklist before allowing the
event to proceed." (D.I. 84 at A109) The Checklist
identifies Elizabeth Small ("Small") as the NORBA
Official. Small, however, did not complete her
portion of the Checklist and did not sign it. (D.I.
84 at A110)

When McDonough arrived at the race site, he
again paid for a one-day trial membership and
signed the release. (D.I. 68 at A7) Blaker also paid

for a one-day trial membership and signed the
release. (D.I. 71 at A59) No one at the race site
explained the documents to the race participants.
(D.I. 71 at A41) The release provides in part:

> I acknowledge that cycling is an inherently
> dangerous sport in which I participate at my own
> risk and that NORBA is a non-profit corporation
> formed to advance the sport of cycling, the efforts
> of which directly benefit me. In consideration of
> the agreement with NORBA to issue an amateur
> license to me, hereby on behalf of myself, my
> heirs, assigns and personal representatives, I
> release and forever discharge NORBA and the
> United States Cycling Federation, its employees,
> agents, members, sponsors, promoters, and
> affiliates from any and all liability, claim, loss,
> cost or expense, and waive any such claims
> against any such person or organization, arising
> directly or indirectly from or attributable in any
> legal way to any action or omission to act of any
> such person or organization in connection with
> sponsorship, organization or execution of any
> bicycle racing or sporting event, in which I may
> participate as a rider, team member or spectator.

**\*3** (D.I. 68 at A5) On the back of the trial
membership and release certain "Racing
Regulations" are set forth. (D.I. 68 at A8). At
section 4.6, NORBA recommends that each
participant carry "[a]t least 8 ounces of water." (D.I.
68 at A8) Section 5.6 provides that neutral water
will be provided for any race that exceeds 60
minutes in length. (D.I. 68 at A8)

According to James McGroerty ("McGroerty"),
the President, officer, and Co-Founder of Trail
Spinners, it is commonly understood by those who
participate in races that they are required to sign the
release. (D.I. 71 at A45) McGroerty stated that:
"Most of [his] friends who are avid racers look at
the form as you are signing this paper basically
saying yes, I am doing this race at my own risk on
the course. If I get hurt, it's my own fault. It's
basically the way we look at it when we sign these
forms and compete in an event." (D.I. 71 at A45)
Dowd, who also signed the release that day, stated
that she understood that the release was intended to
protect the defendants from liability. (D.I. 71 at
A89) Dowd, however, did not believe that the
release was intended to relieve the defendants from
providing "common sense safety precautions,
particularly on site trained medical personnel with
an ambulance." (D.I. 71 at A89) Dowd stated that

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.
**(Cite as: 1997 WL 309503, \*3 (D.Del.))**

she would not have signed the release if she had known there was no medical assistance immediately available. (D.I. 71 at A89)

Before the start of the race, McGroerty addressed the race contestants from the hood of his car. (D.I. 71 at A38 and A42) He addressed the participants without a bullhorn. (D.I. 71 at A37) There were approximately 80 to 100 total participants in the group that raced with McDonough and Blaker. (D.I. 71 at A37 and A62) McGroerty told the race contestants that there was no ambulance on site, but that one could be called. (D.I. 71 at A42) McGroerty did not specifically warn the participants about heat exhaustion. (D.I. 71 at A42) Instead, McGroerty told the contestants to be "careful, ... take their time" and not to "ride over your head, which means going beyond your ability." (D.I. 71 at A42) McGroerty also told them to "watch their bodies, make sure they didn't push themselves too hard because it was hot out." (D.I. 71 at A42) Finally, he told them that "[i]f they felt dizzy or nauseous, to back off, stay cool and keep from going too hard." (D.I. 71 at A42) McGroerty did not get any questions after he addressed the participants. (D.I. 71 at A37) McGroerty testified that he does not have Red Cross, CPR or EMT certification of any kind. (D.I. 71 at A43) He also does not know the signs of exertional heat stroke. (D.I. 71 at A43)

At approximately 9:00 a.m., McDonough and Blaker left the starting line with other contestants. (D.I. 71 at A23 and A62) Both McDonough and Blaker had brought water bottles with them. (D.I. 71 at A61) The temperature on that day was "extremely hot [ ] with high humidity." (D.I. 71 at A85) Although McDonough and Blaker began the race together, they were separated because Blaker had a flat tire. (D.I. 71 at A63) After Blaker changed his flat tire, he continued in the race and eventually completed the course. (D.I. 71 at A64) McDonough, however, did not. (D.I. 71 at A64)

\*4 McGroerty found McDonough when he went to investigate whether some participants had accidently or deliberately missed the course markings. (D.I. 71 at A44) McGroerty first saw McDonough's bike. As he approached the bike, he saw McDonough who was about five or six feet from his bike. (D.I. 71 at A44) According to McGroerty, other participants would not have seen McDonough since he was off to the side of the course, but could have seen his bike. (D.I. 71 at A44)

When McGroerty found McDonough, he was on the ground lying on his side and his breathing was heavy and labored. (D.I. 71 at A44) McDonough appeared to have trouble breathing and was not responsive. (D.I. 71 at A44) According to McGroerty, McDonough appeared to be unconscious. (D.I. 71 at A44) Based on these observations, McGroerty called 911 from his cellular phone. (D.I. 71 at A44) After calling 911, McGroerty went to the start/finish area and sought assistance. (D.I. 71 at A42 and A87) He led two people back to where McDonough was found and they administered CPR until an ambulance arrived. (D.I. 71 at A42 and A87-A88) According to Dowd, one of the two people who administered CPR, no one gave McDonough any water before the ambulance arrived because no water was provided. (D.I. 71 at A88) Blaker, however, testified that when McDonough's bike was brought back from where McDonough had been found, it still had a water bottle attached to it that was half full. (D.I. 71 at A65)

Dowd stated that the race was "generally disorganized" and that there was a lot of confusion. (D.I. 71 at A86) According to Dowd, the race was delayed for 30 minutes and no maps of the course were given to the participants or posted. (D.I. 71 at A87-A88) Small, the NORBA official on duty at the race, reported to NORBA that the "[r]ace director [Bowen] was 'light' in the emergency medical area." (D.I. 84 at A110) Small also reported that no course maps were available, but that the course was adequately marked. (D.I. 84 at A110) Overall, Small stated that mistakes were made since no water was provided, no emergency medical personnel were on site, and the course was too long. (D.I. 84 at A114)

Dowd stated that it took her about 5 minutes to reach McDonough and that the ambulance arrived 10 to 15 minutes after she began administering CPR. (D.I. 71 at A88) When the ambulance arrived, McDonough was treated by paramedics and helicoptered to the Medical Center of Delaware in Christiana, Delaware. (D.I. 71 at A23) Although hospitalized, McDonough died of heat stroke on August 30, 1993. (D.I. 70 at 1)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.
(Cite as: 1997 WL 309503, *4 (D.Del.))

Page   6

III. DISCUSSION

1. Summary Judgment Standard

Summary judgment should be granted only if a court concludes that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).   The moving party bears the burden of proving that no genuine issue of material fact is in dispute. Matsushita Elec. Indus.   Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).   Once the moving party has carried its initial burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.' " Id. at 587.   "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n. 1 (3d Cir.1995) (citations omitted).   If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).   The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that factual issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).     This court, however, must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir.1995) (citation omitted).

2. Express or Primary Assumption of Risk

*5   Since Delaware adopted a comparative negligence statute, [FN1] it has become necessary to distinguish between primary and secondary assumption of the risk. Koutoufaris v. Dick, 604 A.2d 390, 397 (Del.1992); cf. Bib v. Merlonghi, 252 A.2d 548, 550 (Del.1969) Primary assumption, sometimes referred to as express assumption of risk, "involves the express consent to relieve the defendant of any obligation of care while secondary assumption [of risk] consists of voluntarily encountering a known unreasonable risk which is out of proportion to the advantage gained." Koutoufaris, 604 A.2d at 397-398.   With the adoption of the comparative negligence statute in Delaware, secondary assumption of risk became "totally subsumed within comparative negligence." Id. at 398.   Primary assumption of risk, however, still exists as a complete bar to recovery.   See id. (stating that primary assumption of risk "might well constitute a complete bar to recover, as a matter of law, even in a comparative negligence jurisdiction") (citation omitted);  see also Patton v. Simone, 626 A.2d 844, 852 (Del.Super.Ct.1992);  see also Staats v.   Lawrence,   576   A.2d   663,   668 (Del.Super.Ct.1990).

> FN1.  In 1984, Delaware adopted a modified comparative negligence statute, which allows a jury to apportion liability where both parties are negligent only if the plaintiff's negligence is less than fifty percent.  10 Del. C. § 8132 (1984).

Defendants argue that plaintiffs' action is barred, as a matter of law, because McDonough expressly assumed the risks inherent in an off-road bicycle race when he signed the release.     Defendants contend that the release, in plain and unambiguous language, is intended to protect defendants from all liability arising out of any hazards encountered in an off-road bike race.  (D.I. 78 at 9) Defendants assert that McDonough, as a college graduate and former participant in a NORBA event, must have had an understanding of the these inherent dangers when he signed the release.   As further support, defendants note that McDonough signed an identical Agreement and Release just one week prior to the C & D race. Based on these facts, defendants assert that summary judgment is appropriate.

In considering the facts and making all reasonable inferences in plaintiffs' favor, the court finds to the contrary.   A release will not be set aside if the language is clear and unambiguous. Hallman v. Dover Downs, Inc., Civ.A. No. 85-618 CMW, 1986 WL 535 at *2 (D.Del., Dec.31, 1986) (citing Chakov v. Outboard Marine Corp., 429 A.2d 984, 985 (Del.1981);   see Bennett v. United States Cycling Federation, 193 Cal.App.3d 1485, 239 Cal.Rptr.  55, 58 (Cal.Ct.App.1987).   Where the language of a release is ambiguous, it must be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.
**(Cite as: 1997 WL 309503, \*5 (D.Del.))**

construed strongly against the party who drafted it. Hallman, 1986 WL 535 at \*2;    Bennett, 239 Cal.Rptr. at 58.    In an express agreement to assume a risk, a plaintiff may undertake to assume all risks of a particular relation or situation, whether they are known or unknown to him.    Restatement (Second) of Torts, § 496D, cmt. a, (1965).    However, for the release to be effective, it must appear that the plaintiff understood the terms of the agreement, or that a reasonable person in his position would have understood the terms.    Bennett, 239 Cal.Rptr. at 58. As the Bennett court stated, "[t]here is little doubt that a subscriber of a bicycle release ... must be held to have waived any hazards relating to bicycle racing that are obvious or that might reasonably have been foreseen."    Id. These hazards include "collisions with other riders, negligently maintained equipment, bicycles which were unfit for racing but nevertheless passed by organizers, [and] bad road surfaces...."    Id. Thus, the understanding of the parties when the release was executed, in light of all the facts and circumstances, is paramount in determining whether the language is clear and unambiguous.    Hallman, 1986 WL 535 at \*2. The evidence must establish that the parties intended the release to apply to the particular conduct of the defendant which has caused the harm.    Restatement (Second) of Torts, § 496B, cmt. d, (1965).

**\*6** In the present case, plaintiffs assert that a genuine issue of material fact exists as to whether McDonough understood that the release included a waiver against the hazards created by defendants' alleged negligent and reckless conduct in promoting the race.    The court agrees.

IV. CONCLUSION

For the reasons stated above, the court shall deny defendants' motion for summary judgment.    An order will issue consistent with this memorandum opinion.

1997 WL 309503 (D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

1986 WL 535
**(Cite as: 1986 WL 535 (D.Del.))**

Page  18

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.

**Randolph and Mildred Stuart HALLMAN,
Plaintiffs,
v.
DOVER DOWNS, INC., a corporation of the
State of Delaware, Defendant.**

**Civ. A. No. 85-618 CMW.**

Dec. 31, 1986.

A. Richard Barros, of Barros, McNamara &
Scanlon, Dover, Delaware, for plaintiffs.

B. Wilson Redfearn, of Tybout, Redfearn,
Casarino & Pell, Wilmington, Delaware, for
defendant.

OPINION

CALEB M. WRIGHT, Senior District Judge.

*1 This is a tort action brought by a newsman
against a race track corporation for injuries he
sustained while reporting on a stock car race.
Defendant moves for summary judgment, arguing
that a signed release bars any recovery. The motion
is denied.

I. FACTS

Plaintiff, Randolph Hallman, was a Richmond
Newspapers reporter assigned to cover the
"Budweiser 500" stock car races at Dover Downs
International Speedway in Dover, Delaware. While
covering the race from a photographers' platform,
Hallman leaned against a wooden railing encircling
the scaffolding. The inclosure buckled and Hallman
tumbled to the concrete below, suffering a mild
cerebral concussion and an open leg wound exposing
a protruding, fractured femur. Hallman's principal
contention is that the release form he signed before
entering the race track is invalid.

Before the stock car race, plaintiff received a
"credential request" from the Director of Public
Relations for the Dover Downs International
Speedway, Brian T. Buchauer. The request noted
that insurance regulations, and National Association

for Stock & Car Racing, Inc. ("NASCAR")
restrictions, prohibited persons from entering the pit
area. The letter did not mention any waiver of
liability. (Plaintiff's Exhibit A). [FN1]

When plaintiff arrived at the Speedway on
Saturday, May 19, 1984, he reported to a "media
trailer". He waited in line with other reporters and
was given two form releases purporting to relieve
defendant, Dover Downs, Inc. from all liability.
All reporters were required to sign the NASCAR
release form before entering defendant's premises.
(PX-B). [FN2] Plaintiff's press badge contained a
liability release for personal injury or property
damage "while preparing, practicing, or
participating in this race meet." (PX-C). [FN3]
General admission tickets contained no liability
waivers. [FN4]

After the fall, plaintiff filed a complaint on
October 22, 1985. Defendant filed a Motion for
Summary Judgment on July 21, 1986.

After considering the briefs prepared by both
parties, this Court denies the motion.

II. DISCUSSION

A. The Summary Judgment Standard

The Court will grant summary judgment only "if
the pleadings, depositions, answers to
interrogatories, and admissions on file, together
with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the
moving party is entitled to judgment as a matter of
law." Fed.R.Civ.P. 56(c). Any doubts as to the
existence of genuine issues of fact will be resolved
against the moving party and any reasonable
inferences from the facts will be resolved in favor of
the party against whom the judgment may be
entered. Continental Insurance Co. v. Bodie, 682
F.2d 436, 438 (3d Cir.1982); Peterson v. Lehigh
Valley Dist. Council, United Bhd. of Carpenters
and Joinders, 676 F.2d 81, 84 (3d Cir.1982);
Devex v. General Motors Corp., 579 F.Supp. 690,
693 n. 3 (D.Del.1984). See Goodman v. Mead
Johnson & Co., 534 F.2d 566 (3d Cir.1976), cert.
denied, 429 U.S. 1038 (1977).

*2 As a practical matter, "[if] the parties disagree
about material facts and if the non-moving party

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

1986 WL 535
**(Cite as: 1986 WL 535, \*2 (D.Del.))**

would be entitled to relief if the jury believed its version of the facts, then summary judgment is inappropriate." Landtect Corp. v. State Mutual Life Assur. Co., 605 F.2d 75, 79 (3d Cir.1979); Adickes v. Kress & Co., 398 U.S. 144, 157 (1970); see e.g., United States v. Diebold, Inc., 369 U.S. 654, 655 (1962);    6 J. Moore, Federal Practice ¶ 56.13[3] (2d ed. 1966).

### B. The Release May Be Ambiguous

Defendant's summary judgment motion raises three questions under Delaware law.   First, is the release ambiguous so that it is not a valid and binding contact?    Second, is the release unconscionable?    Third, is the release void as against public policy?    Construing the evidence before the Court in favor of the non-moving party, the Court finds that there are genuine issues of fact with respect to all three questions.

In construing a release, if the language is clear and unambiguous it will not be set aside. Chakov v. Outboard Marine Corp., 429 A.2d 984, 985 (Del.Supr.1981); Adams v. Jankouskas, 452 A.2d 148, 156 (Del.Supr.1981).   In deciding whether release language is clear and unambiguous, the understanding of the parties is paramount.   "The scope of a release is determined by the intention of the parties as expressed in the terms of the particular instrument, considered in light of all the facts and circumstances.", notes the Second Restatement on Releases.   "In interpreting a release to determine whether a particular claim has been discharged, the primary rule of construction is that the intention of the parties shall govern, and this intention is to be determined with a consideration of what was within the contemplation of the parties when the release was executed." 66 Am.Jur.2d Release § 30 (1973).

Doubt about the clarity of the release is raised by the Deposition of Brian Buchauer, the former Director of Public Relations of Dover Downs International Speedway.   Mr. Buchauer perceived the release in the following manner:  "I am not a lawyer, and you are asking questions of me that I am not qualified to ask or answer....  If you don't understand it, then I certainly am not the one to try and tell you what it says." (Buchauer Affidavit, p. 15). [FN5]

Neither did plaintiff Randolph Hallman have a

clear understanding of the release he signed:

Q. What did you understand that release to pertain to?

A. Well, without having thought about it very much, I assumed that it was a, it indicated that I knew there was a race going on, there were some risks involved with fast cars on a race track.   And that the dangers inherent with that risk, it would be my, would be reasonable for me to expect to be careful about those dangers.

Q. What, if anything, did you think it had to do with the grounds and building?

A. I wouldn't have thought it had anything to do with the grounds.

Hallman Affidavit, p. 89.

This statement indicates that Mr. Hallman also had an understanding different from that of total immunity from liability which is asserted by defendant. "Where ... the language of the release is ambiguous, it must be construed most strongly against the party who drafted it." Adams, 452 A.2d at 156.   As a matter of law, the release cannot be found to be clear and unambiguous.

**\*3** A presumption is created against an intention to contract for immunity from the consequence of one's own negligence and a contract will not be given that meaning unless so expressed in unequivocal language. State v. Interstate Amiesite Corp., 297 A.2d 41 (Del.Supr.1972);  Powell v. Interstate Vendaway Inc., 300 A.2d 241 (Del.Super.1972);  Warburton v. Phoenix Steel Corporation, 321 A.2d 345 (Del.Super.1974), aff'd., Nobel J. Dick, Inc. v. Warburton, 334 A.2d 225 (Del.Supr.1975);  J.A. Jones Const.  Co. v. City of Dover, 372 A.2d 540, 552 (Del.Supr.1977), appeal dismissed, 377 A.2d 1 (Del.Supr.1977).    Courts will not enforce provisions in contracts of adhesion which limit the duties or liability of the stronger party unless such provisions are "conspicuous, plain and clear" and will not operate to defeat the reasonable expectations of the parties.  Madden v. Kaiser Foundation Hospitals, 552 P.2d 1178 (1976).

The single page NASCAR release of liability,

1986 WL 535
(Cite as: 1986 WL 535, *3 (D.Del.))

which all media representatives signed before receiving press credentials, is not conspicuous, plain and clear. Most of the release is written in tiny print. Reporters, waiting in line to enter the track, were pressured to sign, grab their credentials and move on as quickly as possible. (PX-H). The release could have been mistaken as a media sign in sheet, given that there were no explanations of the releases' meaning. (PX-G; PX-B).

C. The Release May Be Unconscionable

The release signed by Hallman may also be unconscionable. To find unconscionability, there must be an absence of meaningful choice and contract terms must be unreasonably favorable to one of the parties. Tulowitzki v. Atlantic Richfield Co., 396 A.2d 956 (Del.Supr.1978).

Plaintiff had no choice in this action. He was required to sign liability releases prior to entering the defendant's race track. The release includes a statement that "we have each inspected the track premises, know the risks and dangers inherent in...." But plaintiff could not enter the race track to perform his job as a reporter before signing the waiver. Nor could he enter the premises for purposes of inspection and "know the risks and dangers" until signing the release. Plaintiff was in a classic "Catch-22" situation because he had no choice but to sign the release to perform his job, even though he could not first inspect the race premises.

Plaintiff's lack of choice emanated from contract terms that unreasonably favored one party. Dover Downs, Inc. sought press coverage of their event, as evidenced by their solicitation of the news media. (PX-E). At the same time, however, the release forms purport to relieve defendant from any liability while the reporters report on racing events that defendant badly wanted publicized.

The unconscionability test also involves the question of whether a contractual provision amounts to the taking of an unfair advantage by one party over the other. J.A. Jones Const. Co. v. City of Dover, 372 A.2d at 552 (discussing 6 Del.C. § 2-719(3) which defines unconscionability in the sale of consumer goods context as one party taking unfair advantage over the other party.).

*4 The releases take unfair advantage of the media that defendant wants to have at their track. The terms of the waiver were not explained by defendant to the media, (PX-G), and the waivers are signed as a routine manner after waiting in line to enter the track. (PX-H).

Nor does the release bear a reasonable relation to the risk involved. See Tulowitzki, 396 A.2d at 960. A rotted railing on an observation deck is not "a risk or danger inherent in racing." An uncontrollable car may be a foreseeable risk, but a defective structure is not. Defendant, moreover, does not require releases of liability for horse racing--indicating that even they believe the risks contemplated by the release involved the dangers of auto racing, not the dangers posed by defendant's structures. (PX-I). Waiving liability before something unanticipated happens to injure a person may well be unconscionable. [FN6]

Delaware law permits a court, as a matter of law, to refuse to enforce any contract found to have been unconscionable at the time it was made. 6 Del.C. § 2-302(1). Defendant's only argument that the release is not unconscionable is that the "business-practices-of-the-community" test used in Tulowitzki should be applied. This test asks whether contract terms are so extreme as to appear unconscionable according to the business practices of the time and place. Tulowitzki, 396 A.2d at 960. The Court does not have sufficient facts before it to make factual determinations that the release was or was not in line with the business practices of the community. Facts must be developed at a later stage in the proceedings, making summary judgment inappropriate at this time.

D. The Release May Be Void As Against Public Policy

A release given before liability arises may be void as contrary to public policy. This includes anticipatory releases from liability for injuries to the person of the releasor or to his property or business. 66 Am.Jur.2d Release § 14 (1973). Parties may agree to waive contract, statutory, or other rights, but only if public policy is not involved. 17 Am.Jur.2d Contracts § 188 (1964). The law does not look with favor on provisions which relieve one from liability for his own fault or wrong. Boll v. Sharp & Dohme, Inc., 121 N.Y.S.2d 20, 22

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

1986 WL 535
(Cite as: 1986 WL 535, *4 (D.Del.))

(N.Y.App.Div.1953) ("Contracts breaking down common-law liability and relieving persons from just penalties for their negligent and improper conduct are not to be favored, and should not be given an enforcement beyond that demanded by their strict construction...."). [FN7]

In Delaware, "contract language will not suffice to relieve a contracting party of its failure to satisfy legal obligations unless the contract language makes it crystal clear and unequivocal that the parties specifically contemplated that the contracting party would be relieved of its own defaults." J.A. Jones, 372 A.2d at 553. [FN8]  As indicated in the analysis, supra, it is not at all clear from the release that the parties "contemplated" a release of liability for a negligently maintained railing. Delaware cases which have found contractual language sufficiently clear to protect a party against a claim based on its own negligence have all specifically referred to the negligence of the protected party. Warburton v. Phoenix Steel Corporation, 321 A.2d 345 (Del.Super.1974), aff'd., Noble J. Dick, Inc. v. Warburton, 334 A.2d 225 (Del.Super.1975); All-State Inv. & Sec. Agcy., Inc. v. Turner Const. Co., 301 A.2d at 273.    Conversely, contractual provisions which purport to give protection generally against liability or which even protect against negligence generally have been held not to meet the test for protection from a claim based on one's own negligence. State v. Interstate Amiesite Corp., 297 A.2d 41 (Del.Supr.1972);  Blum v. Kaufman, 297 A.2d 48 (Del.Supr.1972);  Powell v. Interstate Vendaway, Inc., 300 A.2d 241 (Del.Super.1972).

*5 The release in the instant case appears to protect against negligence generally.  But the Court does not have before it sufficient facts to determine whether the release specifically refers to the negligence involved, and therefore should be upheld, or whether the language is so broad that the release should be voided as contrary to public policy.  The absence of clear language and manifest intent renders summary judgment inappropriate.

Some courts answer the question of whether a release is void as against public policy by examining, not the language of the release, but whether a duty is owed by the person who seeks release.    A term exempting a party from tort liability for harm negligently caused is

unenforceable on grounds of public policy if the term exempts one charged with the duty of public service from liability to one to whom that duty is owed.

An important factor in determining a duty of public service is whether a party holds himself out as willing to perform a service for any member of the public who seeks it.  If this is true, and another party is confronted with a standardized adhesion contract of exculpation, the contract will be void as against public policy.    In Tunkl v. Regents of University of California, 383 P.2d 441 (1963), the court voided a release signed by a patient in a medical center.   The ruling was that because the medical treatment was considered essential, defendant had an advantage in bargaining power over plaintiff and plaintiff had little or no choice but to accept the terms.

A later decision held, however, that "purely recreational activities such as sport parachuting can hardly be considered 'essential'." Hulsey v. Elsinore Parachute Center, 168 Cal.App.3d 333, 343 (1985).    But in the case at bar, plaintiff reporter was not engaging in a "purely recreational activity".  Entering the race track was part of his job and he had no choice but to accept the terms dictated by the race track. [FN9]   At this stage in the proceedings, the Court does not possess sufficient facts to determine whether a duty is owed by the race track to reporters.    Summary judgment is inappropriate.

In conclusion, the release signed by plaintiff may be void because it is ambiguous, unconscionable or against public policy.

For the foregoing reasons, defendant's motion for summary judgment is denied.

An Order will enter in conformity with this Opinion.

FN1. Hereinafter references to exhibits will take the form PX-letter e.g.: "PX-A".

FN2. The Release reads: Each of the undersigned hereby request permission to enter upon the premises above described and observe or participate in qualifying practice and motor racing events sanctioned by the National Association of Stock Car

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

1986 WL 535                                                            Page  22
(Cite as: 1986 WL 535, *5 (D.Del.))

Auto Racing, Inc., hereinafter called NASCAR and any of the other sanctioning bodies listed below, respectively, at said track on this date and race dates succeeding the event scheduled for this date, in accordance with and subject to NASCAR Rules and Regulations, as a driver, mechanic, owner, attendant, or otherwise. We each have inspected the track premises, know the risks and dangers inherent in entering the premises and participating in, observing the qualifying, and practicing for motor racing events held on Race premises, realize that conditions may become more hazardous while each of us are on the premises, that unanticipated and unexpected dangers may arise during said events. We each enter the premises voluntarily and assume every risk for loss, damage or injury (including death) that any of the undersigned or our respective property brought on the above premises, may sustain while in or enroute to, from, into or out of said premises, from any cause whatsoever. In consideration of receiving permission to enter the premises, being permitted and privileged to participate or assist others participating in said event, as evidenced by the Permit colored coded and numbered as shown on this form, each of the undersigned, for himself, his heirs, next of kin, personal representatives and assigns, hereby RELEASES, REMISES AND FOREVER DISCHARGES AND AGREES TO SAVE AND HOLD HARMLESS AND INDEMNIFY NASCAR AND SANCTIONING BODY AND THE PROMOTERS PRESENTING SAID EVENT, THE OWNERS, AND LESSEES OF THE PREMISES, THE PARTICIPANTS THEREIN, THE OWNERS, SPONSORS AND MANUFACTURERS OF ALL RACING EQUIPMENT USED IN SAID EVENT AND THE OFFICERS, OFFICIALS, DIRECTORS, AGENTS, EMPLOYEES AND SERVANTS OF ALL OF THEM, OR AND FROM ALL LIABILITY CLAIMS, DEMANDS, CAUSES OF ACTION AND POSSIBLE CAUSES OF ACTION WHATSOEVER, ARISING OUT OF OR RELATED TO ANY LOSS, DAMAGE OR INJURY (INCLUDING DEATH) THAT MAY BE SUSTAINED BY OUR RESPECTIVE PERSONS OR PROPERTY, THAT MAY OTHERWISE ACCRUE TO ANY OF US OR TO OUR RESPECTIVE HEIRS, NEXT OF KIN OR PERSONAL REPRESENTATIVES WHILE IN, ON, ENROUTE TO, FROM, OR OUT OF SAID PREMISES FROM ANY CAUSE WHATSOEVER INCLUDING NEGLIGENCE OF ANY OF THE

FOREGOING. NASCAR, or sanctioning body, and their assigns may use any of our names and photographs including pictures of our cars and photographs taken during said event for publicity purposes including endorsements, in any media before, during and after the above event. This RELEASE shall be binding upon each of the undersigned and their respective distributees, heirs, next of kin and personal representatives. In signing this REQUEST AND RELEASE each of the undersigned presents that he: (a) Is not the agent, servant or employee of NASCAR, or sanctioning body, the promoter or any of their agents, officers, servants or employees. (b) Is a participant and an independent contractor, subject to NASCAR, or sanctioning body, Rules and Regulations, and assumes and takes all responsibility for all charges, premiums and taxes, if any, payable on any funds that he may receive as a result of his activities, including, without limiting the generality of the foregoing, social security taxes, unemployment insurance taxes, compensation insurance, income taxes and withholding taxes. (c) Possesses a valid driver's license from his home state; (d) Has read this REQUEST AND RELEASE of Liability, understands it and signs it voluntarily and is of sound mind. IN WITNESS WHEREOF, each of the undersigned has hereunto set his hand and seal the day and year above written. All reporters were required to sign below this form.

FN3. The Press Badge reads: "I hereby release Speedway operator, promoter NASCAR and any other person or persons connected with this race from all liability for personal injury or property damage while preparing, practicing or participating in this race meet. This permit issued to the terms and conditions of "release" executed by me to whom this permit is issued. This permit is not assignable and is a mere license revocable without notice at the pleasure of NASCAR or promoter. DOVER DOWNS INTERNATIONAL SPEEDWAY (Signature) NO. 584 Date PRESS

FN4. Plaintiff also received a form letter to the media noting the location of the photo platforms (Exhibit E).

FN5. Mr. Buchauer also discussed the release with the President of Dover Downs Corporation, Dennis McGlynn: Q. Did you discuss the releases that Mr. Hallman signed? A. Yes. But I thank I brought

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

1986 WL 535
(Cite as: 1986 WL 535, *5 (D.Del.))

that up, asking does the release--you know, what significance does the release have involving liability. Dennis [the President] didn't really know. I mean he couldn't give an answer based on any kind of a legal expertise or anything. Q. So, in fact, you were asking him what that release meant, that my client had signed? A. No, not what it meant. I was asking if the release had any bearing on it; just out of curiosity, what protection does that release afford to the Speedway? Q. You didn't really know then? A. I didn't know. Buchauer's Deposition, pp. 607.

FN6. Plaintiff Hallman signed a second release. But this release, by its terms, only releases defendant from liability for injury incurred "while preparing, practicing or participating in this track meet." Because plaintiff was a media spectator and not a race participant, and was not involved in preparing or practicing for the race, this release is inapplicable to him.

FN7. See also McCarthy v. National Association for Stock Car Auto Racing Inc., 226 A.2d 713, 715 (N.J.Supr.1967) (holding that releases signed by a racer absolving a racing association from liability for injury were invalid as against public policy because they purported to contract away safety requirements prescribed by motor racing statutes). See also Wilmington Housing Authority v. Williamson, 228 A.2d 782, 785 (Del.Supr.1967) (contracts to relieve one from the consequences of his own negligence are not favored in the law, and, if possible, will be construed not to confer immunity from liability).

FN8. Pennsylvania R.R. Co. v. Gulf Oil Corp., 223 A.2d 79, 81 (Del.Super.1966). All-State Inv. & Sec. Ag., Inc. v. Turner Const. Co., 301 A.2d 273 (Del.Supr.1972) (exculpatory clauses in certain construction contracts are void and unenforceable as against public policy).

FN9. Public policy differs from state to state. In Delaware, however, "the principle has long been established ... that contractual provisions which purport to relieve a party from liability for matters resulting from its own fault are not favored." Marshall v. Maryland D. & V.R. Co., 112 A. 526 (Del.Super.1921); Pan American World Airways v. United Aircraft Corp., 163 A.2d 582 (Del.Supr.1960), cited in J.A. Jones Const. Co. v.

City of Dover, 372 A.2d 540, 546 (Del.Super.1977).

1986 WL 535 (D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in A.2d
(Cite as: 1999 WL 1241073 (Del.Super.))

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.

**Charles W. TUCKER, Plaintiff,**
v.
**ALBUN, INC., trading as Seacoast Speedway, a
Delaware Corporation, Defendant.**

No. Civ.A. 97C-04-025.

Sept. 27, 1999.

Bruce A. Rogers, Rogers & Mooney, P.A.,
Georgetown, Delaware, for the Plaintiff.

Marla L. Tocker, Marshall, Dennehey, Warner,
Coleman & Goggin, Wilmington, Delaware, for
Defendants.

MEMORANDUM OPINION

LEE, J.

Motion for Summary Judgment--Denied

**\*1** Charles W. Tucker ("Plaintiff") filed this suit
against the Defendant, Albun Inc., trading as
Seacoast Speedway ("Defendant"), seeking damages
for injuries that he incurred when he fell on the
Defendant's property. The Defendant's moved for
summary judgment arguing that the Plaintiff's
claims are barred under either of two theories. The
Defendant first urges that the Release the Plaintiff
signed is a complete bar to suit. Second, the
Defendant argues that if the Release does not bar
suit, then, in the alternative, the Plaintiff, in light of
his "equal knowledge" of the risks involved,
assumed the risk of the presence of holes and ruts in
the infield of the racetrack. Moreover, they urge,
Seacoast had no duty to warn the Plaintiff of these
"obvious inherent risks." This is the Court's
decision on the motion.

STATEMENT OF FACTS  [FN1]

FN1. As this matter is before the Court on the
Defendant's Motion for Summary Judgment, the
facts recited below are those most favorable to the

non-moving party, the Plaintiff.

The Defendant, Albun, Inc., owns Seacoast
Speedway ("Speedway") near Georgetown,
Delaware. The stock of Albun, Inc. is, in turn,
owned by Mrs. Loretta G. Williams and her
husband. The Plaintiff, Charles W. Tucker, was a
frequent visitor to the racetrack. He attended most
Saturday evening races for a number of years as
either a race driver, a member of a pit crew, or a
spectator.

On September 9, 1995, the Plaintiff went to the
Speedway to attend the races as a spectator. Upon
arrival, Mrs. Williams asked if he would work on a
"wrecker" in return for free admission to the
Speedway. The Plaintiff agreed to help out and
signed the Release from liability required of all
persons entering the pit or infield areas. This was
the same release he had signed on prior occasions
when entering the pit area. [FN2]

FN2. The text of the Release states: IN
CONSIDERATION of being permitted to compete,
officiate, observe, work for, or participate in any
way in the EVENT(S) or being permitted to enter
for any purpose any RESTRICTED AREA (defined
as any area requiring special authorization,
credentials, or permission to enter or any area to
which admission by the general public is restricted
or prohibited), EACH OF THE UNDERSIGNED,
for himself, his personal representatives, heirs, and
next of kin: 1. Acknowledges, agrees, and
represents that he has or will immediately upon
entering such RESTRICTED AREAS, and will
continuously thereafter, inspect the RESTRICTED
AREAS which he enters and he further agrees and
warrants that, if at any time, he is in or about
RESTRICTED AREAS and he feels anything to be
unsafe, he will immediately advise the officials of
such and will leave the RESTRICTED AREAS and/
or refuse to participate further in the EVENT(S).
2.    HEREBY    RELEASES,    WAIVES,
DISCHARGES AND COVENANTS NOT TO SUE
the promoters, participants, racing associations,
sanctioning organizations or any subdivision
thereof, track operators, track owners, officials, car
owners, drivers, pit crews, rescue personnel, any
persons in any RESTRICTED AREA, promoters,
sponsors, advertisers, owners and lessees of
premises used to conduct the EVENT(S), premises
and event inspectors, surveyors, underwriters,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

consultants and other who give recommendations, directions, or instructions or engage in risk evaluation or loss control activities regarding the premises or EVENT(S) and each of them, their directors, officers, agents and employees, all for the purposes herein referred to as "Releasees," FROM ALL LIABILITY TO THE UNDERSIGNED, his personal representatives, assigns, heirs, and next of kin FOR ANY AND ALL LOSS OR DAMAGE, AND ANY CLAIM OR DEMANDS THEREFOR ON ACCOUNT OF INJURY TO THE PERSON OR PROPERTY OR RESULTING IN DEATH OF THE UNDERSIGNED ARISING OUT OF OR RELATED TO THE EVENT(S), WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE.  3. HEREBY AGREES TO INDEMNIFY AND SAVE AND HOLD HARMLESS the Releasees and each of them FROM ANY LOSS, LIABILITY, DAMAGE, OR COST they may incur arising out of or related to the EVENT(S) WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE.  4. HEREBY ASSUMES FULL RESPONSIBILITY FOR ANY RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE arising out of or related to the EVENT(S) whether caused by the NEGLIGENCE OF RELEASEES or otherwise.  5. HEREBY acknowledges that THE ACTIVITIES OF THE EVENT(S) ARE VERY DANGEROUS and involve the risk of serious injury and/or death and/or property damage. Each of THE UNDERSIGNED also expressly acknowledges that INJURIES RECEIVED MAY BE COMPOUNDED OR INCREASED BY NEGLIGENT RESCUE OPERATIONS OR PROCEDURES OF THE RELEASEES.    6. HEREBY agrees that this Release and Waiver of Liability, Assumption of Risk and Indemnity Agreement extends to all acts of negligence by the Releasees, INCLUDING NEGLIGENT RESCUE OPERATIONS and is intended to be as broad and inclusive as is permitted by the laws of the Province or State in which the Event(s) is/are conducted and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full legal force and effect.  I HAVE READ THIS RELEASE AND WAIVER OF LIABILITY, ASSUMPTION OF RISK AND INDEMNITY AGREEMENT, FULLY UNDERSTAND ITS TERMS, UNDERSTAND THAT I HAVE GIVEN UP SUBSTANTIAL RIGHTS BY SIGNING IT, AND HAVE SIGNED

IT FREELY AND VOLUNTARILY WITHOUT INDUCEMENT, ASSURANCE OR GUARANTEE BEING MADE TO ME AND INTEND MY SIGNATURE TO BE A COMPLETE AND UNCONDITIONAL RELEASE OF ALL LIABILITY TO THE GREATEST EXTENT ALLOWED BY LAW.

His duties that evening, while on the wrecker, were to assist in the removal of wrecked or disabled race cars and any debris from the racing surface. He was to be stationed with the other wreckers in the infield area. During the race, one of the participating race cars lost its rear bumper. Before the cars could come around the track again, the Plaintiff and his partner on the wrecker that evening ran from their truck in the infield to the track so that they could retrieve the bumper from the racing surface.

The infield at the Speedway has a grassy surface that extends to the clay race track. While running to retrieve the bumper, the Plaintiff stepped in a hole and fell down. This fall injured his shoulder giving rise to the present litigation.

DISCUSSION

1. Standard of Review.

In acting on a motion for summary judgment, "the Court's function is to examine the record and determine whether there is a genuine issue of fact." Battista v. Chrysler Corp., Del.Super., 454 A.2d 286, 290 (1982). Summary judgment is appropriate where, after viewing the record in a light most favorable to the non-moving party, the Court finds there are no genuine issues of material fact. Camac v. Hall, Del.Super., 698 A.2d 394, 396 (1996). A material factual dispute exists where the parties to the action disagree on the factual predicates for the legal principles they advance. Merrill v. Crothall-American, Inc., Del.Super., 606 A.2d 96, 99 (1992). Moreover, the "Court's decision must be based only on the record presented, including all pleadings, affidavits, depositions, admissions, and answers to interrogatories, not on what evidence is 'potentially possible." ' Id. (quoting Rochester v. Katalan, Del.Super., 320 A.2d 704, 708, fn. 7 (1974)). "Summary judgment will not be granted if the record indicates that a material fact is in dispute or if it seems desirable to inquire more thoroughly into

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

the facts in order to clarify the application of the law to the circumstances." Camac at 396; Ebersole v. Lowengrub, Del.Supr., 180 A.2d 467, 470 (1962).

II. Application of the Law to the Facts of the Case.

*2 In applying the summary judgment standard to this case, summary judgment should only be granted if there are no material issues of fact in dispute regarding both the validity and the application of the release and the potential liability of the Defendant to the Plaintiff under a negligence theory.

A. The Release. Delaware Courts recognize the validity of a general release of a party from liability. Chakov v. Outboard Marine Corp., Del.Supr., 429 A.2d 984, 985 (1981); see also Hollerman v. Hicks, Del.Super., C.A. 95C-06-027, Terry, J. (April 8, 1997)(Opinion). A release is valid if it meets three requirements. First, the release must not be ambiguous. Second, the release must not be unconscionable. Finally, the release must not be against public policy. Hallman v. Dover Downs, Inc., D. Del., C.A. No. 85-618-CMW, Wright, J. (Dec. 31, 1986). See also Egan & Sons Air Conditioning Co. v. General Motors Corp., Del.Super., C.A. Nos. 88L-MY-18 and 88L-MY-28, Gebelein, J. (April 27, 1988) (Mem.Op.) at 6 ([T]he Court first scrutinizes the releases for their validity, secondly for their clarity, and finally, for their scope.).

In determining whether a release is clear or ambiguous, the Delaware courts have developed an often used standard.

In construing a release, the intent of the parties as to its scope and effect are [sic] controlling, and the court will attempt to ascertain the intent from the overall language of the document. And where the language of the release is clear and unambiguous, it will not lightly be set aside. Where, however, the language of the release is ambiguous, it must be construed most strongly against the party who drafted it. (Internal citations omitted) Judge Trucking Co. v. Estate of Cooper, C.A. No. 92C-03-041, Graves, J. (Sept. 29, 1994) (Mem.Op.) at 8. See also, Hollerman at 7.

Moreover, through a release, a person may assume all risks, known or unknown, inherent in a particular situation. "However, for the release to be effective, it must appear that the plaintiff understood

the terms of the agreement, or that a reasonable person in his position would have understood the terms.... The evidence must establish that the parties intended the release to apply to the particular conduct of the defendant which has caused the harm." McDonough v. National Off-Road Bicycle Ass., D. Del., C.A. No. 95-504-SLR, Robinson, J. (June 2, 1997) (Mem.Op.)(Summary judgment denied where the Court found there was a material issue of fact whether a cyclist competing in a race contemplated harm occurring from a source other than the normal hazards of bicycle racing before executing a release, normal hazards being collision or rough roads and trails not necessarily death from heat stroke allegedly caused by negligent event management).

In a case relied upon by both parties in the present action, Hallman v. Dover Downs, Inc., supra, the United States District Court for the District of Delaware denied a motion for summary judgment in a case with facts that are almost on "all fours" with those of the current dispute. In Hallman, a newspaper reporter was assigned by the paper to cover a stock car race at Dover Downs International Speedway. Before he was allowed onto the premises, he was required to sign a release. Hallman at 2. Moreover, the reporter's press badge contained a liability release for personal injury or property damage. Id. at 3. While reporting on the races, the reporter leaned against a wooden railing that gave way and caused him to fall to the ground below. The Court denied Dover Downs' motion for summary judgment after finding that material issues of fact existed as to whether the release was ambiguous, unconscionable, or violated public policy. Id. at 5.

*3 Judge Wright, in Hallman, found the release was ambiguous after evaluating the pre-trial statements of both the reporter and the track's representatives concerning their perceptions of the release. The track representative stated that: "I am not a lawyer, and you are asking questions of me that I am not qualified to ask or answer....If you don't understand it, then I certainly am not the one to try and tell you what it says." Id. at 6. The reporter, when asked about his understanding of the release, stated:

A. Well, without having thought about it very much, I assumed that it was a, it indicated that I knew there was a race going on, there were some risks involved with fast cars on a race track. And

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

that the dangers inherent with that risk, it would be my, would be reasonable for me to expect to be careful about those dangers.
Q: What, if anything, did you think it had to do with the grounds and building?
A: I wouldn't have thought it had anything to do with the grounds. Id. at 7.

Because these statements by the parties indicated a fundamental lack of understanding by both on the nature of the release, Judge Wright ruled that the release could not be clear and unambiguous as a matter of law. Id. The Court also found that the release was not clear and unambiguous because most of the release was in small print with only certain portions in bold type and the reporters may not have had adequate opportunity to digest the full import of the release at the time of execution. Id. at 8.

Judge Wright, in Hallman, also found there was an issue of fact whether the release was unconscionable. Id. at 9. Two issues drove this finding by the court. First, the Court found the reporter had no choice; he had to sign the release in order to do his job as a reporter. Id. at 9. Second, the Court found the release did not necessarily relate to the harm involved. "An uncontrollable car may be a foreseeable risk, but a defective structure is not." Id. at 10.

Finally, Judge Wright found that summary judgment was not appropriate because the record was not sufficiently developed to rule as a matter of law that the release did not violate public policy. The Court based this finding on two different theories. First, the law does not favor provisions relieving one from liability for harm caused by his own fault or wrong. Id. at 11. For such a provision to be upheld, it must be "crystal clear" in its language evincing the clear intent of the parties to absolve the protected party of liability created by that party's own actions. Id. at 12 (citing J.A. Jones Const. Co. v. City of Dover, Del.Super., 372 A.2d 540, 553 (1977)). As noted above, the Court found the scope of the release was not certain, thus, summary judgment was not appropriate. As an alternative, Judge Wright looked to see if the release violated public policy because the person seeking the release owed a duty to the other. Id. at 13. On this issue, the court did not possess sufficient facts to determine whether the race track owed a duty to reporters covering the races. Id. at 14.

*4 In the present case, the motion for summary judgment is denied with regard to the issue of the release Mr. Tucker executed prior to his admittance to the Speedway. The motion is denied because under current Delaware law, including the Hallman case, there is a material issue of fact as to the nature of the terms of the release. Thus, the release is ambiguous and the legal effects of the release can only be evaluated after a full airing of the facts.

Mr. Tucker would have a difficult time arguing that he did not know he was signing a release. In his statements, he repeatedly acknowledges that a signed release was a prerequisite to admittance to the pit and infield areas. For this reason, Mr. Tucker's situation is somewhat different from that of the reporter in Hallman where there was some question of whether he even knew he was signing a release.

In this case, the release does not clearly define the scope of the Release's coverage. In addressing the potential harms or injuries covered by the Release, it states that it covers those harms "ARISING OUT OF OR RELATED TO THE EVENT(S)...." This language is repeated several times in the release and is used consistently. This language, however, is subject to two interpretations. A very broad interpretation could find that as soon as a person came to the track and signed the release, everything that could happen to him arises out of the events. The argument would be that for the event, the person would not be in attendance and thus subject to harm. A narrower interpretation would be that the contract language refers to only those potential harms with causes directly related to the events at the Speedway--car racing. In Hallman, Judge Wright appears to have subscribed to the narrower interpretation because the language in that release more clearly attempts to cover more activities. The Hallman release addresses harms "ARISING OUT OF OR RELATED TO ANY LOSS ... THAT MAY BE SUSTAINED ... WHILE IN, ON, ENROUTE TO, FROM, OR OUT OF SAID PREMISES FROM ANY CAUSE WHATSOEVER...." Hallman at 3.

This ambiguity in the language of the Release appears to have caused the parties to differ in their understanding of the Release. Like in Hallman, in the instant case, the statements of the parties indicate there may be some question concerning the parties' intent or understanding as to the scope and coverage

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in A.2d                                                                   **Page 13**
**(Cite as: 1999 WL 1241073, \*4 (Del.Super.))**

of the release Tucker signed. Illustrative of this conflict is the testimony of both the Plaintiff and the Defendant at arbitration. The following indicates the Defendant's view of the release:

Q: What is your understanding of the release? What is your understanding of what the purpose of it is and what does it do?

A: That in return for being allowed to be in the pit area as a participant, you sign that you will not-- you sign a release waiver. You waive your right to--I don't know how to put it in words. All the words are there. It says, "Release and Waiver of Liability." That is what you're saying. You are releasing the track and anyone associated with it; that you know that racing is a dangerous sport and you are willing to give up your rights in order to get in there.

\*5 Q: And would you consider that as your understanding, that you would give up all rights no matter what happened?

A: Right. You do--you have rules. We have rules. A lot of safety rules. We're very safety conscious. And so, you know, you have rules. And the driver, when he signs in, he agrees to abide by the rules and that he will keep order in his pit, things like that. (Arbitration Transcript at 20-21, Cross-examination of Loretta G. Williams (Aug. 21, 1997)).

The plaintiff, in his testimony at arbitration states:

Q: What did you think you were signing when you signed [the release]?

A: The outtake that I have gotten off of the release forms is if you're negligent to the point where something happens and it's your fault, then they are not liable. But if you're employed by them, it's just like workmen's compensation. (Arbitration Transcript at 51, Direct Examination of Charles W. Tucker (Aug. 21, 1997)).

While both parties appear to have a general idea of the intended effect of the release signed by the Plaintiff, before the Court can rule as a matter of law that the release bars the Plaintiff's claim, several other factual issues must be developed and resolved. The most important issue would be the scope of the release. Did the parties intend that the release cover every conceivable harm--including those not related to racing? The Defendant's testimony above seems to give the impression that the release is meant to cover only those potential harms caused by racing related actions. Further evidence of this is that only persons who were in close proximity to the cars and

the racing action were required to sign a release. General spectators, in the grandstand, do not have to sign a release. Judge Wright took note of a similar fact in Hallman. There, Dover Downs required a release for auto racing events but not for horse racing. Hallman at 3.

The Defendant tries to link the Plaintiff's injury to racing activities by arguing that "it is logical that ruts or grooves in the grassy area adjacent to a race track are an inherent risk and that they could pose a potential tripping hazard for one 'working' in the racing infield." Defendants Opening Brief in Support of Its Motion for Summary Judgment at 10. The Defendant's theory is that ruts and grooves are caused by the emergency vehicles driving over the infield surface and debris thrown from the track. Defendant's Opening Brief at 10 and 13. If this theory is accepted, then holes, grooves, and ruts in the infield may be risks associated with racing and thus within the scope of the Release even under the narrow interpretation of the Release language. The question of whether those types of risks are inherent in racing activities is a question of fact and should be reserved for a trier of fact. Because there is some question concerning the scope of this release, its terms are ambiguous.

While the discussion above, concerning the ambiguities of the release, is somewhat lengthy, the remaining questions concerning unconscionability and public policy are less complex and can be dealt with summarily. In Hallman, Judge Wright found that the release in issue may have been unconscionable because there was an absence of meaningful choice. The reporter had no choice but to sign the release, otherwise he could not complete his assigned tasks. Hallman at 8-9. Judge Wright also found the release was unconscionable because the release did not "bear a reasonable relation to the risk involved." Hallman at 10. In the present case, the Plaintiff did have a meaningful choice. He could have paid for general admission and watched the races from the grandstand with the rest of the spectators. Thus, the Release cannot be unconscionable for that reason. However, as discussed above, there may be a question of whether the Release covers the harm that occurred to the Plaintiff. Thus, the Release may be unconscionable if it bears no relation to the risk involved.

\*6 Finally, a release may be invalid if it violates

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

public policy. A release may violate public policy if the language exempting the benefitted party from his own negligence is not "crystal clear." Hallman at 12 (citing J.A. Jones Const. Co. v. City of Dover, Del.Super., 372 A.2d 540, 553 (1977)). Moreover, "a term exempting a party from tort liability for harm negligently caused is unenforceable on grounds of public policy if the term exempts one charged with the duty of public service from liability to one whom that duty is owed." Hallman at 13. The language of this Release, "WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE," is fairly clear that even negligence of the Speedway is to be included within the purview of the release. However, to fall within this clause, the negligent acts or omissions of the Defendant must fall within the scope of activities covered by the Release. Moreover, the issue of whether the defendant owes the Plaintiff any duty, and the nature of such duty depends on the Plaintiff's classification and is discussed in the next section of this Opinion.

Ultimately, this Court finds that there are material issues of fact that must be addressed before the validity and legal effect of the Release may be evaluated. The Release may be invalid because it is ambiguous, unconscionable, or violates public policy. To properly rule on these issues, this Court needs additional facts that are either in dispute or are not in the record before the Court. Most importantly, the Court would need facts tending to show the intended scope of the Release. Once those facts are settled, the validity and effect of the release can be evaluated. For these reasons, summary judgment is not appropriate for the issue of the release.

Defendant's Duty to the Plaintiff and Assumption of Risk. The Defendant's Opening Brief presents a second argument for Summary Judgment. The Defendant argues that it owed the Plaintiff no duty and that the Plaintiff assumed the risk upon entering the infield area. Summary judgment is not appropriate on either issue.

In this case, the Defendant is the possessor of land upon which the Plaintiff was injured. The duty of care a possessor of land owes to one injured on the property will depend on the classification of the one injured. At any given time, a person may fall into any number of classifications designed by our

society. A person may be a mother or a father or teacher or a doctor. The law also classifies people. Under the law, a person may be a master, a servant, or an independent contractor. Moreover, a person on the property of another may be either a trespasser, a licensee, or an invitee. A person's classification under the law often determines the rights and duties of that person.

In the present case, the issue of whether the Plaintiff was an employee or servant of the Defendant at the time of the injury has been decided in the negative. Tucker v. Seacoast Speedway, Del.Super., C.A. No 99A-02-002, Lee, J. (July 1, 1999)(Mem.Op.). Thus, any duty the Defendant, as the possessor of the land, owed to the Plaintiff will be defined by the Plaintiff's status at the time he was on the property. In determining the Plaintiff's status, "the Courts of Delaware employ the classifications set forth in the Restatement (Second) of Torts (1965)." Absalom v. Mason-Dixon Post No. 7234, Del.Super., C.A. No. 95C-09-022, Lee, J. (Sept. 18, 1996) (Mem.Op.) at 5. See also, DiOSSI v. Maroney, Del.Supr., 548 A.2d 1361, 1365 (1988).

\*7  The Restatement (Second) of Torts (1965) ("Restatement") classifies persons as either Possessors, Trespassers, Licensees, or Invitees.

A Possessor of land is defined by the Restatement as:

(a) a person who is in occupation of the land with intent to control it or

(b) a person who has been in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it, or

(c) a person who is entitled to immediate occupation of the land, if no other person is in possession under Clauses (a) and (b). Restatement (Second) of Torts § 328E (1965).

A trespasser is "a person who enters or remains upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise." Restatement (Second) of Torts § 329 (1965). The Restatement defines a Licensee as "a person who is privileged to enter or remain on land only by virtue of the possessor's consent." Restatement (Second) of Torts § 330 (1965). Three types of people are licensees:

1. One whose presence on the land is solely for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

his own purposes, in which the possessor has no interest, and to whom the privilege of entering is extended as a mere personal favor to the individual.

2. The members of the possessor's household, and

3. Social guests of the possessor. Restatement (Second) of Torts § 330 cmt. h (1965).

Also, in the context of licensees, "consent" and "permission" means that the person in possession of the premises is "willing that the [licensee] shall enter or remain on the land, or that his conduct is such as to give the [licensee] reason to believe that he is willing that he shall enter, if he so desires." Restatement (Second) of Torts § 330 cmt. c (1965).

Finally, the Restatement uses the following definition for an Invitee:

§ 332. Invitee Defined

(1) An invitee is either a public invitee or a business visitor.

(2) A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public.

(3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land. Restatement (Second) of Torts § 332 (1965).

The comments to this section on invitees are particularly helpful in fleshing out how one becomes an invitee of a landowner or possessor. For instance, "[a]n invitation differs from mere permission in this: an invitation is conduct which justifies others in believing that the possessor desires them to enter the land; permission is conduct justifying others in believing that the possessor is willing that they shall enter if they desire to do so." Restatement (Second) of Torts § 332 cmt. b (1965). Moreover, "the nature of the use to which the possessor puts his land is often sufficient to express to the reasonable understanding of the public, or classes or members of it, a willingness or unwillingness to receive them." Restatement (Second) of Torts § 332 cmt. c (1965).

**\*8** [T]he visitor has the status of an invitee only while he is on the part of the land to which his invitation extends--or in other words, the part of the land upon which the possessor gives him reason to believe that his presence is desired for the purpose for which he has come. In determining the area included within the

invitation, the purpose for which the land is held open, or the particular business purpose for which the invitation is extended, is of great importance. Restatement (Second) of Torts § 332 cmt. l (1965).

Finally, if the invitee exceeds the scope of the invitation, the invitee becomes either a trespasser or a licensee, depending on whether he goes on that portion of the property without or with the consent of the possessor. Id.

While the parties in the present action seem to assume that the Plaintiff was a business invitee at the time of the injury, there seems to be some argument that he is something other than an invitee. For instance, the Plaintiff would not have been an invitee if by going into the infield of the track he exceeded the scope of his original invitation. The facts in the record before this Court show a discrepancy in the scope of the Plaintiff's invitation to the track. The Defendant testified that the Plaintiff was given a "pit pass" as a favor. He had no duties and could freely enter the pit area. He would not have access to the infield area. (Arbitration Transcript pp. 9-10.) The Defendant, however, states that when he arrived at the track that night, he was given free admission in exchange for working as a "wrecker" in the infield. Id. at 45-46. From this, the Court can discern that there exists material factual disputes concerning those facts necessary for an accurate determination of the Plaintiff's status at the time of the injury. To make this determination, the following facts would need to be developed. First, what was the scope of his invitation into the Speedway that evening? Was he supposed to be in the pits or on a wrecker? If the Plaintiff was not to be in the infield initially, did the Defendant see him there during the evening and not tell him to leave? These facts would help determine if he was an invitee, licensee, or a trespasser at the time of the injury. Because there are material issues of fact in dispute on the issue of the Plaintiff's status, I am denying summary judgment in favor of a full and complete development of the salient facts. As summary judgment is denied for this reason, this Opinion will not address the duties a landowner owes to each of the classifications of persons.

In addition to the duty issue addressed above, the Defendant, in its Opening Brief in Support of its Motion for Summary Judgment, argues that the "PLAINTIFF ASSUMED THE RISK OF HIS

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

INJURY SINCE HE WAS EQUAL IN KNOWLEDGE TO SEACOAST OF THE RISK OF THE PRESENCE OF HOLES AND RUTS IN THE INFIELD...." Defendant's Opening Brief at 11. The affirmative defense of "assumption of risk" is "fact intensive and not susceptible to disposition, as a matter of law, through summary judgment." DiOSSI at 1368. See also Morris v. Hitchens, Del.Super., C.A. No. 91C-05-045, Lee, J.(March 18, 1993)(Mem.Op.) at 4-5.

### CONCLUSION

\*9 There are material issues of fact to be developed and decided concerning several matters. First, the release is ambiguous. Second, the factual predicate for determining the Plaintiff's status while on the Defendant's land is disputed. Finally, the issue of any assumption of risk by the Plaintiff is not subject to a motion for summary judgment. Thus, the Defendant's Motion for Summary Judgment is denied.

IT IS SO ORDERED.

1999 WL 1241073 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

Not Reported in F.Supp.                                                                    Page 1

Not Reported in F.Supp., 1996 WL 622557 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Briefs and Other Related Documents
Hansen v. Umtech Industrieservice Und Spedition,
GmbHD.Del.,1996.Only the Westlaw citation is
currently available.
United States District Court, D. Delaware.
Joseph A. HANSEN, Plaintiff,
v.
UMTECH INDUSTRIESERVICE UND
SPEDITION, GMBH, a Foreign Corporation,
Defendant.
**Civ. A. No. 95-516 MMS.**

July 3, 1996.

Jan R. Jurden, and Matthew P. Denn, Young,
Conaway, Stargatt & Taylor, and Vincent A.
Bifferato, Jr., Herrmann & Bifferato, Wilmington,
DE, for plaintiff.
John S. Spadaro, and Patricia A. Garthwaite,
Murphy, Welch & Spadaro, Wilmington, DE, for
defendant.

*MEMORANDUM OPINION*
MURRAY M. SCHWARTZ, Senior District Judge.

I. Introduction

*1 The motions presently before the Court arise out
of a personal injury action brought by plaintiff
Joseph A. Hansen ("Hansen") against defendant
Umtech Industrieservice Und Spedition, GmbH ("
Umtech"). Hansen alleges personal injuries to his
arm and hand, suffered while attempting to free his
pant leg from a machine allegedly sold and installed
by Umtech. Hansen sued under various theories of
negligence, strict liability, and breach of implied
warranty. Jurisdiction is based on diversity of
citizenship, 28 U.S.C. § 1332.

II. Factual Background

The facts underlying the complaint giving rise to
these motions are relatively simple. Hansen, a
Maryland citizen, was employed by K-F
Environmental Technologies, Inc. ("K-F"), and at
all times relevant to this action, was assigned to
work at the Kent County Waste Water Treatment
Plant.[FN1] Docket Item ("D.I.") 6 ("Complaint") at
¶¶ 1, 4.[FN2] Umtech is a German corporation
with its principal place of business in Edenkoben,
Germany. *Id.* ¶ 2. On October 1, 1993, Hansen
was working with a waste treatment dryer allegedly
sold and installed by Umtech ("Dryer 2"). *Id.* ¶¶
5, 6. While Hansen was working, the leg of his
pants became caught in an exposed moving drive
chain and sprocket assembly. In the attempt to free
his pant leg from the assembly, his left hand became
caught in the assembly. *Id.* ¶ 7. As a result, Hansen
suffered the loss of three fingers, a fracture of his
left arm, and pain and suffering. *Id.* ¶ 8.

FN1. K-F is not a party to this litigation.

FN2. All references to the complaint are
made to plaintiff's Second Amended
Complaint, D.I. 6, filed September 27,
1995.

Hansen filed this action against Umtech alleging
liability arising out of the sale and installation of the
dryer which caused Hansen's injury. The litigation
has generated several motions. Hansen has moved
to compel certain discovery from Umtech. D.I. 41.
Umtech has moved to disqualify Hansen's
vocational rehabilitation expert, D.I. 44, and has
also moved to disqualify Hansen's medical experts
and an economist. D.I. 60. Umtech has also moved
for summary judgment on Hansen's negligence
claim, D.I. 72, as well as on his claims for strict
liability and for breach of implied warranty of
merchantability. D.I. 70.

Oral argument was held on June 19, 1996. The
Court denied in part Hansen's motion to compel,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 2

Not Reported in F.Supp., 1996 WL 622557 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

D.I. 41, and the remaining grounds for the motion, through the course of the argument, became moot. The Court also denied Umtech's motion to disqualify Hansen's medical experts and his economist, D.I. 60. The motions remaining for consideration are (1) Umtech's motion to disqualify Hansen's vocational rehabilitation expert, D.I. 44; (2) Umtech's motion for summary judgment on the negligence claim, D.I. 72; and (3) Umtech's motion for summary judgment on the strict liability and breach of implied warranty of merchantability claims, D.I. 70. Each motion will be addressed separately.

### A. Umtech's Motion to Disqualify Plaintiff's Expert Castro

Umtech has moved to disqualify plaintiff's vocational rehabilitation expert Jose Castro ("Castro ") from testifying as an expert witness, and from offering expert services or other assistance in the prosecution of this case. D.I. 44. Umtech further moved to disqualify Castro's employer, the Delaware Valley Rehabilitation Services, Inc. (" DVRS"), from participating in this case, *id.,* and moved to prevent plaintiff from relying on or otherwise making use of any work product or advice prepared or offered by DVRS.

*2 On December 4, 1995, Umtech's counsel Patricia Garthwaite ("Garthwaite") contacted Thomas L. Yohe ("Yohe"), a vocational rehabilitation expert employed by DVRS. D.I. 45 at 3. During the initial conversation with Yohe, Garthwaite inquired whether DVRS had any conflict of interest which might preclude it from consulting on the case. Yohe telephoned Garthwaite back promptly and responded that no conflict existed. *Id.* at 4. During this second telephone conversation, Garthwaite discussed certain substantive matters relating to the case with Yohe. According to a certification in the record, Garthwaite's discussion with Yohe included the following topics:
[A]t a minimum, we discussed the date of the plaintiff's accident; my knowledge (as of December 4) of the function and operation of the sludge dryer unit at issue in this case; my analysis (as of the same date) of how the accident might have occurred;

specific facts relating to the plaintiff's job duties and salary that I regarded as potentially relevant to the issue of vocational rehabilitation; and the relative strengths and weaknesses of our defense posture on those issues, in light of the plaintiff's age, level of training and marketable skills.

*Id.,* Exhibit ("Exh.") A, ¶ 5. The following day, Garthwaite sent a confirmation letter confirming the retention of Yohe as an expert, and included a sentence requesting confidentiality. *Id.* at Exh. B. That same day, Yohe sent by facsimile a document entitled "Typical Records Needed in Personal Injury Cases" to Garthwaite. *Id.* at Exh. C. However, neither Yohe nor Garthwaite took any further action with respect to this facsimile in particular, or to the case in general.

Meanwhile, in February, 1996, Hansen retained the same firm of DVRS to consult for its case, specifically retaining expert Castro. Before the retainer was finalized, Hansen inquired as to whether any conflicts of interest existed which might affect or prohibit Castro from working on the case. Castro ran a conflicts check in the DVRS computer system which tracks conflicts of interest. However, Yohe's representation of Hansen's adversary did not surface, because Yohe had failed to enter the information regarding his representation of Umtech into the computer system, and because Yohe himself was on vacation at the time. Thus, Castro told Hansen that there was no conflict, and agreed to the representation.

In furtherance of the representation, Castro began to work on Hansen's case. On February 29, 1996, Castro, on behalf of DVRS, issued a 13-page, single-spaced report which analyzed topics including Hansen's medical status, social/educational factors, vocational history, transferable skills, career assessment, and wage earning capacity. D.I. 50 at B14-26. On March 7, 1996, Hansen's counsel sent a check in the amount of $1,440.02 to DVRS for its services. *Id.* at B27.

Umtech contends that Castro should be disqualified because Umtech's counsel, Garthwaite, retained DVRS in a confidential relationship and confidential information passed between them. D.I.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

45. Umtech also urges that the disclosure of confidential information on the part of Castro should be irrebuttably presumed, and that policy considerations such as avoiding the appearance of impropriety support disqualification. Finally, Umtech argues that the interest in preventing jury confusion in the likely event that Umtech would cross-examine Castro on his affiliation with the same firm as Umtech's prior expert supports disqualification.

**\*3** Hansen responds by arguing that Castro should not be disqualified because Castro has not and will not discuss the case with Yohe. D.I. 49. Hansen argues that Umtech did not have a confidential relationship with Yohe and did not disclose confidential information. Further, Hansen argues that Umtech would not be prejudiced by Hansen's use of DVRS as expert consultants. Finally, Hansen disputes Umtech's analogy to attorney conflicts cases, where courts are more apt to disqualify attorneys with conflicting loyalties.

Central to resolution of this issue is what standard applies to the disqualification issue. After briefing was complete, the parties now agree that the standard for conflicts disqualification for attorneys is more stringent than that of experts. *Compare,* D.I. 49 at 14, and D.I. 51 at 14-15 (Umtech arguing that "irrespective of the "attorney rules" debate, disclosure of confidential information by DVRS to Hansen should be irrebuttably presumed). This proposition is amply supported by case law. *See, e.g., EEOC v. Locals 14 and 15, Int'l Union of Operating Engineers,* 24 Fair Empl. Prac. Cas. (BNA) 1821; 25 Empl. Prac. Dec. (CCH) ¶ 31,783 at 6 (S.D.N.Y. Feb. 11, 1981) (rejecting analogy to attorney-client disqualification); *Paul v. Rawlings Sporting Goods Co.,* 123 F.R.D. 271, 281 (S.D. Ohio 1988) (same); *English Feedlot, Inc. v. Norden Labs., Inc.,* 833 F. Supp. 1498, 1501 (D. Colo. 1993) (same); *Cordy v. Sherwin-Williams Co.,* 156 F.R.D. 575, 580 (D.N.J. 1994) (same).

There are two scenarios in which motions to disqualify experts typically arise. The first is where one expert is originally retained by one party to litigation, and that expert subsequently switches sides to consult as an expert for that party's

adversary. These cases are referred to as " side-switching" cases, and form the most common basis for motions to disqualify. A second scenario, such as in the case *sub judice,* occurs where an expert is retained by a party to litigation, and then the adversary retains an expert who is in some way affiliated with the expert retained by the first party. In both cases, a conflict of interest may arise which may preclude one or both parties from using its retained expert, depending on the nature and extent of the relationship and the exchange of confidential information between each party and its expert.

While there is relatively sparse case law on expert disqualification concerning either factual scenario, analysis must begin with the recognition of the inherent power of federal courts to disqualify experts. *English Feedlot,* 833 F. Supp. at 1501; *Cordy,* 156 F.R.D. at 579-80; *Wang Labs., Inc. v. Toshiba Corp.,* 762 F. Supp 1246, 1248 (E.D. Va. 1991). This power exists to further the judicial duty to protect the integrity of the adversary process and to promote public confidence in the fairness and integrity of the legal process. *Wang,* 762 F. Supp at 1248; *Paul,* 123 F.R.D. at 278.

**\*4** Courts have fashioned a two-part inquiry used to determine whether disqualification is necessary:
First, was it objectively reasonable for the first party who claims to have retained the consultant to conclude that a confidential relationship existed?
Second, was any confidential or privileged information disclosed by the first party to the consultant?

*Paul,* 123 F.R.D. at 278; *Wang,* 762 F. Supp at 1248 . In *Paul,* the plaintiff had suffered extensive head injuries from being struck by a baseball while wearing a helmet manufactured by defendant sporting goods company. Plaintiff retained an expert in mechanical engineering to consult in connection with his personal injury action against defendant. However, defendant had previously used the same expert for the purpose of engaging in extensive testing of its helmets, but the court found that the consultation was not specifically for the purpose of the lawsuit. Applying the two-part test, the court found that although defendant's counsel reasonably believed that a confidential relationship

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                              Page 4

Not Reported in F.Supp., 1996 WL 622557 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

had been established with the expert, no confidential or privileged information passed from defendant to the expert. *Id.* at 280. Thus, disqualification was not warranted.

The result reached in *Paul* is appropriately characterized by a situation where "despite the existence of a formal contractual relationship, so little of substance occurs during the course of the relationship that neither the integrity of the trial process, nor the interests of the party who retained the expert, would be served by blanket disqualification." *Paul,* 123 F.R.D. at 278. In connection with the two-part test set forth in *Paul,* a negative answer to either prong should result in a finding of no disqualification. *Wang,* 762 F. Supp at 1248 ("But disqualification is likely inappropriate if either inquiry yields a negative result."). As the *Wang* court explained, in interpreting *Paul,* even if a confidential relationship exists, disqualification is inappropriate unless some privileged or confidential information passed; if this were not the rule, then a lawyer could potentially disqualify an expert merely by retaining him with no intention of actually using the expert's services, to disable his opponent from using the expert for himself. *Id.* at 1248.

The *Paul* two-part inquiry has been repeatedly cited and utilized by courts ruling on motions to disqualify experts who have engaged in side-switching. In *Wang,* 762 F. Supp. 1246, the court disqualified an expert who had consulted with plaintiff on the issue of the validity of plaintiff's patent, communicated to plaintiff's counsel that in his opinion the patent was invalid, and then was subsequently retained by defendant for the same litigation. The court found a confidential relationship existed because the plaintiff's attorney gave the expert a detailed memorandum used by the expert containing, *inter alia,* the patent file history and potential defenses to the lawsuit, both of which the court found to be protected confidential work product. *Id.* at 1249. Similarly, in *Cordy,* 156 F.R.D. 575, the court disqualified defendant's expert who had previously consulted with plaintiff's counsel in a personal injury action, and then changed sides to consult for the defendant. Plaintiff had made telephone calls to the expert, executed a

retainer agreement, forwarded a retainer check, sent a three-ring binder of documents to the expert relating to the investigation of the injury, and had been billed for 27 hours of work in the amount of $2,094.23. Further, the expert had issued an oral report for plaintiff, all before the expert switched sides. *Id.* at 577.

*5 However, in *Mayer v. Dell,* 139 F.R.D. 1 (D.D.C. 1991), the court reached an opposite conclusion. That court declined to disqualify defendant's expert on plaintiff's motion, finding that plaintiff, who had purported to retain the same expert before defendant, had never actually retained the expert, had only met with the expert on one occasion, had only given the expert one document, which was the complaint, had not received the benefit of any of the expert's work, had never asked the expert to sign a confidentiality agreement, and had paid no fee to the expert. *Id.* at 2. In *English Feedlot,* 833 F. Supp. 1498, the court also denied a motion to disqualify plaintiff's expert who had previously consulted for defendant in prior litigation, because defendant had not disclosed confidential information to the expert. *Id.* at 1501.

These cases illustrate the types of factors considered by courts ruling on motions to disqualify. All of these cases, however, involved side-switching experts. There are even fewer cases dealing with conflicts caused by experts who are affiliated with experts consulting for the other side. *EEOC,* 25 Empl. Prac. Dec. (CCH) ¶ 31,783, addressed this situation. There, counsel for defendant contacted an expert for the purposes of consulting on Title VII litigation. Consultations were limited to two days, and included discussions about the relevant labor market, defense theories, and the strengths and weaknesses of the defense and the EEOC's positions. *Id.* at 3. Less than one year later, that expert founded a new consulting firm whose shares were owned in part by another expert who was subsequently retained by the EEOC for the same litigation. *Id.* at 4. The court found that because there was no evidence that any substantive information was exchanged among the expert-partners, nor was there evidence of danger of future inadvertent disclosure, disqualification was not warranted. *Id.* at 7. Indeed, the court found that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 5

Not Reported in F.Supp., 1996 WL 622557 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

because the experts had limited contact, separate offices, no mutual access to computer accounts in which they store data, separate file areas, and a strong ethic of maintaining client confidentiality, the danger of leakage of information was "minimal." *Id.*

The other case dealing with affiliated experts disqualification motion is *Great Lakes Dredge & Dock Co. v. Harnischfeger Corp.,* 734 F. Supp. 334 (N.D. Ill. 1990). There, plaintiff retained a consulting firm to determine the cause of failure of its ship's bearings. The consulting firm employed an expert in metallurgy to consult, with the intention to use his testimony at trial against the defendant who sold the ship to plaintiff. *Id.* at 335. Defendant filed a third-party complaint against the bearing manufacturer. The third-party defendant then retained its own expert. *Id.* Plaintiff moved to disqualify the third-party defendant's expert on the ground that he worked at the same consulting firm at which its own expert occasionally worked and, in fact, frequently supervised plaintiff's expert's work. *Id.*

*6 The court reviewed the *Paul* line of cases, noting that the facts of those cases were unlike those before it: "[t]he other cases involved the 'switching sides' expert who at one time or another did work for a party's adversary." *Id.* at 338. The only case with similar facts the *Great Lakes* court cited was *EEOC, supra.* Concluding that disqualification would be denied, the court noted the following relevant factors: neither party alleged it had disclosed confidential or privileged information to the opposing side's expert; plaintiff's expert had not discussed the case with the firm which employs defendant's expert; defendant's expert denied knowledge of plaintiff's expert's work; "no communication or 'leakage' whatsoever of any information, whether confidential, privileged, or otherwise" had occurred; and both parties were aware of the situation and could take steps to prevent inadvertent disclosure. *Id.* at 338-39. Thus, while not expressly applying the *Paul* test for side-switching experts, the court considered the same confidentiality concerns.

A party seeking to disqualify another party's expert

bears the burden of demonstrating the existence of a confidential relationship and the passing of confidential information. *Cordy,* 156 F.R.D. at 580; *English Feedlot,* 833 F. Supp. at 1501-02. In this case, Umtech bears the burden of demonstrating that Umtech and Yohe had a confidential relationship and that confidential or privileged information passed between them, such that plaintiff should be prohibited from using his expert from the same firm.

### 1. Confidential Relationship Between Umtech and Yohe

Umtech argues that a confidential relationship existed between Umtech and Yohe. It argues that DVRS was retained in December, 1995, with the intent to use Yohe as a consulting, and possibly a testimonial, expert. According to Garthwaite's certification, she spoke with Yohe twice on the telephone to discuss the possibility of retaining him. D.I. 45 at Exh. A. Yohe was formally retained during the second conversation, which was confirmed by written letter (mistakenly) dated December 4, 1995. Also during that second conversation, Garthwaite discussed aspects of the case including the date of the plaintiff's accident, her knowledge (as of December 4) of the function and operation of the sludge dryer unit at issue in this case, her analysis (as of the same date) of how the accident might have occurred, specific facts relating to the plaintiff's job duties and salary that she regarded as potentially relevant to the issue of vocational rehabilitation, and the relative strengths and weaknesses of Umtech's defense posture on those issues, in light of the plaintiff's age, level of training and marketable skills. *Id.* ¶ 5. Garthwaite further states that she asked about the records Yohe would need to conduct his analysis, and the next day, she received a facsimile of a document entitled "Typical Records Needed in Personal Injury Cases." *Id.* ¶¶ 5, 6.

*7 *Paul* requires a court to determine whether counsel reasonably believes a confidential relationship has been established with the expert. *Paul,* 123 F.R.D. at 278. In this case, Garthwaite might reasonably have believed a confidential

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 6

Not Reported in F.Supp., 1996 WL 622557 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

relationship was created between herself and Yohe, given the fact that she sent a confirmation letter regarding the retention of Yohe, which contained a reminder of the need for confidentiality. Whether that belief was reasonable need not be determined. It will be assumed that a confidential relationship between attorney an expert did exist.

### 2. Exchange of Confidential Information

Despite the existence of a confidential relationship, the amount of confidential information which passed to the expert is questionable. Garthwaite certifies that she has had no further personal contact with Yohe since December 5, 1995, and that she never forwarded any documentation to Yohe so that he might begin his analysis. The record does not indicate that Umtech or Garthwaite's law firm ever paid any money to Yohe or DVRS. Yohe, in a letter dated March 8, 1996, states that he "did not open a file [in December] as [he] was anticipating receiving materials in the near future." D.I. 45 at Exh. D. He explained that he typically opens a case upon receipt of the materials needed, *id.,* and it has been his experience that occasionally following initial attorney contact, he never hears about the case again. He further admitted that he "frankly, forgot about the matter until [his] phone call with [defense counsel]" on March 8, 1996. *Id.* He stated he "never had reason to speak about this case" with Castro until the conflict surfaced, *id.,* and that he does not, at any rate, work closely with Castro or participate in any details of Castro's work.

While counsel stated that she discussed her analysis of the case, including its strengths and weaknesses, with Yohe, Yohe has no recollection of the details of that conversation. D.I. 45 at Exh. D. Additionally, Garthwaite's disclosures in connection with the liability phase of the case are not germane to either Yohe's expertise or expert opinion. Further, Yohe forgot about the conflict until the conflict was made known to him by Castro and Umtech's counsel. *Id.* It is clear, then, that to the extent that counsel disclosed confidential information, Yohe did not in any way use that information. Furthermore, and more importantly, Yohe never discussed the case with anyone,

including Castro. Suffice it to say that if the expert himself can't remember any of the information, he certainly could not have passed it along to the other expert. Like *Paul,* this is a case where "despite the existence of a formal contractual relationship, so little of substance occurs during the course of the relationship that neither the integrity of the trial process, nor the interests of the party who retained the expert, would be served by blanket disqualification." *Paul,* 123 F.R.D. at 278.

**\*8** The most important consideration in expert disqualification cases, as noted above, is the preservation of confidentiality. The *Paul* inquiry relates to side-switching experts, and its rationale of confidentiality, rather than the two-part inquiry, guides this Court, as it is faced with a dissimilar factual context. Like the *EEOC* and *Great Lakes* courts, the absence of evidence that any substantive information was exchanged among the affiliated experts, and their being no prospect of future inadvertent disclosure, leads the Court to conclude that disqualification is not warranted. Like those cases, Yohe and Castro maintain separate practices and have limited contact beyond "pleasant conversation." D.I. 45 at Exh. D. Neither has a supervisory relationship over the other. *Id.* Accordingly, Umtech's motion to disqualify Castro will be denied. Similarly, Umtech's request to disqualify DVRS from participating in the case, and to prevent Hansen from relying on any work product or advice from DVRS, will be denied.

### B. Umtech's Motion for Summary Judgment: Negligence

Before examining the arguments in this motion, it is important to identify the theory under which Hansen asserts liability by Umtech. His complaint refers to Umtech's duty as *manufacturer* of Dryer 2. D.I. 5, ¶¶ 9-16. However, plaintiff appears to have abandoned his manufacturer theory and relies exclusively on theories of duty as seller to warn, and a duty as the installer to make the equipment safe.

Umtech moves for summary judgment on several grounds. First, Umtech argues that plaintiff's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 7

Not Reported in F.Supp., 1996 WL 622557 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

contributory negligence is the dominant, if not the sole, proximate cause of his injury, in that Hansen (1) was aware of the danger of exposure to the chain drive yet chose to clean the dryer without first shutting it off, and then (2) failed to shut off the machine once his pant leg was caught; (3) twice failed to look before attempting to free his pant leg; and (4) failed to immediately call for help. D.I. 73. Umtech further argues that it bears no liability for K-F's negligent operation of Dryer 2, that K-F was a sophisticated purchaser and was provided a safety manual with warnings, and that Umtech had no reason to know of a defect in Dryer 2. Umtech's reply brief more succinctly (if not differently) states its defense in legal terms: Umtech owed Hansen no duty; K-F's negligence is a superseding cause of Hansen's injuries; Hansen's own negligence is a superseding cause of his injuries; and at a minimum, Hansen's own negligence is the main proximate cause of his injuries. D.I. 86.

### 1. Negligence Standard

In order to recover in an action for negligence, a plaintiff must show by a preponderance of the evidence that the defendant's negligent act or omission violated a duty which was owed to the plaintiff. *Culver v. Bennett*, 588 A.2d 1094, 1096-97 (Del. 1991).[FN3] Plaintiff must also show that the defendant's act of negligence was the proximate cause of plaintiff's injury. *Id.* at 1097. With respect to proximate cause, Delaware adheres to the "but for" rule: "a defendant's conduct is the cause of an event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it." *Reese v. Home Budget Ctr.*, 619 A.2d 907, 910 (Del. 1992). Delaware also recognizes there can be more than one proximate cause of an injury. *Id.; see also Culver*, 588 A.2d at 1097. The issue of proximate cause is ordinarily a question of fact to be submitted to the jury. *Id.; see also Duphily v. Delaware Elec. Coop., Inc.*, 662 A.2d 821, 830 (Del. 1995).

> FN3. The parties have stipulated that Delaware law applies to this dispute. *See*

*infra* Part C(1).

### 2. Contributory Negligence

**\*9** In 1984, Delaware enacted a modified comparative negligence statute, 10 *Del. C.* § 8132, which provides:

In all actions brought to recover damages for negligence which results in death or injury to person or property, the fact that the plaintiff may have been contributorily negligent shall not bar a recovery by the plaintiff or his legal representative where such negligence was not greater than the negligence of the defendant or the combined negligence of all defendants against whom recovery is sought, but any damages awarded shall be diminished in proportion to the amount of negligence attributed to the plaintiff.

This statute has been interpreted by the Supreme Court of Delaware as follows:[I]f the plaintiff's contributory negligence is 50% or less, the plaintiff is permitted to recover, although the recovery is reduced proportionally. However, if the plaintiff's contributory negligence is 51% or greater, it is an absolute bar to recovery according to the Delaware statute.

*Culver*, 588 A.2d at 1098.

Umtech's central argument is that Hansen's contributory negligence was the main, if not the sole, cause of his injury, and therefore, his claim is barred. Umtech argues that the accident would never have occurred but for Hansen's negligence. It argues that Hansen was aware of the danger of exposure to the chain drive yet chose to clean the dryer without first shutting it off, and then neglected three safe alternative courses of conduct by failing to shut off the machine once his pant leg was caught, failing to look before attempting to free his pant leg, and failing to immediately call for help. Umtech argues that these acts amount to the dominant, if not the sole, proximate cause of his injuries. D.I. 73. In short, Umtech argues that Hansen chose the risky path by attempting to clean the dryer without first shutting it off, and then failed to use reasonable methods to shut it off once his pants were caught.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 8

Not Reported in F.Supp., 1996 WL 622557 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

Umtech relies heavily on *Johnson v. Hockessin Tractor, Inc.,* 420 A.2d 154 (Del. 1980). In that case, plaintiff was injured while attempting to shut off a tractor engine by reaching under the carburetor for a valve, without looking, and instead placed his fingers into an operating belt and pulley system. *Id.* at 155. The court found that plaintiff knew of the danger created by shutting off the tractor engine with that valve rather than with the "kill button," and his attempt to shut off the engine with that valve in any event, without looking, constituted contributory negligence. Accordingly, the court affirmed the trial court's grant of summary judgment in favor of defendants:

In addition, we note that plaintiff could have used an inherently safe method ... to shut off the tractor engine. Instead he chose to use ... a method which he knew was fraught with risk, particularly when done without looking. If a person has the choice of two alternate paths, one known to be safe, the other known to be risky, the unnecessary choice of the risky path constitutes contributory negligence.

\*10 Accordingly, we find no error in the Trial Court's conclusion of contributory negligence as a matter of law.

*Id.* at 158-59 (citations omitted).

Reliance on *Johnson* is unavailing to Umtech. *Johnson* was decided in 1982, two years before the Delaware Legislature enacted the modified comparative negligence statute, 10 *Del. C.* § 8132. When *Johnson* was decided, the Supreme Court of Delaware was using the common law contributory negligence doctrine, which held that contributory negligence was an absolute bar to any recovery by a plaintiff in Delaware. *See Culver,* 588 A.2d at 1097. Thus, once the court found any negligence on the part of the plaintiff, summary judgment would necessarily be entered against him. Now, however, a finding of negligence on the part of the plaintiff does not necessarily yield the same result. Only upon a finding that the plaintiff was more than 50% negligent will summary judgment be granted against him. Stripped to its most basic element, Umtech is asking this Court to decide that the combination of Hansen's acts and omissions amounts to more than 50% of the negligence which led to his injury. This determination cannot be made as a matter of law,

and therefore must be made by a jury. Summary judgment on the ground of contributory negligence will be denied.[FN4]

> FN4. Umtech's reply brief argues that Hansen's negligence was also the superseding cause of his injuries, which would absolve Umtech from liability. Despite the fact that Umtech raises a new legal defense in its reply brief, this argument is without merit. Superseding causes refer to new and independent acts, *see Duphily,* 662 A.2d at 829, not to the plaintiff's own negligence. The proper defense arising out of plaintiff's own negligence is contributory negligence, as Umtech had originally argued.

### 3. *Effect of Alleged Negligent Operation of Facility by K-F*

Umtech argues that it bears no liability for the negligent operation of Dryer 2 by Hansen's employer, K-F. Hansen stated in his deposition that K-F had increased production at the facility, which increased the frequency of clogging of the dryer. D.I. 74 at A-70-72. Increased production also rendered it infeasible, according to Hansen, to shut off the dryer when cleaning was needed. *Id.* at A-151-52. Further, Hansen alleges that the blower on the platform was broken, and this caused poor visibility on the platform, further adding to the danger. *Id.* at A-198. Umtech asserts these allegations are properly directed at K-F, not Umtech, and Umtech bears no responsibility for K-F's failures.

While not clearly stated in its opening brief, Umtech's reply brief argues that K-F's alleged acts of negligence are the superseding cause of Hansen's injuries. D.I. 86 at 15. A superseding cause is a new and independent act, itself a proximate cause, which breaks the causal connection between the original tortious conduct and the injury. *Duphily,* 662 A.2d at 829. If the intervening act of negligence was not reasonably foreseeable to the original tortfeasor, the intervening act supersedes and becomes the sole proximate cause of the plaintiff's injuries, relieving

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 9

Not Reported in F.Supp., 1996 WL 622557 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

the original tortfeasor of liability. *Id.*

The Supreme Court of Delaware has held that the question of superseding cause is "fact-driven" and is a question for the jury. *Id.* The *Duphily* court explained:

[A]n intervening negligent act will not relieve the original tortfeasor from liability if: the original tortfeasor at the time of his negligence *should have realized* (foreseen) that another's negligence might cause harm; or, if a *reasonable person* would not consider the occurrence of the intervening act as *highly extraordinary;* or if the intervening act was not *extraordinarily negligent.* Considerations of foreseeability and what a reasonable person would regard as highly extraordinary are factual questions ordinarily reserved for the jury.

**\*11** *Id.* at 830-31 (emphasis in original); *see also* Restatement (Second) of Torts § 453 cmt. b (1965) ( "[if] under the undisputed facts there is room for reasonable difference of opinion as to whether such act was negligent or foreseeable, the question should be left to the jury.").

As noted above, a superseding cause is a new and independent act, *itself a proximate cause,* which breaks the causal connection between the original tortious conduct and the injury. *Duphily,* 662 A.2d at 829 (emphasis supplied). Umtech has failed to demonstrate how K-F's alleged acts of negligence are the proximate cause of Hansen's injuries. According to both parties, the acts of K-F were (1) the increased production at the facility, coupled with the changes in chemicals used, which caused an exponential increase in dryer clogging, and (2) the failure to repair the blower on the top of the platform, which caused poor visibility and obscured Hansen's vision. Neither of these acts, alone or in the aggregate, was the "but for" cause of Hansen's injuries. Poor visibility did not cause Hansen's pant leg to become caught: the exposed chain drive was the cause of his entanglement. Increased production did not cause his pant leg to become caught: if anything, it made the number of occasions on which Hansen was on the platform greater. However, even if Hansen's job required him to stand on the platform all day long, a protected chain drive would have still prevented his accident. Thus, the

superseding cause argument cannot prevail as a matter of law at this stage of the proceeding, because there has been no demonstration of proximate cause on the part of K-F.

Even if Umtech had demonstrated how K-F's alleged negligence proximately caused Hansen's injuries, the superseding cause argument would have to be left to the jury. The Court will not make factual determinations on summary judgment as to whether it was foreseeable to Umtech, at the time of its alleged negligent installation of the dryer, that K-F would increase productivity and/or change the formula for the sludge cake, which Umtech asserts causes more clogging of the dryer, or whether it was foreseeable that a blower might break, and cause poor visibility on the platform. Summary judgment on the ground of superseding cause will be denied.

*4. Sophisticated Purchaser Defense to Duty to Warn*

Umtech also argues that it supplied K-F with a detailed operating manual for Dryer 2, which was more than 60 pages in length. Umtech argues that it was entitled to rely on K-F to warn its employees of the dangers or defects as set out in the manual. The manual was provided by Umtech to K-F, in German; K-F's president, Petra Freuhbis, translated it into English. The safety manual provided to K-F by Umtech contains the following warnings:
3.1 MAKE SURE ALL COVERS AND DOORS ARE LOCKED AND SECURED TIGHTLY BEFORE START-UP!
3.2 KEEP ALL TROUGH COVERS AND DOORS AT CHAIN DRIVES CLOSED. Screws on covers and doors may only be opened during shutdowns. Ensure that it is not possible to accidentally start the equipment during cleaning and maintenance procedures (Lock Out Tag Out Systems!). Upon completion of cleaning and maintenance all covers and doors must be closed and secured.
**\*12** 3.3 SAFETY COVERS ON CHAIN DRIVES may not be removed during operation. Equipment must be shut off for repairs and secured against accidental start-up (see 3.2).

D.I. 83 at B98 (emphasis in original).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 10

Not Reported in F.Supp., 1996 WL 622557 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

The Supreme Court of Delaware has not addressed whether the so-called "sophisticated purchaser" defense has a place in Delaware jurisprudence. While Delaware trial court decisions do not control where the Delaware Supreme Court has not spoken, a decision of the Delaware state trial court may be considered when a federal court engages in the hazardous chore of divining state law. *Cf. Robinson v. Jiffy Executive Limousine Co.,* 4 F.3d 237 (3d Cir. 1993).

Several Delaware Superior Court decisions recognize the so-called "sophisticated purchaser" defense. This defense was first discussed in *In re Asbestos Litigation (Mergenthaler),* 542 A.2d 1205 (Del. Super. Ct. 1986) ("*Mergenthaler*"). There, plaintiffs had brought an action against several asbestos suppliers alleging, *inter alia,* failure to warn of the dangers associated with asbestos products. *Id.* at 1207. The defendants argued that plaintiffs' employers were sophisticated purchasers of the products and knew of the dangers of asbestos exposure. The court reviewed decisions of courts across the country and concluded that "some version of a 'sophisticated purchaser' defense is the norm in most jurisdictions." *Id.* at 1211. The standard which must be met to invoke the defense was set forth as follows:

[W]hen a supplier provides a product it knows to be dangerous to a purchaser/employer whom the supplier knows or reasonably believes is aware of that danger, there is no duty on the part of the supplier to warn the employees of that purchaser unless the supplier knows or has reason to suspect that the requisite warning will fail to reach the employees, the users of the product.

*Id.* at 1212.

This standard has been analyzed as a two-part inquiry to determine whether the sophisticated purchaser defense is available to a defendant:

First, did the supplier of the dangerous product know or reasonably believe that the purchaser was aware of the dangers of the product? If the answer is no, the supplier may not avail himself of this defense. If the answer is yes, the purchaser is considered "sophisticated," and the seller may rely on the purchaser to warn others of the danger of the product. The next inquiry is whether the supplier knew or had reason to suspect that the warning would fail to reach the purchaser's employees or the users of the product? If the answer is yes, the supplier is not relieved from his duty to warn.

*Sanderson v. Firestone Tire & Rubber Co.,* 1994 WL 807899 at *2 (Del. Super. Ct. July 28, 1994).

The *Mergenthaler* court, applying the standard above, ultimately concluded that summary judgment for defendants was improper. As to the first inquiry, the court found that the purchaser was sophisticated as a matter of law because it was involved with asbestos, had knowledge of the asbestos industry, and held itself out as following all OSHA regulations relating to asbestos. *Id.* at 1213. As to the second inquiry, however, the court held it was a jury question as to whether the supplier knew or had reason to suspect that the warnings were not being given to the purchaser's employees. *Id.* The court noted that while the supplier had never sent an agent to the purchaser's plant to observe its safety measures, in addition to the fact that the purchaser had represented that it was following OSHA regulations, the supplier was nonetheless aware of the purchaser's warnings because it had seen the purchaser's warning labels. The court stated that if a jury determined that the warning labels were inadequate, it may also find that the supplier was on notice that the purchaser's safety measures were inadequate. *Id.*

*13 In *Steffen v. Colt Indus. Operating Corp.,* 1987 WL 8689 (Del. Super. Ct. Feb. 4, 1987), the court, in dicta, discussed this defense in connection with an industrial accident similar to the accident in the case *sub judice.* There, plaintiff was injured at work while attempting to lubricate a pump manufactured by defendant. Defendant had sent plaintiff's employer a safety manual containing the warning " Do not relubricate the pump while it is running." *Id.* at *2. Plaintiff, however, had not been instructed by his employer to first shut off the pump before attempting to relubricate it. *Id.* The court rejected plaintiff's failure to warn argument against the defendant, finding that defendant discharged its duty to warn by providing the safety manual to the employer, and reasonably believed that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 11

Not Reported in F.Supp., 1996 WL 622557 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

employer was aware of the dangers associated with relubricating a moving pump. *Id.* at \*4. Further, the court noted that defendant had no reason to suspect that the employer was not providing the warning to its employees, as it has an "economic incentive in not exposing its employees to unnecessary dangers." *Id.*

Umtech argues its duty to warn did not extend to Hansen because the warnings provided to K-F, a sophisticated purchaser, should have satisfied its duty. Applying the two-part test of *Mergenthaler* to these facts, the first inquiry is whether Umtech knew or reasonably believed that K-F was aware of the dangers of the product. Umtech argues that K-F provides sophisticated services at the Kent County site, including "dewatering of waste-activated sludge " and "[sludge] drying services." D.I. 73 at 32. Umtech notes that K-F employs roughly thirty-five employees. *Id.* Further, Umtech states that K-F operates waste treatment facilities for other government and private entities in the United States. *Id.* Because of these factors, Umtech believes that K-F is a sophisticated purchaser of Dryer 2 as a matter of law.

After reviewing the record, the Court concludes that the issue of K-F's sophistication should be determined by a jury. As noted above, " sophistication" for the purpose of this defense refers to the purchaser's awareness of the dangers of the product. This means K-F is sophisticated if Umtech reasonably believed K-F was aware of the dangers posed by Dryer 2. The record simply does not support that determination as a matter of law. Umtech provided a safety manual to K-F containing warnings about the dangers of exposed chain drives, and the necessity to replace guards if they are removed. However, one could argue that the absence of the guard over the chain drive which caused Hansen's injury suggests that Umtech did not believe this particular chain drive to pose a threat.

As an additional matter, the only evidence Umtech provided regarding K-F's sophistication is the number of persons K-F employs, its line of business, and its nationwide operations in this line of business. These facts do not necessarily support a conclusion that K-F is knowledgeable about all the

individual component machines and constituent parts which comprise a waste treatment plant such as the one at Kent County. Furthermore, K-F's *lack* of sophistication with respect to this dryer could be reasonably inferred from the fact that Umtech had to supply the personnel to install the machine in the first place. *See* D.I. 74 at A-220. Finally, K-F's president testified that K-F currently manages only two or three facilities in the country. *Id.* at A-7. Whether this fact warrants a conclusion that K-F is " sophisticated" should be determined by a jury. *See Sanderson,* 1994 WL 807899 at \*2 (because the record was unclear as to whether the defendant knew or reasonably believed that the purchaser was aware of the dangers, i.e., whether the purchaser was sophisticated, summary judgment for defendant was improper).

\*14 Even assuming *arguendo* that K-F could be deemed "sophisticated," the next inquiry, whether Umtech knew or had reason to suspect that the warning would fail to reach K-F's employees, is also a jury question incapable of resolution at the summary judgment stage. First and foremost, Umtech had no on-site personnel overseeing operations at the Kent County plant after Dryer 2 was installed. Thus, it did not know if K-F was following its warnings in the safety manual regarding the importance of turning off the machine for cleaning. Further, after carefully reviewing the record, there is no evidence which supports an inference that Umtech knew or had any reason to suspect that warnings would reach K-F's employees. Therefore, the Court will not decide this issue as a matter of law at summary judgment. The " sophisticated purchaser" defense must be evaluated by a jury.

Umtech's final argument is that it had no duty to warn Hansen of defects, as it was merely the seller of a product which it did not manufacture. Umtech argues that a seller of goods has no duty to test or inspect a product for danger if the seller "neither knows nor has reason to know that [the product] is, or is likely to be, dangerous." D.I. 73 at 33 (quoting *Spaur v. Owens-Corning Fiberglas Corp.,* 510 N.W.2d 854, 864 (Iowa 1994)).

Hansen argues that "Umtech had a duty to be aware

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 12

Not Reported in F.Supp., 1996 WL 622557 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

of defects in Dryer No. 2 that reasonably should have been discovered in light of Umtech's peculiar opportunity and competence as a dealer in this particular type of chattel." D.I. 82 at 10-11. Hansen argues that Umtech held itself out as a sophisticated seller and installer of waste dryers, and that Umtech was aware of the danger of unguarded chain drives, as evidenced by its extensive warnings in the safety manual regarding the need to replace chain guards that are removed. *Id.* at 11-14. Hansen argues that because Umtech was more than a mere seller, its duty to warn exceeded that of a mere seller.

Both parties cite *In re Asbestos Litigation,* C.A. No. 90C-10-72 (Del. Super. Ct. June 2, 1993), as authority for their arguments. Umtech urges that this case supports its position that a seller has only a limited duty to inspect for defects. Hansen argues that this case also held that where the seller of the product also engages in installation, it may be held to a higher standard of care. D.I. 82 at 11. Specifically, Hansen points to the following language from the *Asbestos* opinion:
[Defendant] ... was, however, more than just a supplier of products. It also conducted an insulation installation business according to evidence in the record. When, as here, a supplier exceeds its role as a mere supplier of goods, it may be held to a higher standard of care. In a case very similar to this case the Maryland Court of Appeal[s] rejected the standard sought by defendant. In particular, the Maryland Court held that a supplier of asbestos products who also installed those products had a duty to warn if it knew, or had reason to know, *or should have known* of these hazards.

*15 *Asbestos, supra* at 3 (citations omitted) (emphasis in original).

Whether Umtech or Hansen correctly states the limit of the *Asbestos* court's rule, the Court concludes that even if Umtech is held to the lower duty standard applicable to mere sellers, there is sufficient evidence of record which could demonstrate to a jury that Umtech breached this duty. Umtech cites to the Supreme Court of Iowa for the proposition that a seller of goods has no duty to test or inspect a product for danger "who neither knows nor has reason to know that it is, or is likely

to be, dangerous." D.I. 73 at 33 (quoting *Spaur,* 510 N.W.2d at 864). Umtech then cites an analogous rule from lower court decisions in Delaware. D.I. 73 at 33. Assuming *arguendo* that this standard would be applied by the Supreme Court of Delaware, by Umtech's own admission in its safety manual, it *had knowledge* that the chain drives should be protected by guards. Umtech provided ample warning in the safety manual that the guards of moving chain drives must be replaced before the machine may safely be turned on. *See* D.I. 83 at B88, B100. Thus, even if Umtech's duty as seller was merely to warn of defects it knew to be dangerous, a reasonable jury may find that Umtech breached this duty. Umtech's motion for summary judgment on this ground will be denied.

### C. Umtech's Motion for Summary Judgment: Breach of Implied Warranty and Strict Liability

Umtech also moves for summary judgment on Counts III and IV of the Complaint, which respectively set forth claims for breach of implied warranties and strict liability.

#### 1. *Strict Liability*

On May 2, 1996, Umtech moved for summary judgment on the issue of choice of law. D.I. 65. Umtech's position was that Delaware law governs the dispute. *Id.* On May 17, 1996, counsel for Hansen responded to the motion by letter, advising that he did not contest the application of Delaware law to the dispute. D.I. 79. On May 22, 1996, the Court denied Umtech's motion for summary judgment on choice of law, given the agreement between the parties that Delaware law applies. D.I. 84.

Delaware does not recognize a claim for strict liability in tort arising out of the sale of a product, due to the adoption of the Uniform Commercial Code. *Cline v. Prowler Indus., Inc.,* 418 A.2d 968 (Del. 1980). In light of Hansen's agreement that Delaware law applies, Hansen has elected not to pursue its claim for strict liability. *See* D.I. 82 at 1. Accordingly, Umtech's motion for summary

Not Reported in F.Supp.                                                Page 13

Not Reported in F.Supp., 1996 WL 622557 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

judgment on the strict liability claim is unopposed and will be granted.

### 2. *Breach of Implied Warranty of Merchantability*

Count III of Hansen's complaint alleges a breach of implied warranty of merchantability under 6 *Del. C.* § 2-314. A well-pleaded merchantability claim requires proof of the following elements:
(1) that a merchant sold goods;
(2) which were defective at the time of the sale;
(3) causing injury to the ultimate consumer;
**\*16** (4) the proximate cause of which was the defective nature of the goods; and
(5) that the seller received notice of the injury.

*Neilson Business Equip. Ctr. Inc. v. Monteleone,* 524 A.2d 1172, 1174 (Del. 1987); *DiJenno v. Libbey Glass Div., Owens-Ill., Inc.,* 668 F. Supp. 373, 377 (D. Del. 1987).

Umtech argues that this claim should be dismissed because Hansen's own contributory negligence was the dominant, if not the sole, proximate cause of his injuries. D.I. 71 at 4. Hansen argues that Umtech's argument is legally flawed because Delaware recognizes that there can be more than one proximate cause of a plaintiff's injury. The Court agrees. *See Reese,* 619 A.2d at 910; *see also Culver,* 588 A.2d at 1097. Umtech's argument is without merit, and summary judgment on this claim will be denied.

### IV. Conclusion

Umtech's motion to disqualify Hansen's expert Castro will be denied. Umtech's motion for summary judgment on the negligence claim will be denied. Umtech's motion for summary judgment on the strict liability claim will be granted. Umtech's motion for summary judgment on the breach of implied warranty of merchantability claim will be denied. An appropriate order will be entered.

D.Del.,1996.
Hansen v. Umtech Industrieservice Und Spedition, GBmbH

Not Reported in F.Supp., 1996 WL 622557 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:95cv00516 (Docket) (Aug. 22, 1995)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                    Page 1

Not Reported in A.2d, 1997 WL 817878 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**H**
Trievel v. SaboDel.Super.,1997.Only the Westlaw
citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware.
Tara TRIEVEL, Individually and as Administratrix
for the Estate of Sharon A. Trievel, Trena Trievel
and Tiffany Trievel, and M. Doris Schultz
v.
Frederick L. SABO, Sr.
**No. 94C-12-213-WTQ.**

May 2, 1997.

Letter Opinion and Order on Defendant's Motion
for Judgment as a Matter of Law-Motion Granted.

James J. Maron, Esquire, Maron, Marvel & Wilks,
P.A., Wilmington, DE.
Dennis D. Ferri, Esquire, Arthur D. Kuhl, Esquire,
Dennis D. Ferri, P.A., Wilmington, DE.
QUILLEN, J.
*1 Gentlemen:

This case arises out of a terrible truck-bicycle
accident that took the life of Sharon A. Trievel.
Ms. Trievel is survived by her three daughters and
her mother, who are the plaintiffs. Ms. Trievel ("
decedent") was on her bicycle at the time of the
accident and Frederick L. Sabo, Sr. ("defendant")
was the driver of the truck.

At the conclusion of the plaintiffs' evidence on
liability, defendant moved for a judgment as a
matter of law, pursuant to Rule 50(a) of the
Superior Court Civil Rules, asserting, in the
language of the Rule, "there is no legally sufficient
evidentiary basis for a reasonable jury to find
[defendant liable]." The Motion raises two
questions: (1) Can a reasonable jury find that
defendant was negligent in a manner proximately
causing the accident? (2) Can a reasonable jury

find that decedent's negligence proximately causing
the accident was, in the language of Delaware's
comparative negligence statute, "*not* greater than
the negligence of the defendant?" 10 *Del. C.* § 8131
(emphasis added). So, the defendant argues by the
Motion that, as a matter of law, (1) he is totally
without legal fault for the accident or (2) plaintiff,
in any event, bears at least 51% of the legal
responsibility for the accident.

The Court has no difficulty, on plaintiffs' own
evidence, reaching the conclusion that the decedent
was negligent in a manner proximately causing the
accident as a matter of law. In so ruling, I assume
the decedent could lawfully cross the highway at the
point that she did, either as a pedestrian or as a
bicyclist. The evidence demonstrates that the
decedent, in the process of crossing a major
highway, got on her bicycle and entered the
northbound passing lane in the path of an oncoming
truck. She deserted her asserted status as a
pedestrian and placed herself in a helpless position
by failure to look, failure to see, or proceeding
without being able to see. The plaintiffs' decedent
was clearly contributorily negligent and her own
negligence was clearly a proximate cause of the
accident. No reasonable jury could conclude
otherwise.[FN1]

> FN1. This is not to say that issue would
> not be submitted to the jury given the
> dynamics of a comparative negligence
> trial. Directing the jury as to one party's
> liability could inadvertently and
> mistakenly stack the deck on the
> comparative negligence factual question.
> In fact, it is not always clear which way the
> deck is stacked since the party with the
> favorable ruling sometimes gets
> shortchanged because the evidence tends
> to focus on the open questions.

Our State Supreme Court has stated that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

adoption of the comparative negligence statute in 1984 "manifests a legislative intention from that date to retreat from a system of inflexible and unforgiving rules in favor of evaluation of the plaintiffs' conduct on a case-by-case basis." *Koutoufaris v. Dick,* Del.Supr., 604 A.2d 390, 398 (1992). Our Supreme Court provided excellent guidance on the crux of the statute in *Culver v. Bennett,* Del.Supr., 588 A.2d 1094 (1991), a case of "first impression concerning the proper construction of Delaware's modified comparative negligence statute." Justice Holland wrote:

Under Delaware's common law contributory negligence doctrine, if the plaintiff's negligence was a proximate cause of his or her own injury in *any* respect, that negligence was an absolute bar to the plaintiff's recovery. A "pure" comparative negligence statute would permit a plaintiff to recover even if his or her percentage of negligence is greater than that of the defendant or defendants, reduced, however, by the degree of contributory negligence. *See* S. Woods, *Comparative Fault* 24 (2nd ed.1987). Pursuant to Delaware's modified comparative negligence statute, if the plaintiff's contributory negligence is 50% or less, the plaintiff is permitted to recover, although the recovery is reduced proportionally. However, if the plaintiff's contributory negligence is 51% or greater, it is an absolute bar to recovery according to the Delaware statute.

\*2 *Id.* at 1098.

While the question is not totally free from doubt, the Court is not persuaded at this stage in the proceeding to rule that defendant, as a matter of law, was *not* negligent in a manner proximately causing the accident. Issues of the defendant's negligence and proximate cause-speed, switching lanes, appropriate care approaching caution lights, driving with an unfastened boat motor in the back of his truck, lookout-are all problematic. But, at this point, all inferences must be drawn in favor of the plaintiffs and the evidence of liability is not complete. Presumably, the currently absent defense expert and the defendant are expected to testify on the question of liability. [FN2] At the moment, the case against the defendant is for the trier of fact. *Compare Ford v. Hockstetter,*

S.D.Supr., 85 S.D. 4, 176 N.W.2d 501 (1970) *with Landry v. United Servs. Auto. Ass'n.,* Wis.Supr., 49 Wis.2d 150, 181 N.W.2d 407 (1970).

> FN2. The defendant's taped statement to the investigating police officer was read to the jury as part of the plaintiffs' case in chief.

The difficult second question remains. Assuming defendant was negligent in a manner proximately causing the accident in the most severe sense permitted by the evidence, was decedent's causal negligence (fault), as a matter of law, at least a 51% contribution to the accident? Could a reasonable jury find it was only 50% or less? If the jury returned a 50%-50% verdict, would the Court, on motion by the defendant, be obligated to set it aside and enter judgment for the defendant?

There is an initial question of whether it is ever appropriate for the Court to make any ruling as a matter of law on this question since it necessarily involves weighing the given negligence of the decedent and the assumed negligence of the defendant. Defense counsel have supplied a somewhat similar case under a Nebraska statute; the statute evidently permitted recovery by the plaintiff if plaintiff's negligence was slight and defendant's negligence in comparison was gross. In that particular case, defendant's negligence was assumed to be egregious and the Court granted defendant's motion for summary judgment. *Hovey v. Hedke,* 8th Cir., 1992 U.S.App. LEXIS 31960 (1992). It should also be noted that, notwithstanding the great deference Delaware grants to juries in negligence cases, our Supreme Court, under the former law of contributory negligence, would rule as a matter of law in negligence matters when only one inference is reasonable. *Wooten v. Kiger,* Del.Supr., 226 A.2d 238, 239 (1967) (plaintiff in an intersection accident found contributorily negligent as a matter of law even when she had the right of way); *Jewell v. Pennsylvania RR. Co.,* Del.Supr., 183 A.2d 193, 196 (1962) (plaintiff driver contributorily negligent as a matter of law at a railroad crossing); *DiSabatino v.. Ellis,* Del.Supr., 184 A.2d 469, 474

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 3

Not Reported in A.2d, 1997 WL 817878 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

(1962) (plaintiff driver on unfavored street at intersection found contributorily negligent as a matter of law); *Johnson v. Hockessin Tractor, Inc.,* Del.Supr., 420 A.2d 154, 158-59 (1980) (plaintiff truck purchaser in products liability case contributorily negligent as a matter of law in a manner of adjusting carburetor).

**\*3** Notwithstanding the fact that "the apportionment of negligence is peculiarly the province of the jury ... , the question should be determined by the Court if no other inference can reasonably be drawn from the evidence that plaintiff's or decedent's negligence was [equal to, or] greater than defendant's negligence, and it is proper to refuse to submit the question of comparative negligence to the jury." 1 BLASHFIELD AUTOMOBILE LAW AND PRACTICE, § 63.11, pp. 532-33 (3d ed.1965) (brackets added to exclude law inapplicable in Delaware).[FN3] It is not only within the power of the Court but it has been said it is "the duty of the Court to so hold." *Schuh v. Fox River Tractor Co.,* Wis.Supr., 63 Wis.2d 728, 218 N.W.2d 279, 287 (1974). *See also Gvora v. Carlson,* Wis.Supr., 255 Wis. 118, 37 N.W.2d 848, 849 (1949); *McGlothin v. Thompson,* Mo.Supr., 347 Mo. 708, 148 S.W.2d 558, 564 (1941).

> FN3. Unlike many comparative negligence states, Delaware permits a plaintiff proportionate recovery in a 50-50 situation.

Sometimes, comparative negligence rulings barring the plaintiff are made as a matter of law when the driving appears wanton on its face. *Dehnert v. Garrett Feed Co.,* S.D.Supr., 84 S.D. 233, 169 N.W.2d 719, 721-22 (1969) (hazardous maneuver of driving on wrong side of road). Sometimes criminal law is implicated, such as in driving under the influence cases. *Hovey v. Hedke,* 1992 U.S.App. LEXIS 31960. But the Courts have not limited holdings to these obvious egregious cases. *See Schuh,* 218 N.W.2d at 287 (affirming grant to defendant of judgment after jury verdict where jury had found defendant 60% at fault); *Gross v. Midwest Speedways, Inc.,* Wis.Supr., 81 Wis.2d 129, 260 N.W.2d 36, 41 (1977) (reversing judgment and directing trial court to enter summary

judgment where jury had found defendant in question to be 80% at fault).

There is no moral element in the evidence of decedent's negligence in this case, no drug use, no alcohol use, no intentional indifference to the safety of others. But the negligence is severe. In addition to the basic facts noted above, decedent was crossing Route 1 (which I assume here, and would find as a factfinder, she was not prohibited from doing) at an intersection which had a light in every direction but the one she was pursuing. She knew the area. She had passed a "Stop" sign and road marking that mandated vehicle traffic go to the right. She was proceeding toward two "Do Not Enter" signs. The roadway had no marked crosswalk or even a natural unmarked crosswalk. Instead of walking her bike across Route 1, which was her habit, she mounted her bike at or near the start of the roadway and pedaled in advance of oncoming traffic on the nearest northbound lane and then pedaled into the northbound passing lane of traffic without maintaining a proper lookout and taking adequate care for her own safety. Even granting her permitted use of the roadway as a pedestrian or bicyclist, surely she was on notice that this was a highly dangerous place to cross a heavily traveled four-lane highway and that she was proceeding in a totally unfavored direction. The circumstances would cause a reasonable person to exercise a great deal of discretion and reasoned judgment. As plaintiffs' expert said, decedent obviously should not ride out in front of an oncoming car.

**\*4** To put the comparison in the legal arena, decedent's behavior, already found negligent as a matter of law, clearly approached wanton behavior, wanton disregard for her own safety. She may have committed an act so unreasonable or dangerous that she should have known there was an imminent likelihood of harm to herself. Indeed, such activity is also inherently dangerous to others. To put it more precisely, if the law would permit contributory wantonness, and if she had been hit by a driver driving wantonly, the Court would have, on request, submitted contributory wantonness to the jury.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1997 WL 817878 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

On the other side of the coin, there is no possible way that Mr. Sabo's conduct could be considered wanton. The best complaint against him, considering the allegations either singularly or collectively, would amount to simple negligence.

There is understandably an attempt to build a case, with inference upon inference, that Mr. Sabo made a seriously negligent maneuver, changing lanes, which in some aggravated fashion caused the accident. Stated simply, Mr. Sabo pulled from the right lane to the left passing lane at the last minute, accelerated approaching a caution light with a large boat motor in the back of his pick up. Counting Mr. Sabo, whose statement to the police is in evidence, there were seven eye-witnesses to this accident. None of them implicates Mr. Sabo; none say he was speeding (at least three specifically estimate he was not); none say he was, at the critical time, doing anything except traveling rather normally in the left passing lane; none say he had time to react to the decedent. An eighth witnesses, decedent's fiancee, who had "shot across" the highway, heard "skids" and a "thud." Even Mrs. Grabowski, whose trial testimony has taken a defensive mode as compared with her earlier statements to the police, will not fault the defendant. Plaintiffs' counsel, in an outburst of optimism, purports to get some comfort from Mr. Lingo's testimony that simply is not there-the truck driver, who purportedly went from the right lane to the left lane, if at all, did so "400 to 500 feet" prior to the accident and "didn't have a chance" to avoid the accident. It is hard to tell whether plaintiffs want to credit or discredit Mr. Lingo, but the expert's "cone of vision" discredit disappears if Mr. Lingo happened to turn his head slightly. The only evidence to support plaintiffs' theory is found in two conclusions of the plaintiffs' accident reconstruction expert: defendant was going 45 mph [FN4] and defendant's swerve to the left started in the right lane. The later highly speculative opinion probably should have been excluded; but, even if it is given full credit, defendant was permitted to change lanes and there can be no doubt that the chief swerve here was caused by an effort to avoid the accident. The evidence as to the boat motor, not an unusual resort load, was nebulous at best and pick up trucks are built to carry loads. In short, there is nothing here

but a modest jury liability case on the issues of defendant's negligence and proximate cause. The defendant's causal negligence, if any, was modest indeed and at best a jury question of simple negligence is presented.

> FN4. Both sides have agreed the governing speed limit was 40 mph. This is kind of strange because the photographs in evidence only show 45 mph signs, almost immediately after this intersection, and it is easy to question the wisdom of raising the speed limit on Route 1 between Route 273 and Rehoboth Avenue. It may be that the speed limit was lowered for the bridge and not raised because the traffic signal here is within several hundred feet of the bridge. But, in any event, 40 mph is the governing speed limit.

**\*5** Approaching this matter as the Court has, by what the Court would submit to a jury, is of course not, either legally or factually, a finding of wantonness as opposed to negligence. But the analysis and the necessary underlying facts do satisfy the Court that a reasonable jury must find the decedent's causal fault was at least 51%, regardless of any finding with regard to the conduct of the defendant.

I think, for purposes of review, I would be remiss if I did not mention the procedural background of the present motion. This jury trial started on April 21, 1997 and continued through mid-day April 23. It was to resume on April 28, pursuant to the original schedule. After the break on April 23, it was learned that the mother of the defendant's expert witness on liability had died in Poland and, notwithstanding some effort to obtain the expert's trial deposition, he, due to pressing family circumstances, had to depart on the evening of April 23 and would not practically be available again until May 19, 1997. When the Court, while trying to figure out what to do logistically, learned that the defendant was going to move for judgment as a matter of law, the Court, to make the record for the motion, directed the plaintiffs, who had almost finished their case as to liability, to finish the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 5

Not Reported in A.2d, 1997 WL 817878 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

liability case on April 28, which the plaintiffs did. Thereafter, the trial was recessed for three weeks, until May 19, 1997. While I think all participants want the trial to continue (it is an emotionally and financially draining trial), there is an underlying recognition that we may be expecting the jury to do an impossible task in remembering and distinguishing the evidence. While this Judge is not a fan of jury note-taking, this is one time I wish I had so permitted.

I note all of this background in the present context for two purposes. First, the logistical situation at hand helps indicate why the Court has gone herein to such lengths to explain its ruling in writing; it is not a ruling sparked by convenience and is one the Court feared it would have to make as the case unfolded early on. Plaintiffs have a weak liability case. Second, if the trial logistics had been more routine, I want to acknowledge that I would reserve decision on the present motion both after the plaintiffs' case and at the close of all the evidence. I would grant it only after reconsideration on the full record in the event the jury found for the plaintiffs. I assume, barring a complete suicidal disaster in the defendant's case, the ruling would be the same; but, in the event of an appeal, the Supreme Court would have the option to re-enter the verdict. I regret I do not think that should be done in this case. This decision by the Court as a matter of law is a close call; but it is the Court's to make and the Court will make it. I am not going to reserve decision in the present situation because of my concern about our ability to make a meaningful presentation to the jury. If the trial were to continue, there would be probably at least a full week of trial to go, including a promised view in Sussex County. Since, in my opinion, the defendant is entitled to judgment as a matter of law now, I am going to act in accordance with my "duty" now and not hedge my bets by awaiting confirmation of my viewpoint through the verdict of the jury. Under the circumstances of the case, the jury should be discharged and judgment entered now for the defendant as a matter of law.

*6 With regard to the jury, I have only received one letter (from Juror # 14) requesting to be excused due to a pre-planned vacation. I have this date

excused that juror.

I plan to discharge the whole jury at the end of next week. If the plaintiffs want to reargue the current Motion for Judgment as a Matter of Law and preserve the jury, please file the Motion to Reargue early next week.

JUDGMENT IS ENTERED FOR THE DEFENDANT AS A MATTER OF LAW. IT IS SO ORDERED.

Del.Super.,1997.
Trievel v. Sabo
Not Reported in A.2d, 1997 WL 817878 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.