# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

DELBERT E. ROLLISON,                          :
                                              :     **C.A. No.: 06-159 SLR**
                                              :
          Plaintiff,                          :
                                              :
                                              :
v.                                            :     <u>**JURY OF SIX DEMANDED**</u>
                                              :
NEAL SHOEMAKER, as parent and legal           :
guardian of TRAVIS SHOEMAKER,                 :
NEAL SHOEMAKER, individually,                 :
TRAVIS SHOEMAKER, individually,               :
BLUE DIAMOND, LLC, a Delaware                 :
corporation, HOUGHTONS AMUSEMENT              :
PARK, LLC, a Delaware corporation,            :
JACK BRADY, individually and d/b/a KSR        :
MOTOR SPORTS, and PARKWAY                     :
GRAVEL, a Delaware corporation,               :

          Defendants.

## <u>APPENDIX TO REPLY BRIEF OF PLAINITFF, DELBERT E. ROLLISON, IN OPPOSITION OF DEFENDANTS MOTION FOR SUMMARY JUDGMENT</u>

Deposition Transcript of Allan DeCarlo          B 1-77

Deposition Transcript of Delbert Rollison       B 78-204


                                DOROSHOW, PASQUALE,
                                   KRAWITZ & BHAYA

                         By:    /s/ Matthew R. Fogg
                                ARTHUR M. KRAWITZ (ID No. 2440)
                                MATTHEW R. FOGG (ID No. 4254)
                                1202 Kirkwood Highway
                                Wilmington, DE 19805
                                (302) 998-0100
                                Attorneys for Plaintiff

DATED: 12/11/2006

Allan DeCarlo

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DELBERT E. ROLLISON,                    : C. A. No.:

         Plaintiff,                     : 06-159 SLR

v.                                      :

NEAL SHOEMAKER, an individual, BLUE     :

DIAMOND, LLC, a Delaware corporation,   :

HOUGHTONS AMUSEMENT PARK, LLC, a        :

Delaware corporation, JACK BRADY,       :

Individually and d/b/a KSR MOTOR SPORTS,:

BENCHMARK BUILDERS, INC., a Delaware    :

Corporation, and PARKWAY GRAVEL, a      :

Delaware corporation,                   :

         Defendants.                    :

          Deposition of ALLAN DeCARLO, taken pursuant
to notice before Tanya M. Congo, a Notary Public and
Certified Shorthand Reporter, at the law offices of
Doroshow, Pasquale, Krawitz & Bhaya, 1202 Kirkwood
Highway, Wilmington, Delaware, on Friday, November
17, 2006, beginning at approximately 10:10 a.m.,
there being present:

               APPEARANCES:

               DOROSHOW, PASQUALE, KRAWITZ & BHAYA
               1202 Kirkwood Highway
               Wilmington, Delaware 19805
               BY:  ARTHUR M. KRAWITZ, ESQUIRE
                    MATTHEW R. FOGG, ESQUIRE
                    Attorneys for Plaintiff

Allan DeCarlo

Page 2

```
 1    APPEARANCES (Continued:)

 2              TYBOUT, REDFEARN & PELL
                750 South Madison Street, Suite 400
 3              Wilmington, Delaware 19805
                BY:  SHERRY RUGGERIO-FALLON, ESQUIRE
 4              Attorney for Defendants,
                The Shoemakers
 5
                CASARINO, CHRISTMAN & SHALK, P.A.
 6              800 North King Street, Suite 200
                Wilmington, Delaware 19899
 7              BY:  COLIN M. SHALK, ESQUIRE
                Attorney for Defendant,
 8              Houghtons Amusement Park, LLC

 9              AKIN & HERRON, P.A.
                1220 North Market Street, Suite 300
10              Wilmington, Delaware 19899
                BY:  ROGER A. AKIN, ESQUIRE
11              Attorney for Defendants,
                Blue Diamond, LLC
12              Benchmark Builders, Inc.
                Parkway Gravel

13

14

15

16

17

18

19

20

21

22

23

24
```

Allan DeCarlo

Page 3

1              ALLAN DeCARLO, having first been duly

2   sworn according to law, was examined and testified as

3   follows:

4              MR. AKIN:  Could I say something on

5   the record just before we start, about Mr. Brady.

6              MR. KRAWITZ:  Sure.

7              MR. AKIN:  Just to put it on the

8   record.

9              My name is Roger Akin.  I represent

10  defendants Parkway Gravel and Blue Diamond, LLC in

11  this litigation.  I wanted to make a statement with

12  regard to defendant, Jack Brady, doing business as

13  KSR Motor Sports.

14             Mr. Brady, as far as I'm aware,

15  remains pro se in this litigation.

16             My office has been making a

17  substantial number of attempts to get Mr. Brady to

18  Delaware to give a deposition.  I'm told he lives

19  nearby in Southeastern Pennsylvania.

20             Mr. Brady confirmed his attendance

21  with my staff for his deposition yesterday, and then

22  earlier this week told us that he was travelling and

23  could not make it yesterday.  Yesterday would be

24  November 16.  He, however, then did confirm that he

Allan DeCarlo

Page 4

1   would attend his personal deposition today, November

2   17, at the conclusion of Mr. DeCarlo's deposition.

3              At 12:30 this morning, my office

4   received an E-mail from Mr. Brady indicating that he

5   was in Pittsburgh and could not attend an 11:00 a.m.

6   Deposition.  So Mr. Brady is not appearing today,

7   apparently, for his deposition.

8              Before we went on the record, I asked

9   counsel if there was any objection to briefly, if the

10  Court agrees, to briefly continuing the discovery

11  period and the depositive motions cut off date so

12  that Mr. Brady could be deposed, and I don't believe

13  there was any objection to that request.  So we will

14  be making such an application to the Court shortly.

15  Thank you.

16             MR. KRAWITZ:  You're welcome.

17                  DIRECT EXAMINATION

18  BY MR. KRAWITZ:

19     Q.   Mr. DeCarlo, my name is Art Krawitz.  I

20  represent Delbert Rollison.  I'm going to be asking

21  you some questions today about an incident that

22  occurred on July 3rd of 2004.

23             Sir, where do you live?

24     A.   Physical address?

$B4$

Allan DeCarlo

Page 5

1       Q.   Yes.

2       A.   711 Phillips Avenue, Wilmington, Delaware

3   19809.

4       Q.   And for whom do you work?

5       A.   Blue Diamond, LLC.

6       Q.   What is your position with Blue Diamond,

7   LLC?

8       A.   I run the motorcross side of the park.

9       Q.   How long have you done that?

10      A.   Three years and three months, I think.

11      Q.   Do you have any position within the

12  corporation?

13      A.   As far as?

14      Q.   Well, let me ask you this:  What's your

15  job title?

16      A.   My job title is motorcross manager, I

17  guess you could say.

18      Q.   Who do you report to?

19      A.   Report to?

20      Q.   Yes.  Do you have a supervisor?

21      A.   No, directly to the owners.

22      Q.   Who are the owners?

23      A.   Nicholas Ferrara and Vincent Greggo.

24      Q.   You said that you run the motorcross side

Allan DeCarlo

Page 6

1    of the park.  You talk about sides of the park.  Can

2    you tell me what sides of the park there are?

3          A.    There's a motorcross, there's an amusement

4    park, and a BMX track.

5          Q.    And back in 2004, who ran the amusement

6    park?

7          A.    Actually it was leased to Jim Houghton.

8          Q.    And was there someone who ran the BMX

9    track?

10         A.    Yes.

11         Q.    Who was that?

12         A.    It was Don Matti.

13         Q.    How do you spell the last name, do you

14   know?

15         A.    M-a-t-t-i, I think.  I don't know.

16         Q.    So as of July 3rd of 2004, you were the

17   motorcross manager; is that correct?

18         A.    Yes.

19         Q.    Can you tell me what did you do as

20   motorcross manager?

21         A.    Day-to-day operations of the motorcross

22   track.  It's open five days a week.

23         Q.    Was that all year round?

24         A.    Yes.

B6

Allan DeCarlo

Page 7

1       Q.    What would occur on the motorcross tracks

2    on a daily basis?

3       A.    Daily basis is practice.

4       Q.    Can you describe what would happen during

5    practices?

6       A.    They bring their motorcycles in, they sign

7    up, then they go ride it.

8       Q.    So people, members of the public could

9    bring their motorcycles there?

10      A.    Yes.  Exactly.

11      Q.    Was there a course or a track set up for

12   that?

13      A.    Yes, there's tracks, two tracks.

14      Q.    Back then there were two tracks?

15      A.    Yes.

16      Q.    Who constructed those tracks?

17      A.    Me.  I, myself.

18      Q.    Can you describe how those tracks were

19   constructed?

20      A.    They were build with machines and dirt.

21      Q.    Under your direction?

22      A.    Yes.

23      Q.    Was the motorcross side of Blue Diamond

24   Park, was that open to any member of the public?

Allan DeCarlo

Page 8

1      A.    Yes.

2      Q.    Did members of the public have to pay an

3   admission fee?

4      A.    Yes.

5      Q.    Do you recall what that admission fee was

6   back in 2004?

7      A.    It was a membership fee of $50.00, and

8   then it was $25.00 a day to ride.

9      Q.    Can you specifically describe your job

10  duties on a daily basis.  What was a typical day like

11  for you?  What did you do?

12     A.    Morning I'd go in, do maintenance on the

13  tracks.

14     Q.    What kind of maintenance?

15     A.    Fixing jumps, water, that type of stuff.

16     Q.    Back in 2004, did you have a staff that

17  worked for you?

18     A.    Yes.

19     Q.    Who were those people?

20     A.    Full time was Jason Ricketts, Aaron

21  Boniot, B-o-n-i-o-t.  I always forget.

22     Q.    Who else did you have in 2004?

23     A.    I had numerous part timers.  I couldn't

24  even beyond the list start to list because it

Allan DeCarlo

Page 9

1    changes.

2         Q.    Do you remember any of the part timers as

3    of July of 2004?

4         A.    I'd have to get back in payroll records.

5         Q.    Do you have those payroll records?

6         A.    I don't have them on site.  I'd have to

7    get them from the main office.

8         Q.    You have access to those payroll records?

9         A.    Uh-huh.

10        Q.    Yes?

11        A.    Yes.

12        Q.    In addition to in the morning taking care

13   of the track, what else did you do during the course

14   of the day?

15        A.    Monitor the tracks.

16        Q.    What do you mean by that?

17        A.    Just watch to make sure nobody falls, make

18   sure nobody does something they're not supposed to

19   do.

20        Q.    What kinds of things were people not

21   supposed to do?

22        A.    Go the wrong way on the track, go too fast

23   in the pit area, stuff like that.

24        Q.    When those type of things did happen, that

Allan DeCarlo

Page 10

1    somebody was going too fast in the pit area, how was

2    that handled?

3        A.    We'd give him them a warning the first

4    time to slow down.  Second time made them park their

5    bike.

6        Q.    Did you have any instances where people

7    didn't follow your directions and you had them

8    removed from the Park?

9        A.    Yeah, a few times.  Yes.

10        Q.    What else did you do during the course of

11    a normal day?

12        A.    That's about it.  I mean, just monitor the

13    track.  I mean, that's about all there is to do.

14        Q.    Now, were you present at the Park on July

15    3rd 2004?

16        A.    Yes, I was.

17        Q.    Can you describe what events were

18    occurring that day?

19        A.    I had a motorcross race, and we had the

20    Monster Truck Show.  Jack Brady had the Monster Truck

21    Show.

22        Q.    What was your role with regard to the

23    motorcross race?

24        A.    I run the whole motorcross.  My role is

Allan DeCarlo

Page 11

 1   referee and promoter.

 2        Q.   What did you do as promoter?

 3        A.   Promoter aspect is I just basically

 4   promote the race prior actually.

 5        Q.   How did you do that?

 6        A.   Just advertising.

 7        Q.   What kind of advertising was done?

 8        A.   Magazine, website.

 9        Q.   What kind of magazine?

10        A.   It's a motorcycle magazine.  It was

11   Motorcycle Racing Action.

12        Q.   Motorcycle Racing?

13        A.   Racing Action.

14        Q.   Who publishes that?

15        A.   It's a private.  Jim Bull.  He's a

16   private.  He's kind of a one-man show.

17        Q.   I'm sorry, Jim?

18        A.   Jim Bull.

19        Q.   B-u-l-l?

20        A.   B-u-l-l.

21        Q.   Is he in Delaware?

22        A.   He's in Pennsylvania.

23        Q.   Do you know where in Pennsylvania?

24        A.   He was in Conestoga, which is up in the

B 11

Allan DeCarlo

Page 12

1    Reading area I believe.

2        Q.    Does Blue Diamond Park subscribe to that

3    magazine?

4        A.    No, we were advertising.  At that time we

5    were advertising with him.

6        Q.    Now, the Monster Truck Show, how did that

7    come about?

8        A.    I met Mr. Brady --

9             MR. AKIN:  You're speaking of the one

10   in July of '04 where Mr. Rollison was injured?

11   BY MR. KRAWITZ:

12       Q.    Yes.

13       A.    He had previous shows at the Park before

14   that date.

15       Q.    That's Mr. Brady?

16       A.    Yes.

17       Q.    How many shows did he have prior to July

18   of 2004?

19       A.    To the best of my remembrance, it was two.

20       Q.    Can you tell me what kind of shows they

21   were?

22       A.    They were Monster Truck, stunt show, and I

23   think that was all in the previous shows.

24       Q.    Let's talk about the one on July 3rd of

B12

Allan DeCarlo

Page 13

1    2004.  How did that even come about?

2         A.    Actually at the beginning of the year,

3    going back to the beginning of the year, months

4    prior -- I'm not sure exactly when.  I'm saying the

5    beginning of the year.  It could have been March.

6    Mr. Brady approached us with dates he would like to

7    do shows for that year.

8         Q.    What happened then?

9         A.    I guess we agreed.  What I remember, we

10   agreed to those dates.

11        Q.    When you say we agreed, who is it that

12   agreed?

13        A.    It would have been Blue Diamond.  But

14   actually it was at that time our marketing director

15   was Colleen Healy, and she handled that.

16        Q.    Does she still work for Blue Diamond?

17        A.    No, she doesn't.

18        Q.    When did Colleen Healy work there?

19        A.    She worked there from the opening, which

20   is somewhere in '03 -- I'm not sure exactly when she

21   started -- until I think the beginning of the Park

22   season, which would have been like June of '05.

23        Q.    Do you know why Ms. Healy left?

24        A.    She left for a change.  She went into real

Allan DeCarlo

Page 14

1    estate instead of marketing I guess you could say.

2         Q.    Now, do you have any knowledge of what

3    agreement was reached between Ms. Healy and Mr.

4    Brady?

5         A.    As far as?

6         Q.    Well, what do you know about what was

7    agreed upon?  Did they just agree upon dates?  Were

8    there contracts signed?

9         A.    I don't really know if there were

10   contracts signed.  I know they agreed on dates.

11        Q.    Do you know what took place after the

12   dates were agreed upon?  We'll talk about the July

13   3rd 2004 show.  Do you know if there was any

14   advertising done for that show?

15        A.    Yes, I know Jack Brady did do advertising.

16   That was his responsibility.

17        Q.    How do you know that that was Mr. Brady's

18   responsibility?

19        A.    I was told that.

20        Q.    By whom?

21        A.    By him and Colleen Healy.

22        Q.    Were you aware of any of the advertising

23   that Mr. Brady did for the July, 2004 show?

24        A.    I know he had flyers out in different

Allan DeCarlo

Page 15

1    areas, dealerships.  I'm not sure exactly where.  I

2    think he did some radio.

3        Q.   Were any flyers out at Blue Diamond Park?

4        A.   There was a poster hanging at the

5    motorcross track.

6        Q.   Was that where the Monster Truck Show was

7    to take place?

8        A.   No, it was down at the sign-up office

9    where they sign up to come ride the motorcross track.

10        Q.   Do you remember any other advertising

11    about this Monster Truck Show for July, 2004 that was

12    present at Blue Diamond Park?

13        A.   No.

14        Q.   What role, if any, did you have with

15    regard to this Monster Truck Show?

16        A.   I didn't have any role in the Monster

17    Truck Show itself.

18        Q.   Where was the show to take place?

19        A.   The show took place on the northwest

20    corner of the property.

21        Q.   What was there?

22        A.   Nothing.

23        Q.   Who decided where it would take place?

24        A.   It was a good area because it had a hill

Allan DeCarlo

Page 16

1    for spectators to view.  Who decided, I couldn't

2    answer that.  It was just like a perfect fit.

3         Q.   Is that location a location that Mr. Brady

4    picked out?

5         A.   I don't remember if it was just him or if

6    it was like everybody agreed that it was a good fit.

7         Q.   When you say everybody agreed, who was

8    even involved in this discussion?

9         A.   It would have been me, Colleen, Jack

10   Brady.

11        Q.   So that was the agreed upon location.  Do

12   you know if Mr. Brady paid any money to Blue Diamond

13   Park in order to have the event at Blue Diamond Park?

14        A.   As far as I know there was an agreement.

15   I don't believe he has ever paid.

16        Q.   What was your understanding of what the

17   agreement was?

18        A.   I believe it was, I think it was $1,000,

19   and then if he hit a certain spectator number, it was

20   a percentage after that.  I'm not sure of the exact

21   agreement there.

22        Q.   Do you know who would have made that

23   agreement?

24        A.   That would have been Colleen.

Allan DeCarlo

Page 17

1       Q.   And what is your understanding of who

2   would get a percentage?

3       A.   Who would get the percentage?

4       Q.   Yes.

5       A.   Blue Diamond Park, Blue Diamond, LLC.

6       Q.   Did this event, this Monster Truck Show

7   take place in the part of the Park that you were

8   responsible for?

9       A.   No.

10      Q.   Was there any manager or employee who was

11  responsible for the part of the Park that the show

12  took place in?

13      A.   No.  Let me go back.  Can I go back to the

14  first question?  I guess in a sense I'm responsible

15  for the grounds as far as maintaining the grounds.

16  So I just wanted to clarify that.  Not that I'm not

17  responsible for it, but I do maintain the grounds,

18  too.

19      Q.   The Monster Show, is it a fair statement

20  that that didn't take place in the amusement park

21  side part of the Park?

22      A.   Yes.

23      Q.   To make sure I have this right, is there

24  another part to the Park other than the amusement

Allan DeCarlo

Page 18

1  park and the motorcross part?

2      A.   Uh-huh.

3      Q.   Is there a third part?

4      A.   No, that was just basically a field with a

5  hill.  So it really isn't a -- it wasn't an

6  attraction until Jack Brady wanted to do the show, I

7  should say.

8      Q.   Is it a fair statement, though, that

9  someone from Blue Diamond agreed that the show would

10  take place in a specific space, and that's that area

11  that you mentioned in the northwest corner with a

12  hill?

13      A.   Yes.

14      Q.   What was your understanding of what would

15  happen if a member of the public wanted to attend the

16  Monster Truck Show?

17      A.   To attend to spectate?

18      Q.   Yes.

19      A.   They would park in the parking lot.  There

20  was a fenced in area where they weren't allowed.

21  Then they would go up onto the hill.

22      Q.   Was there one entrance to the Park or more

23  than one entrance to the Park?

24      A.   To the actual Park itself?

Allan DeCarlo

Page 19

1    Q.   Yes.

2    A.   There's two entrances, but the one

3    entrance was closed for the Monster Truck Show.

4    Q.   Does that mean that all the spectators

5    would have had to go in the same entrance?

6    A.   Yes.

7    Q.   Was that entrance marked in any way as

8    being the entrance to Blue Diamond Park?

9    A.   Yes, there is.  It's marked.  There's

10   signs there.

11   Q.   There's signs that say Blue Diamond?

12   A.   Yes.

13   Q.   When a spectator was to enter, did they

14   have to pay any fee?

15   A.   Yes.

16   Q.   Where would they pay the fee?

17   A.   They would have paid the fee when they

18   walked to the spectator entrance, which was marked.

19   Q.   Do you know what that fee was for this

20   show in July of 2004?

21   A.   I think it was $12.00, but that's not --

22   Q.   That's just your estimate.

23   A.   Yes.

24   Q.   But you're sure there was a fee that a

B 19

Allan DeCarlo

Page 20

1    spectator had to pay?

2         A.    Yes.

3         Q.    Who collected these fees?

4         A.    Jack Brady.

5         Q.    Was there a ticket booth where the fees

6    were actually being collected?

7         A.    I believe he had some sort of portable

8    trailer.

9         Q.    For that event in July of 2004, did anyone

10   from Blue Diamond Park attempt to make any count of

11   the spectators?

12        A.    I think, yes.

13        Q.    How was that done?

14        A.    Basically in the ticket booth watching

15   over.  I'm not sure how they did it.

16        Q.    Do you know who was in the ticket booth?

17        A.    No, I don't remember.

18        Q.    Do you know who would have assigned the

19   person to be in the ticket booth?

20        A.    I believe it would have been my father,

21   which is Ernie DeCarlo.

22        Q.    What did your father do there?  I don't

23   remember hearing his name before.

24        A.    At that present time he really was, he was

B20

Allan DeCarlo

Page 21

1    more on the construction side I guess you could say.

2    He really wasn't, at that present time he wasn't

3    involved in the Park as much as he is now.

4         Q.    Why do you think that he was present on

5    July 3rd of 2004?

6         A.    My memory served.  I don't know if he was

7    present, but I think he had something to do with the

8    -- I'm just thinking.  I'm trying to remember, that's

9    all.

10        Q.    Do you know who asked your father to be

11   present in the area of the ticket booth --

12        A.    I think it would --

13        Q.    You have to let me finish my question.  We

14   have to go one at a time.

15              Do you know who asked your father to

16   be present in the area of the ticket booth on July

17   3rd of 2004?

18        A.    It would have been, I believe, Nick

19   Ferrara.

20        Q.    So a spectator coming in on July 3rd 2004

21   would have paid for admission.  Would they have

22   gotten some kind of receipt, or hand stamp, or wrist

23   bracelet?  How does that work?

24        A.    It was tickets, and I believe they were

B20

Allan DeCarlo

Page 22

1    ripped and you kept half the ticket.

2        Q.    Do you know where the tickets came from?

3        A.    Jack Brady had them printed.

4        Q.    Do you have an estimate of the number of

5    spectators that attended the Monster Truck Show on

6    July 3rd 2004?

7        A.    No, I don't.

8        Q.    Do you have any recollection from being

9    there how many spectators were there?

10       A.    I believe it was around fifteen hundred.

11       Q.    I just want to be clear.  Do you know

12   whether or not for the event on July 3rd 2004 Jack

13   Brady signed any contracts with Blue Diamond Park?

14       A.    I have no recollection.

15       Q.    Do you have an understanding of what fees,

16   if any, were paid by participants in the Monster

17   Truck Show?

18       A.    No.

19       Q.    Do you know if there was a fee for

20   participants?

21       A.    I believe there was, but I don't know what

22   amounts.

23       Q.    Do you know where the participants for the

24   Monster Truck Show entered Blue Diamond Park on July

Allan DeCarlo

Page 23

1   3rd 2004?

2       A.   They would have probably entered off

3   Hamburg Road entrance, which is kind of the main

4   entrance.

5       Q.   Is that where the spectators were

6   entering?

7       A.   Yes.

8       Q.   Do you recall what time Blue Diamond Park

9   opened on July 3rd of 2004?

10      A.   July 3rd or July 4th?

11      Q.   I said July 3rd.  That's the date of this

12  incident.

13      A.   Is that the day?

14      Q.   That's the one we have.

15      A.   The gates would have been opened at six

16  a.m.

17      Q.   Why that early?

18      A.   Because of the motorcross race.  It starts

19  at eight.  People start coming in at six.

20      Q.   Did the motorcross go on all day long?

21      A.   Yes.

22      Q.   Until what time?

23      A.   It went on until about five thirty, six

24  o'clock.

B22

Allan DeCarlo

Page 24

```
 1         Q.    If a spectator paid to see the Monster

 2    Truck Show, could they go to any part of Blue Diamond

 3    Park?

 4         A.    No.  Could they go?

 5         Q.    Yes.

 6         A.    If they wanted to come to the motorcross,

 7    they would have to pay to get in to be a spectator at

 8    the motorcross.  So, no, in reality they couldn't go

 9    just anywhere.

10         Q.    If someone paid to go to the motorcross,

11    could that person with the same entrance fee go to

12    the amusement part of the Park?

13         A.    No.

14         Q.    Did you observe any part of the Monster

15    Truck Show?

16         A.    Yes.

17         Q.    Can you tell us what you observed?

18         A.    I observed the actual show itself.

19         Q.    Do you remember what time that took place?

20         A.    I'm thinking seven thirty.

21         Q.    In the evening?

22         A.    Yes.

23         Q.    I'm sorry, it started at seven thirty?

24         A.    Yes, I believe so.
```

B23

Allan DeCarlo

Page 25

1      Q.   Do you know for how long that ran?

2      A.   It would normally run two to three hours.

3      Q.   Were you present the entire time?

4      A.   I probably, myself, got up to the show

5   actually probably between eight and nine at night.

6      Q.   Do you know if anybody else from Blue

7   Diamond Park was present at any part of the Monster

8   Truck Show on July 3rd 2004?

9      A.   The only ones that I know were present was

10  the person at the ticket booth checking the tickets.

11  And as far as that goes anybody else, no, other than

12  maybe some of my workers went up there to watch the

13  show after we got done working on the track, the

14  motorcross track.

15     Q.   Do you know who set up any of the

16  procedures for where people drive their trucks or

17  where spectators would sit?

18     A.   The only thing that I know that was set up

19  that I know who set up would be the spectator fencing

20  and the barrier for the spectators, and that would

21  have been Blue Diamond.

22     Q.   Let's talk about that.  Can you describe

23  where the spectator fencing was?

24     A.   There was a concrete barrier wall that ran

Allan DeCarlo

Page 26

1    --

2        Q.   Mr. DeCarlo, I'm going to give you a piece

3    of paper.  If you're able to draw that for me.

4        A.   The road came around like this, and then

5    this would have been what was called the show floor.

6        Q.   Maybe you could write the word floor in

7    that circle.

8        A.   Okay.

9        Q.   Can you tell us what the show floor is?

10       A.   It's a terminology in the business that

11   actually is where the actual show happens, the

12   Monster Trucks, the drags and the stunt show.

13       Q.   Maybe you could tell us, where is the hill

14   in relation to it?

15       A.   The hill would be here.

16       Q.   You're drawing some kind of diagonal line.

17       A.   Yeah, just to show you that that was like

18   the spectator -- this wasn't actually spectator, but

19   this is the hill per se, and this was the barrier.

20       Q.   If you'll just write where the hill was,

21   and if you would just draw an arrow to where you're

22   saying the barrier was.

23       A.   Right here was the barrier.

24       Q.   Can you write barrier next to that so that

B25

Allan DeCarlo

Page 27

1    we see it.  Is that what you called previously the

2    barrier for the spectators?

3         A.    Yes.

4         Q.    What was that barrier made of?

5         A.    They're concrete.  They're actually called

6    a Jersey barrier.

7         Q.    Who decided to place those Jersey barriers

8    where they were placed?

9         A.    It was a combination between me and Jack

10   Brady, myself and Jack Brady.

11        Q.    From your perspective, how did you decide

12   where Jersey barriers are to be placed?

13        A.    Well, Jack showed me where the show floor

14   was going to be laid out.  We needed a buffer zone

15   between the show floor and the barrier.

16        Q.    How do you know that a buffer zone was

17   needed between the show floor and the barrier?

18        A.    Jack Brady said that -- he basically said

19   it needed to be there in case a truck or something

20   lost control they had room to shut down, I should

21   say.

22        Q.    Was there any other reason that the

23   barrier was placed where it was?

24        A.    Just to protect the spectators.

Allan DeCarlo

Page 28

1    Q.    Now, do you know how many of these Jersey

2    barriers, where you've drawn a barrier, how many of

3    the Jersey barriers were put into position?

4    A.    I'm going to say thirty-five.  That is a

5    guess.

6    Q.    Do you have any idea what those Jersey

7    barriers weigh?

8    A.    Probably six to seven thousand pounds

9    each.

10    Q.    Where do they come from?

11    A.    We borrowed them from a construction

12    company.

13    Q.    I'm sorry, did you say you borrowed them

14    or bought?

15    A.    We borrowed them.

16    Q.    What construction company?

17    A.    Greggo and Ferrara.

18    Q.    Greggo and Ferrara.

19    A.    They kind of gave them to us.

20    Q.    That's not what I'm getting at.  Were

21    these Jersey barriers kept at Blue Diamond Park so

22    that you could use them as you needed?

23    A.    Yes.

24    Q.    How were they moved into place?

b26

Allan DeCarlo

Page 29

1      A.    What they call a lull, which would be a

2   kind of forklift, but it's an off road forklift.

3      Q.    Did you actually place those barriers

4   yourself?

5      A.    No.

6      Q.    Who did?

7      A.    Jack Brady did.

8      Q.    Jack Brady used that forklift?

9      A.    Yes.

10      Q.    Whose forklift was it?

11      A.    I don't recall.

12      Q.    Did Jack Brady bring the forklift there?

13      A.    I'm not sure if it was rented from Tri

14   Supply.  I'm not sure.  Or if they loaned it.

15      Q.    The type of forklift that you're

16   describing, was that always there and available to

17   Blue Diamond?

18      A.    No.

19      Q.    In the time that you were working at Blue

20   Diamond Park, were there other events for which

21   Jersey barriers were placed?

22      A.    No.

23      Q.    This area where the Monster Truck Show

24   took place, was that a regular area that was in use

827

Allan DeCarlo

Page 30

1    for Monster Truck Shows, or was that something

2    temporary for this day?

3         A.    It was set up.

4         Q.    What other kinds of events were held

5    there?

6         A.    That's all.

7         Q.    Just Monster Truck?

8         A.    Just Monster Truck.

9         Q.    Is that a fair statement, that there were

10   Monster Truck Shows there that took place that were

11   set up by other than Jack Brady?

12        A.    No, just Jack Brady.

13        Q.    I'm sorry, before July 3rd 2004, how many

14   Monster Truck Shows had Jack Brady put on at that

15   location that we're talking about?

16        A.    I believe it was two.

17        Q.    For the two previous Monster Truck Shows,

18   were there Jersey barriers put in place where you

19   described them?

20        A.    Yes.

21        Q.    And what happened after the events, were

22   the Jersey barriers left there or removed?

23        A.    They were left there.

24        Q.    So when Mr. Brady came in for the July 3rd

Allan DeCarlo

Page 31

1    2004 show, were the Jersey barriers already in place?

2        A.    Yes.

3        Q.    Is it correct that the barriers were only

4    on one side?  You've kind of drawn a hill.  Were they

5    only on one side of the hill?

6        A.    Yes.

7        Q.    Were there any other kinds of barriers or

8    fencing that were in place?

9        A.    There was a fence from -- this would have

10   been where the spectators walked up to the hill.

11       Q.    You're drawing the road now?

12       A.    Yes.  This was the ticket area.  So there

13   was a fence that ran from the parking lot, which was

14   right here.  This is the edge of the parking lot and

15   went up this road.

16       Q.    You're writing parking lot on there.

17       A.    There was a fence that ran from here all

18   the way up here, and then down here.  And then

19   approximately eight feet from the barrier, the fence

20   ran all the way here like so.

21       Q.    If you'll write fence next to that dotted

22   line that you just drew.  What kind of fence was

23   that?

24       A.    It was an orange construction safety

B29

Allan DeCarlo

Page 32

1    fence.

2        Q.    Who placed the orange construction safety

3    fence?

4        A.    Blue Diamond.

5        Q.    Who actually put that fence up?

6        A.    I believe it was Bob Krysnowski.

7        Q.    Any idea how to spell that?

8        A.    No.

9        Q.    What did Bob Krysnowski do?

10       A.    He was kind of the maintenance guy, grass

11   cutter, et cetera.

12       Q.    Why was the fence put up?

13       A.    To keep spectators from pit areas and

14   active operations of the Monster Truck Show.

15       Q.    At whose direction was the fence put up?

16       A.    I believe Jack Brady showed them where he

17   was using the pit areas.  Actually he might have

18   showed me.

19       Q.    Let me ask your best recollection.  Mr.

20   Brady showed you where the pit areas were going to

21   be?

22       A.    Exactly.

23       Q.    Then what happened after that?

24       A.    Blue Diamond placed the orange fence.

B 30

Allan DeCarlo

Page 33

1          Q.    Are you the person who directed where this
2     orange fence would be placed?
3          A.    Yes.
4          Q.    Tell me how you decided where to place the
5     fence.
6          A.    Just because Jack Brady showed me where he
7     wanted the pit areas.
8          Q.    Just in terms of terminology, are the pit
9     area and a staging area the same thing?
10         A.    Yes.
11         Q.    If you would show on that drawing what
12    you're referring to as pit area or staging area.
13         A.    This is where the Monster Trucks pitted in
14    this area, on that side of the entrance road.
15         Q.    I'm sorry, when you say on that side of
16    the entrance road, are you able to describe that.
17    The entrance road --
18         A.    Is this.
19         Q.    Can you mark that entrance road?
20         A.    Yes.
21         Q.    So where you're written the word Monster
22    Truck --
23         A.    That was where they parked their rigs, per
24    se, their big trucks.  Their haulers.

B 3 (

Allan DeCarlo

Page 34

1        Q.    Were there other types of vehicles other

2    than Monster Trucks that were present at the show on

3    that day?

4        A.    Yes.

5        Q.    What other kinds of vehicles were there?

6        A.    There was I believe Tough Trucks.

7        Q.    Can you tell me what a Tough Truck is?

8        A.    It's a truck that people set up to race.

9    It's kind of a -- it's like a little Ford Explorer

10   truck or a Mazda B2000 that they set up to race.

11   They jump with them.  That's the best way I can

12   explain it.

13       Q.    Were there other kinds of vehicles?

14       A.    There was mud drags.

15       Q.    A mud drag and a mud racer is the same

16   thing?

17       A.    Yes.

18       Q.    What do those do?

19       A.    They basically go under a clock in a drag

20   strip that, not drag strip but a strip of mud, they

21   drag under a clock, under time one at a time.

22       Q.    That was one of the events that was part

23   of this Monster Truck Show?

24       A.    Yes.

B32

Allan DeCarlo

Page 35

1     Q.   Where was the actual strip that the mud

2  drags were to race on?

3     A.   It would have been almost the middle of

4  the show floor.

5     Q.   Was there a particular area where the mud

6  drags were to kind of park or gather before the

7  event?

8     A.   They parked on the other side of the

9  entrance road, which would have been in this area.

10     Q.   Can you put mud drags or Mud Racers.  In

11  that area where you've designated for mud drags, is

12  it your understanding that that's where the mud drag,

13  the actual vehicles that you call mud drags would

14  park?

15     A.   Yes.

16     Q.   Were there also vehicles that were needed

17  to move the mud drags?

18     A.   From my understanding yes, they did have

19  tow vehicles.

20     Q.   Did tow vehicles also park in that area

21  that you designated for mud drags?

22     A.   Yes.

23     Q.   Were there crews that would go along with

24  each of the mud drags?

B 33

Allan DeCarlo

Page 36

1        A.    There were crews, yes.

2        Q.    What was your understanding of the route

3    that would be taken for a mud drag racer and crew to

4    get from the mud drag area to the floor area where

5    they would compete?

6        A.    They were to go, not running, dead engine

7    the terminology is.  There was a little like ditch

8    that runs along the road here.  So they couldn't just

9    go right over to the show.  They had to tow their

10   vehicles around here where there wasn't a ditch.

11   They took their vehicle onto the road into the floor

12   area.

13       Q.    Maybe you could put an arrow along the

14   road that the mud drags would follow.  If you'll do

15   that and mark that route.

16       A.    Now, I'm not sure exactly, because like I

17   said this is all estimate to me which way they

18   actually, you know.

19       Q.    The area that you've already designated

20   where the mud drags were to be, that's called the

21   staging area.

22       A.    Right.

23       Q.    Then you've shown arrows that go along a

24   line that you've previously marked as a road,

B 34

Allan DeCarlo

Page 37

1    correct?

2        A.    Correct.

3        Q.    When you're designating a road, is that an

4    asphalt road that ran through Diamond Park?

5        A.    Yes.

6        Q.    If I'm understanding what you drew, the

7    mud drags would move along the road, and then it

8    looks like there was a spot that you're indicating

9    where the mud drags would then leave the road to

10   enter the show floor?

11       A.    Yes.

12       Q.    Now, you said that the mud drags would

13   move from the staging area with a dead engine.  Is

14   that the correct term?

15       A.    Yes.

16       Q.    How was it, to your knowledge, that the

17   mud drag teams or crews would know that, that they

18   were supposed to move with a dead engine?

19       A.    I think it's kind of a written

20   understanding, and also most of them guys have

21   Thirty, Forty Thousand Dollars in their engines and

22   they don't want to run them until they have to, if

23   you understand.

24       Q.    When you say that there's something

B 35

Allan DeCarlo

Page 38

1    written, what kind of written thing would there be?

2    Is that from Blue Diamond?

3        A.   No, that would have been Jack Brady's

4    stipulations.

5        Q.   Did you ever see a copy of Jack Brady's

6    stipulations?

7        A.   No.

8        Q.   Did you ever ask to see a copy of Jack

9    Brady's stipulations?

10       A.   No.

11       Q.   What was your understanding of the path,

12   if any, that the crew members for the mud drags were

13   to take when moving from the mud drag staging area to

14   the show floor?

15       A.   I don't know of any.

16       Q.   Was that totally up to the people that

17   were in the crews?

18       A.   That was up to the promoter, which would

19   be Jack Brady.

20       Q.   How do you know that that was up to the

21   promoter as opposed to Blue Diamond?

22       A.   He was responsible for the show.

23       Q.   What do you base your knowledge on that

24   Jack Brady was responsible for the show?

B 36

Page 39

1      A.   It was his show.  I mean, it was KSR Motor

2   Sports.

3      Q.   Do you have any knowledge of what Blue

4   Diamond agreed to do with regard to Jack Brady's

5   show?

6      A.   The only knowledge that I know that we

7   agreed to was the barrier for spectators.

8      Q.   What about the fence?

9      A.   I meant barrier and the spectator

10   protection areas, I guess.  So the fence, too.

11      Q.   To the best of your knowledge whose

12   decision was it to place the Jersey barriers?

13      A.   Jack Brady's.

14      Q.   And whose decision was it to place the

15   fence?

16      A.   It was Jack's also.  He told us what he

17   needed for protection.

18      Q.   Did you take a look at how things were

19   configured in terms of the Jersey barriers and the

20   fence, and make any recommendations on your own?

21      A.   No.

22      Q.   Why not?

23      A.   I mean, I looked at it and I thought it

24   was adequate.  Jack and I both looked at the whole

B-37

Allan DeCarlo

Page 40

1    area and thought it was adequate.  I didn't make any

2    recommendations, I should say.

3        Q.   Is there anything that would have told a

4    spectator or a member of a crew participating in this

5    event that this event was being run by Jack Brady and

6    his outfit as opposed to Blue Diamond Park?

7        A.   All advertising had; presented by KSR

8    Motor Sports.

9        Q.   Anything else?

10       A.   No.

11       Q.   I just want to make sure.  In the show

12   that Jack Brady was putting on, what was your

13   understanding of the different elements of that show.

14   There were Monster Trucks, that was one of them?

15       A.   There was Monster Trucks.

16       Q.   Let's just stop there.  What was your

17   understanding of what the Monster Trucks were to do?

18       A.   The Monster Trucks were to crush cars.

19   There was two different types of Monster Trucks

20   events.  One was the free style, which is they go out

21   and do what they -- they do it in the wildest they

22   can do, I guess, and they're scored on that and see

23   who wins.  In other words, wheelies, car crushing,

24   jumping, that type of stuff.

B38

Allan DeCarlo

Page 41

1        Q.    How was it that the Monster Trucks could

2   jump?  Were there any kind of obstacles they could

3   jump over?

4        A.    There was cars, a couple little dirt piles

5   that they can go over.

6        Q.    Do you know how many Monster Trucks were

7   participating in this event?

8        A.    I think five.

9        Q.    What other parts to the show were there?

10       A.    Had the Tough Trucks.

11       Q.    What did the Tough Trucks do?

12       A.    There was a little course that they ran

13  through for time.  It was just a little obstacle

14  course I guess you could say.

15       Q.    Do you know the speed of the vehicles when

16  they would go through that course?

17       A.    Maybe twenty-five mile an hour, because it

18  was really tight and small.

19       Q.    Then there were the Mud Racers?

20       A.    The Mud Racers.

21       Q.    They would race on a track?

22       A.    They would go, it was a miniature drag

23  strip, but it was mud that was a hundred and fifty

24  feet long.

639

Allan DeCarlo

Page 42

```
 1        Q.    What speed did the Mud Racers go?

 2        A.    I don't really know.

 3        Q.    Can you estimate?

 4        A.    No.  It was a three or four second run and

 5    a hundred and fifty feet, so I don't --

 6        Q.    Who set up this mud drag strip?

 7        A.    The mud drag strip, I personally disc it

 8    and watered it.

 9        Q.    I'm sorry, did what to it?

10        A.    Disc it.  Turned up the dirt so it would

11    get loose, and then soak it with water.

12        Q.    Do you know if there are any requirements

13    for members of the pit crew that they have to

14    satisfy?

15        A.    No.

16        Q.    Do you know if there was any age

17    requirement to participate in the events?

18        A.    No.

19        Q.    Was there any kind of ticket, or wrist

20    band, or anything that members of the crews would

21    receive?

22        A.    I believe Jack gave them a wrist band.

23        Q.    Do you know what the purpose was for that?

24        A.    To note who was allowed in the pits.
```

B 40

Allan DeCarlo

Page 43

1      Q.    When was the last time that you spoke to

2  Jack Brady?

3      A.    It's been three months, four months.

4      Q.    What did you talk about the last time you

5  spoke to him?

6      A.    Actually he called me.  It was about he

7  wanted to take a ride truck to Frightland, and he

8  knew I had the connections.

9      Q.    I don't know what that means.  What is

10  that?

11      A.    A ride truck is a Monster Truck that the

12  general public pays a fee, gets in, and rides around.

13      Q.    Did you ever talk to him about this

14  incident where Mr. Rollison was injured?

15      A.    Very briefly when I was served with

16  papers.

17      Q.    What was your discussion with him at that

18  time?

19      A.    I asked him if he was served with papers.

20      Q.    Have any other discussion about that?

21      A.    No.  I asked him what happened, why did it

22  happen.

23      Q.    What did Mr. Brady tell you?

24      A.    He didn't have much to say.

B41

Allan DeCarlo

Page 44

1       Q.    Did he say anything?

2       A.    I don't recall.  I really don't recall.

3       Q.    On the diagram that you drew, the route

4    from the staging area for the mud drags to the show

5    floor, was that an area where the members of the

6    general public could walk?

7       A.    No.

8       Q.    How was the public kept away from there?

9       A.    There was a barrier or cones blocking the

10   exit to the parking lot, and then there was another

11   set of cones that blocked the road where they came

12   out.  I'm running out of paper, but where they came

13   out.

14      Q.    Who would put the cones there?

15      A.    That would have been our cones, but it was

16   manned by Jack Brady's security.

17      Q.    What kind of security did Jack Brady have

18   for this event?

19      A.    He normally hired an outside security

20   company, but I don't remember who they were.

21      Q.    What did that security company do?

22      A.    They basically manned the entrance so no

23   general public could get into the pit area or the

24   show floor, and they provided security, spectator

B42

Allan DeCarlo

Page 45

1    security up on top, and at the entrances where they

2    collect the tickets and the money.

3        Q.   Anything else that the security company

4    did?

5        A.   No.

6        Q.   There was mentioned in testimony that

7    there was an ambulance present during this event.  Do

8    you have any knowledge about that?

9        A.   During the event, the actual event, yes,

10   there was an ambulance.  Actually there was a fire

11   truck also.

12       Q.   Do you know where the ambulance was from?

13       A.   Wilmington Manor.

14       Q.   How was it that the ambulance and fire

15   truck were present there?

16       A.   How was it?

17       Q.   Yes.  Did someone ask them?

18       A.   Jack asked me to see if I could get in

19   contact with them, and I contacted Wilmington Manor

20   and they graciously came.

21       Q.   Why did you agree to contact Wilmington

22   Manor?

23       A.   Because I had the contact there.  I got a

24   personal relationship with them, and Jack knew that I

B43

Allan DeCarlo

Page 46

1    had that relationship.

2        Q.   Was Wilmington Manor paid in any manner to

3    be present?

4        A.   I don't believe so.

5        Q.   On the area that you designated as the

6    show floor, were there any barriers within the show

7    floor area, barriers or fences?

8        A.   There was actually, on the show floor

9    there was a barrier and it was laid on its side and

10   used for a ramp for the Monster Trucks.

11       Q.   That was only used for a ramp?

12       A.   Yes.

13       Q.   There's been some discussion about a

14   waiver that was signed by some of the participants in

15   this event.  Do you know where that waiver came from?

16       A.   Jack Brady.

17       Q.   Blue Diamond Park had nothing to do with

18   that?  You're shaking your head.

19       A.   Oh, no, Blue Diamond Park had nothing to

20   do with it.  I'm sorry, I forgot I had to speak.

21       Q.   In the two events previous that Jack Brady

22   ran at Blue Diamond Park, were there any problems

23   with how the events were conducted?

24       A.   Not to my knowledge.

B44

Allan DeCarlo

Page 47

1       Q.    How did you find out that Mr. Rollison had

2   been injured?

3       A.    It was the next day.  I didn't know who it

4   was.

5       Q.    How did you find out the next day?

6       A.    Jack Brady told me.

7       Q.    Do you remember what he told you?

8       A.    He just told me that somebody was injured.

9   I didn't know the extent of the injury.

10      Q.    Did you ask Mr. Brady to fill out any kind

11  of report or anything like that?

12      A.    He said he was going to.  I didn't ask

13  him.  He told me he was going to.

14      Q.    Did you ever see any kind of report filled

15  out by Jack Brady?

16      A.    No.

17      Q.    During the time that you were at Blue

18  Diamond Park on July 3rd 2004, were any problems of

19  any type reported to you with regard to the event

20  that Jack Brady was running?

21      A.    No.

22            MR. KRAWITZ:  Those are all the

23  questions I have right now.  The other attorneys may

24  have some questions for you.

B45

Allan DeCarlo

Page 48

1                    CROSS-EXAMINATION

2    BY MR. SHALK:

3         Q.   Mr. DeCarlo, I understand from your

4    earlier testimony that you manage the motorcross park

5    at Blue Diamond?

6         A.   Yes.

7         Q.   There was a separate part of Blue Diamond

8    that was the amusement park; is that correct?

9         A.   Yes.

10        Q.   I think you testified that Houghton ran

11   the amusement park?

12        A.   Yes.

13        Q.   How is it divided up?  Just give me a

14   general sense what the place looks like?

15        A.    It's ninety acres, a hundred acres, so

16   it's pretty -- I mean, the amusement park is pretty

17   divided.  It's fenced in separate.  Then there's

18   another road that's separate road that takes you back

19   to the motorcross.  Then there's a separate area for

20   BMX.  It's pretty divided up.

21        Q.   If I were at the amusement park and I

22   wanted to walk over to the motorcross, how far would

23   I have to go?

24        A.   Probably close to a half a mile.

B 96

Allan DeCarlo

Page 49

1        Q.   You said there was another section of it

2    also?

3        A.   BMX.

4        Q.   The BMX.  If I went over to the BMX using

5    the same scenario, how far would I have to go?

6        A.   From the amusement park it's closer.  It's

7    less than half the distance.

8        Q.   So a little less than a quarter of a mile?

9        A.   Yes.

10       Q.   All of the things, the BMX, the motorcross

11   and the amusement park are all under Blue Diamond

12   Park; is that correct?

13       A.   Yes.

14       Q.   The Houghton Company ran the amusement

15   park; is that right?

16       A.   Yes.

17       Q.   Do you know what the arrangement was

18   between the Houghton Company and Blue Diamond Park?

19       A.   I really don't know about the financial

20   arrangements.  I think it was a percentage of -- I

21   don't know.  I know he was leasing it.  I don't know

22   the financial.

23       Q.   He being Houghton?

24       A.   Yes, Houghton.

B 47

Allan DeCarlo

Page 50

1     Q.   You may have said this earlier, but who

2   owns Blue Diamond Park?

3     A.   It's a subsidiary of Greggo and Ferrara.

4     Q.   Was there any connection between the

5   amusement park and the Monster Truck Show that you've

6   talked about for the last hour or so?

7     A.   To my knowledge, no.

8     Q.   Do you know whether Houghton had any

9   financial interest in the proceeds of the Monster

10  Truck Show?

11    A.   No.

12    Q.   It sounds like Mr. Brady and Blue Diamond

13  had some kind of arrangement to put on the Monster

14  Truck Show; is that correct?

15    A.   Yes.

16    Q.   If I understand you correctly, the

17  amusement park itself had no arrangement or no

18  participation in the Monster Truck Show as far you

19  know.

20    A.   As far as I know.

21         MR. SHALK:   I don't have anything

22  further.

23         MS. RUGGERIO-FALLON:   I have some

24  questions, but first I think we ought to mark Mr.

B 48

Allan DeCarlo

Page 51

1   DeCarlo's drawing as Exhibit 1 to his deposition.  If

2   we could get someone to photocopy it so that I don't

3   have to come up to that end of the table.

4                    MR. KRAWITZ:  Let's have it marked.

5                    MS. RUGGERIO-FALLON:  While that's

6   being done, maybe we can take a short break.

7                    (Whereupon, the document was marked as

8   DeCarlo Exhibit No. 1 for identification.)

9   BY MS. RUGGERIO-FALLON:

10        Q.   Mr. DeCarlo, how old are you, sir?

11        A.   Forty-one.

12        Q.   Just briefly, what's your educational

13   background beginning with high school?

14        A.   High school.

15        Q.   Where did you graduate from?

16        A.   McKean.

17        Q.   Do you remember what year?

18        A.   '84, '85.  I don't remember.

19        Q.   Any post high school education; college or

20   anything?

21        A.   No.

22        Q.   How long had you been working at Blue

23   Diamond at the time of this incident, since it

24   opened?

B49

Allan DeCarlo

Page 52

    1       A.    Yes, since it opened.

    2       Q.    You said that was sometime in '03?

    3       A.    August of '03.

    4       Q.    Prior to that, had you had any type of

    5    experience with staging or promoting these types of

    6    recreational events?

    7       A.    I've been involved with the motorcross

    8    part of it for seven years prior.

    9       Q.    In what way?  Did you race, promoted them?

   10       A.    My son raced.  I worked with promoters at

   11    different events.

   12       Q.    Did you personally have a relationship

   13    with Jack Brady before the two shows that he put on

   14    at Blue Diamond?

   15       A.    I had met him through another guy.  So I

   16    didn't really have a relationship, but I knew him.

   17       Q.    How long before he actually put on a show

   18    at Blue Diamond would you say you became acquainted

   19    with him or knew him?

   20       A.    I'd say about a year.

   21       Q.    Did he approach you or someone else from

   22    Blue Diamond the first time he wanted to promote an

   23    event there?

   24       A.    I think he approached me.

Allan DeCarlo

Page 53

1      Q.    Who did you put him in touch with, who did

2    you have to clear for him to put on an event there?

3      A.    Actually Nick Ferrara.

4      Q.    Now, I just want to establish for the

5    present day the premises of Blue Diamond looked

6    different than the way they were configured at the

7    time of Mr. Rollison's accident in July of 2004; is

8    that right?

9      A.    Yes.

10     Q.    Specifically with regard to the area where

11   the Monster Truck Show and the mud drags were held

12   back in 2004, what's different about the way that

13   area looks today?

14     A.    All the barriers are gone.  The fencing is

15   gone.  It's cleaned up.

16     Q.    At the time that this event occurred in

17   July of 2004, was the area where the Monster Show and

18   the mud drags were held fairly dirt covered shall we

19   say?

20     A.    Yes.

21     Q.    Whereas now it's got full lawn of grass

22   that has to be mowed, correct?

23     A.    Yes.

24     Q.    So if we were to go there today there

BS1

Allan DeCarlo

Page 54

1    wouldn't be any impressions in the ground that would

2    actually follow the road or the route that was taken

3    by the Mud Drags towards the, I think you called it a

4    floor or the staging area?

5         A.   Yes.

6         Q.   Now, were you actually on the premises on

7    the day when Mr. Rollison had his accident?

8         A.   Yes.

9         Q.   You were not at the Monster Truck show or

10   the Mud Drag show at the time it happened; is that

11   correct?

12        A.   Correct.

13        Q.   What time did you arrive on the premises

14   on the day this happened?

15        A.   It was between eight and nine.

16        Q.   In the morning?

17        A.   On the premises?

18        Q.   On the premises itself.  How early did you

19   get there that day?

20        A.   I spent the night there.

21        Q.   Were you the one responsible for opening

22   it up at six a.m.?

23        A.   Yes.

24        Q.   Opening the gates?

Allan DeCarlo

Page 55

1       A.   Yes.

2       Q.   How long did you stay there for the entire

3  day, July 3, 2004?

4       A.   Actually I was there for the weekend.  I

5  never left the premises.

6       Q.   Where did you stay when you were staying

7  overnight on the premises?

8       A.   In my motor home.

9       Q.   What did you physically do after you

10 opened up the premises on July 3?

11      A.   Started prepping the track for the

12 motorcross race.

13      Q.   What did that consist of?

14      A.   Watering, grading.

15      Q.   What else did you do?

16      A.   Started the motorcross race approximately

17 eight thirty.

18      Q.   In the morning?

19      A.   Yes.

20      Q.   How long did that go on?

21      A.   Until about five thirty, six.

22      Q.   Did you stay at that location for the

23 entire time, or did you go to other locations?

24      A.   I went up to the Monster Truck show

B53

Allan DeCarlo

Page 56

1    approximately between eight and nine o'clock that

2    night.

3        Q.   I know that to some extent this is

4    conversational and you can anticipate my questions,

5    but so we have a clear record you have to wait until

6    I'm finished.

7            Now, I think I recall your testimony

8    was that there was just one main entrance into the

9    Park, Blue Diamond Park, for all the events that were

10   going on that day; is that correct?

11       A.   Can I explain?

12       Q.   Yes.  And correct me if I'm wrong.

13       A.   The one entrance was only after I'm

14   thinking five o'clock.  Once they started setting up

15   for the actual Monster Truck show, that's when we

16   closed the other entrance, if you understand.

17       Q.   So how many entrances were opened up until

18   that time, two?

19       A.   Yes.

20       Q.   One of them is off of Route 13?

21       A.   Yes.

22       Q.   Where is the other entrance?

23       A.   Off of Hamburg Road.

24       Q.   What's the main entrance considered, Route

Allan DeCarlo

Page 57

1    13?

2        A.    Hamburg Road.

3        Q.    Now, what entrance was closed prior to the

4    Monster Truck show?

5        A.    The Route 13 entrance.

6        Q.    Now, you said that there was a special

7    admission fee for spectators going to the Monster

8    Truck show and I presume the Mud Drag show, that was

9    collected by Jack Brady, correct?

10       A.    Correct.

11       Q.    So how was it that, for example, if a

12   spectator was coming in from whatever entrance before

13   the Route 13 entrance was closed and they were coming

14   in not to see the Monster Truck but maybe to see the

15   motorcross or use Houghton's Amusements, how were

16   they directed where to go?

17             Who did they see about paying their

18   admission fee to go to whatever particular event they

19   wanted to go to?

20       A.    The amusement park had its own entrance

21   off the parking lot, and a ticket booth.  The

22   motorcross has its own road.  It's totally separate.

23   I mean, it's separate.  You go to the top of the hill

24   and there's a person there to sign you in.

Allan DeCarlo

Page 58

1        Q.   Well, if somebody is pulling in in a car

2    off of, say, Route 13, how do they know where to go

3    if they want to go see motorcross, like where to park

4    and get out of their car so they can go to these

5    events?  Is there somebody from Blue Diamond with

6    directions?

7        A.   Not normally.  There's a few signs that

8    say; motorcross this way.  The amusement park is

9    pretty self-explanatory.

10       Q.   Were there any signs directing the Mud

11   Drags and the Monster Truck spectators where to go?

12       A.   Yes, there was signs at the bottom of the

13   hill where they walk up into the place.

14       Q.   What type of signage was that?

15       A.   I think it was just a spectators enter

16   here sign.

17       Q.   Was that something that was put up by Jack

18   Brady, or Blue Diamond?

19       A.   I believe it was Jack.  I think actually

20   he had a banner-type thing.

21       Q.   Did Blue Diamond put up any signage

22   directing spectators and/or participants where to go?

23       A.   I don't believe so.

24       Q.   Now, did each activity have its own

Allan DeCarlo

Page 59

1    separate ticket booth?  In other words, was there a

2    separate ticket booth where people would go into the

3    motorcross as opposed to the Monster Truck show?

4         A.   Yes.

5         Q.   Who at Blue Diamond, if you know, was

6    responsible for figuring out what amount Jack Brady

7    owed Blue Diamond for admission fees for the activity

8    that he had going on that day?

9         A.   That I really don't know who made that

10   decision.

11        Q.   Is there an accounting department or

12   bookkeeping department for the owners or for the

13   Park?

14        A.   It would more than likely be the owners

15   that made the decision.

16        Q.   Now, you say that Jack Brady had put on

17   two prior shows before the one on this date?

18        A.   Yes.

19        Q.   Do you know when they were approximately?

20        A.   No, I don't.

21        Q.   Would they have been the same year?

22        A.   Yeah, they were within months prior.

23        Q.   Were there ever any contracts executed

24   between Blue Diamond and Jack Brady for any of the

Allan DeCarlo

Page 60

1    previous shows?

2         A.    I really don't know.

3         Q.    Was it typical for Blue Diamond to execute

4    a contract with a promoter who was coming to use the

5    premises to put on a show?

6         A.    It is typical.

7         Q.    Do you know what generally the terms of

8    the contract between Blue Diamond and the event

9    promoter require?

10        A.    No.

11        Q.    Do you know if the requirement of

12   liability insurance is a condition to having someone

13   else come on premises?

14        A.    Yes.

15        Q.    How do you know that that's a condition of

16   having someone come on premises?

17        A.    It's not written anywhere, but that's a

18   condition that has to be done.  Anybody that steps

19   foot that wants to do anything has to have liability

20   insurance.

21        Q.    Well, who at Blue Diamond is responsible

22   for making sure that someone coming on to run a show

23   has liability insurance, if you know?

24        A.    That would have been Colleen Healy at that

Allan DeCarlo

Page 61

1    time.  Anybody who handles the show.

2        Q.   What would she do to verify that, if you

3    know?

4        A.   Supposed to make a copy of the insurance

5    policy.  They're supposed to show a certificate of

6    insurance listing Blue Diamond as a --

7        Q.   That's what I was going to ask.  The

8    insurance coverage, that would insure the liability

9    of Blue Diamond as well as whatever promoter was

10   coming on premises; is that correct?

11       A.   Yes.

12       Q.   Do you know if that was done with regard

13   to any show that Jack Brady put on at Blue Diamond,

14   not just this one?

15       A.   I do not know.

16       Q.   If such records were made and certificates

17   of insurance photocopied or obtained, where would

18   they be kept?

19       A.   Well, they're supposed to be kept at Blue

20   Diamond in the office.

21       Q.   Is there like a main office?  Was that in

22   the trailer at the time they were on premises?

23       A.   Yes.

24       Q.   Is there one person in charge of taking

Allan DeCarlo

Page 62

1   care of files, maintaining them?

2        A.   At that time it was Colleen.  Since then

3   there's been two other people.

4        Q.   Do you know if any of those people have

5   ever checked to see if there was a certificate of

6   insurance from Jack Brady?

7        A.   I can say I personally checked.

8        Q.   Where did you check?

9        A.   In the filing cabinets at the office where

10  they should have been.

11       Q.   How do you file things like that?  Is it

12  by name of promoter, or by date of event?

13       A.   There was a file set up for Monster Truck

14  shows.

15       Q.   Do you still have that file?

16       A.   I believe it's still up there.

17       Q.   Is there anything in it relating to the

18  Monster Truck show that was put on, on the date of

19  this accident?

20       A.   There was --

21       Q.   I know that there's no certificate of

22  insurance.

23       A.   There was actually nothing in it.

24       Q.   What records would you normally expect to

Allan DeCarlo

Page 63

1    find in such a file other than a certificate of

2    insurance?

3        A.    Contract.  I mean, maybe a flyer showing,

4    you know.  But you would think they would be in

5    there.

6        Q.    Is there a sample form contract that you

7    would still have in your possession, let me finish

8    the question, that would have been drafted or used by

9    Blue Diamond in 2004 for an event such as this, even

10   though you don't have the actual one, to the extent

11   one was used with Jack Brady?

12       A.    I really don't know.

13       Q.    Who would know that?

14       A.    Maybe the lady that's in the office now

15   might know if there's something available.

16       Q.    Were there events other than Monster Truck

17   shows and Mud Drags that contracted with Blue Diamond

18   to use the part of the premises that were being used

19   at this time?

20       A.    No.

21       Q.    So had any other events ever been set up

22   on that part of the premises other than Jack Brady's

23   Monster Truck shows prior to July of '04?

24       A.    No.

Allan DeCarlo

Page 64

1       Q.   Did Blue Diamond use any kind of a waiver

2   form for persons gaining entrance to the motorcross

3   event on the same date as the Monster Truck event?

4       A.   Yes.

5       Q.   Who drafted the waiver form?

6       A.   The AMA, American Motorcycle Association,

7   and Naughton Insurance.

8       Q.   Were there any turn styles the spectators

9   had to walk through for any of these events that

10  might have a counter on them so you could track the

11  number of people coming in?

12      A.   No.

13      Q.   Have you ever used turn styles at Blue

14  Diamond Park?

15      A.   No.

16      Q.   Was there a different price range for the

17  motorcross event as opposed to the Monster Truck

18  event, if you know?

19      A.   Yes.

20      Q.   What was the price of the motorcross?

21      A.   Spectator fee was $10.00.

22      Q.   Do you know what the participant fee was,

23  if any?

24      A.   $25.00.

Allan DeCarlo

Page 65

1      Q.   That's right, you said that.  What was

2    this membership fee that you talked about, what fee

3    is that?

4      A.   That's for practice.  We're open for

5    practice five days a week, fifty-two weeks a year

6    weather permitting.

7      Q.   So the $50.00 membership fee covers

8    practice on an annual basis for anybody who wants to

9    use the field?

10     A.   Yes.

11     Q.   You said you didn't know if or what the

12   participant fee was for members participating in the

13   Monster Truck or Mud Drag show; is that correct?

14     A.   Yes, I don't know.

15     Q.   Do you know if Blue Diamond received a

16   percentage of the fees from the participants in that

17   event?

18     A.   No.

19     Q.   You don't know, or Blue Diamond did not

20   receive anything?

21     A.   I know we didn't.

22     Q.   What was done, if anything, by Blue

23   Diamond to direct the spectators who were going to

24   the Monster Truck and Mud Drag show to the spectator

Allan DeCarlo

Page 66

1   area as opposed to making them go onto the area where

2   the actual participants were involved?  Was there

3   anything done?

4        A.   That was actually Jack Brady's

5   responsibility.

6        Q.   What was done as far as you know, if

7   anything?

8        A.   He had security there.

9        Q.   Now, was the procurement or the retention

10  of a security agency another condition to the

11  contract for the promoter to stage an event there?

12       A.   I really don't know that answer.

13       Q.   Did Blue Diamond hire a security agency

14  with regard to the motorcross event?

15       A.   No.

16       Q.   Did Blue Diamond in house provide security

17  for the motorcross event for the same purpose, that

18  is to keep the spectators in case they didn't know

19  where they were going, keep them off the field?

20       A.   Yes.

21       Q.   As far as you know, does Blue Diamond have

22  any interest in KSR Motor Sports?

23       A.   No.

24       Q.   Does any owner of Blue Diamond premises

Allan DeCarlo

Page 67

1   have any interest in KSR Motor Sports?

2        A.   No.

3        Q.   Do you personally have any interest in KSR

4   Motor Sports?

5        A.   No.

6        Q.   Who was responsible for setting the timing

7   of these events on the premises on the date that this

8   occurred?

9        A.   For the Monster Show?

10       Q.   For all events that were going on, on that

11  date.

12       A.   I was responsible for the motorcross.

13       Q.   And how did you pick the time?  Eight a.m.

14  seems like an unreasonably early time to go to a

15  race, but how did you choose it?

16       A.   Every race starts that way because it's a

17  long day.  It's always long days.

18       Q.   What type of organization is the AMA,

19  American Motorcross Association?

20       A.   They're a sanctioning body, and they

21  handle all the motorcross events across the country

22  pretty much.

23       Q.   Do they also set national standards as to

24  how these should be conducted and what you need to

Allan DeCarlo

Page 68

1    follow as far as procedure, safety, things like that,

2    if you know?

3        A.    Certain things are required by the

4    insurance company.  So there is standards for certain

5    stuff.

6        Q.    With regard to the motorcross, is there a

7    requirement by the AMA or by Blue Diamond's insurer

8    that an ambulance and fire truck be on premises?

9        A.    On race day?

10       Q.    Yes.

11       A.    AMA and the insurance requires an

12   ambulance.

13       Q.    So they weren't there specifically for

14   Jack Brady's event, they were there because of the

15   motorcross event; is that correct?

16       A.    No.  I had a specific ambulance company do

17   my race because they're required to be at the track.

18   Wilmington Manor was there just specifically for the

19   two or three hour Jack Brady show.

20       Q.    There was only one ambulance there, and

21   that was there for both the motorcross and the

22   Monster Truck, or is that incorrect?

23       A.    My ambulance is hired by me.  They were

24   hired by Blue Diamond to do the motorcross race.

Allan DeCarlo

Page 69

1        Q.    Was there a separate ambulance, if you

2    know, for the Monster Truck and Mud Drag regardless

3    of who hired that ambulance?

4        A.    That was Wilmington Manor, and they were

5    only there for the show.

6        Q.    They provided both an ambulance and the

7    fire truck?

8        A.    Yes.

9        Q.    Do you know, if you do, from the time Blue

10   Diamond has been open in 2003 up through July of 2004

11   when Mr. Rollison had his accident, whether there had

12   ever been any other instances of either spectators or

13   participants being injured in an event on the

14   premises?

15       A.    Yes.

16       Q.    How many times would you say?

17       A.    I wouldn't even begin.  I couldn't even

18   remember back that far.

19       Q.    More than ten?

20       A.    I would say.  We deal with motorcross, I

21   mean dirt bikes, so people fall and get hurt on a

22   daily basis.

23       Q.    Is there anyone in the role of a risk

24   manager so to speak, someone who takes reports when

Allan DeCarlo

Page 70

1    these incidents occur from Blue Diamond?

2        A.    That would be myself for the motorcross.

3    See, I handle motorcross only.  So that would be

4    myself, and at the time I had a full time EMT.

5        Q.    Was there anybody at Blue Diamond

6    responsible for making out an incident report, an

7    accident report for events sponsored or promoted by

8    other entities who came onto the premises for a

9    recreational activity?

10       A.    There should have been.

11       Q.    Who would have been responsible for that

12   on the date that this happened to Mr. Rollison?

13       A.    I would assume to say it would have been

14   the same person that handled the whole deal, the

15   whole --

16       Q.    Colleen Healy perhaps?

17       A.    I would say.

18       Q.    Do you know if the incident was ever

19   formally reported and an incident or accident report

20   completed by Blue Diamond for Mr. Rollison's

21   accident?

22       A.    No.

23       Q.    There was not?

24       A.    No, there wasn't.

Allan DeCarlo

Page 71

1      Q.   Are you saying that Blue Diamond's

2  procedures were such at the time that there should

3  have been?

4      A.   Yes.

5      Q.   Does Blue Diamond currently have a claim

6  outstanding against Jack Brady that hasn't been

7  satisfied for his share of the fees or revenues

8  generated by this event that he held on July 3rd of

9  2004?

10     A.   I really don't know that.  I don't know.

11          MS. RUGGERIO-FALLON:  That's all I

12  have.  Thank you.

13          MR. AKIN:  If I could just ask one or

14  two questions to clarify.

15              CROSS-EXAMINATION

16  BY MR. AKIN:

17     Q.   Mr. DeCarlo, have you ever heard of a

18  company called Parkway Gravel?

19     A.   Yes.

20     Q.   What, if any, relationship does Parkway

21  Gravel have to the Blue Diamond site?

22     A.   Other than they're the borrow pit

23  operation next door.

24     Q.   By next door you mean off the site where

Allan DeCarlo

Page 72

1    the recreational activities occur?

2         A.   Yes.

3         Q.   They run a borrow pit there?

4         A.   Yes.

5         Q.   Does Parkway Gravel own any part of the

6    Blue Diamond facility?

7         A.   I believe it was all the same property.

8    I'm not really sure of the specifics.

9         Q.   Just to clarify the record, the actual

10   owner of the land where Mr. Rollison suffered an

11   injury is who or what company?

12        A.   I really don't know that answer.

13        Q.   You indicated earlier in your testimony, I

14   think you mentioned Mr. Greggo and Mr. Ferrara having

15   some relationship to the land.  Was that your

16   testimony earlier?

17        A.   Yes.

18        Q.   Are they the two principals of the firm

19   Greggo and Ferrara?

20        A.   Yes.

21        Q.   Just to finish this out, does Greggo and

22   Ferrara own the land where the Blue Diamond facility

23   is located?

24        A.   No.

Allan DeCarlo

Page 73

1    Q.   But as you sit here today, you're not

2  certain who is the title owner of the Blue Diamond

3  land; is that correct?

4    A.   Exactly.

5         MR. AKIN:  All right.  That's all I

6  have.  Thank you.

7         MR. KRAWITZ:  I just have a few

8  questions.

9              REDIRECT EXAMINATION

10  BY MR. KRAWITZ:

11    Q.   You saw the layout of any fencing or

12  barriers at the Monster Truck show before the show

13  started, correct?

14    A.   Correct.

15    Q.   Is it correct that had you wanted any

16  additional fencing or barriers placed in that area

17  you could have done that?

18    A.   If I wanted to, correct.  Yes.

19    Q.   Do you know if either you or Blue Diamond

20  have any pictures of the event that took place on

21  July 3rd 2004?

22    A.   I personally don't and Blue Diamond

23  doesn't.  I'm not saying there's not none out there.

24    Q.   Do you have any knowledge of anybody who

Allan DeCarlo

Page 74

1   does have pictures of the event that took place on

2   July 3rd 2004?

3       A.   Yes.

4       Q.   Who might that be that would have

5   pictures?

6       A.   It would be Richie Walker.

7       Q.   Who is Richie Walker?

8       A.   He was just a guy that was there.  His son

9   took video actually, not pictures.  But I'm still

10  trying to contact.

11      Q.   Richie Walker, was he a spectator?

12      A.   No, he led the ride truck, the Monster

13  Truck ride truck, he drove that.

14      Q.   Where does he live?

15      A.   Southeastern Pennsylvania.  I'm not sure

16  exactly what area.  Media or somewhere around that

17  area.

18      Q.   Do you have an address for him?

19      A.   No, I don't have a physical address.

20      Q.   What is his father's name?

21      A.   Richie Walker, that's the guy.  His son is

22  the one that had the video.

23      Q.   What's the son's name?

24      A.   I don't remember his name.

Allan DeCarlo

Page 75

1      Q.   On July 3rd of 2004, how many Blue Diamond

2  employees were at Blue Diamond Park that day?

3      A.   I'm thinking because of my motorcross race

4  going on, probably around fifteen or twenty, because

5  the race requires a lot of people.

6      Q.   When you say the race, was that --

7      A.   The motorcross race.

8      Q.   Were there any employees who were assigned

9  to the Monster Truck event?

10     A.   Prior to the event starting?

11     Q.   Let's start there, yes.  How about prior

12  to the event starting?

13     A.   No.

14     Q.   How about after the event started?

15     A.   Yes.

16     Q.   How many employees?

17     A.   I believe it was just the one at the

18  ticket booth.

19     Q.   Are there any specific standards that

20  you're aware of for running or administrating a

21  Monster Truck show?

22     A.   No.

23          MR. KRAWITZ:  Thank you.  I have

24  nothing further.

Allan DeCarlo

Page 76

1                    MS. RUGGERIO-FALLON:  All done.

2                    MR. AKIN:  Nothing further.  We'll

3    read and sign, please.

4                    (Thereupon, signature having not been

5    waived, at 11:55 a.m. the deposition concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Allan DeCarlo

Page 77

```
 1              I HAVE READ THE FOREGOING DEPOSITION,

 2    AND IT IS TRUE AND CORRECT TO THE BEST OF MY

 3    KNOWLEDGE.

 4

 5

 6                    _____

 7                    ALLAN DeCARLO

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Allan DeCarlo

Page 78

```
 1                    INDEX

 2           Deposition of Allan DeCarlo

 3               November 17, 2006

 4   Examination of:              PAGE

 5   Allan DeCarlo

 6   (By Mr. Krawitz)            4, 73

 7   (By Mr. Shalk)                48

 8   (By Ms. Ruggerio-Fallon)      51

 9   (By Mr. Akin)                 71

10                  EXHIBITS

11   NAME              DESCRIPTION    PAGE

12   DeCarlo No. 1     Drawing         51

13

14

15

16

17

18

19

20

21

22

23

24
```

Allan DeCarlo

Page 79

```
 1              C E R T I F I C A T I O N

 2                  I, TANYA M. CONGO, Certified Shorthand

 3   Reporter, certify that the foregoing is a true and

 4   accurate transcript of the foregoing deposition, that

 5   the witness was first sworn by me at the time, place

 6   and on the date herein before set forth.

 7                  I further certify that I am neither

 8   attorney nor counsel for, not related to nor employed

 9   by any of the parties to the action in which this

10   deposition was taken; further, that I am not a

11   relative or employee of any attorney or counsel

12   employed in this case, or am I financially interested

13   in this action.

14   _____

15   Tanya M. Congo

16   Certified Shorthand Reporter and Notary Public of the

17   State of Delaware, #189-PS

18

19

20

21

22

23

24
```

Delbert E.  Rollison

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DELBERT E. ROLLISON,                )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )
                                    )
NEAL SHOEMAKER, an individual,      )
BLUE DIAMOND, LLC, a Delaware       )
corporation, HOUGHTONS              )
AMUSEMENT PARK, LLC, a              )   C.A. NO: 06-159 SLR
Delaware corporation, JACK          )
BRADY, individually and d/b/a       )
KSR MOTOR SPORTS, BENCHMARK         )
BUILDERS, INC., a Delaware          )
corporation, and PARKWAY            )
GRAVEL, a Delaware                  )
Corporation.                        )
                                    )
        Defendants.                 )

        Deposition of DELBERT EUGENE ROLLISON taken
pursuant to notice at the law offices of Doroshow,
Pasquale, Krawitz & Bhaya, 1202 Kirkwood Highway,
Wilmington, Delaware, beginning at 10:20 a.m. on Friday,
August 4, 2006, before Robert Wayne Wilcox, Jr.,
Registered Professional Reporter and Notary Public.

APPEARANCES:

        MATTHEW R. FOGG, ESQ.
        DOROSHOW, PASQUALE, KRAWITZ & BHAYA
         1202 Kirkwood Highway
         Wilmington, Delaware  19805
         for the Plaintiff,

                CORBETT & WILCOX
         Registered Professional Reporters
230 North Market Street    Wilmington, DE 19801
                (302) 571-0510
            www.corbettreporting.com

Delbert E.  Rollison

Page 2

 1 APPEARANCES (CONT'D):

 2        SHERRY RUGGIERO FALLON, ESQ.
          TYBOUT, REDFEARN & PELL
 3          750 South Madison Street - Suite 400
            Wilmington, Delaware  19801
 4          for the Defendant Shoemaker,

 5        ROGER A. AKIN, ESQ.
          AKIN & HERRON, P.A.
 6          1220 North Market Street - Suite 300
            Wilmington, Delaware  19801
 7          for the Defendants Blue Diamond, LLC,
            and Parkway Gravel,
 8
          COLIN M. SHALK, ESQ.
 9        CASARINO, CHRISTMAN & SHALK, P.A.
            800 North King Street - Suite 200
10          Wilmington, Delaware  19801
            for the Defendant Houghton's Amusement
11          Park, LLC.

12                       - - - - -

13               DELBERT EUGENE ROLLISON,

14         the witness herein, having first been

15         duly sworn on oath, was examined and

16         testified as follows:

17 BY MS. FALLON:

18     Q.   Good morning, Mr. Rollison.

19     A.   Good morning.

20                How are you?

21     Q.   Fine.  Thank you.

22                I'm Sherry Fallon.  I represent Neal

23 Shoemaker in this matter.  I'm going to ask you some

24 questions today about the lawsuit, about the incident and

Delbert E.  Rollison

1 about your injuries.  If you don't understand a question,

2 please let me know.  If you need it rephrased or

3 repeated, please speak up.  If you feel you need to take

4 a break, not to tour our offices again but for any other

5 reason, just speak up.

6                    First of all, I'm going to start with

7 some background information.  I need your full name,

8 current address and date of birth.

9      A.   Delbert Eugene Rollison --

10     Q.   Okay.

11     A.   -- Jr.

12                    My address is P.O. Box 272, Waterford,

13 Virginia 20197.  My birth date is 7/4/60.

14     Q.   Do you live off a particular street or road in

15 Waterford, Virginia?

16     A.   Actually, I have an apartment in Martinsburg,

17 Virginia, and my mail goes to the Waterford address.

18 It's a temporary address until I buy a house.  So it's

19 a -- the apartment I have is a temporary address.

20     Q.   Okay.  In July of 2002 where did you reside?

21     A.   I just transferred from San Antonio, Texas to

22 Martinsburg with the same company, and I was staying with

23 a friend of mine until I found a permanent address.

24     Q.   Who were you staying with in July of 2002?

Delbert E.  Rollison

```
Page 4
 1      A.   A relative, Tony Rollison.

 2      Q.   What was Mr. Tony Rollison's address?

 3      A.   I'm not sure of the address.  It was Charles

 4 Town, West Virginia.

 5           MR. AKIN:  Ms. Ruggiero, did you mean to

 6 be asking about July of '04?

 7           MS. FALLON:  I'm sorry.  July of '04.

 8 That's correct.

 9 BY MS. FALLON:

10      Q.   I asked you about July of '02.  Let's go back

11 to July of '04.  Where were you residing at that time?

12      A.   That's the answer I gave you -- '04.

13      Q.   With Tony Rollison in Charles Town --

14      A.   Charles Town.

15      Q.   -- West Virginia?

16           You don't know the street address; is

17 that correct?

18      A.   No, I don't.

19      Q.   How long did you reside with Tony Rollison in

20 July of 2004?

21      A.   Approximately 90 days.  Something like that.

22      Q.   Where did you move from there?

23      A.   To where my residence is now in Martinsburg,

24 West Virginia.
```

Delbert E.   Rollison

1      Q.   You told me that that was a temporary

2 residence.  It's been temporary since 2004?

3      A.   Yes.

4      Q.   What is the full address of that temporary

5 residence?

6      A.   It's 95 Burgess Way, Spring Mills,

7 Apartment 8.

8      Q.   What is the ZIP code?

9      A.   25401.

10     Q.   Now, when you go home after today, is that the

11 residence that you'll be going home to?

12     A.   Yes.

13     Q.   How did you get here today?  Did you drive?

14     A.   I drove yesterday.  I spent the night in town.

15     Q.   Now, your post office box where your mail is

16 sent is in Virginia, not West Virginia.  Correct?

17     A.   Correct.

18     Q.   How is it that you obtain your mail if your

19 primary residence, albeit temporary, is in West Virginia?

20     A.   I grew up and resided in Virginia --

21 Waterford -- for many years.  I just kept that address as

22 a temporary address until I had a more stable address --

23 residence.

24     Q.   How far is that from Martinsburg -- Waterford?

Delbert E.  Rollison

```
Page 6
  1      A.   It's 40 miles.
  2      Q.   Are you presently looking for a permanent
 3 residence?
  4      A.   I was until the market -- the real estate has
 5 really skyrocketed.  It's starting to come down, so it's
 6 looking more attractive now.  And my move from
 7 San Antonio to Martinsburg was -- it could be just a
 8 temporary situation.  So I didn't really want to jump
 9 into something.  I might be returning to San Antonio.
 10      Q.   Where did you live when you resided in
 11 San Antonio?
 12      A.   I don't have the address, but it's in the town
 13 of San Antonio.
 14      Q.   How long did you reside in San Antonio?  From
 15 what year to what year?
 16      A.   2000 to just prior to the accident.
 17      Q.   Where did you live before that?
 18      A.   Lake Charles, Louisiana.
 19      Q.   Did you own a residence or rent a residence?
 20      A.   Rent.
 21      Q.   Do you remember the address?
 22      A.   No, I don't.
 23      Q.   How long did you live in Lake Charles,
 24 Louisiana?
```

Delbert E.  Rollison

1      A.   Four and a half years.

2      Q.   What's your marital status presently?

3      A.   Single.

4      Q.   What was your marital status in July of 2004?

5      A.   Single.

6      Q.   Have you ever been married?

7      A.   Yes.

8      Q.   Over what period of time were you married?

9 What year to what year?

10     A.   I'm not sure of the dates.  But 1994 to '96.

11 Something like that.

12     Q.   Do you have any children?

13     A.   No.

14     Q.   Have you ever served in the military?

15     A.   No.

16     Q.   Can you give me some information concerning

17 your educational background beginning with where you

18 attended high school?

19     A.   I went to Loudoun Valley High School.

20     Q.   Where is that located?

21     A.   It's in Percyville, Virginia.

22     Q.   What year did you graduate?

23     A.   1979.

24     Q.   Did you go on for any higher education beyond

Delbert E.  Rollison

Page 8

1  high school?

2      A.   I went to Rice Aviation, which is a technical

3  school.

4      Q.   Where was that located?

5      A.   In Chesapeake, Virginia.

6      Q.   What period did you attend Rice Aviation?

7      A.   '91 through the beginning of '93, I believe.

8      Q.   Did you receive any kind of degrees or a

9  certification from that institution?

10     A.   Yes.

11     Q.   What did you receive?

12     A.   Airframe and power plant certification.   In

13  short they call it A&P.

14     Q.   Have you had any other training, certification

15  or education beyond Rice Aviation?

16     A.   Not really formally.  I've been through a lot

17  of different training with my company I work for.

18     Q.   By whom are you employed currently?

19     A.   Sino Swearingen Aircraft Corporation.

20     Q.   What is your current position?

21     A.   I'm an instructor/coordinator.

22     Q.   What do you do?

23     A.   I instruct new hires on the techniques we use

24  to build aircraft, and I do some refresher training for

Delbert E.  Rollison

Page 9

1 our employees -- on-the-job training.

2       Q.    Do you have a pilot's license?

3       A.    Yes.

4       Q.    When did you obtain your pilot's license?

5       A.    1986.

6       Q.    Is it current?  In good standing?

7       A.    Yes.

8       Q.    Do you own any aircraft?

9       A.    No.

10      Q.    Where did you work in July of 2004?

11      A.    At Sino Swearingen.

12      Q.    What was your position back then?

13      A.    I was a process planner.

14      Q.    What does a process planner do?

15      A.    They type up the verbal letters to the

16 mechanics to follow step by step on how to build an

17 aircraft.

18      Q.    How long had you held that position as of the

19 time of the accident?

20      A.    One year.

21      Q.    What had you done prior to that?

22      A.    I was a supervisor on a maintenance floor

23 supervising mechanics.

24      Q.    How long did you hold that position?

Delbert E.  Rollison

Page 10

1       A.    Five years.

2       Q.    Overall, what is your total time with this

3 employer?  How much time have you been employed by this

4 company in different positions?

5       A.    Close to seven years, I believe.

6       Q.    Where did you work prior to that time?

7       A.    Northrop-Grumman.

8       Q.    I'm sorry.  Say it again.

9       A.    Northrop-Grumman Aircraft Corporation.

10      Q.    What did you do for that company?

11      A.    I started out as an aircraft mechanic and then

12 progressed to an area lead.

13      Q.    Over what period did you work for

14 Northrop-Grumman?

15      A.    1995 to nineteen -- the end of 1999.

16      Q.    What is the address of your current employer?

17      A.    In Martinsburg?

18      Q.    Yes.

19      A.    731 Novec Drive.

20      Q.    Same ZIP code as your --

21      A.    Yes.

22      Q.    -- residence?

23            Who is your immediate supervisor there?

24      A.    Then?  At the time of the accident?

Delbert E.  Rollison

Page 11

1      Q.   Presently.  And then I'll ask you at the time

2 of the accident.  But presently, who is your immediate

3 supervisor?

4      A.   Deb Sibler.

5      Q.   Can you spell the last name?

6      A.   S-i-b-l-e-r.

7      Q.   Deb -- I take it she's a female.

8      A.   Yes.

9      Q.   Who was your immediate supervisor at the time

10 of the accident?

11      A.   Don Block.

12      Q.   At the same location?

13      A.   Yes.

14      Q.   On 731 Novec Drive?

15      A.   (The witness indicated.)

16      Q.   Yes?

17      A.   Yes.

18      Q.   Your current position as an instructor/

19 coordinator, is that a position above the process planner

20 position you held at the time of the incident?

21      A.   I wouldn't call it a promotion.

22      Q.   Is the pay rate different?

23      A.   Yes.

24      Q.   Is it more or less than what you earned in

Delbert E.   Rollison

Page 12

1 July of 2004?

2        A.    It's more.

3        Q.    Are you currently employed full-time?

4        A.    Yes.

5        Q.    Were you employed full-time at the time of the

6 incident in July of 2004?

7        A.    Yes.

8        Q.    Can you generally describe your health prior

9 to the incident at Blue Diamond Park in July of 2004?

10        A.    Very good health.  I have a cholesterol

11 problem.  It's not that drastic.  But I have no illnesses

12 or diseases or allergies.

13        Q.    Were you required to go for annual physicals

14 or physicals on some other regular basis in connection

15 with your employment?

16        A.    Yes.

17        Q.    How frequent did you go for physical exams?

18        A.    Once a year.

19        Q.    Who would perform the physical exams?

20        A.    It's a clinic in Martinsburg that was hired by

21 our corporation.

22        Q.    What is the name of that clinic?

23        A.    I'm not sure.

24        Q.    What is the name of the physician or other

Delbert E.  Rollison

Page 13

1  health care provider who would perform the examination at

2  the clinic?

3       A.   I'm not sure.

4       Q.   When was the last time you had such an

5  examination in connection with your employment?

6       A.   2002.

7       Q.   Okay.  I thought you said you went annually.

8       A.   It's just -- I'm not sure.  I'm trying to give

9  you the best answer I can.  It's -- 2002 is the last I

10 remember.  But I don't recall going back after that.

11      Q.   Well, what about in connection with keeping

12 your pilot's license in good standing?  Do you have to go

13 for physicals on a regular basis?

14      A.   Yes, I do.

15      Q.   How frequently?

16      A.   Every two years.

17      Q.   When was the last time you had a physical in

18 connection with maintenance of your pilot's license?

19      A.   2003, I believe.

20      Q.   Okay.  Where was that performed?

21      A.   Leesburg, Virginia.

22      Q.   By whom?

23      A.   Dr. Hoocker.

24      Q.   Can you spell that?

Delbert E.  Rollison

Page 14

```
 1      A.  No, I can't.
 2      Q.  Was Dr. Hoocker your primary care physician in
 3 2003?
 4      A.  No.
 5      Q.  Is it a male or a female?
 6      A.  Male.
 7      Q.  Do you know the first name of Dr. Hoocker?
 8      A.  No.
 9      Q.  Did you see Dr. Hoocker on more than one
10 occasion?
11      A.  No.
12      Q.  You told me you had to get physicals every two
13 years for your pilot's license.  So if your last one was
14 in 2003, I'm presuming, based on your answer, that you
15 would have been due in 2005 for a physical.  Did you have
16 a physical in 2005?
17      A.  No, I did not.
18      Q.  Then how do you keep your license in good
19 standing if you haven't been examined?
20      A.  Your license and your medical are two
21 different certifications.
22      Q.  Who issued your license?
23      A.  My examiner.
24      Q.  What type of license?  What facility did it
```

Delbert E.  Rollison

1 come from?  Do you have it with you, by any chance, so I

2 can make a photocopy of it?

3      A.   No, I don't.

4      Q.   Who is it from?  Is it an FAA license?  What

5 type of license is it?  What organization licenses you as

6 a pilot?

7      A.   FAA.

8      Q.   Is there a particular facility or location

9 that you go to when you want to renew your license or

10 keep it in good standing or whatever?

11     A.   It doesn't require you to renew your pilot's

12 license.  You just need to renew your medical.

13     Q.   How do you do that?  Is it through the mail?

14 Do you report to a facility?  How do you do that?

15     A.   You go to a doctor that is recognized by the

16 FAA.  They have a generic physical they give you.

17     Q.   And the last time you did this was with a

18 Dr. Hoocker in Leesburg, Virginia.  Is that correct?

19     A.   Yes.

20     Q.   When was the last time you piloted an

21 aircraft?

22     A.   As pilot in command?  2002.

23     Q.   Who has been your family physician or primary

24 care physician in the past ten years?  And if there have

Delbert E.  Rollison

Page 16

1 been more than one, let's go through them and the periods

2 of time you've treated with them.

3        A.   I've never really had a family physician.  I

4 had a doctor, Dr. Hoocker, which was my family doctor I

5 went to until I was in my early 20s.  But since then I've

6 never really had a family doctor that I went to

7 routinely.

8        Q.   Is Dr. Hoocker still in practice as far as you

9 know?

10        A.   The doctor retired, but I think his son, which

11 has the same name, has taken over his practice.

12        Q.   And you saw the son of the doctor who has been

13 your primary care practitioner in 2003?  Is he the one

14 who did your medical for the pilot's license?

15        A.   No.

16        Q.   Who did it?  The original Dr. Hoocker?  The

17 senior?

18        A.   Senior.

19        Q.   Okay.  Let's start with the current year.

20             You currently don't have a primary care

21 physician; is that correct?

22        A.   I do now.

23        Q.   Okay.  Who is your primary care physician now?

24        A.   Jessica Byrd.

Delbert E.  Rollison

```
 1      Q.   Can you spell the last name, please?

 2      A.   B-y-r-d.

 3      Q.   Where does Dr. Byrd practice?  Her address?

 4      A.   Winchester, Virginia.

 5      Q.   Do you know the street or road upon which her

 6 office practice is located?

 7      A.    It's called Apple Valley Family Practices.

 8 It's a...

 9      Q.   But you can't tell me the street other than

10 it's in Winchester, Virginia?

11      A.   No, I can't.

12      Q.   How long has Dr. Byrd been your primary care

13 physician?  Since what year?

14      A.   One year.

15      Q.   Who --

16      A.   I take that back.  It's almost two years now.

17      Q.   Okay.  Did you become a patient of Dr. Byrd

18 after this incident at Blue Diamond?

19      A.   Yes.

20      Q.   Prior to that who did you see when you needed

21 to be examined for colds or any type of condition?

22      A.   I never really required a doctor.  I have

23 always been really healthy.  I don't have any allergies.

24 I had no real reason to go to a family doctor.
```

Delbert E.  Rollison

Page 18

1      Q.    When was your high cholesterol diagnosed?

2      A.    After the accident I went to the doctor.

3      Q.    It's my understanding you had previous

4 problems concerning your low back.  Is that correct?

5      A.    Yes.

6      Q.    When did your low back problems start?

7      A.    In my mid 20s.

8      Q.    Was there a particular incident, accident or

9 event that precipitated them?

10     A.    From what I remember, I was trimming my

11 parents' hedges.  And just a sharp pain in my back, which

12 ever since then was kind of like a once-a-year-type

13 thing.  I had to -- it just kind of comes and goes.  It

14 wasn't a real big deal.

15     Q.    What did you do for it when you began to get

16 the pain that you said comes and goes?  What type of

17 treatment would you get?

18     A.    I basically just -- in bed for a day or two

19 with my legs elevated.

20     Q.    You wouldn't treat with a health care

21 provider?

22     A.    Not until later on.

23     Q.    When did you first treat with a health care

24 provider for your low back?

Delbert E.  Rollison

Page 19

 1      A.    19 -- it was early '80s.  '82-83.

 2      Q.    Who did you treat with?

 3      A.    I believe the doctor's name was Abdul.

 4      Q.    Is that a first or last name?

 5      A.    That's a last name.

 6      Q.    Where was Dr. Abdul's practice located?

 7      A.    It's in Hagerstown, Maryland.

 8      Q.    What prompted you to see Dr. Abdul?  Was there

 9 a work-related incident?  An accident?  What happened?

10      A.    At the time I was in construction running

11 heavy equipment, and the jarring of the equipment

12 aggravated my back to the point where I never had that

13 much pain before.

14      Q.    Where was your pain?

15      A.    It was in a lower disc.

16      Q.    Was it on one side more that the other?

17      A.    I don't recall.

18      Q.    Did it radiate into either of your legs?

19      A.    No.

20      Q.    Did you make a worker's compensation claim for

21 that injury?

22      A.    Yeah.

23      Q.    I'm sorry?

24      A.    Yes.

Delbert E.  Rollison

Page 20

1      Q.    That claim was presented in the State of

2 Maryland?

3      A.    Virginia.

4      Q.    Okay.  Were you represented by counsel with

5 regard to that comp claim?

6      A.    No.

7      Q.    What was the name of your employer at the time

8 you made the worker's comp claim?

9      A.    A.L. Nance.

10     Q.    What type of a company was it?

11     A.    A small excavating company.

12     Q.    How long had you been employed by that

13 company?

14     A.    I don't remember exactly how long it was.

15     Q.    What type of treatment did Dr. Abdul provide?

16     A.    I'm not sure of the technical words, but he

17 did some trimming on the vertebrae to relieve some of the

18 pressure from off of one of the discs in layman's terms.

19     Q.    Okay.  You had surgery on your back?

20     A.    Yes.

21     Q.    When was the date of your surgery?

22     A.    It was 1983, '82.  I'm not sure exactly.  In

23 that area.

24     Q.    Okay.  Did you ever return to employment for

Delbert E.  Rollison

1 A.L. Nance after your lower back injury with the heavy

2 equipment use?

3        A.    Yes.

4        Q.    Until what period of time did you work for

5 them?  When did you last work for them?  Do you remember

6 the year?

7        A.    I don't remember.

8        Q.    What relief, if any, did you get from the

9 surgery performed by Dr. Abdul?

10        A.    None.

11        Q.    Do you still continue to have low back pain to

12 this day?

13        A.    It comes and goes.  Once a year I have a small

14 episode with it.  It puts me down for a week or two.  A

15 week, not two.  A week.  And usually in a couple days I'm

16 pretty much back to normal.

17        Q.    Are you currently under the care of any health

18 care provider for low back complaints?

19        A.    No.

20        Q.    Were you under the care of any health care

21 provider for low back complaints in July of 2004?

22        A.    No.

23        Q.    Were you having the same experience, that is,

24 low back pain coming and going, in or around July of 2004

Delbert E.  Rollison

Page 22

1 before this accident happened?

2      A.   No.

3      Q.   When was the last time you had any low back

4 pain prior to the July 2004 incident?

5      A.   I can't give you an honest answer.  I don't

6 remember.

7      Q.   Was it activity-related?  If you would, for

8 example, exert yourself with strenuous activity, would

9 you feel it in your back prior to July of 2004?

10      A.   It could be something as simple as washing

11 dishes or brushing my teeth or picking up 300 pounds.

12 One or the other could do it.

13      Q.   Other than your lower back, have you ever had

14 any types of complaints whatsoever in any other parts of

15 your body prior to the incident in July of 2004?

16      A.   I broke my arm twice when I was a kid riding a

17 bicycle.

18      Q.   Which arm was broken?

19      A.   The right arm.

20      Q.   How old were you each time?

21      A.   Twelve, thirteen, possibly.

22      Q.   Have you ever had any other types of worker's

23 comp claims other than the one you discussed in 1982 or

24 1983 at any time up until the present?

Delbert E.  Rollison

Page 23

1      A.   Not that I can recall.

2      Q.   Have you ever been involved in any motor

3 vehicle accidents at any time prior to July of 2004?

4      A.   I don't understand the -- from --

5      Q.   Were you involved in any car accidents before

6 July of 2004?

7      A.   Yes.

8      Q.   Okay.  Why don't you tell me about them?  How

9 many?

10     A.   One.

11     Q.   When did it happen?

12     A.   1978.

13     Q.   Were you a driver?  A passenger?  A

14 pedestrian?

15     A.   A passenger.

16     Q.   Where did it happen?

17     A.   Near Percyville, Virginia.

18     Q.   Did you sustain any kind of personal injuries

19 in the accident?

20     A.   No.

21     Q.   Did you make any type of claim for personal

22 injuries as a result of the accident?

23     A.   No.

24     Q.   From 1978 to 2004, were you involved in any

B100

Delbert E.  Rollison

Page 24

1 motor vehicle accidents?  Car accidents?

2     A.    No.

3     Q.    Were you involved in any worker's compensation

4 claims other than the one you told us about that occurred

5 in 1982 or 1983 involving the low back?

6     A.    No.

7     Q.    Were you involved in any kind of accidents

8 whatsoever -- slip and falls, falling down, falling off

9 ladders, falling off a roof, any mishaps at home -- any

10 accident of any nature whatsoever prior to July of 2004?

11    A.    No.

12    Q.    Since July of 2004, have you had any kind of

13 accidents whatsoever?

14    A.    No.

15    Q.    Prior to July of 2004, had you ever visited

16 the Blue Diamond racetrack?

17    A.    No.

18    Q.    What brought you there on July 3rd of 2004?

19    A.    My brother was a participant in the activities

20 there, and he invited me to go with him.

21    Q.    Your brother is Randy Rollison?

22    A.    Correct.

23    Q.    Randy with a Y?

24    A.    Right.

Delbert E.  Rollison

Page 25

1      Q.   What is his address presently?

2      A.   I'm not sure of his address.  It's Bluemont,

3 Virginia.  I'm not sure of his street address.

4      Q.   Do you have a telephone number for him?

5      A.   (540) 554-2629.

6      Q.   Now, what specifically did your brother Randy

7 Rollison invite you to do on July 3rd, 2004?

8      A.   To join him in the race that he was

9 participating in.

10     Q.   What type of race was that?

11     A.   I call it mud drag racing.  I'm not sure if

12 that's the technical word for it, but...

13     Q.   Is your brother older or younger than you?

14     A.   Younger.

15     Q.   What's his age?

16     A.   He is now 44.

17     Q.   Okay.  Had you ever participated with him in

18 other mud drag racing events?

19     A.   No.

20     Q.   Did you yourself personally engage in mud drag

21 racing as a hobby or entertainment?

22     A.   No.

23     Q.   What caused you to participate on this

24 particular occasion?

Delbert E. Rollison

Page 26

1    A.    I just transferred from San Antonio to pretty

2  much home, which is Virginia, and he was excited about me

3  coming up and going to watch him race.  I had never seen

4  it before, so...

5              MS. FALLON:  Let's go off the record for

6  one minute.

7              (A brief recess was taken.)

8                  - - - - -

9              DELBERT EUGENE ROLLISON, resumes

10 BY MS. FALLON:

11   Q.    To your knowledge, if you know, Mr. Rollison,

12 how long has your brother Randy Rollison been involved in

13 mud drag racing?

14   A.    Two to three years.

15   Q.    Prior to July 3 of 2004, you had never gone to

16 any of these events either on your own or with your

17 brother; is that accurate?

18   A.    The event entitles monster trucks, mud drag

19 racing, some other activities of -- I've never seen

20 before.  So mud drag racing is just one of --

21   Q.    Okay.

22   A.    -- the participating activities in the event

23 for that evening.

24   Q.    Prior to July 3 of 2004, had you ever

B/03

Delbert E.  Rollison

Page 27

1 personally participated as a spectator or a participant

2 in a mud drag racing event solely?

3      A.   No.

4      Q.   Prior to July 3 of 2004, had you ever

5 attended, either as a spectator or as a participant, a

6 mud drag racing only event with your brother?

7      A.   No.

8      Q.   So this was your first time to see a race like

9 this involving mud drag racers.  Is that accurate?

10     A.   And last.

11     Q.   Okay.  I can appreciate that.

12               Did you go with anyone other than your

13 brother?  Was there like an entourage or a contingent

14 with you?

15     A.   Yes.

16               MS. FALLON:  We'll go off the record.

17               (A brief discussion was held off the

18 record.)

19 BY MS. FALLON:

20     Q.   Who was with you on July 3 of 2004?

21     A.   My brother Randy Rollison, Wayne Tapscott.

22     Q.   Go ahead.

23     A.   The other names I'm not familiar with.

24 They're not friends of mine.  They're friends of my

B/04

Delbert E.   Rollison

Page 28

1 brother's.

2    Q.    Okay.  Would that be Stephen Littleton?

3    A.    Yes.

4    Q.    And Mark McCaughey?

5    A.    Yes.

6    Q.    Was there anyone else that was with you?

7    A.    I believe that's it.

8    Q.    When had you arrived in Delaware for the mud

9 racing?

10    A.    Approximately between ten- and eleven o'clock

11 a.m.

12    Q.    Okay.  So this wasn't a situation where you

13 had stayed overnight at your brother's house and then

14 gone with him to the event.  Is that right?

15    A.    Correct.

16    Q.    So you had driven from your residence, your

17 apartment, in Martinsburg, West Virginia on the day of

18 the event, July 3?

19    A.    I left my relative's house where I was

20 staying.

21    Q.    Okay.  Who were you staying with?

22    A.    Tony Rollison.

23    Q.    Okay.

24    A.    I drove from his house to my brother's

$Bl\omega\varsigma$

Delbert E.  Rollison

Page 29

1 house --

2     Q.   All right.

3     A.   -- Randy's house.

4     Q.   How did you get to Blue Diamond Park?

5     A.   My vehicle.

6     Q.   Did you follow anyone or did you have a set of

7 directions to get there?  How did you get there?

8     A.   We followed Wayne Tapscott.

9     Q.   Had you known Mr. Tapscott before July 3 of

10 2004?

11     A.   Just in passing.

12     Q.   How about Mr. Mark McCaughey?  Had you known

13 him before July of 2004?

14     A.   The same with all of them.

15     Q.   Stephen Littleton as well?

16     A.   Right.

17     Q.   When you arrived at Blue Diamond Park, was

18 there a general parking lot where you could park your

19 vehicle?

20     A.   We parked in the area where it was -- the drag

21 races -- vehicles were parked.  It wasn't a general

22 parking area.  It was an area, I guess, reserved for the

23 people that were participating in the race.

24     Q.   Okay.  So you were allowed to park there even

8/06

Delbert E. Rollison

Page 30

1 though you were not a participant?

2      A.    Correct.  My vehicle was pulling my brother's

3 trailer which had the mud dragster on it.

4      Q.    What type of trailer were you pulling with

5 your vehicle?

6      A.    Just an 18-foot car carrier.  It was open.

7      Q.    What type of vehicle were you driving?

8      A.    My personal Dodge pickup.

9      Q.    And the mud racer was carried in the trailer?

10     A.    Correct.

11     Q.    When you got there and parked, did you take

12 the mud racer off the trailer?  Did you assist your

13 brother in doing that?

14     A.    We did unload it.

15     Q.    Okay.  How soon before the race did you get

16 there, the intended race, that is?

17     A.    About six, seven hours.

18     Q.    Okay.  What did you do when you got there?

19 For instance, did you go looking at any other of the

20 entertainment that was going on there or did you

21 basically stay with your brother and get preparations

22 ready for the race with the mud racer?

23     A.    I helped prepare the vehicle.  A lot of the

24 people that were participating were walking by talking to

Delbert E.  Rollison

Page 31

1 my brother, and they were just talking racing.  And I was

2 pretty much stuck there to the time that the race

3 started.  I didn't leave the area.

4      Q.   Okay.  Was the vehicle itself, the mud racer,

5 removed from the trailer area where it was parked at any

6 time until just prior that the race was set to begin?

7      A.   No.

8      Q.   You did not go into any of the other areas of

9 Blue Diamond Park?  You stayed with your vehicle and with

10 the mud racer near the trailer?

11      A.   That's correct.

12      Q.   What did you do during that time period?  Was

13 it like a tailgate?  Did you have anything to eat?

14      A.   We had refreshments, coolers and lunches

15 with -- that we had packed.

16      Q.   Did you have any alcoholic beverages during

17 that time?

18      A.   No.

19      Q.   Were you taking any prescription medication?

20      A.   No.

21      Q.   As the time approached for the race to begin,

22 what did you do?

23      A.   There was nothing really to do.  Just stand

24 there waiting for them to call the vehicles to be taken

Delbert E.   Rollison

Page 32

1 to the staging area, I think is the proper verbiage of

2 that area.

3       Q.    Was there an area for spectators to stand or

4 sit in that was either gated off or fenced off from the

5 area where the cars would be racing?

6       A.    Yes.

7       Q.    Was it your intention to go into that area

8 which was designated for spectators or was it your

9 intention to be, for lack of a better term, part of the

10 pit crew for your brother and his vehicle at the time of

11 the race?

12      A.    My intentions were to stay with my brother.

13      Q.    Okay.  Were you going to assist him in any way

14 for the race?

15      A.    Kind of the -- the term is, I guess, to stage

16 somebody -- to have them pull up to the starting line, to

17 kind of motion to how far they could come to the starting

18 line without going over it, assisting him putting the

19 seatbelts on.  You know, things like that.

20      Q.    Okay.  But you had never done that sort of

21 thing before; correct?

22      A.    I have before, yes --

23      Q.    Okay.

24      A.    -- with drag racing cars.

Delbert E.  Rollison

Page 33

1      Q.   On how many occasions have you participated in

2 car drag races before this incident in July of 2004?

3      A.   Five or six times.

4      Q.   Have you raced cars yourself?

5      A.   No.

6      Q.   To the extent you've been a participant in

7 five to six drag races, what was the extent of your

8 participation?

9      A.   Helping unload the car, loading the car,

10 preparing the car for the race, minor adjustments.

11      Q.   What type of cars?

12      A.   It's called a bracket race.  It's not a street

13 legal car.  It's a modified --

14              MR. AKIN:  I'm sorry.  What was the word

15 you used, sir?

16              THE WITNESS:  It's a not a street legal.

17 It was a modified car.

18              MR. AKIN:  Before that.  The kind of

19 race.

20              THE WITNESS:  Drag racing.

21              MR. AKIN:  Oh.

22              THE WITNESS:  It's on asphalt.

23              MR. SHALK:  I thought you used the word

24 "bracket."

Delbert E.  Rollison

```
Page 34
 1                    MS. FALLON:  Yeah.  I thought you

 2 used --

 3                    THE WITNESS:  It's bracket racing.

 4 It's --

 5                    MR. AKIN:  That's the word.

 6                    THE WITNESS:  It's a term they use for a

 7 fast car that's going to run with a slow car.  It's all

 8 gauged by how the light is coming on, depending on your

 9 speeds.  So the fast car would take off way behind the

10 slower car.

11 BY MS. FALLON:

12      Q.   Did you have a relative or a friend that had

13 this as a recreational hobby?

14      A.   It was a relative.

15      Q.   Who was it?

16      A.   Mike Rollison.

17      Q.   Is he another brother?

18      A.   He's a cousin.

19      Q.   At what locations did you go with Mike

20 Rollison for these types of drag racing events?

21      A.   75 and 80 Drag Way.

22      Q.   Where was that?

23      A.   It's in Hagerstown.  Either Hagerstown or

24 Boonsboro.  It's in between the two.
```

Blll

Delbert E.  Rollison

Page 35

1      Q.   In Maryland?

2      A.   Yes, ma'am.

3      Q.   Were all five to six times that you

4 participated at that location?

5      A.   Yes.

6      Q.   When you arrived at Blue Diamond in your

7 vehicle trailing the mud racer, was there any type of an

8 entrance fee that you had to pay to get into the

9 facility?

10     A.   As I recall, my brother paid the fee.  I'm not

11 sure if it's a personal entry fee or an entry fee to

12 bring the vehicle in to race the vehicle -- if it's a

13 charge over and beyond what a person would pay for

14 just --

15     Q.   For admission.

16     A.   -- himself to get in.

17              Right.

18     Q.   You did not personally pay any admission fee

19 to get in; is that correct?

20     A.   To the best of my knowledge, he paid my way

21 in.

22     Q.   Did he pay at the door before you entered?

23     A.   I'm not sure.

24     Q.   Did he pay the fee on the day of the event?

B112

Delbert E.  Rollison

Page 36

1       A.    Yes.

2       Q.    Were you with him when he paid the fee?

3       A.    I can't remember exactly.  I'm thinking it

4  was -- we were in the parking area.  We had already

5  parked the vehicle.  I think somebody came along and took

6  our -- his money.  I'm not a hundred percent, but I think

7  that's what happened.

8       Q.    Did you have to sign any documents or fill out

9  any paperwork in order for you to be present and

10 participate with him in the mud drag race?

11      A.    In the later evening of that same day, a lady

12 did come by and ask us to sign a waiver.

13      Q.    Prior to the mud race starting.  Is that

14 correct?

15      A.    Just before it started.

16      Q.    Okay.  Who came around?  Do you remember the

17 name of the person or what organization that person said

18 they were with?

19      A.    To the best of my knowledge, it was a lady.  I

20 believe her name was Ann.  And I believe she was the wife

21 of one of the drag racers.  I believe.

22      Q.    What form did Ann present to you?  You've

23 referred to it as a waiver.  Can you be more specific as

24 to what it was?  How many pages?  What you signed?  Did

B113

Delbert E.  Rollison

Page 37

1 you keep a copy?

2      A.   I couldn't describe it.  It was just a legal

3 form.  And it was passed around from person to person.

4 And I was, I think, the last one to sign it.

5      Q.   What did you do with it after you signed it?

6      A.   I don't know if I gave it back to her or gave

7 it to one of the guys.  I'm not sure.

8      Q.   Did you read it before you signed it?

9      A.   No, I did not.

10      Q.   Well, how did you know what you were signing?

11      A.   The top of it was titled with a legal form.  I

12 was sure it was just a waiver that you would sign if you

13 went to any type of a sporting event or something like

14 that.

15      Q.   Had you been --

16      A.   It's pretty generic.

17      Q.   Had you been presented with a similar type of

18 waiver form at other events that you had participated in,

19 for instance, these other five to six drag races with

20 Mike Rollison?

21      A.   No.

22      Q.   Was this the first time you were ever

23 presented with a waiver form to sign?

24      A.   In a sporting vehicle-type issue, yes, first

B114

Delbert E.  Rollison

Page 38

1 time.

2     Q.    How about in other types of recreational
3 activities that you participated in?  Did you ever have
4 to sign a waiver to participate in a particular type of
5 recreation or hobby?

6     A.    I rode an elephant in a parade one time.  I
7 had to sign a waiver.

8     Q.    Maybe some of the other attorneys will have
9 more questions about that.  I'm thinking I'm not going to
10 go there.

11                 The document that you signed -- you did
12 not retain a copy.  Is that correct?

13    A.    I was not offered one.

14    Q.    Okay.  Were you given any type of wristband or
15 pass or badge to wear or carry with you to identify you
16 and distinguish you as a participant versus just a
17 spectator on site for the event?

18    A.    I might have, but I don't remember recalling
19 one.  I might have but I don't recall one.

20    Q.    At any time while you were present on Blue
21 Diamond's facility, either before or after this incident
22 that we're getting to talk about, did you ever see any
23 kind of signs or posters or handouts of any nature with
24 warnings or directions or instructions to participants in

Delbert E.  Rollison

Page 39

1 the events there at the facility?

2      A.   Yes.

3      Q.   What did you see and where was it located?

4      A.   I'm not sure how I obtained it, but it was

5 rules refraining from speeding of the vehicles in the

6 parking lots.  No alcohol consumption while operating the

7 vehicles.  You had to be a licensed driver to operate the

8 vehicles.  There was a couple other things.  I don't know

9 if I was given one or it was handed out to us.  I don't

10 remember.  I remember it was a white sheet with a logo on

11 the front with four, five, six --

12     Q.   Okay.

13     A.   -- some of the ground rules, I think.

14     Q.   So it was in the nature of a handout rather

15 than something being poster-sized or otherwise

16 permanently affixed to like a wall of the facility.  Is

17 that correct?

18     A.   Correct.

19     Q.   You said there was a logo on it.  Do you

20 remember whose logo was on the document?

21     A.   No, I don't.

22     Q.   Did you retain possession of that document and

23 hand it over to your attorney or anyone?

24     A.   I don't remember if I gave it to him or not.

B 116

Delbert E.  Rollison

Page 40

1 I'm not sure.

2      Q.   Do you think you still have it?

3      A.   It could be possible, yes.

4      Q.   Would you look for it?  If you have it, just

5 give it to Mr. Fogg so he can produce it to the rest of

6 us.

7      A.   Yes.

8           MR. FOGG:  I can represent that I do not

9 have it at this point.

10 BY MS. FALLON:

11      Q.   Do you remember how many pages it was?

12      A.   Just one.

13      Q.   You didn't have to sign it.  It was just given

14 to you for your information.  Is that correct?

15      A.   I think it could have been handed out as you

16 come in the gate.  I'm not sure.  Somebody could have

17 passed them around.  I'm not sure.

18      Q.   Okay.  Was there any inspection that the

19 vehicle had to go through before you entered the staging

20 area?

21      A.   I believe there is, but I'm not -- I don't

22 remember them inspecting it.

23      Q.   What makes you think that there was some type

24 of an inspection, and who do you think conducted it?

Delbert E.   Rollison

Page 41

1      A.   I remember people talking about inspection,

2 but I don't know if it was done in the parking lot or if

3 it was done at the staging area prior to the lineup for

4 the race.

5      Q.   Okay.  While you were waiting for the race to

6 start, were there any representatives that you recall

7 meeting from the facility -- Blue Diamond Park?

8      A.   No.

9      Q.   Before the incident occurred, were you ever

10 introduced or did you meet an individual by the name of

11 Jack Brady?

12      A.   I heard his name mentioned in some

13 conversations in the parking lot.

14      Q.   But you never met him personally or talked to

15 him; is that correct?

16      A.   Not that I know of.

17      Q.   I take it you didn't know my client, Neal

18 Shoemaker, prior to the race.  Or is that an incorrect

19 assumption on my part?

20      A.   I never met the gentleman till that day.

21      Q.   Had you seen him in or around the parking area

22 while you were spending time waiting for the race to

23 begin, if you recall?

24      A.   I'm sure I did, but I don't remember exactly

B118

Delbert E.  Rollison

Page 42

1 introducing myself to him or talking to him.  I just -- I

2 might have seen him walking by or something like that.

3     Q.    Okay.  How were the participants in the race

4 alerted that it was time to get their vehicles moving

5 towards the staging area?

6     A.    I believe the lady that was kind of

7 coordinating the drag race participants in the -- she's

8 the one who came and told us to prepare and get ready to

9 go to the staging area.

10    Q.    Was this the same person that sent around the

11 waiver form for everyone to sign?  The woman you referred

12 to as Ann?

13    A.    Yes.

14    Q.    So the same woman came by and started

15 informing everyone that they should be getting ready to

16 go to the staging area.  Is that correct?

17    A.    Yes.

18    Q.    Are you able to draw a diagram that shows your

19 path from the trailer area where you were waiting for the

20 race to begin up to the point where the incident

21 occurred?

22    A.    Yes.

23    Q.    Okay.  I'm going to give you some paper.

24              MS. FALLON:  Off the record.

Delbert E. Rollison

Page 43

1                    (A brief discussion was held off the

2 record.)

3                    MS. FALLON: I've asked the witness to

4 draw a diagram taking us from the parking area for the

5 truck and trailer where you entered up to the point where

6 you were located when the injury you claim occurred.

7                    MR. FOGG: Off the record while he's

8 drawing that.

9                    (A brief recess was taken.)

10                    - - - - -

11            DELBERT EUGENE ROLLISON, resumes

12 BY MS. FALLON:

13    Q.   Mr. Rollison, thank you for drawing your

14 diagram.  We're going to have the court reporter mark

15 that as Rollison Exhibit No. 1, and then we'll go on.

16                    (Rollison Deposition Exhibit No. 1 was

17 marked for identification.)

18 BY MS. FALLON:

19    Q.   In the rectangle that you've labeled on the

20 right of that diagram "parking lot for racers," I'm

21 presuming that's the area where you parked your truck

22 that was trailing the mud racer.  Is that correct?

23    A.   Correct.

24    Q.   Was that a blacktop area or otherwise paved

8|20

Delbert E.  Rollison

Page 44

1 area, or is that dirt?

2        A.    It was dirt and grass.

3        Q.    Okay.  You've also drawn a line with arrows.

4                    Why don't you tell me what that line

5 represents?

6        A.    That's the route that the racers take to the

7 staging area.

8        Q.    Okay.  You've also drawn a line that kind of

9 bisects the diagram called "paved road."  Was that the

10 only paved road in this area that you've drawn on your

11 diagram?

12       A.    To my best knowledge, yes.

13       Q.    Okay.  How was it paved?  Was it blacktopped?

14       A.    Blacktopped, yes.

15       Q.    So to get from the parking lot to the staging

16 area and across the paved road, was that path at all

17 paved?

18       A.    No.

19       Q.    Was it a recognizable path in the sense that

20 it had tire markings in it or was dirt with grass on

21 either side so that you can really tell that it was some

22 kind of a trail or path?

23       A.    It was distinguished enough that you could see

24 that it was grass -- partially grass on either side and a

B|21

Delbert E.  Rollison

Page 45

1 little grass path in the middle where the two tires had

2 been traveling.

3      Q.   Okay.  Now, when you exited the parking lot,

4 were you on foot or were you on some type of vehicle?

5      A.   I was walking.

6      Q.   Where was your brother?

7      A.   My brother and the rest of the vehicles were

8 getting hooked up.  I think -- I'm not sure about where I

9 was as far as if I was in the back of the crowd or ahead

10 of the crowd, but I know my brother had already left.

11 Randy had already left before I started walking.  He was

12 ahead of me.

13     Q.   Was your brother in some type of a procession

14 of these vehicles?

15     A.   They weren't back to back going.  They were

16 kind of like spotted -- whenever they got ready, they

17 were headed in that direction.

18     Q.   Was it a single line as opposed to two or

19 three abreast of one another traveling to this staging

20 area?

21     A.   Single line.

22     Q.   Where was your brother in that line?  Was he

23 the first vehicle, if you recall?

24     A.   I don't recall.

B/22

Delbert E.  Rollison

Page 46

1     Q.   Did he actually have his mud racer in

2 operation, or was it being towed or pulled by another

3 vehicle?

4     A.   It was being pulled by another vehicle.

5     Q.   What type of vehicle was pulling it?

6     A.   It was an ATV recreational vehicle.

7     Q.   3-wheel?  4-wheel?

8     A.   4-wheel.

9     Q.   Who was operating the ATV?

10    A.   I believe it was a gentleman by the name of

11 Steve -- Stephen.

12    Q.   Okay.  The Steve Littleton that we've

13 discussed previously?

14    A.   Yes.

15    Q.   Where was Mark McCaughey?  Was he on foot like

16 you?

17    A.   Mark is a close friend of Wayne Tapscott's --

18    Q.   Okay.

19    A.   -- which had his own race vehicle there too.

20    Q.   Okay.

21    A.   So I'm assuming he was near by Wayne --

22    Q.   Okay.

23    A.   -- but not sure.

24    Q.   You did not take Wayne's vehicle on your

B123

Delbert E. Rollison

Page 47

1 trailer, though, did you? Just your brother's?

2       A.    Just my brother's.

3       Q.    Okay. How did you know where to walk or where

4 to go? Were you given any instruction?

5       A.    No.

6       Q.    You just followed the crowd?

7       A.    It wasn't the crowd. It was just a -- you're

8 sitting right in front of it. All day you could see the

9 people walking in this same area back and forth all day

10 long with different activities going on. It was kind of

11 obvious where you needed to walk. You have a small road

12 parallel to a racetrack. There was a small grassy --

13 partially grass/dirt area between the monster trucks and

14 the path to the staging area. And that's where people

15 were walking.

16       Q.    All right. So tell us the path that you took

17 on foot? Does it follow this line with the arrows that

18 you drew?

19       A.    No, it does not.

20       Q.    All right. Can you tell us the path that you

21 took on foot? Show it to us on the diagram.

22       A.    There's a parking lot area here.

23       Q.    Okay.

24       A.    There's a guardrail which runs parallel to the

B24

Delbert E.  Rollison

Page 48

1 paved area which is like a single road.  It's not very

2 wide.

3      Q.   Could you write "guardrail" on that line

4 you've drawn so we know what that is.

5      A.   And throughout the day people were going from

6 the parking lot walking down this gentle ditched area up

7 to this road and crossing the road and going straight

8 over to this walk area here.

9      Q.   What type of guardrail was it?  Like a metal

10 type of guardrail that you would see on a highway?

11      A.   Yes.

12      Q.   It was low so you could cross over it?

13      A.   Step over it.

14      Q.   Step over it?

15      A.   Mm-hmm.

16      Q.   Were there any other kind of fencing or other

17 barriers in between the parking lot area and the paved

18 road area that you've shown?

19      A.   No.

20      Q.   Were there any kind of fences or barriers

21 between the paved road area that you've shown and the

22 racing area that you've drawn to the right of the

23 diagram?

24      A.   The only fencing that I remember is an orange

Delbert E.  Rollison

Page 49

1 safety fence that I think went around the grandstands.

2       Q.    Okay.  Where you've marked "grandstand

3 seating."  Correct?

4       A.    Correct.

5       Q.    The trucks that you've marked 4-by-4 trucks,

6 do we also refer to them as monster trucks?  Are you

7 comfortable with that?

8       A.    Correct.

9       Q.    Okay.  All right.  Now, you started to tell us

10 the path that you took from the parking lot just before

11 the incident occurred.  Show us that path.

12       A.    Randy, my brother, and Wayne and the rest of

13 the racing people were being towed, pushed, pulled or

14 drive their vehicles around this road here.

15       Q.    The line that you've shown with arrows?

16       A.    Arrows.

17       Q.    Okay.

18       A.    And the remaining people, myself and a few

19 other spectators or pit crew, what have you, crossed

20 through this gentle ditch area up over the guardrail,

21 crossed over the single lane paved road and up to the --

22 I guess it's a temporary walkway between the -- to the

23 staging area.

24       Q.    Okay.  It wasn't designated as a walkway in

Delbert E.  Rollison

Page 50

1 the sense that it wasn't paved over.  Correct?

2        A.   Correct.

3        Q.   It was just kind of a mixture of grass and

4 dirt.  Correct?

5        A.   Correct.

6        Q.   As you took that path, was there any activity

7 in the area where you've drawn 4-by-4 trucks?

8        A.    There were trucks sitting there, I guess, as a

9 presentation there for some kind of show they were

10 putting on.  There was a show.  There was no activity as

11 far as I know.  Just people standing around looking at

12 them and things like that.  But there was no racing of

13 them that I know of.

14        Q.   How much of an area of separation was there

15 between the area where the 4-by-4 trucks were situated

16 and the road that the mud racers were on traveling

17 towards the staging area?

18        A.   Sixty feet, I believe.

19        Q.   Okay.  Were --

20        A.   That's a guess.

21        Q.   Were there any signs or markings warning

22 people to stay clear of the monster truck area?

23        A.    There was no caution signs, warning signs at

24 all on the whole property that I remember.

B127

Delbert E.  Rollison

Page 51

1    Q.   Okay.  Going into this on the day of the

2 event, did you and your brother have any discussions

3 about what other events might be going on in addition to

4 the mud racing at Blue Diamond Park?

5    A.   I was aware of the monster trucks being there.

6 I had never seen them before.  And I remember him telling

7 me about the lawn mower races, which I remember laughing

8 at that they would race lawn mowers.  So I remember

9 joking about that.  I remember seeing that.

10    Q.   Before your brother was in the procession or

11 line of racers going towards the staging area, did anyone

12 come around and talk about the timing of these events --

13 what would happen first or anything like that?

14    A.   Officially, no.  But I think somebody found

15 out that our particular race wouldn't happen until early

16 evening, because I remember I was upset with my brother

17 that we got there so early and the race was so late in

18 the evening.  Officially, somebody didn't tell us that

19 I remember.

20    Q.   What was your understanding of when the

21 monster truck event was going to start, if you had one?

22    A.   I wasn't told.

23    Q.   Okay.  All right.  Were there other people

24 around you on foot as you walked from the parking lot

B128

Delbert E.   Rollison

Page 52

1 across the guardrail through the ditch and across the

2 paved road to this staging area?  Were there other people

3 walking along with you?

4       A.    Yes.

5       Q.    You were not in particular walking with any

6 one of your brother's friends.  You were by yourself at

7 that point; is that correct?

8       A.    I had walked with a gentleman.  I don't know

9 him.  I never seen him before.  We just kind of happened

10 to be walking the same direction, the same speed, and we

11 just kind of talked as we walked towards the staging

12 area.

13      Q.    He wasn't with your brother --

14      A.    No.

15      Q.    -- or Mr. Tapscott's racing group -- what I'll

16 call your racing group loosely -- was he?

17      A.    No.

18      Q.    Did you get that gentleman's name?  Or no?

19      A.    No.

20      Q.    How many people would you say were walking in

21 the same path or direction as you prior to the incident?

22      A.    There was quite a few people lined up behind

23 the 4-by-4s -- people -- I guess pit crews working on the

24 trucks.  People had kids down there taking pictures with

B|29

Delbert E.   Rollison

Page 53

1 the trucks or standing beside it.   There was a lot of

2 activity along beside the trucks there.

3      Q.   How about coming from the parking lot in the

4 direction you were headed?   How many people from the

5 parking lot were going across this area perhaps to assist

6 with the mud racers or be spectators or whatever?

7      A.   I don't know.

8      Q.   Okay.

9      A.   It wasn't very many.

10      Q.   Okay.   Were you on your cell phone at any time

11 prior to the incident occurring?

12      A.   No, I was not.

13      Q.   Did you have any kind of like iPods or any

14 reason to have any kind of earplugs or headphones in your

15 ear just prior to the incident occurring?

16      A.   No, I did not.

17      Q.   Did your brother give you any instructions

18 about wearing earplugs because of the loudness of the

19 vehicles at this event?

20      A.   No, he did not.

21      Q.   You did not have any on you or in your pocket

22 or anything like that?

23      A.   No.

24      Q.   I notice you're wearing glasses today.

3/30

Delbert E.  Rollison

Page 54

1                 Were you wearing glasses at the time?

2      A.   I'm sure I was.  I can't remember for sure I

3 had them on, but I usually wear them all the time.

4      Q.   What type of vision problem do you have that

5 requires you wearing glasses?

6      A.   I really just need them for reading.  But

7 during my day I have to take them on and off because I

8 have to read blueprints and things like that.

9      Q.   Okay.

10     A.   So I pretty much wear them all the time.

11     Q.   Are they prescription?

12     A.   Yes.

13     Q.   Who writes your prescription for your glasses?

14     A.   It's an eye doctor in Martinsburg,

15 West Virginia.  I'm not sure of his name.  It's in the

16 Martinsburg Mall.  An Eye Masters-type thing that we use

17 through our company.

18     Q.   The glasses that you were wearing at the time

19 of the incident, were they sunglasses?

20     A.   No.

21     Q.   Were they the type that you're wearing today?

22     A.   Correct.

23     Q.   Same prescription?

24     A.   Yes.

Delbert E. Rollison

Page 55

1      Q.   Were you carrying anything?

2      A.   Yes.

3      Q.   What were you carrying?

4      A.   My brother's helmet, which he wears in the
5 race, and a disposable camera.

6      Q.   Okay.  Did you have each of those items
7 separately in each hand, or were you carrying both in one
8 hand?

9      A.   I believe I had the camera in the helmet.  I
10 was carrying it from the strap.

11     Q.   Okay.  In your right hand?

12     A.   I don't remember.

13     Q.   Are you right-handed or left-handed?

14     A.   Right-handed.

15     Q.   What kind of footwear were you wearing?

16     A.   Hiking-type boots.

17     Q.   Were you carrying any kind of beverages?
18 Water or anything like that?

19     A.   No.

20     Q.   Tell us the path that you took after you
21 crossed the paved road.

22     A.   I crossed the paved road.  I walked up towards
23 the -- just temporary road they used to go to the staging
24 area.  I crossed that.  And I walked with the other

B132

Delbert E.  Rollison

Page 56

1 gentleman behind the 4-by-4s.  They were pointing in this

2 direction towards the grandstands.  So I was walking

3 behind the trucks between the trucks and the road they

4 used to travel to the staging area.

5      Q.    Okay.  So to your left would have been the

6 back end of the monster trucks.  Is that correct?

7      A.    Correct.

8      Q.    And to your right, can I call it a procession

9 of the mud racers that were either being driven, pushed

10 or towed to the staging area?

11      A.    Correct.

12      Q.    Do you know how many mud racers or vehicles

13 total were in that procession to your right?

14      A.    I would think between five and six, seven.

15 Somewhere in that general number.

16      Q.    Did you see any that were being actively in

17 operation, in other words, driven to the staging area as

18 opposed to being pulled or towed by some other vehicle?

19      A.    I think so but I'm not for sure.  I think

20 somebody did drive but I'm not for sure.

21      Q.    Okay.  If this incident had not occurred,

22 where was it your attention to go to by reference to your

23 diagram?  Where did you expect to go and remain for

24 purposes of the race?

B133

Delbert E.  Rollison

Page 57

1      A.   Of course, I had never been there before.  But

2 I was under the impression they were going to be parking

3 to the left-hand side of the racetrack.

4      Q.   Okay.

5      A.   There was a staging area.  They would make

6 sure they had their belts on, their helmets on, preparing

7 for their turn to race.

8      Q.   Okay.  Again, you were not intending to then

9 go back to the grandstand seating for this event?

10     A.   Correct.

11     Q.   Okay.  What happened as you walked in between

12 the 4-by-4 monster trucks and the procession of the mud

13 racers?

14     A.   I was walking along with this gentleman,

15 which -- he was on my left-hand side.  And we were just

16 talking about racing or something like that.  Just

17 ordinary stuff.  And then that's when I was struck by the

18 vehicle from behind.

19     Q.   Okay.  The vehicle that you later found was

20 owned by my client, Mr. Shoemaker?

21     A.   Yes.

22     Q.   What part of your body was struck from behind?

23     A.   It was in the back of my thighs.  It just felt

24 like a really heavy weight just slamming me.  It was

B134

Delbert E.  Rollison

Page 58

1 nothing like a small push or some kind of inkling.  It

2 was just like all of a sudden -- I was there, and all of

3 a sudden this heavy force drug me to the ground face

4 first.

5        Q.   I was going to ask that.

6             Where were you positioned after you felt

7 this force from the rear?

8        A.   It knocked me so quickly to the ground I

9 didn't have time to put my hands in front of me.  That's

10 how fast it happened.  It knocked me down.  I turned

11 around.  I could see the center of the axle of his

12 vehicle.  And then --

13        Q.   Which vehicle was it, by the way?

14        A.   I mean --

15        Q.   Describe the vehicle itself.

16             Was it the mud racer or the ATV?

17        A.   Yes.  The mud racer.  The mud racer.

18        Q.   Okay.

19        A.   Once I was knocked down, I tried to crawl or

20 get out of the way of the vehicle.  And I went to try to

21 roll out of the direction of it.  And that's when the

22 right-hand wheel of the vehicle hit my leg.

23        Q.   Okay.  Which leg?

24        A.   The right leg.

Delbert E.  Rollison

Page 59

1    Q.    How did you determine that it was the mud

2 racer vehicle that was the force that knocked you from

3 behind?

4    A.    As soon as I was slammed to the ground, I

5 could turn.  And it was -- my legs were underneath of the

6 axle.  I could see the axle right in front of my face --

7 two feet from my face.

8    Q.    Okay.  You're looking to your right.  It was

9 to your right side?

10    A.    I was looking to my right.  I could see the

11 center of the vehicle.  There's a -- I could see the axle

12 of the vehicle right there in front of my face.

13    Q.    Do you recall there being any monster trucks

14 in the vicinity of where this occurred at the time it

15 occurred, that is, monster trucks in operation?

16    A.    As far as moving?

17    Q.    Moving or engines revving or anything like

18 that.

19    A.    I don't recall one moving, but it could have

20 been running.  I would -- I don't remember that.  I

21 didn't see anything move.

22    Q.    What was the noise level like just before this

23 incident happened?

24    A.    It was noisy, but it wasn't like deafening

Delbert E.  Rollison

Page 60

1 where you couldn't hear.  I could hear the people beside

2 me talk in normal tone.

3     Q.   Were the engines of the monster trucks or any

4 of them -- could you hear any engine noise from the

5 monster trucks?

6     A.   I don't recall.

7     Q.   Do you recall seeing any monster trucks in

8 close proximity to you either before this incident or

9 right after you had struck the ground?

10    A.   I said earlier I was walking between the

11 trucks and the road, and I was somewhere in the middle.

12 I never saw anything move.  It could have been running.

13 There was nothing else around that area that was

14 traveling my direction or the opposite direction.

15    Q.   Did any spectators push you or bump you just

16 prior to you hitting the ground?

17    A.   No.

18    Q.   Do you recall hearing anyone yell to you to

19 get out of the way or make any other comment to you just

20 before you fell to the ground?

21    A.   No.

22    Q.   Who came to your assistance once you hit the

23 ground, if anyone?

24    A.   The gentleman I was walking by.  I believe he

Delbert E.  Rollison

Page 61

1 was the one that went to get the ambulance.  Of course,

2 the ambulance was within sight.  It was only a few

3 hundred feet away.  It wasn't very far away.  After that

4 I don't remember where he went to.  I don't remember

5 seeing him.

6                     Of course, some people -- spectators

7 came around.  I do remember Mr. Shoemaker coming to me.

8 I remember the lady that took our names on the waiver.

9 And the lady I thought was organizing this mud drag, she

10 was there also later on.  Of course, my brother and some

11 of his friends showed up later on too.

12        Q.    Do you remember what Mr. Shoemaker said to

13 you?

14        A.    Yes.

15        Q.    What did he say?

16        A.    He said, "I'm sorry, man."  He said, "I didn't

17 see you."

18        Q.    Did he say anything else?

19        A.    That's the only thing that stuck in my mind.

20 It could have been "Are you all right?" or "How bad are

21 you hurt?"  I don't remember those kind of words.  I

22 remember him saying, you know, "I didn't see you."  I was

23 like really shocked by that.

24        Q.    Who was behind the steering wheel of this

B 138

Delbert E.  Rollison

Page 62

1 vehicle that you described as having struck you?

2      A.    I found out later it was Mr. Shoemaker's son.

3      Q.    Did you see the driver at the time, or you

4 just don't have a recollection of even seeing him?

5      A.    I don't recollect seeing him.

6      Q.    Do you know if that vehicle was being pushed

7 or pulled or how it was getting across the path to the

8 stadium?

9      A.    It was being pushed.

10      Q.    What was it being pushed by?

11      A.    A 4-wheel sport vehicle -- ATV.

12      Q.    When did you observe that?  Was that after you

13 had been injured?

14      A.    I noticed it prior to the incident when I was

15 in the parking lot.  I thought it was kind of odd because

16 everybody was being pulled from the front using bungy

17 straps and this was being pushed by an ATV with a steel

18 pipe in between the vehicle and the drag machine --

19 racer.

20      Q.    Prior to the incident as you were walking

21 towards the staging area engaged in conversation with

22 this unknown person, how much of a distance did you keep

23 between your body and the vehicles that were in this

24 procession to your right?

Delbert E.  Rollison

Page 63

1      A.    Between 8 and 10 feet.  Maybe 12.  I would

2 think around maybe 8 to 10 feet.

3      Q.    When was the last time in terms of seconds or

4 minutes or however you want to describe it that you had

5 turned to your right to look to see how close you were to

6 this procession of vehicles before this incident

7 occurred?

8      A.    There was no procession of vehicles.  Only a

9 few went.  And it was like -- it's not like they were

10 coming one after another.  It was just like one, and then

11 maybe a few minutes later a straggler would come.  So

12 it's not like they were coming right after each other.

13 It's -- is that the answer you're looking for?

14     Q.    Well, prior to feeling this force behind you,

15 were you aware that there was a vehicle approaching at

16 whatever distance from behind you?  Were you aware of

17 that?

18     A.    No, I was not.

19     Q.    You were aware, however, that the vehicles

20 were using this path to get to the staging area; correct?

21     A.    Yes.

22     Q.    You were aware that you were walking in an

23 area where you were bounded on the left by monster trucks

24 and on the right by the vehicles that were taking that

B140

Delbert E.  Rollison

Page 64

1 path either being operated, pushed or pulled towards the

2 staging area; correct?

3       A.    Correct.

4       Q.    When you were engaged in conversation with

5 this unknown gentleman who was walking along your left

6 side -- is that right?

7       A.    My left.

8       Q.    Did you ever glance from time to time over

9 toward your right to see if there was anything to your

10 right that you needed to be concerned about?

11      A.    I don't recall, but I'm sure I viewed my

12 surroundings.  I've spent most of my professional life

13 around large aircraft -- dangerous areas.  So it's a

14 little tidbit of mine to keep myself informed with my

15 surroundings.  I'm sure I had a pretty good visual of

16 what was going on around me.

17      Q.    At the time you felt this force from behind,

18 did you observe any mud racers being operated, pushed or

19 pulled ahead of you at some distance just before this

20 incident involving your injury occurred?

21      A.    I believe most of the vehicles were already at

22 the staging area when I was walking in that direction.

23      Q.    Were there any vehicles that you could see in

24 the distance ahead of you going in that direction?

B/41

Delbert E.   Rollison

```
                                                      Page 65
 1        A.    I don't remember seeing any in motion.
 2        Q.    Were you walking behind, albeit a distance,
 3 whatever that distance was -- were you walking behind
 4 your brother's vehicle that was being pulled towards the
 5 staging area?
 6        A.    My brother was already at the staging area
 7 when I was in the accident.
 8        Q.    How far away was that from you at the spot
 9 where the accident occurred?
10        A.    I never made it to the staging area.  So I'm
11 guessing it's probably 3- or 400 feet.
12        Q.    Had your brother passed you as you were
13 walking towards the staging areas, or was he already
14 ahead of you as you walked?
15        A.    I believe he was already ahead of me.
16        Q.    Did any vehicles pass you on your right just
17 prior to this incident occurring?
18        A.    Yes.
19        Q.    How many vehicles passed you, would you say?
20        A.    I remember just one.
21        Q.    How close to your right side did that vehicle
22 pass you in terms of feet?
23        A.    Ten feet.  Something like that.  Eight to ten
24 feet.
```

B142

Delbert E.  Rollison

Page 66

1      Q.    Where were you when that vehicle passed you?
2  Was it right before this happened or --

3      A.    This vehicle had passed me.  And then it was
4  no more than a minute or, at the most, two minutes before
5  I was struck.  I'm guessing at that time.  But I'm not
6  for sure.  It only took five minutes to walk from this
7  area to maybe this area.  It was not a very long
8  distance.  So you could walk the whole thing in three
9  minutes in front of the grandstands.

10     Q.    Where were you taken after the accident?

11     A.    The ambulance took myself and my brother to
12  Christian Hospital or Wilmington.  Christian Hospital, I
13  believe it was.

14     Q.    Christiana Hospital?

15     A.    Yes.

16     Q.    Your interrogatory answers say that you were
17  treated by the Wilmington Hospital Emergency Room.  Do
18  you recall what hospital you were treated at right after
19  the accident?

20     A.    I probably said Wilmington, but I'm sure it
21  was called Christian or another --

22     Q.    You believe it was the Christiana Hospital
23  where you received treatment?

24     A.    I'm pretty sure it was.

BM3

Delbert E.  Rollison

1      Q.    Were you admitted to Christiana Hospital for

2 any length of time or were you treated and released?

3      A.    I didn't stay overnight.

4      Q.    Okay.

5      A.    They asked me to but I did not.

6      Q.    Where did you go after being released from the

7 hospital?

8      A.    To my parents' house in Leesburg, Virginia.

9      Q.    Tell me all of the injuries that you

10 complained of to the hospital staff at Christiana when

11 you were treated there?

12     A.    Of course, it was the right knee, kneecap,

13 which was dislocated about eight inches up on my thigh.

14 Of course, I had some soreness in my buttocks and the

15 back of my legs and my arms.  But the initial pain was my

16 right kneecap.

17     Q.    Did you lose consciousness at any point?

18     A.    Not that I know of.  I don't think so.

19     Q.    When you say you fell flat on your face and

20 couldn't brace yourself with your hands, did you injure

21 any part of your face?  Your nose?  Any bruises or

22 anything like that?

23     A.    Just a soreness the next day from the, I

24 guess, initial, you know, being slammed to the ground.

B147

Delbert E.  Rollison

Page 68

1 But nothing bruised or cut or abrasions.

2      Q.    Did your glasses break?

3      A.    No.

4      Q.    Did they come off when you fell?

5      A.    Yes.

6      Q.    Were you able to retrieve them, or did someone

7 retrieve them for you?

8      A.    Yes.

9      Q.    Who retrieved them?

10      A.    Somebody had picked up my helmet, the

11 disposable camera.  Something else -- my cigarettes came

12 out of my pocket and the glasses.  And they put all of

13 that in the helmet.  And then when my brother came to my

14 aid once he heard -- he's the one who took those items

15 with him.

16      Q.    Had you taken any pictures on that disposable

17 camera up to this point?

18      A.    No.

19      Q.    Now, what is your parents' names?

20      A.    Delbert Eugene Rollison, my father.

21      Q.    Where did they live at the time?

22      A.    In Leesburg, Virginia -- 206 Stratford Place

23 Southeast.

24      Q.    What's the ZIP code there, if you know?

Delbert E.  Rollison

Page 69

1       A.    I'd be -- I'm not sure.

2       Q.    Do they still live there?

3       A.    Yes.

4       Q.    Both of your parents are still alive?

5       A.    Yes.

6       Q.    How did you get from Christiana Hospital to

7  Leesburg, Virginia?

8       A.    Wayne Tapscott -- after the race they came to

9  the hospital.  They were there when I was released early

10 in the morning.  And I rode in the back of his king cab

11 truck lying on the back seat.

12      Q.    Did anyone else go with you on that trip?  Did

13 your brother, for example?

14      A.    My brother was -- I believe was in the truck

15 with me going back to my parents' house.  One of the

16 guys -- Mark -- drove my truck home.

17      Q.    How long of a ride was it from Christiana

18 Hospital?

19      A.    Three and a half, four hours.

20      Q.    When was the next time you received any

21 medical care after being released from Christiana

22 Hospital?

23      A.    The 4th of July is my birthday.  The day after

24 my birthday I went to Dr. Cook, which is -- employs my

Delbert E.  Rollison

Page 70

1 sister.  She works there as a billing -- she recommended

2 going to him.

3          Q.    What specialty is Dr. Cook?

4          A.    Yes.

5          Q.    What's Dr. Cook's specialty?  Is it like

6 orthopaedics or --

7          A.    Yes.

8          Q.    What's Dr. Cook's first name?  Is it Randolph?

9          A.    Randolph.

10         Q.    What type of treatment did Dr. Cook provide

11 for you?

12         A.    The day of the first visit?

13         Q.    Yeah.

14               Overall, what did he do for you?  Did he

15 take x-rays or MRIs and then perform a surgical procedure

16 at some point?

17         A.    The first day he saw me he viewed the x-rays

18 that were taken by the hospital in Wilmington.  He

19 suggested immediate surgery.  I believe the surgery was

20 the next day by Dr. Cook.  My prior postop operations

21 were done by him, and my second operation was done by him

22 too.  And the follow-up.

23         Q.    When was the second operation?  Approximately

24 when, if you remember.  I could look at your medical

13/47

Delbert E.  Rollison

Page 71

1 records.

2       A.    December 1st, 2nd, 3rd.  Something like that.
3 Early December.

4       Q.    Of 2004?

5       A.    Yes.

6       Q.    When were you treated at the Winchester
7 Medical Center?

8       A.    As far as my family practice doctor?

9       Q.    Well, they're listed as among the providers
10 that have knowledge of the accident or have treated you
11 for the accident.  So when did you treat at Winchester
12 Medical Center?  Is that where Dr. Byrd's practice is or
13 is that a different facility?

14      A.    I went to Dr. Byrd as a family doctor.  I
15 started going to her.  I got my cholesterol -- and she
16 recommended me going to the hospital for chest rays.
17 Something else I went there for.  Just a routine
18 examination.  A physical is what I was really looking
19 for -- to have somebody like Dr. Byrd to be my family
20 doctor from then on.

21      Q.    Did Dr. Cook refer you for any physical
22 therapy?

23      A.    Yes, he did.

24      Q.    Where did you take physical therapy?  At what

B/48

Delbert E.   Rollison

Page 72

1 facility?

2      A.    At his office.   He has a therapist facility

3 there.

4      Q.    How long did you take physical therapy?

5      A.    It was quite a few months.   I'm not sure

6 exactly how many months, but it was quite a while.

7      Q.    Why was a second operative procedure required

8 for your right knee?

9      A.    During my therapy I noticed my leg was

10 swelling and turning a reddish color.

11      Q.    Your knee?

12      A.    My right knee.

13      Q.    Where on the knee was it swelling?

14      A.    Above the kneecap.

15      Q.    So it was swelling and turning a reddish

16 color.   Any other symptoms?

17      A.    You could see an oozing of some kind of matter

18 coming out.

19      Q.    How would you describe it?   Like pus or --

20      A.    Pus, yeah.

21      Q.    So Dr. Cook took you back in the operating

22 room for that condition?

23      A.    Once I -- I went to the doctor.   He looked --

24 he was on vacation.   His nurse looked at it and excused

B149

Delbert E.  Rollison

1 me to go back home and come back the following week once

2 Dr. Cook came in from vacation.  He saw my knee.  He

3 literally pushed me back in the chair and took his hands

4 and just pulled the incision back open and dug it out

5 with Q-Tips because it was --

6       Q.   Infected?

7       A.   Very bad, yeah.  He seemed to be pretty upset

8 about it.

9       Q.   Are you still under Dr. Cook's care?

10      A.   No.

11      Q.   Are you seeing anyone with regard to your

12 right knee?

13      A.   To my what?  Excuse me?

14      Q.   With regard to your right knee, are you seeing

15 any other health care provider presently?

16      A.   No.

17      Q.   When did your treatment end for that

18 particular injury?  How long ago?

19      A.   I'm not sure of a date.

20      Q.   More than a year?

21      A.   It was less than a year.

22      Q.   Do you still have problems with your right

23 knee?

24      A.   Yes.

Delbert E.  Rollison

Page 74

1      Q.    Describe for me what type of complaints you
2 still have today.

3      A.    At work.  I can walk on level ground pretty
4 well, but at the end of the day my leg is aggravated.  I
5 can barely pick it up off the ground.  My personal
6 life -- it's constant -- it's always a fear of stepping
7 up on curbs, stepping off of curbs, up and down steps.  I
8 have to use the handrail sometimes.  Towards the end of
9 the day when my leg is fatigued from standing, which I
10 have to do in my class sometimes -- that really irritates
11 it.  A lot of activities I used to do I can't do now.

12      Q.    Like what activities?  You have to give us
13 examples of what you did before that you don't do now or
14 do less frequently.

15      A.    I used to ride bike.  I rode bike.  I could
16 still ride, but I can't do the hills.  When I push down
17 on the pedal, it hurts -- the pain.  Kayaking -- I can't
18 do it at all.

19      Q.    Why is that?  What prevents you from kayaking?
20 Just your positioning?

21      A.    Because you have to slide yourself down into
22 the whole.  Trying to get back out, it's -- I can't put
23 any weight on my right leg to push myself up.  I have to
24 use my left leg all the time to favor myself.  Steps -- I

8151

Delbert E.  Rollison

Page 75

1 have to go left leg first.  Going down steps or off a

2 curb you have to go left leg.  It's kind of a constant

3 reminder of don't go right leg first because it will

4 collapse on you -- on me.

5       Q.   Any other activities other than kayaking or

6 biking?

7       A.   I cannot run.

8       Q.   Did you run in races before this accident or

9 did you just do recreational jogging?

10      A.   Recreational.

11              MR. SHALK:  I have to go.

12              MS. FALLON:  Do you want to ask any

13 questions before you go?

14              MR. SHALK:  He answered them about an

15 hour ago.  I don't need a copy.

16              (Mr. Shalk exited the conference room.)

17 BY MS. FALLON:

18      Q.   Any other activities that you can think of

19 that have been affected by your injuries from this

20 incident?

21      A.   Everything I do is -- hiking, fly fishing I

22 do.  It's all related to uneven ground.  Things like that

23 I have to really watch how I move.  And even getting in

24 and out of cars.  Driving for more than 45 minutes, my

Delbert E.  Rollison

Page 76

1 leg starts aching.  I have some pain patches I've used to

2 put on to keep the pain down.

3       Q.   Who prescribes the pain patches?

4       A.   They're just over-the-counter things.  I used

5 to --

6       Q.   What are they?

7            I'm sorry.  Go ahead.

8       A.   My doctor did give me prescription pain

9 patches.  I use those for long trips.  But now either I

10 take a Tylenol or just small patches I can put on we have

11 at work in our medicine cabinet.  So over-the-counter.

12      Q.   Were there any other injuries you suffered in

13 this accident other than the right knee injury?

14      A.   No.

15      Q.   Was your back at all affected by this

16 incident -- your low back?

17      A.   At that time, no.  Later it was.

18      Q.   Okay.  How much later?

19      A.   After I started walking more.  It's -- the

20 doctor said my gait -- the way I walk now is favoring

21 my -- taking the weight on my left leg, which is throwing

22 my hips out, and my back is -- before it was going out

23 once a year or so, but now it's aggravating all day long.

24 It's sometimes better; sometimes worse.  But it depends

B153

Delbert E.  Rollison

Page 77

1 on my activities that day.  Especially my hips are

2 getting sore.  Limping.

3      Q.   I'm sorry.  You're limping sometimes.  Is that

4 what you started --

5      A.   Towards the end of my day if I'm on my feet

6 doing normal daily things that -- at the end of the day,

7 I'm using my hand to pull myself up the steps.

8      Q.   Are you being treated for any of these

9 complaints at present?

10     A.   No.

11     Q.   Have you previously been treated for anything

12 related to your low back subsequent or after this

13 accident occurred?

14     A.   Yes.

15     Q.   Who treated you for your low back aches and

16 pains?

17     A.   It's Dr. Cook's partner.  I can't remember his

18 name.  He's a pain management.  Dr. Cook recommended to

19 see him.  He recommended some x-rays, which I did.  Then

20 he brought me back to his office, and they gave me the

21 injections in the back.

22     Q.   How many injections have you had in your back?

23     A.   I had four one day, and he told me to come

24 back the following week and have the other four.  I guess

B154

Delbert E.   Rollison

Page 78

1 he had to do it in sessions.

2       Q.   How long ago was that?

3       A.   I would say March/April of this year.

4       Q.   Have you had any plans for further injections

5 to your back?

6       A.   Yes.  If it's -- if it comes back -- which he

7 says it will probably be three to four months they're

8 good for.  So far it's done pretty well.  It's kept the

9 pain down.  But the stiffness is still there.  But

10 bearable pain.

11      Q.   Have you ever had any psychological or

12 psychiatric counseling before July of 2004?

13      A.   No.

14      Q.   Have you had any since July of 2004?

15      A.   No.

16      Q.   Other than your low back aggravation and the

17 right knee injury, are there any other complaints or

18 injuries that you believe you suffered in this incident?

19      A.   Financially, mentally.  Financially, of

20 course, the sick leave and the vacation time I had to

21 take, plus the bills that have accumulated that I have to

22 keep up with.  The traveling from my home to the family

23 doctor.  Cook's office is an hour one way.  So I had to

24 spend an hour both ways, plus the time left.  My vacation

Delbert E.  Rollison

Page 79

1 is taken from going back and forth missing work.  I think

2 I counted 20-some, 30-some times I went to the therapist.

3 And at nights my leg is -- at the end of the day, it's --

4 I have to put pillows under it.  It's hard to sleep

5 sometimes.

6      Q.    Your right leg?

7      A.    Right leg.  It's just a general aggravation

8 of, you know, constantly being -- worrying about it --

9 how to walk, how to step off of things, you know, afraid

10 to go up ladders.  Or when I pick up something, I have to

11 keep my leg locked so it doesn't fold on me.  Of course,

12 I'm not a very vain person, but, you know, wearing shorts

13 is -- people say, "What happened?"  You have to go over

14 and over again.  There's this huge scar on my knee.

15      Q.    Are you able to show us the scar?  If you're

16 not, that's fine.  Are you able to show us the scar with

17 the pants you're wearing today?

18      A.    I'll try.  It starts about right here.

19      Q.    Okay.

20      A.    Like that far and runs down to here.

21      Q.    Let's talk about work.

22                 How much time, if any, did you miss

23 immediately after the incident occurred from that date

24 forward?  Consecutive days.

Delbert E. Rollison

Page 80

1       A.    I'm just guessing.  A month and a half.

2       Q.    When you returned to employment, did you

3 return at your full-time duty level?

4       A.    No.

5       Q.    Did you return on some lesser level?

6 Part-time or --

7       A.    I was in a wheelchair and crutches.

8       Q.    For how long?

9       A.    I'm guessing three weeks.  Maybe a month.

10       Q.    Were you trying to do some level of work at

11 your place of employment?  A couple hours a day?

12       A.    They pretty much restricted me to my desk.  I

13 normally would be on the aircraft crawling around doing

14 some of the tooling, but I was told not to do that.

15       Q.    When you were out of the wheelchair on the

16 crutches, did you resume your full-time duties at work?

17       A.    Yes.  But limited.  The way I had to

18 accomplish it, I was always -- I had to sit down instead

19 of kneel.  I cannot kneel on one knee.  My knee is still

20 numb.  I can't kneel or move around or crawl like I used

21 to.  I have to find other ways of getting a job done.

22       Q.    How long were you out of work with the second

23 procedure on December 2, 2004?

24       A.    It wasn't as long.  I think at the max three

B157

Delbert E.   Rollison

Page 81

1 weeks.  I think two is -- two to three weeks, I believe.

2         Q.    Have there been other periods where you've

3 missed consecutive days from your employment other than

4 just missing time to go to doctors' appointments or

5 therapy appointments or whatever?  I'm talking about a

6 period of consecutive days missed.

7         A.    There was, I think, three or four days I

8 missed when I was going from the parking lot where I work

9 to my vehicle.  I -- my knee just gave out, and it folded

10 on me.  It sort of like bent back.  I hyperextended it.

11 There was nothing the doctor could do.  Just wear my

12 brace.  I was advised I was trying to do too much, and I

13 was going too fast and pushing myself.

14        Q.    When did that happen?

15        A.    January/February.

16        Q.    Of this year?

17        A.    Last year.

18        Q.    2005?

19        A.    Yes.  It was right after the second surgery.

20        Q.    Have you missed any consecutive days from work

21 this year?

22        A.    No.

23        Q.    When did you change your position from --

24 well, if I'm mistaken, you can correct me -- from process

B158

Delbert E.  Rollison

Page 82

1 planner -- was that it? --

2      A.    Mm-hmm.

3      Q.    -- to instructor coordinator?

4            When did you get that position -- the

5 instructor coordinator position?

6      A.    It was April or May of 2005.

7      Q.    That's the position you've been working ever

8 since?

9      A.    Mm-hmm.

10     Q.    Yes?

11     A.    Yes.

12     Q.    I want to go back and just ask you another

13 question about the incident itself.  I have here in front

14 of me your answers to the questions called

15 interrogatories that my client had submitted.

16           At question No. 3 you were asked to

17 describe how the accident occurred.  Maybe your attorney

18 can put that response in front of you.  Okay.  Your first

19 part of your answer indicates that at approximately

20 6:30 p.m. you were walking from the parking area to the

21 staging area with other pit crew members both in front of

22 you and behind you.  Who were the pit crew members in

23 front of you?

24     A.    I don't know who they were.  Just people who

Delbert E.   Rollison

Page 83

1 were walking along the same direction.

2      Q.    Okay.   They weren't members of your brother's
3 pit crew, in other words?

4      A.    No.

5      Q.    Would that answer be the same for the pit crew
6 members walking behind you?   They were just people that
7 you thought in general were belonging to pit crews for
8 the other racers.   Is that correct?

9      A.    It could be for the racers or it could be
10 people walking along behind the monster trucks.   Not
11 particular just being pit crew members.   It could be
12 anybody walking in that direction.

13      Q.    Well, I'm just going by what you referred to
14 in the interrogatory answer.   You said other pit crew
15 members both in front of you and behind you.   Is that an
16 accurate description of the people that were walking
17 behind you and in front of you?

18      A.    I can't say for sure people behind me.   I know
19 there was people in front of me and behind me.   But as
20 far as being a pit crew, I would think people in that
21 area should be there for some reason other than
22 spectators, so...

23      Q.    Okay.   And the time is correct?   6:30 p.m. is
24 approximately when the incident occurred?

Delbert E.  Rollison

Page 84

1    A.   Early evening.  6:30, 7:00.  Something like

2 that.

3    Q.   Okay.  You say the defendant, my client,

4 Mr. Shoemaker was operating a 4-wheeler pushing a truck

5 that was steered by his son Travis Shoemaker.  Is that

6 your understanding?

7    A.   It was a race vehicle.

8    Q.   Okay.  It's called a truck in this

9 interrogatory.  Was that your word or --

10    A.   No.

11    Q.   Did you describe it as a truck when you --

12    A.   It's a mud racer.

13    Q.   Okay.  So you would agree that Mr. Shoemaker's

14 son was not steering a truck.  He was steering a mud

15 racer.  Is that your answer?

16    A.   Correct.

17    Q.   You say while being pushed by the 4-wheeler

18 the monster truck struck the plaintiff, running over his

19 knee and causing severe injuries.  Is that your testimony

20 under oath as to how this accident occurred?

21    A.   It wasn't a monster truck.  It was a mud

22 racer.  Somebody has got their verbiage wrong here.  But

23 it was a mud racer of -- Shoemaker ran the mud racer, not

24 the monster truck.

B161

Delbert E.  Rollison

Page 85

1    Q.   Do you recall answering these questions?  Did
2 you actually prepare any answers to these?

3    A.   I could have.  I'm not sure -- aware of --
4 remember exactly.  But maybe the verbiage is not correct
5 here as far as what you call the vehicle.

6    Q.   At any time before or after this incident
7 occurred, do you recall the monster truck show starting
8 up and that event taking place in and around where you
9 had fallen?

10    A.   No.

11    Q.   You don't recall one way or the other?

12    A.   I'm guessing.  But usually something like that
13 is the premier of the show, and they always have it last.

14    Q.   Well, I'm not talking about the usual course.
15 I'm talking about on the day of the incident.

16    A.   I never saw them move.

17    Q.   Do you recall seeing any of the logos or names
18 of any of the monster trucks in the vicinity where you
19 fell?

20    A.   No.

21    Q.   Do you happen to recall a monster truck with
22 the logo "Thrasher" painted on its side anywhere near the
23 area where the incident occurred?

24    A.   I don't recall.

B162

Delbert E.  Rollison

Page 86

1                    MS. FALLON:  That's all I have for right

2 now.

3                    MR. AKIN:  I don't have a lot of

4 questions, but can we take a five- or ten-minute break?

5                    MS. FALLON:  Okay.

6                    (A brief recess taken.)

7                        - - - - -

8             DELBERT EUGENE ROLLISON, resumes

9                    MR. FOGG:  Right after we took this

10 break, Mr. Rollison leaned over to me and said he thinks

11 he may have given the wrong name as to his family doctor,

12 which I think he would like to clarify.

13                    MS. FALLON:  Sure.

14                    THE WITNESS:  The doctor that gave me my

15 medical for my pilot's license was Dr. Hoocker.  The

16 doctor of my childhood and early 20s -- I'm trying to

17 remember his name.  I remembered it and now I forgot it.

18 His office is in Percyville, but I can't remember his

19 name right off the --

20                    MS. FALLON:  Okay.

21                    THE WITNESS:  I can't remember his name

22 right now.

23                    MS. FALLON:  If you remember it, either

24 after we're off the record or whatever, just so long as

B 163

Delbert E.  Rollison

Page 87

1 you supply it to your attorney --

2                    THE WITNESS:  Okay.

3                    MS. FALLON:  -- Mr. Fogg can then

4 provide it to counsel.

5 BY MR. AKIN:

6    Q.   Okay.  Good afternoon, sir.  My name is Roger

7 Akin.  I represent Blue Diamond and Parkway Gravel in

8 this lawsuit, and I have some questions.  Ms. Fallon

9 covered a lot of the areas that I wanted to question you

10 about, but I had some additional questions.

11                    First of all, just for clarification, on

12 the drawing which you prepared, which is now Rollison

13 Exhibit 1, you placed a bold X on the line called "Road

14 to the Staging Area."  I think I missed it.  Was that the

15 point where you believe that the accident occurred?

16    A.   Yes.

17    Q.   Okay.  Since this accident occurred, have you

18 given any statements to anyone other than your attorneys

19 in this case?

20    A.   No, I have not.

21    Q.   Okay.  Have you been contacted by any

22 insurance representatives or anyone else involved in the

23 racing that day to give a verbal or a written statement

24 about what you believe occurred?

Delbert E.  Rollison

Page 88

1      A.    The only person that has contacted me other

2 than my attorney is Neal Shoemaker.  He called me

3 twice -- the day after the accident and --

4      Q.    What did you discuss?

5      A.    He was concerned about my health.  He asked me

6 how I was doing.

7      Q.    He contacted you on the telephone?

8      A.    Yes.

9      Q.    Did you and he discuss the accident itself at

10 all?

11     A.    I don't recall.  I think he just called out of

12 concern for my health.  It wasn't who did what or who --

13 whatever.  It was just a matter of my well-being.

14     Q.    Okay.

15     A.    The second call was more or less towards the

16 legal thing.

17     Q.    The second call from --

18     A.    Neal Shoemaker.

19     Q.    Okay.  About the legal thing?

20     A.    Well, I hired an attorney prior to Matt, and

21 her name was Karen Harris.  And she sent him a letter in

22 the mail saying she was representing me.  And when he

23 received the letter, he called me and asked me what was

24 the deal and why I was -- he was being sued.

8165

Delbert E.   Rollison

Page 89

1       Q.    Okay.  Ms. Harris, is she a Delaware attorney?

2       A.    She's a Virginia attorney.

3       Q.    You retained her regarding this incident?

4       A.    Yes.

5       Q.    Did she contact Mr. Shoemaker to your

6  knowledge?

7       A.    She contacted -- I'm sure it was him and his

8  insurance company.  She started the basic -- a ball

9  rolling on this.  As far as I know, she did.

10       Q.    All right.  Did she file any legal claims on

11  your behalf before you retained Mr. Fogg's law firm?

12       A.    I think she just -- she wrote a letter to the

13  insurance company stating basics of what happened.  I

14  don't think it was anything that went any further than

15  that.

16       Q.    What insurance company did she communicate

17  with?

18       A.    I have no idea.

19       Q.    Do you know whose insurance company it was

20  that she contacted?

21       A.    Neal Shoemaker's.

22            MR. AKIN:  Okay.  Let me ask the court

23  reporter to mark this as the next exhibit.

24            (Rollison Deposition Exhibit No. 2 was

B166

Delbert E.  Rollison

Page 90

1 marked for identification.)

2 BY MR. AKIN:

3      Q.   I've handed you, sir, what appears to be a

4 document captioned Delaware Basic Life Support which

5 appears to be a document that may have been filled out by

6 the company that provided the ambulance service to the

7 race that day.  Have you ever seen this form before

8 today, sir?

9      A.   No, sir.

10      Q.   All right.  It appears about a third of the

11 way down the page that the person who prepared this

12 document wrote a narrative of what that person understood

13 to have occurred.

14               Let me read a couple of sentences from

15 that.  Quote, at standby for a monster truck race, PT,

16 which I think is patient, was struck by a mid-sized car

17 at a low speed.  Bystander pushed patient to the ground

18 as car approached patient.  Patient's right leg was still

19 in the path of the car.

20               Do you remember having a conversation

21 with any of the ambulance crew on the date of the

22 incident in which you described what occurred?

23      A.   No.  There was never any kind of comments or

24 anything made of what happened in the accident.

B167

Delbert E.   Rollison

1      Q.   All right.  This particular document states at

2 least, according to the author of the document, that a

3 bystander pushed patient, which I assume is you, to the

4 ground as a car approached you.  Do you remember making

5 such a statement to any individual on or after the date

6 of this accident?

7      A.   This is the first I've ever heard anything

8 like this before.  I never heard of it or...

9      Q.   Do you know whether a witness to the incident

10 provided that information to the ambulance crew?

11     A.   I have no idea.

12               MR. AKIN:  Let me ask the reporter what

13 we've marked this as.

14               THE REPORTER:  This would be Rollison 2.

15 BY MR. AKIN:

16     Q.   Is it your testimony today that that is an

17 incorrect description of what occurred in this accident?

18     A.   Yes, it is.

19     Q.   Do you recall whether anyone tried to push you

20 out of the way of the mud racer just before you were hit?

21     A.   I was never touched.  I was -- there was no

22 warning at all that the vehicle was coming behind me.

23 Once I was knocked to the ground, I could hear Neal's son

24 telling his dad, "Dad, stop, stop."  I could hear him

B168

Delbert E.  Rollison

Page 92

1 yelling while I was trying to get my footing to roll out

2 of the way, but, of course, this happened in split

3 seconds.  But I could hear his son yelling at his dad to

4 tell him to stop.

5        Q.   Do you recall his specific words?

6        A.   "Dad, stop, stop."

7                  And that's when his father came around

8 to me and says, "Man, are you all right?  I didn't even

9 see you" or "didn't see you."

10       Q.   Let me ask you a couple questions about the

11 accident itself.  I think you testified that you crossed

12 from the parking lot over the guardrail across the paved

13 road and then you were walking in an area generally

14 between the racetrack and where the monster trucks were

15 lined up.  Is that an accurate --

16       A.   It was between --

17       Q.   -- summary of your testimony?

18       A.   It was between the monster trucks and the

19 little service road to the staging area.  It's not next

20 to the racetrack.  There was the racetrack and then a

21 little approach track to the stage -- approach to the

22 staging area for the monster trucks.

23       Q.   Okay.  Did it appear to you that all of the

24 mud racers were going along the same route to get to the

Delbert E.  Rollison

Page 93

1 staging area?

2       A.    I assume so, yes.

3       Q.    Was that a worn path in the dirt or the grass?

4       A.    Yes.

5       Q.    All right.  Did all the mud racers, to your

6 recollection, generally stay on that path as they went

7 over to the staging area?

8       A.    I don't know if they all stayed there.  I

9 didn't see all of them travel that area, but I'm sure

10 they took the same general route.  But I can't say for

11 sure.  I wasn't watching each one of them.

12      Q.    Did you make an effort to stay off of that

13 path as the mud racers were going to the staging area?

14      A.    Yes.

15      Q.    Is it your testimony, then, that

16 Mr. Shoemaker's had left the path at the time when it hit

17 you, or was it on that path?

18      A.    I'm assuming he had to have left the path to

19 hit me where I was standing or walking.

20      Q.    Okay.  You say you assume that.

21                    Do you know for a fact whether

22 Mr. Shoemaker's mud racer had left the path or was still

23 on the path when it struck you?

24      A.    He was off the path when he hit me.  Of

B170

Delbert E.   Rollison

Page 94

1 course, I was -- he was behind me, so I can't see him

2 veering.  But he would have to do that to get to where I

3 was at -- my position.

4      Q.   In terms of feet, approximately how far off of

5 the path was the Shoemaker vehicle when it hit you?

6      A.   I was between eight and ten feet off the

7 track, and the center of the vehicle hit me dead center

8 in the back of my legs between the two front wheels.  So

9 if you go by his right tire, he was probably six feet

10 from the edge of the left-hand side of the road.

11     Q.   At any time before you were struck, did anyone

12 cry out to warn you that a vehicle was approaching you

13 from the rear?

14     A.   No.  I never was pushed, warned.  Nothing.

15     Q.   Let me ask you some questions about a document

16 and ask the reporter to mark this as the next exhibit in

17 sequence.  I guess that's Rollison 3.

18               (Rollison Deposition Exhibit No. 3 was

19 marked for identification.)

20 BY MR. AKIN:

21     Q.   I'll ask you to just take a look for a minute

22 or two at this document, sir.  I'm going to ask you some

23 questions about it.

24     A.   (The witness complied with counsel's request.)

Delbert E.  Rollison

Page 95

1       Q.    First of all, do you recognize this document?

2       A.    I recognize my signature.

3       Q.    Is that your signature at the bottom of the

4 page?

5       A.    Yes.

6       Q.    Do you go by the name "Gene Rollison"

7 occasionally?

8       A.    That's my name that people call me in public.

9 My real name is Delbert -- my first name.

10       Q.    But to your friends you are called "Gene."  Is

11 that correct?

12       A.    Correct.

13       Q.    Let's go to the bottom of this form.

14             There are three columns at the bottom of

15 the form.  One is Print Name Here.  And there are four

16 names.  Then it appears that Gene Rollison is printed on

17 the last line.  Is that correct?

18       A.    Yes.

19       Q.    Did you print your name on that form at that

20 place?

21       A.    It doesn't look like my handwriting -- the

22 printed part -- but it does in the handwritten -- the

23 center column looks like my signature.  But on the left

24 the printed doesn't look like the way I would print my

B172

Delbert E.  Rollison

Page 96

1 name.

2    Q.   Is it your testimony that someone else printed

3 your name on this form?

4    A.   I could have done it, but it doesn't generally

5 look like my -- the way I sign my name.

6    Q.   Okay.

7    A.   I could have.  I'm just not saying for sure I

8 did it.

9    Q.   Down the center column, the form asks the same

10 person to sign his name.  Does that appear to be your

11 signature in the center column on the last line?

12    A.   Yes, it does.

13    Q.   All right.  Then just to the right of the

14 signatures there appear to be numbers.  There appears to

15 be the number 269 after your signature.  Do you know what

16 those numbers represent?

17    A.   No, I do not.

18    Q.   Were you given an identification badge or tag

19 with such a number on it to your recollection?

20    A.   Not that I remember.

21    Q.   Okay.  The third column is Duties.

22            What words are written there?

23    A.   I never wrote those --

24    Q.   Okay.

B173

Delbert E.   Rollison

Page 97

1      A.    -- words there.

2      Q.    Can you read those words?

3      A.    Sand drags?  And it's d-r-a-y-s.

4      Q.    Just for the record, would you read the other

5  three printed names in the left column?

6      A.    Randy Rollison --

7      Q.    If you can.

8      A.    -- Mark -- I can't really make that one out.

9      Q.    All right.  There's been some testimony today

10  about a Mark McCaughey.  Is it possible at least that

11  that's Mr. McCaughey's name?

12      A.    It looks like a Mark W.

13      Q.    All right.  Your attorneys have filed answers

14  to Mr. Shoemaker's interrogatories, and in response to

15  Interrogatory 2 you identify a Mark McCaughey of

16  Bluemont, Virginia as a person who may have knowledge of

17  how the accident occurred.  Is that Mr. McCaughey's

18  printed name in that left column in the second line?

19      A.    I couldn't say whether it is or isn't one way

20  or the other.

21      Q.    Okay.

22      A.    I'm not sure.

23      Q.    Can you read the third name in that list?

24      A.    Stephen Littleton.

Corbett & Wilcox                    B174

Delbert E.  Rollison

Page 98

1    Q.   All right.  Now, if we assume for the moment

2 that this is a form that you and some other members of

3 your crew were provided, do you recall at what time of

4 the day you were given this form?

5    A.   I'm thinking it was prior to the staging of

6 the vehicles.  5:00, 5:30, 6:00.  Something like that.

7    Q.   Okay.

8    A.   It was later in the evening --

9    Q.   All right.

10   A.   -- or afternoon.

11   Q.   Your recollection is that a woman gave you

12 this form to sign.  Is that correct?

13   A.   Yes.

14   Q.   What is your recollection of her name?

15   A.   I think her name was Ann.

16   Q.   Okay.  But you don't recall her last name?

17   A.   I'm not sure if that's her first name.  I

18 just -- for some reason I think it's Ann, but I could be

19 wrong.

20   Q.   Could you describe her for the record?

21   A.   Thin, medium, shoulder length dark brown hair.

22   Q.   Would you identify her again if you saw her?

23   A.   No.

24   Q.   All right.  When she approached you and the

B175

Delbert E.  Rollison

Page 99

1 others and asked for your signatures on this form, did

2 she identify who she was representing in asking you to do

3 that?

4       A.   No.

5       Q.   What words did she state when she presented

6 this form to you and the crew?

7       A.   She didn't really present it to me.  She

8 handed it to my -- the people I was with that day.  And

9 one of the people handed it to me.  And I just -- I saw

10 the legal title and I just signed it.  It was a basic

11 waiver -- basic coverage.

12      Q.   Okay.  Do you have any understanding as to

13 whether you and the rest of the crew was required to sign

14 this form?

15      A.   I don't remember it being said you had to.  I

16 don't remember.

17      Q.   There's been some other testimony in this case

18 that people participating in the event were required to

19 sign this and that that was a condition of their

20 participation.  Do you have any recollection as to

21 whether that's correct?

22      A.   I don't -- I'm not for sure.

23      Q.   What did you understand would have occurred if

24 you had refused to sign it, if anything?

B176

Delbert E. Rollison

Page 100

1    A.   I don't -- like I said, it was handed to by

2 one of my teammates.  Then when I signed it, it was given

3 back to the lady which was -- in my opinion, she's

4 organizing the drag racers, not as a representative of

5 the producer of the event.  She was just acting as a

6 helper organizing a small group of racers.

7    Q.   Do you know who was the producer or promoter

8 of this event?

9    A.   I understand Jack was the one that was

10 promoting the show.  I'm not for sure, but it's what I

11 heard from people talking.

12   Q.   Do you know his last name?

13   A.   You guys were just talking about him just this

14 morning -- or this afternoon.  I'm not sure.  I can't

15 remember his name.  But...

16   Q.   Okay.

17   A.   Brierly (phonetic)?  Jack Brierly?

18   Q.   All right.  I think there's been some

19 testimony in the case that the promoter of the event was

20 Jack Brady.

21   A.   Brady, yes.

22   Q.   Okay.  Did you meet Mr. Brady on July 3, 2004?

23   A.   Not that I'm aware of.

24   Q.   Do you know if he was present at the site?

B177

Delbert E. Rollison

Page 101

1    A.   I have no idea.

2    Q.   Okay.  Now, the form was apparently signed by
3 several people before you, and then it was given to you.
4 Is that correct?

5    A.   As far as I remember.  It was one of the -- my
6 teammates handed it to me.

7    Q.   All right.  What did your teammate say when he
8 handed it to you?

9    A.   Just a -- I don't remember their verbiage.  I
10 don't remember.  Just somebody handing it to me and -- I
11 assume it was just a waiver to -- you had to sign, which
12 is pretty normal for some kind of sporting event like
13 that.

14    Q.   Okay.  Do you remember which one of your
15 teammates or which one of the crew gave it to you to
16 sign?

17    A.   I'm guessing it was the person prior to me
18 signing it.  I'm not sure.

19    Q.   That would be Mr. Littleton?

20    A.   (The witness indicated.)

21               THE REPORTER:  I'm sorry.  Was that a
22 yes?

23               THE WITNESS:  I'm not sure.

24

Delbert E.  Rollison

Page 102

1 BY MR. AKIN:

2    Q.  All right.  You said a minute ago that you

3 assumed that it was a certain kind of form.  What did you

4 assume that the form was?

5    A.  Just -- it's a waiver that -- in case

6 something that was -- happened.  People -- if they were

7 following the rules and something happened -- an engine

8 blew up and shrapnel would hit you -- you -- they're not

9 responsible for that.  Something that's out of the -- out

10 of their control.

11    Q.  Okay.  In case something happened, what would

12 be the effect of this form, if you know?

13              MR. FOGG:  I object.  It calls for a

14 legal conclusion.

15 BY MR. AKIN:

16    Q.  All right.  You can answer the question, if

17 you have an answer.

18    A.  Can you say the question again, please?

19    Q.  Yeah.

20              If you sign this form, what did you

21 understand the effect of the form to be?

22    A.  Like I say, if a vehicle went out of control

23 while it was being operated by a racer or the engine blew

24 up or somebody fell on you or somebody hit you over the

B179

Delbert E.  Rollison

Page 103

1 head with a beer bottle or something like that.  Not

2 necessarily a beer bottle.  But if somebody tripped you

3 or something like that.  An accident.  I'm not really

4 sure.

5      Q.   All right.  But if one of those things

6 happened, what would this form do?

7                    MR. FOGG:  Same objection.  He can

8 answer.

9 BY MR. AKIN:

10     Q.   You can answer.

11     A.   I'm not sure.

12     Q.   Okay.  But you just stated several things that

13 could occur -- a beer bottle hit someone on the head, a

14 car goes out of control, some shrapnel flies through the

15 air from a blown engine -- something like that.  If

16 anything, what did you understand this form would do if

17 you were, for instance, to receive injuries from one of

18 those sorts of incidents?

19     A.   I don't know.  I'm not a lawyer or didn't read

20 it --

21     Q.   Okay.

22     A.   -- in detail.

23               So I'm not for sure.

24     Q.   So it's your testimony that you did not read

B180

Delbert E.  Rollison

Page 104

1 the form before you signed it?

2      A.    Correct.

3      Q.    Did you read any of it before you signed it?

4      A.    No.

5      Q.    Did you ask any of your crew what it was that

6 you were signing?

7      A.    No.

8      Q.    Okay.  Now, going back to the bottom of the

9 form, there's a typed statement in the second column that

10 says "I have read this release."  Do you see that sort of

11 superimposed under or over the signatures in the middle

12 column?

13      A.    I see it, yes.

14      Q.    All right.  But it's your testimony that in

15 fact you did not read it before you signed it.  Correct?

16      A.    Correct.

17      Q.    Did you have time to read it before you signed

18 it?

19      A.    Yes.  I could have.

20      Q.    Okay.  So was anyone suggesting that you sign

21 it but not read it?

22      A.    No.

23      Q.    You testified earlier that you in the past

24 have had some involvement in some bracket races.  Is that

B|8|

Delbert E.  Rollison

Page 105

1 correct?

2      A.   Yes.

3      Q.   Was that as a crew member or a racer?

4      A.   It was a -- as a friend and a crew member

5 helping a person out that was -- that had the race car

6 that was driving it.

7      Q.   All right.  In regard to those prior bracket

8 races or drag races, were you asked to sign a form in

9 order to participate in those activities?

10     A.   No.

11     Q.   So is this the first time you had ever signed

12 such a form to your knowledge in conjunction with a

13 sporting event or a racing activity?

14     A.   I've been to a lot of air shows.  I'm sure

15 I've -- I might have signed something like that, because

16 I've been out on the flight lines with aircraft

17 retrieving them and launching them.  I'm sure I've --

18 maybe have or maybe haven't.  I can't remember for sure,

19 but...

20     Q.   Do you remember where you have worked around

21 aircraft where you may have been asked to sign some sort

22 of waiver form?

23     A.   Sun in the Fun Air Show.

24     Q.   Where did that occur?

B 182

Delbert E.  Rollison

Page 106

1        A.    That's in Lakeland, Florida.

2        Q.    Were you involved in working on aircraft at an

3  air show in Florida?

4        A.    I was there as a spectator, but I was allowed

5  to enter the prepared area for the aircraft to come and

6  go as a -- somebody with experience was allowed in there.

7        Q.    All right.

8        A.    Not -- a regular spectator is not allowed.

9        Q.    Okay.  Is it your recollection that you may

10  have signed a waiver form before you were allowed into

11  that area?

12       A.    I can't say if I did or didn't.  But chances

13  are I've signed some in my history, yes.

14       Q.    On your way up to Delaware back in July of

15  '04, did you and the members of the crew discuss the fact

16  that you would be asked to sign a form?

17       A.    I was riding with my brother Randy, and it

18  never came to conversation.

19       Q.    Okay.  Did you have any understanding as to

20  whether being in proximity to race cars in an event like

21  this involved certain danger to people in the immediate

22  vicinity?

23       A.    There's always a danger in any kind of

24  activity like this.

B183

Delbert E.  Rollison

1      Q.   All right.  What sorts of dangers are present

2 in mud racing activities to your knowledge?

3      A.   They're traveling at a high speed in a

4 straight line which can go out of control in a short

5 distance with spectators, crew people surrounding --

6 concession stands and things like that.

7      Q.   Let me ask you to take a minute to read to

8 yourself paragraph 3 of this form.  I've got a couple of

9 questions for you.

10     A.   (The witness complied with counsel's request.)

11     Q.   Have you had a chance to read paragraph 3,

12 sir?

13     A.   Yes.

14     Q.   All right.  Realizing you're not an attorney,

15 I don't believe, nonetheless, what do you believe that

16 you were agreeing to in regard to paragraph 3?

17     A.   It was a basic liability of some of the

18 dangers you might be involved in in a racing arena like

19 that --

20     Q.   All right.

21     A.   -- in general.

22     Q.   Okay.  You say "basic liability."

23               But in regard to paragraph 3, what is it

24 that you were promising to do or not to do as a result of

Delbert E.  Rollison

Page 108

1 the language in paragraph 3?

2       A.   I don't hold the person responsible for their

3 actions or -- I'm not sure.

4       Q.   All right.

5       A.   I have to read it and try to memorize it.

6 But, in general, they're not responsible for somebody

7 that's doing something they shouldn't be doing.

8 They're -- but something happened that -- they're not --

9 out of their control.

10      Q.   Isn't it true in paragraph 3 by signing this

11 document you're agreeing to assume personal

12 responsibility for injuries that may have occurred in

13 conjunction with race activities that day?

14      A.   That's what the waiver says, yes.

15      Q.   Paragraph 6 states -- and I'll quote -- the

16 activities of the event are very dangerous and involve

17 the risk of serious injury or death or property damage.

18 Do you agree or disagree with that statement in regard to

19 mud racing?

20      A.   I agree.

21      Q.   By the way, there's one final signature at the

22 bottom of this release form.  Do you know whose signature

23 that is on the line that says Signature and Title of

24 Witness?

B 185

Delbert E.   Rollison

Page 109

1       A.   No, I do not.

2       Q.   In regard to answers to interrogatories that

3 have been proposed to you by Mr. Shoemaker's attorney, in

4 Interrogatory No. 2 you list a number of people who have

5 knowledge of the accident.  Going through that list of

6 people -- do you have it in front of you now, sir?

7       A.   Yes, I do.

8       Q.   Which of those people, to your knowledge,

9 actually saw the impact between the mud racer and your

10 legs?

11      A.   To the best of my knowledge, none of them.

12      Q.   All right.  Obviously, since you were the

13 injured person, you were a witness to the incident.

14 Correct?

15      A.   Yes.

16      Q.   Is it your testimony that the Shoemakers were

17 not witnesses to the event?

18               THE WITNESS:  We're talking about this

19 column right here, aren't we?

20               MR. FOGG:  Mm-hmm.

21               THE WITNESS:  It's my understanding that

22 the Shoemakers are witnesses.  They were the ones that

23 were -- hit me.  If they saw me, they wouldn't have --

24 they could have avoided me.  So as far as being a witness

B186

Delbert E.  Rollison

Page 110

1 at the scene where the accident happened, they could have

2 avoided me.

3 BY MR. AKIN:

4     Q.   Mr. McCaughey, did he tell you afterwards that

5 he saw what happened?

6     A.   Nobody throughout the whole event said they

7 saw what happened.

8     Q.   All right.  The same question for

9 Mr. Tapscott.  Did he come to you at any time after the

10 accident and tell you that he observed what happened?

11     A.   No.

12     Q.   Same question for Mr. Littleton.

13     A.   No.

14     Q.   Same question for Randy Rollison.

15     A.   No.

16     Q.   Is it your testimony that your brother's

17 vehicle had already reached the staging area and had come

18 to a halt when you were injured, or was it still moving

19 toward the staging area?

20     A.   I knew he was ahead of me.  Whether he was

21 still in transition to get to there or he already

22 stopped, I don't know.  But he was, I'm sure, ahead of

23 me.

24     Q.   Were you in a hurry to get over to the staging

Delbert E.  Rollison

Page 111

1 area because your brother had gotten there or had almost

2 gotten to that point?

3      A.   No, sir.

4      Q.   Okay.  Were you walking in a normal stride?

5      A.   Yes, sir.

6      Q.   You were walking at least with another person,

7 I believe was your testimony.  Is that correct?

8      A.   Yes.  We were not together.  We were not team

9 members.  We were just somebody that happened to be

10 walking at the same time --

11      Q.   All right.

12      A.   -- same speed.

13      Q.   Were you talking with each other as you moved

14 toward the staging area?

15      A.   Just in general.  What did you think of that?

16 Or whatever -- it wasn't like an in-depth conversation.

17 It was just, "Hi.  How are you?"  You know, things like

18 that.

19      Q.   At any time on the date of this accident, did

20 you remember having any discussions or seeing anyone at

21 the site who was a representative of the owner of the

22 land where the race occurred?

23      A.   I never saw anybody really in charge or

24 directing anybody on what to do or where to go.  The only

B188

Delbert E.  Rollison

Page 112

1 person I really saw as coordinating was this lady.  I

2 believe her name was Ann.

3      Q.   All right.  She instructed the crews to move

4 their vehicles to the staging area.  Is that correct?

5      A.   Yes, sir.

6      Q.   Do you recall her giving any other

7 instructions that day to the racers or their crews?

8      A.   Not that I'm aware of.

9      Q.   Had your brother participated in prior races

10 at Blue Diamond Park, that is, races prior to July 3,

11 2004?

12      A.   I don't think so.  But I'm not sure.

13      Q.   Has your brother participated in any races at

14 Blue Diamond since July of 2004 to your knowledge?

15      A.   I don't think so.  But I'm not sure.

16      Q.   Okay.  Have you been back to Blue Diamond Park

17 since this accident occurred?

18      A.   No, sir.

19      Q.   Do you know, as you sit here today, who owns

20 the Blue Diamond Park?  What person or company or other

21 entity owns the facility?

22      A.   I guess it's owned by some gravel corporation.

23      Q.   Do you know the name of that company?

24      A.   Not right off the top of my head, no.  It was

Delbert E.   Rollison

Page 113

1 a partnership.

2     Q.   After the accident occurred, did you or any

3 lawyer on your behalf contact or attempt to contact the

4 owners of the facility to your knowledge?

5     A.   No, sir.

6     Q.   Ms. Fallon asked you a couple of questions

7 earlier about another form that may have been handed out

8 which gave people some general instructions or rules

9 regarding the event such as only licensed drivers can

10 participate and people shouldn't consume alcohol before

11 operating vehicles and those sorts of things.  Your

12 recollection is those instructions were on a one-page

13 form.  Is that correct?

14     A.   Yes.  It was a regular-size paper.  It was

15 bold letters.  It was maybe five or six different items

16 to read.  And at the top there was some kind of logo -- a

17 company logo.  It was flags of -- you know, checkered

18 flags or something like that.  I'm not sure.

19     Q.   Okay.  Was that piece of paper given to all

20 people who were signing these release forms to your

21 knowledge?

22     A.   I have no idea how -- I don't know if it was

23 given to us when we came in the gate --

24     Q.   Okay.

B190

Delbert E.  Rollison

Page 114

1      A.   -- or -- I'm not sure.

2      Q.   Did each one of your crew receive a separate

3 copy of that document, or was it one per crew?

4      A.   I have no idea.

5      Q.   All right.  You don't recollect as you sit

6 here today as to whether you kept the form; is that

7 correct?

8      A.   I could have it.  I'm not sure.  But I'll...

9      Q.   Ms. Fallon has asked you to look in your

10 personal records and produce to your attorney a copy of

11 that paper.  We'll be deposing other witnesses in this

12 case.  But if your brother kept a copy of that form, I

13 would ask you to please have him forward a copy to your

14 lawyers so that it can be produced in this case.

15              Will you comply with that, sir?

16      A.   I will.

17      Q.   All right.  Thank you.

18              There's been some testimony in this case

19 that some people may or may not have been distracted as

20 the vehicles moved to the staging area by an operator of

21 a vehicle who may have been operating it in an erratic

22 fashion.  Do you recall any sort of activity as you moved

23 to the staging area where people's attention were drawn

24 to another vehicle whose operator may have been showing

Delbert E.   Rollison

Page 115

1 off with that vehicle?

2      A.    A race vehicle you're referring to?

3      Q.    A race vehicle or any other vehicle within

4 the --

5      A.    Not that I'm aware of.

6      Q.    All right.

7      A.    No.

8      Q.    One more question about the release, which is

9 Rollison 3.  When you were provided this form to sign by,

10 apparently, another member of your crew, was there any

11 coercion or threats regarding the signing of the

12 document, or did you sign it of your own free will?

13     A.    Own free will.

14     Q.    Okay.  So no one said you better sign it or,

15 you know, you'll have to leave or you're in trouble or

16 anything like that?  There was no sort of coercive

17 statement at the time you were given the form to sign.

18 Is that correct?

19     A.    I was not pushed to sign it, no.

20     Q.    Okay.  Again, did you understand that you were

21 required to sign it in order to participate with the crew

22 that day?

23     A.    No.  I didn't think that.  I think maybe

24 everybody who came to that had to sign something like

B192

Delbert E. Rollison

Page 116

1 that. I don't know if it was for the drivers, the

2 spectators, the pit crew people, people in other parts of

3 the show. I'm not sure. I just --

4    Q.   Do you understand that spectators were also

5 required to sign waiver forms that day?

6    A.   I have no idea whether they were or not.

7    Q.   Okay. This spectator area -- and I think

8 you've identified the area where, I guess, general

9 members of the public could be. You have identified that

10 on your drawing as grandstands and seating; correct?

11    A.   Yes.

12    Q.   Were there actual bleachers in that area or

13 was it just a grassy area where people could sit?

14    A.   I think it was just a grassy hill --

15    Q.   Okay.

16    A.   -- that people put blankets down.

17    Q.   All right.

18    A.   There might have been some bleachers

19 someplace, but what I remember is just mostly a hillside

20 people were sitting on.

21    Q.   Was that seating area separated from the area

22 where the participants were by anything?

23    A.   I remember an orange safety fence that you see

24 at construction sites. I think it was kind of roped off

B193

Delbert E.   Rollison

Page 117

1 between the monster trucks and the grandstands.

2      Q.   Okay.  So I'm clear on your testimony, you

3 don't have any understanding as to whether spectators --

4 just general members of the public -- whether they were

5 required to sign waiver forms, do you?

6      A.   I'm not familiar if they are or not.

7      Q.   When you walked across from the parking lot

8 and then across the guardrail and paved road, was there

9 anyone on site who was checking people's identification

10 or asking people to identify themselves before they

11 allowed people to enter the area where the participating

12 vehicles were going?

13      A.   There was nobody there.  There was people

14 sitting on the guardrail.  There was some people with

15 their little lawn mowers they were racing.  There was

16 kids riding their bikes up and down this area here.

17 There was a lot of activities.  Like it wasn't a

18 restricted area or marked off for a pedestrian crossing.

19 It was just -- people were coming back from this lawn

20 mower race -- coming back in that area.  And they were

21 sitting along the guardrail kind of talking to other

22 people.  Kids were walking up and down that area.  It was

23 kind of like a thoroughfare.  It was just an asphalt

24 road.  People were using it to go from one end of the

B144

Delbert E.  Rollison

Page 118

1  parking lot to the other or to -- from one side of the

2  event to the other.  A lot of pedestrian walking.

3       Q.   I'm trying to understand how --

4       A.   There was no --

5       Q.   -- they were keeping members of the general

6  public out of the area where the monster trucks were and

7  where the mud races were being staged.

8       A.   There wasn't.  There was a lot of activity.

9  Prior to this in the early afternoon, there was what I

10 would think would be somebody performing -- driving cars

11 up on two wheels.  They were using this road right here,

12 the paved road, as a practice area.  They were driving

13 back and forth -- which people were walking across in

14 front of them.  And the car actually -- of course, it was

15 going like 15 miles an hour.  But the car actually rolled

16 over on its roof and glass fell out of the windshield.

17 The driver had no helmet.  The guys rolled it -- even

18 some spectators -- not spectators, but people in the

19 general area helped the car guy roll the car back up on

20 its wheels.  And he drove it off as -- I was remembering

21 this was a pretty shady operation the way things were

22 being -- because this guy could have ran off the road and

23 taken out anybody in this general area.

24       Q.   Where did that vehicle roll over?  Was it on

B 195

Delbert E.   Rollison

Page 119

1 the racetrack?

2       A.    It was right in front of where I marked

3 "guardrail."  Right in front of the middle of the parking

4 lot area.

5       Q.    Okay.  One or two more questions.

6                    When you went up with your brother, you

7 actually had duties in regard to getting the car over to

8 the staging area and assisting in getting it ready to

9 race; is that correct?

10      A.    There was no set duties.  I'm a little

11 familiar with race vehicles.  You know, make sure the

12 seatbelts -- make sure the engine is running properly.  A

13 basic check before he heads to the starting line.

14 Something like that.  Make sure nothing is hanging loose.

15 Make sure the safety switch is in the brake position.  In

16 case it does have an accident, it automatically cuts off.

17      Q.    So you were involved in providing some of

18 those services with regard to your brother's vehicle; is

19 that correct?

20      A.    I was going to.

21      Q.    Okay.  Did your brother actually race that

22 day?

23      A.    No, he did not.

24      Q.    Okay.  Why did he not race?  Was it because of

B|96

Delbert E.  Rollison

Page 120

1 your injuries?

2      A.   Yes, sir.

3                MR. AKIN:  All right.  That's all I

4 have.  Thank you.

5                MR. FOGG:  Mr. Rollison, I have a few

6 questions.

7 BY MR. FOGG:

8      Q.   Back to this one page list of rules that

9 you've been questioned about today.  At any time after

10 you crossed the paved road in the area where these events

11 were taking place, did you see anyone enforcing any of

12 those rules?

13      A.   I saw no one with any kind of authority

14 monitoring traffic -- foot traffic or anything.  The only

15 person I saw with any kind of authority was the lady who

16 had gave us the times when to go to race.

17      Q.   Mr. Rollison, I think you testified that you

18 recalled one of those rules stating you had to be a

19 licensed driver to operate the vehicle.  Is that correct?

20      A.   I'm not for sure, but I remember reading

21 something saying if you were caught drinking you would be

22 thrown from the race.  If you were using your vehicle in

23 a -- if you were racing it like between the staging area

24 and the parking lot, if you were going too fast or

B197

Delbert E.  Rollison

Page 121

1 taxiing it too fast or spinning wheels recklessly, you

2 would be thrown out.  I'm thinking there was something in

3 there saying if you were -- you had to be a licensed

4 driver or someone over 16.  I think it was in the same

5 paragraph.

6       Q.   With respect to the rule you said about

7 people, for lack of a better word, driving improperly,

8 they could be thrown out.  You had testified earlier that

9 you saw a car actually flip over on the paved road in

10 front of the parking lot.  Do you have any knowledge as

11 to whether the individual operating that vehicle was

12 removed from the park as a result of that incident?

13      A.   As far as I know, no.  The car was pushed back

14 over by some local people.  Then the guy got in the car

15 and drove off.  I never saw him again.

16      Q.   Other than the rule that you talked about

17 being 16 or a licensed driver in order to operate one of

18 the vehicles, do you recall seeing any other rules on

19 that page that were age specific or talked about being a

20 certain age to do anything at the event?

21      A.   I can't say for sure, but I think it was 16.

22      Q.   Okay.

23      A.   Sixteen or licensed -- or you had to be both.

24 I can't remember.  Something of that nature.

B148

Delbert E.  Rollison

Page 122

1       Q.     In the area after you crossed the paved road
2   where the events were taking place, do you recall seeing
3   any children or people that you believed to be under the
4   age of 18 walking around in that area?

5       A.     Definitely.  All day long.  Between the
6   parking lot and the monster trucks, they had a lot of
7   young people being carried by their parents in their arms
8   and people being led along by their parents supervised.

9       Q.     At any time while you were there, did you
10  observe any children or people that you believed to be
11  under the age of 18 operating any of the ATV or 4-wheeler
12  vehicles that were pushing and/or pulling any mud
13  dragsters?

14      A.     No.

15      Q.     At any time while you were there, did you
16  observe any children or people that you believed to be
17  under the age of 18 behind the steering wheel of any mud
18  dragsters either operating on their own or being pushed
19  or pulled by another vehicle?

20      A.     I can't be for sure, but there's a lot of
21  4-wheelers that had been ridden back and forth around the
22  general area by young people.  Whether they were under 18
23  or not, I'm not sure.  But there was a lot of
24  traveling -- they're very common in race areas where they

B|99

Delbert E.   Rollison

Page 123

1 go from concession stands.  They use them just to travel

2 around instead of walk.

3      Q.   Okay.  At any time did you see any children or

4 people you believe under the age of 18 behind the

5 steering wheel of any of the mud dragsters?

6      A.   The only thing I would know of is Neal

7 Shoemaker's son, which I never saw him actually sitting

8 behind the wheel.  I was told by other people that he was

9 the one that was steering the vehicle.  I never actually

10 saw him in the vehicle.

11                MR. FOGG:  I have no further questions.

12 Thanks.

13                MS. FALLON:  Just to follow up on some

14 of the last questions of your attorney.

15 BY MS. FALLON:

16      Q.   As you walked in this area in between the

17 monster trucks to your left and the mud racers being

18 pushed or towed or moved to the staging area, were there

19 any other vehicles in and around the area where you were

20 walking?  Bicycles?  ATVs?  Any kind of other vehicles

21 other than people on foot in between that area?

22      A.   There was some people going by with these lawn

23 mowers going from this race area, which is the -- it had

24 a circle track in this area.  There were some people

Delbert E.  Rollison

Page 124

1 coming back from that -- one or two.  Not a whole lot.

2 Maybe one or two.

3      Q.    They were sit-down mowers?

4      A.    Yes.

5      Q.    Rider mowers --

6      A.    Yes.

7      Q.    -- in other words?

8            They were like traveling on those rider

9 mowers through the pedestrian crowd that you were a part

10 of moving toward this staging area?

11     A.    Yes.

12     Q.    Do you know if the force that you felt from

13 behind was due to one of those ride-on lawn mowers that

14 was moving through that area?

15     A.    I've never been hit by a lawn mower so I

16 couldn't compare it to anything.  But whatever hit me was

17 a lot of heavy weight and force.  It wasn't like it gave

18 when it hit me.  It was just like I was slammed.

19     Q.    You never saw what hit you?

20     A.    No.

21     Q.    Your next observance was of seeing

22 Mr. Shoemaker's mud racer; correct?

23     A.    Yes.

24     Q.    So you made an assumption that that's what

B201

Delbert E.  Rollison

Page 125

1 struck you; correct?

2      A.   Correct.

3              MS. FALLON:  That's all I have.

4              MR. FOGG:  That does prompt one

5 follow-up.

6 BY MR. FOGG:

7      Q.   With respect to the lawn mowers, were they

8 coming towards you or were they traveling behind you?

9      A.   They were coming towards me.

10             MR. FOGG:  Thank you.  That's it.

11             MR. AKIN:  I have no further questions.

12             (The deposition concluded at 1:35 p.m.

13 this same day.)

14

15               - - - - -

16

17             (I HAVE READ THE FOREGOING DEPOSITION,

18 AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.)

19

20

21

22 _____

23             WITNESS NAME

24

B202

Delbert E.  Rollison

Page 126

```
 1                    INDEX TO TESTIMONY

 2
   DELBERT EUGENE ROLLISON                        PAGE
 3
       Examination by Ms. Fallon                    2
 4     Examination by Mr. Akin                      87
       Examination by Mr. Fogg                     120
 5     Examination by Ms. Fallon                   123
       Examination by Mr. Fogg                     125
 6

 7                     - - - - -

 8
                    INDEX TO EXHIBITS
 9

10 ROLLISON DEPOSITION EXHIBIT NO.                PAGE

11 1    Sketch                                      43

12 2    Delaware Basic Life Support:  Patient       90
        Care Report
13
   3    Release and Waiver of Liability,            94
14      Assumption of Risk and Indemnity
        Agreement
15

16                     - - - - -

17

18

19

20

21

22

23

24
```

B203

Delbert E.  Rollison

1                    C E R T I F I C A T E

2 STATE OF DELAWARE:
                              :
3 NEW CASTLE COUNTY:

4            I, Robert Wayne Wilcox, Jr., a Registered

5 Professional Reporter and Notary Public, within and for

6 the County and State aforesaid, do hereby certify that

7 the foregoing deposition of DELBERT EUGENE ROLLISON, was

8 taken before me, pursuant to notice, at the time and

9 place indicated; that said deponent was by me duly sworn

10 to tell the truth, the whole truth, and nothing but the

11 truth; that the testimony of said deponent was correctly

12 recorded in machine shorthand by me and thereafter

13 transcribed under my supervision with computer-aided

14 transcription; that the deposition is a true record of

15 the testimony given by the witness; and that I am neither

16 of counsel nor kin to any party in said action, nor

17 interested in the outcome thereof.

18            WITNESS my hand and official seal this 17th day

19 of August A.D. 2006.

20

21            _____
               ROBERT WAYNE WILCOX, JR.
22            REGISTERED PROFESSIONAL REPORTER
               CERTIFICATION NO. 101-RPR
23            (Expires January 31, 2008)

24

B 204

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

DELBERT E. ROLLISON,                          :
                                              :        **C.A. No.: 06-159 SLR**
                                              :
        Plaintiff,                 :
                                              :
v.                                            :
                                              :
NEAL SHOEMAKER, as parent and legal           :
guardian of TRAVIS SHOEMAKER,                 :
NEAL SHOEMAKER, individually,                 :
TRAVIS SHOEMAKER, individually,               :
BLUE DIAMOND, LLC, a Delaware                 :
corporation, HOUGHTONS AMUSEMENT              :
PARK, LLC, a Delaware corporation,            :
JACK BRADY, individually and d/b/a KSR        :
MOTOR SPORTS, and PARKWAY                     :
GRAVEL, a Delaware corporation,

        Defendants.

## <u>RESPONSIVE MOTION OF PLAINITFF, DELBERT E. ROLLISON, TO DEFENDANTS, BLUE DIAMOND, LLC AND PARKWAY GRAVEL, INC.'s, MOTION FOR SUMMARY JUDGMENT</u>

      Plaintiff, Delbert E. Rollison, by and through his undersigned counsel, hereby moves this

Court for an order denying defendants, Blue Diamond, LLC, and Parkway Gravel, Inc.'s, motion

for summary judgment on the grounds that there are material issues of facts and/or moving

defendants are not entitled to judgment as a matter of law.  Plaintiff's Reply Brief in support is

filed simultaneously with this motion.

DOROSHOW, PASQUALE,
KRAWITZ & BHAYA

By:     /s/ Matthew R. Fogg
ARTHUR M. KRAWITZ (ID No. 2440)
MATTHEW R. FOGG (ID No. 4254)
1202 Kirkwood Highway
Wilmington, DE 19805
(302) 998-0100
DATED:  12/11/2006                    Attorneys for Plaintiff