IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DELBERT E. ROLLISON,                )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )    C.A. No. 06-159 SLR
                                    )
NEAL SHOEMAKER, an individual,)          TRIAL BY JURY DEMANDED
BLUE DIAMOND, LLC, a Delaware )
corporation, HOUGHTONS            )
AMUSEMENT PARK, LLC, a            )
Delaware corporation JACK         )
BRADY, individually and d/b/a )
KSR MOTOR SPORTS, BENCHMARK      )
BUILDERS, INC. a Delaware        )
corporation, and PARKWAY         )
GRAVEL, a Delaware               )
corporation,                     )
                                 )
        Defendants.              )


**APPENDIX TO REPLY BRIEF OF DEFENDANTS**
**BLUE DIAMOND, LLC AND PARKWAY GRAVEL, INC.**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

|                                                          |         |
| -------------------------------------------------------- | ------- |
|                                                          | Tab A   |
| Deposition Transcript of Delbert E. Rollison             | A-1-2   |
| Deposition Transcript of Neal R. Shoemaker               | A-3-6   |
| Unreported Cases                                         | Tab B   |
| Berrios v. Wilkinson Match (USA), Inc., Del. Super., C.A. No. 82C-AU-80, Bifferato, J. (October 26, 1983) | A-7-9 |
| Hollerman v. Hicks, Del. Super. C.A. 95C-06-027, Terry, Jr. (April 8, 1997) | A-10-13 |
| McDonough v. National Off-Road Bicycle Assn D. Del., C.A. No 95-504-SLR Robinson, J. (June 2, 1997) | A-14-18 |

AKIN & HERRON, P.A.

/s/Roger A. Akin
Roger A. Akin, Esquire
Bar No. 395
1220 N. Market Street, Suite 300
P.O. Box 25047
Wilmington, DE 19899
(302) 427-6987
Attorney for Defendants
Blue Diamond, LLC and
Parkway Gravel, Inc.

Dated: December 21, 2006

Delbert E. Rollison

1 area because your brother had gotten there or had almost

2 gotten to that point?

3      A.   No, sir.

4      Q.   Okay.  Were you walking in a normal stride?

5      A.   Yes, sir.

6      Q.   You were walking at least with another person,

7 I believe was your testimony.  Is that correct?

8      A.   Yes.  We were not together.  We were not team

9 members.  We were just somebody that happened to be

10 walking at the same time --

11      Q.   All right.

12      A.   -- same speed.

13      Q.   Were you talking with each other as you moved

14 toward the staging area?

15      A.   Just in general.  What did you think of that?

16 Or whatever -- it wasn't like an in-depth conversation.

17 It was just, "Hi.  How are you?"  You know, things like

18 that.

19      Q.   At any time on the date of this accident, did

20 you remember having any discussions or seeing anyone at

21 the site who was a representative of the owner of the

22 land where the race occurred?

23      A.   I never saw anybody really in charge or

24 directing anybody on what to do or where to go.  The only

A-1

Delbert E.  Rollison

Page 112

1 person I really saw as coordinating was this lady.  I

2 believe her name was Ann.

3       Q.   All right.  She instructed the crews to move

4 their vehicles to the staging area.  Is that correct?

5       A.   Yes, sir.

6       Q.   Do you recall her giving any other

7 instructions that day to the racers or their crews?

8       A.   Not that I'm aware of.

9       Q.   Had your brother participated in prior races

10 at Blue Diamond Park, that is, races prior to July 3,

11 2004?

12      A.   I don't think so.  But I'm not sure.

13      Q.   Has your brother participated in any races at

14 Blue Diamond since July of 2004 to your knowledge?

15      A.   I don't think so.  But I'm not sure.

16      Q.   Okay.  Have you been back to Blue Diamond Park

17 since this accident occurred?

18      A.   No, sir.

19      Q.   Do you know, as you sit here today, who owns

20 the Blue Diamond Park?  What person or company or other

21 entity owns the facility?

22      A.   I guess it's owned by some gravel corporation.

23      Q.   Do you know the name of that company?

24      A.   Not right off the top of my head, no.  It was

A-2

Neal R.    Shoemaker

1    Q.    -- that you recall as of July 3rd?

2    A.    No.

3    Q.    Okay.  Do you know whether there was any type

4 of fencing between the rear of spectator hill and those

5 amusement rides?

6    A.    Not that I recall.

7    Q.    Okay.  Would you agree with me that the rides,

8 the amusement rides, are a substantial distance from that

9 drag strip and the spectator area?

10    A.    Yes.

11              MS. MONTOBAN:  I don't have any further

12 questions for you.

13 BY MR. AKIN:

14    Q.    Good morning, sir.  My name is Roger Akin, and

15 I represent Parkway Gravel and Blue Diamond, LLC, in this

16 case.  Let me just ask you a few questions.

17              Do you know who owns the land where the

18 drag racing was occurring in July of 2004?

19    A.    No.

20    Q.    All right.  Have you ever heard of a

21 organization or an entity called Blue Diamond, LLC?

22    A.    Yes.

23    Q.    All right.  What is your knowledge of what

24 that entity is?

A-3

Corbett & Wilcox

Neal R.   Shoemaker

1 opening where the driver looks?

2      A.   Oh, absolutely.  Yes.

3      Q.   Since the date of this accident, have you

4 spoken with any representative of Blue Diamond or Parkway

5 Gravel?

6      A.   No.

7      Q.   Okay.  Did anyone come forward immediately

8 after Mr. Rollison was seen on the ground to identify

9 himself as a witness to the accident?

10      A.   No.  Not to my knowledge.

11      Q.   All right.  What is your understanding, if

12 any, of where Mr. Rollison was or where he was going just

13 before the accident occurred?

14      A.   To my knowledge, he was going out to his

15 brother which was ahead of me in the brigade, if you want

16 to call it.

17      Q.   That's the line of vehicles approaching the

18 lineup area?

19      A.   Yes.

20      Q.   Was his brother operating the vehicle just

21 ahead of you to your knowledge?

22      A.   Yes.

23      Q.   Okay.  So it's your understanding that

24 Mr. Delbert Rollison was walking toward his brother's

*A-4*

Corbett & Wilcox

Neal R.  Shoemaker

1       A.   It's fairly quiet.

2       Q.   All right.  Does it have a horn on it?

3       A.   No.

4       Q.   Does it have any sort of audible warning

5 signals that you can use?

6       A.   No.

7       Q.   As you were moving toward the racer lineup

8 area, the monster trucks were to your left.  Is that

9 correct?

10      A.   Yes.

11      Q.   Okay.  Do you know if Mr. Rollison was moving

12 toward his brother's vehicle from your right or your

13 left?

14      A.   I don't know.

15      Q.   So it's your testimony that no one came to you

16 immediately after the accident to tell you that they had

17 seen what happened.  Is that correct?

18      A.   No.

19      Q.   Do you know if just prior to the accident

20 Mr. Delbert Rollison was standing talking with a group of

21 individuals?

22      A.   I don't know.

23      Q.   All right.  As you looked up as Travis told

24 you to stop and as you then stopped your vehicle, did you

A-5

Neal R.  Shoemaker

Page 50

1  see any other individual within, say, 10 to 20 feet of

2  the dragster?

3      A.   Well, there was a whole crowd of people once

4  the incident happened.

5      Q.   All right.

6      A.   But not at the time.  I don't recall anybody

7  in particular.

8      Q.   You testified earlier, I think, that the

9  layout of the racing area was pretty much the same

10 Memorial Day as it was 4th of July weekend.  Is that

11 correct?

12     A.   Yes.

13     Q.   Did you race on July 3, 2004?

14     A.   No, I did not.

15     Q.   All right.  Was that because this accident had

16 occurred?

17     A.   Yes.  To my choice.

18     Q.   All right.  So you were not told by Mr. Brady

19 or anyone else not to race?

20     A.   No.

21     Q.   What is your understanding again of

22 Mr. Brady's role with regard to the July 3 race?

23     A.   He was the promoter.

24     Q.   Okay.  In your terms, what does a promoter do

A-6

Westlaw.

Not Reported in A.2d

Not Reported in A.2d, 1983 WL 413303 (Del.Super.)

**(Cite as: 1983 WL 413303 (Del.Super.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.
Jacinto BERRIOS
v.
WILKINSON MATCH (USA), INC.
**No. CIV. A. 82C-AU-80.**

Submitted: Sept. 26, 1983.
Decided: Oct. 26, 1983.
Robert V. Witsil, Jr., Esq., Brandt & Benson, Wilmington.

James W. Semple, Esq., Flanzer & Isaacs, Wilmington.

BIFFERATO, J.

*1 Gentlemen:

In this products liability action alleging **negligence** in the design, manufacture and assembly of the Jacobson Greens King II riding lawn mower, and breach of implied warranties of merchantability and fitness for a particular purpose, defendant Wilkinson Match (USA), Inc., (Wilkinson) has moved for **summary judgment**. The only issues addressed in defendant's brief were its allegations of **assumption** of the **risk** and **contributory negligence** on the part of the plaintiff. Therefore, this opinion will be restricted to those issues.

The following undisputed facts form the basis of the underlying cause of action. The plaintiff, Mr. Berrios, was born in Puerto Rico on July 26, 1935; he came to Wilmington, Delaware in 1958. He has worked on and off at the Wilmington Country Club for the past 15 years and, at the time of this accident, he was employed there as a greenskeeper.

Mr. Berrios has a seventh grade education which he received in Puerto Rico.

On the morning of August 28, 1980, Mr. Berrios injured his hand while operating a Jacobson Greens Keeper II mower on the Wilmington Country Club North Course. Mr. Berrios had stopped the machine on a green when he noticed that the grass cuttings were not being picked up by the mower. He left the motor running and the mower blades or "reels" turning, and alighted the machine. Cuttings were sticking in the mower at a point where the edge of the basket which collected cuttings met the mower. The accumulation of grass obscured Mr. Berrios' view of the blades; however, he has stated that he knew the blades were turning. As he placed his finger on the edge of the basket in an attempt to clear away the grass, his hand was struck by the turning blades.

Mr. Berrios testified to the following matters at his deposition:
 1. He had received an explanation concerning the use and operation of the mower;
 2. He had operated the mower "a couple of times a week" for "a couple of months" prior to the accident;
 3. He had been instructed not to stop the machine and leave the motor running while on the greens;
 4. He was aware that the blades were driven by the motor;
 5. At the time of the accident he knew the blades of the mower were still turning;
 6. He was aware that if he placed his hand near the blades, he could get hurt;
 7. He was also aware that if he had turned the motor off the blades would have stopped turning.

On the day of the accident and prior thereto, there appeared various warnings on the mower in question. On the front of the operator's console, the following warning appeared:
 Be Careful!

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-7

Not Reported in A.2d                                                                                    Page 2

Not Reported in A.2d, 1983 WL 413303 (Del.Super.)

**(Cite as: 1983 WL 413303 (Del.Super.))**

1. Keep all shields in place;
2. Stop machine to adjust and oil;
3. When mechanism becomes clogged, disengage power before cleaning;
4. Keep hands, feet and clothing away from powerdriven parts.

Additional warnings were present on both sides of the front reels that read in part, "Danger. Stop Engine and Disengage Reels Before Working on Mowers or Emptying Grass Catchings."

**\*2** The principal issue for resolution in this motion for **summary judgment** is whether there is a genuine issue of material fact with respect to the affirmative defenses of **contributory negligence** and/or **assumption** of the **risk.** *State v. Wolcott,* Del.Supr., 83 A .2d 759 (1951).

**Contributory negligence** is defined by the Restatement (Second) of Torts § 463 as conduct on the part of a plaintiff which fails to meet the standard of conduct a reasonable man would conform to for his own protection, and which cooperates with the negligence of the defendant to bring about the plaintiff's injury. By definition, the standard imposed is an objective standard. Assumption of the risk occurs when a plaintiff "knows of the existence of risk, appreciates the danger of it and nevertheless does not avoid it." *Yankanwich v. Wharton,* Del.Supr., 460 A.2d 1326, 1330 (1983); citing *Robinson v. Meding,* Del.Supr., 163 A.2d 272, 276 (1960). But, if the plaintiff has no reasonable alternative but to encounter the defendant's tortious conduct, he will not be deemed to have "assumed the risk." The standard imposed is a subjective standard--what that particular plaintiff sees, knows, understands and appreciates. 460 A.2d at 1330.

Though the application of these two affirmative defenses requires viewing conduct under different governing standards, a single act by a plaintiff may amount to both **assumption** of the **risk** and **contributory negligence.** For example, when a plaintiff voluntarily encounters or assumes a **risk** involving danger which is out of all proportion to the interest he is seeking to advance, both defenses are applicable. Restatement (Second) of Torts §

496A comment d. Alternatively, if by reason of age, or lack of information, experience, intelligence, or judgment, the plaintiff does not understand the risk involved, he will not be deemed to have assumed it, but he may still be adjudged contributorily negligent because his conduct does not conform to the community standard of the reasonable man. *Yankanwich v. Wharton,* Del.Supr., 460 A.2d 1326, 1330 (1983) citing Restatement (Second) of Torts § 496D comment c.

The issues presented by these two defenses are ordinarily questions for the trier of fact, but it is well settled that if the undisputed facts are such that a reasonable juror could only draw one conclusion, summary judgment is appropriate. *Wootten v. Kiger,* Del.Supr., 226 A.2d 238 (1967); *Johnson v. Hockessin Tractor, Inc.,* Del.Supr., 420 A.2d 154 (1980). The Court is satisfied that this case presents just such a situation.

The circumstances surrounding this case are strikingly similar to *Johnson v. Hockessin Tractor, Inc.,* Del.Supr., 420 A.2d 154 (1980), in which the purchaser of a tractor brought an action against a retailer after sustaining injuries to his hand when he attempted to shut off a tractor engine by reaching under the carburetor and turning a small valve or "pet cock" which controlled the flow of gas. In so doing, he placed his hand into the operating belt and pulley system. The Court noted the following facts:

**\*3** Johnson had a background of experience with mechanical devices and was very familiar with the operation of the tractor. Johnson knew that there were two methods that could be used to turn off the tractor's engine: (1) by pressing the "kill button", which was the procedure apparently intended by the manufacturer; and (2) by turning the "pet cock", causing gasoline to flow out of the carburetor and consequently causing the engine to cease functioning.

... Placed within inches of the "pet cock", in plain and open view, was the belt and pulley system. Johnson was fully aware of the positioning of these tractor parts and their functions.

420 A.2d at 156. Also, as in this case, the plaintiff in *Johnson* did not see the moving parts which caused his injury, but knew their location and that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-8

Not Reported in A.2d                                                          Page 3

Not Reported in A.2d, 1983 WL 413303 (Del.Super.)

**(Cite as: 1983 WL 413303 (Del.Super.))**

they were turning.

The Court held that Johnson was guilty of contributory negligence as a matter of law in that he fully understood the inherent danger in his act and knew of an alternative course of action which was safe. The Court stated: "If a person has the choice of two alternate paths, one known to be safe, the other known to be **risky,** the unnecessary choice of the **risky** path constitutes **contributory negligence** ." *Id.* at 159.

In this case Mr. Berrios' own testimony leaves little doubt that he knew of the existence of the **risk** and knew of the danger of being seriously injured by the mower blades. Likewise, he was aware of the fact that by merely shutting down the mower engine he could have alleviated all **risk** of injury. Given the objective he was attempting to accomplish, the substantial **risk** incurred, and the ease in which harm could have been avoided, his conduct was highly unreasonable.

The initial burden of establishing the absence of a genuine issue of material fact has been satisfied by the moving party and is unrebutted by the plaintiff. *Moore v. Sizemore,* Del.Supr., 405 A .2d 679, 680 (1979). Here the plaintiff has failed to present evidence on the relevant issues, but rather has directed the court to issues of fact pertaining to the alleged **negligence** on the part of the defendant. The plaintiff argues that "[t]he existence of the inference of the defendant-manufacturer's **negligence,** when viewed in a light most favorable to the plaintiff, should prevent the granting of defendant's motion for **summary judgment.**" Even conceding **negligence** on the part of the defendant, **contributory negligence** or **assumption** of the **risk** bars recovery here. Restatement (Second) of Torts § 467; Restatement (Second) of Torts § 496A.

For the reasons cited herein, the defendant's motion for **summary judgment** on the issues of **contributory negligence** and **assumption** of the **risk** must be GRANTED.

IT IS SO ORDERED.

Not Reported in A.2d, 1983 WL 413303 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-9

Not Reported in A.2d, 1997 WL 358453 (Del.Super.)

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.
SCOTT **HOLLERMAN**, individually Scott **HOLLERMAN**, as Guardian ad Litem of Samantha L.
**HOLLERMAN**, Scott **HOLLERMAN** as Administrator of the Estate of Patricia B. **Hollerman** and
Jessica N. **Hollerman**, Sylvia **Hollerman**, and George E. **Hollerman**, Plaintiffs,
v.
MARGARET **HICKS** and Mary K. DELGADO, as Administratrix of the Estate of Marvin L. **Hicks**,
Defendants.
No. CIV. A. 95C-06-027.
Submitted March 14, 1997.
Decided April 8, 1997.

Nicholas H. Rodriguez, Esq., Schmittinger & Rodriguez, Dover, Delaware.
Arthur D. Kuhl, Esq., Dennis D. Ferri, P.A., Wilmington, Delaware.
Thomas S. Bouchelle, Esq., Newark, Delaware.

*OPINION*

**\*1** This action arises out of an automobile collision which occurred in Sussex County, Delaware, when a vehicle driven by Marvin Hicks collided with a vehicle which I will call the "Hollerman Vehicle". The plaintiffs are Sylvia Hollerman, who was the driver of the Hollerman vehicle, her husband, George, and the other passengers and personal representatives of deceased passengers who were in the Hollerman vehicle.

Before this action was filed in Delaware, the passengers and the personal representatives of the deceased passengers of the Hollerman vehicle sued Sylvia and George Hollerman in Maryland. They settled that action in December 1994 for $98,000.

Meanwhile, Marvin Hicks died on February 6, 1994 and his mother, Margaret Hicks, who was a co-owner of his vehicle, took possession of his personal estate pursuant to 12 Del. C. § 2306. That statute reads as follows:

(a) The spouse of a decedent or any person who is a grandparent of the decedent, a lineal descendant of a grandparent of the decedent, the personal representative of any of the foregoing who may be deceased, or the guardian or trustee of any of the foregoing who may be incapacitated, or the trustee of a trust created by the decedent, or a funeral director licensed in the State, shall be entitled to the personal estate of the decedent for the purpose of making distribution thereof in accordance with the decedent's will or, if there be no will, with Chapter 5 of this title without awaiting the appointment of a personal representative or probate of a will when:

(1) No petition for the appointment of a personal representative is pending or has been granted;

(2) Thirty days have elapsed since the death of the decedent;

(3) The value of the personal estate of the decedent other than property described in subsections (b) and (c) of § 1901 of this title and other than jointly owned property, does not exceed $20,000;

(4) All known debts of the decedent are paid or provided for;

(5) The surviving spouse's allowance, pursuant to § 2308 of this title, has been paid, provided for, waived or has expired by lapse of time pursuant to subsection (b) of § 2308 of this title; SU22 (6)

A-10

Decedent did not own solely owned real estate located in Delaware; and

(7) There is furnished to any person owing any money, having custody of any property or acting as registrar or transfer agent of any evidence of interest, indebtedness, property or right of the decedent an affidavit showing the existence of the foregoing conditions and the right of the affiant to receive such money or property or to have such evidence transferred for the purpose set forth in this subsection.

(b) Preference for receiving the personal estate of the decedent under this section for the purpose of making distribution thereof shall be given to the spouse, any child, any parent, any sibling, any grandchild or any grandparent of the decedent, or to a funeral director licensed in the State, in that order. There shall be no order of preference among the remaining persons or entities entitled to receive the personal estate pursuant to subsection (a) of this section.

**\*2** Margaret Hicks as the decedent's mother had the priority required by the statute to receive and distribute Marvin Hicks' personal estate. On March 27, 1995 she received $2,000 from Sylvia and George Hollerman's insurance carrier in connection with the Maryland action even though neither she nor her son were named as plaintiffs in that case. In return she executed a release to Sylvia and George Hollerman "and any and all other persons" from any liability arising out of the automobile accident for any and all claims including claims for "contribution and/or indemnity." She signed the release "Margaret Hicks Admin. estate Marvin Hicks," and she furnished the affidavit required by § 2306.

After the Maryland suit was settled, all of the occupants of the Hollerman vehicle or their personal representatives, including Sylvia and George Hollerman who were defendants in the Maryland action, joined together and filed suit in Delaware on July 28, 1995. The defendants are Margaret Hicks individually and Mary Delgado as Administratrix of the estate of Marvin Hicks. Ms. Delgado received letters of Administration from the Kent County Register of Wills on July 27, 1995 for the express purpose of opening up an estate to be sued in Delaware.

The defendants filed a counterclaim against Sylvia Hollerman in Margaret Hicks' own right seeking damages to the vehicle she co-owned with Marvin Hicks. The counterclaim also asserts a claim against Sylvia Hollerman on behalf of the estate of Marvin Hicks for contribution and/or indemnification and for the apportionment of liability in accordance with the Delaware Uniform Contribution Among Joint Tortfeasors Act.

Plaintiff Sylvia Hollerman has filed this motion for summary judgment on the counterclaim. She says that the release executed by Margaret Hicks operates to bar her individual claim and also the claim of Marvin Hicks' estate.

The first issue is whether a person who acts pursuant to 12 _Del. C._ § 2306 for the purpose of receiving and distributing the estate of a decedent can settle and release any personal injury claim which the decedent might have against a third party. There is no Delaware decision on this subject. In considering this issue notice must be taken of 12 _Del. C._ § 1501 which provides that "No one shall act as the executor or administrator of a domiciliary decedent's estate within this State without letters testamentary or of administration being granted in accordance with this title."

When applying a statute, the fundamental rule is to give effect to the intent of the legislature.[FN1] To aid in the determination of legislative intent, the court must examine every section of the statute which in any way deals with the question raised.[FN2] Statutes should be construed in a manner which avoids absurd, meaningless or patently inane results.[FN3] However, when the statutory language is both clear and can be read to be consistent with other provisions of the same legislation and with the legislative purpose and intent, the court must give effect to that intent. [FN4]

**\*3** Section § 2306 was enacted to allow parties to distribute a small estate where all debts of the estate are ascertainable and have been paid, and where the value of the personalty does not exceed $20,000. This statute enables parties with small estates to avoid the sometimes lengthy and

A-11

expensive process of probate. However, the statute specifically states that it bestows these powers upon an individual solely for the purpose of distribution. [FN5] There are many responsibilities undertaken by a fiduciary such as an administrator or executor, only a part of which includes the distribution of property. [FN6] Section 1501 is designed to protect a decedent's estate and its beneficiaries from the unauthorized acts of others and to ensure that there is a party to hold responsible to the estate and its beneficiaries for those actions which are in breach of the personal representative's fiduciary duties.

I do not construe § 2306 to empower a person who is entitled to priority under that statute to settle claims of a decedent's estate which are unliquidated and subject to dispute. That is a function to be exercised by a personal representative appointed pursuant to § 1501 whereby the actions of the fiduciary would be subject to an accounting which must be approved by the Register of Wills with ultimate supervisory responsibility resting in the Court of Chancery. There are many opportunities for fraud if an unliquidated and disputed claim, such as one for personal injury, could be settled by someone supplying an affidavit under § 2306. To confer this power on someone acting under the authority of § 2306 would eviscerate the intent and purpose which underlies § 1501 and would expand the specific and limited purpose of § 2306 beyond what I conclude the legislature intended when it was enacted.

Section 2306 must also be read in context with § 2307(a) which reads:

The person making payment, delivery, transfer or issuance pursuant to the affidavit described in § 2306 of this title shall be released to the same extent as if made to the personal representative of the decedent and the person shall not be required to see to the application thereof or to inquire into the truth of any statement in the affidavit, but the distributees to whom payment, delivery, transfer or issuance is made shall be answerable therefor to any person having a prior right and be accountable to any intestate distributee or to any personal representative thereafter appointed.

To the extent that a person delivers property described in section 2306(a)(7) he is released from further liability for the proper distribution of that property pursuant to 12 Del. C. § 2307. Nothing, however, in either section 2306 or 2307 purports to release a person who may be liable to a decedent for money in some unliquidated, disputable amount from the full extent of his liability, but only to the extent of the actual amount paid. Similarly, nothing in those statutes authorizes or empowers a person furnishing an affidavit pursuant to § 2306 to execute a release in settlement of a disputed claim. For a full release of a disputed claim a personal representative must be appointed pursuant to 12 Del. C. § 1501. In this case the $2000 received on behalf of the estate will be credited against any amount recovered on the counterclaim. Therefore, the plaintiff's motion for summary judgment on the counterclaim of the estate of Marvin Hicks for contribution and/or indemnity is *denied.*

**\*4** The next issue is whether the release binds Margaret Hicks individually in respect to her attempt to recover damages for the loss of the vehicle from Sylvia and George Hollerman. Delaware Courts recognize the validity of a general release. [FN7] In construing a release, the intent of the parties as to its scope and effect is controlling, and the court will attempt to ascertain the intent from the overall language of the document. [FN8] Furthermore, where the language of the release is clear and unambiguous, it will not lightly be set aside. [FN9] In this case, the agreement does not expressly name the parties which are to be bound in its body. The only evidence of such is the signature where Margaret Hicks signed in the capacity as administratrix of the estate of Marvin Hicks. Nowhere does she sign individually. Since this part of the release is arguably ambiguous, it should be construed against the drafter and in defendant's favor. [FN10] Since there is no other evidence to support the claim that she signed in her individual capacity, I construe the release to have been executed by her in her purported capacity as administratrix of her son's estate only. Consequently, plaintiffs' motion for summary judgment on this issue is also *denied.*

*ORDER*

A-12

This 8th day of April, 1997, for the reasons given in the Opinion issued on this date plaintiffs' motion for summary judgment is *denied.*

*IT IS SO ORDERED.*

FN1. *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.,* Del.Supr., 492 A.2d 1242, 1246 (1985).

FN2. *Id.* at 1245.

FN3. *Tulou v. Raytheon Service Co.,* Del.Super., 659 A.2d 796, 805 (1995), *reargument denied,* 1995 WL 269898; *In re Adoption of Swanson,* Del.Supr., 623 A.2d 1095, 1099 (1993).

FN4. *Seth v. State,* Del.Supr., 592 A.2d 436, 440 (1991).

FN5. 12 *Del. C.* § 2306(a).

FN6. *See In re Estate of Wheatley,* Del. Orph., 60 A.2d 113, 115 (1948).

FN7. *Chakov v. Outboard Marine Corp.,* Del.Super., 429 A.2d 984, 985 (1981).

FN8. *Adams v. Jankouskas,* Del.Supr., 452 A.2d 148, 155-56 (1982); *see also Chakov,* 429 A.2d at 985 (citing *Raughley v. Delaware Coach Co.,* Del.Supr., 91 A.2d 245, 248 (1952)).

FN9. *Hob Tea Room v. Miller,* Del.Supr., 89 A.2d 851, 856 (1952).

FN10. *See Farrell v. A.C. & S. Co., Inc.,* Del.Super., 586 A.2d 662, 666 (1990) (holding a that an ambiguity in a release should be resolved against the drafting party).

Copr. (C) West 2006 No Claim to Orig. U.S. Govt. Works Del.Super.,1997.
Hollerman v. Hicks
Not Reported in A.2d, 1997 WL 358453 (Del.Super.)

END OF DOCUMENT

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-13

Not Reported in F.Supp., 1997 WL 309503 (D.Del.)

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Arthur **McDONOUGH** and Linda **McDonough**, in their own right and as Parents of Bradley Alan
**McDonough**, deceased, and Arthur **McDonough** in his own right and as Administrator of the Estate
of Bradley Alan **McDonough**, Plaintiffs,
v.
**NATIONAL OFF-ROAD BICYCLE** ASSN. (NORBA), U.S. Cycling Fed., and Delaware Trail Spinners,
Defendants.
No. Civ. A. 95-504-SLR.
June 2, 1997.

Donald Eilhu Evans, Esquire, Wilmington, Delaware. Counsel for plaintiffs. Of Counsel: Edwin F.
McCoy, Esquire., Philadelphia, Pennsylvania.
Mason E. Turner, Esquire, of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Delaware. Counsel
for defendants.

MEMORANDUM OPINION

SUE L. ROBINSON, District Judge.

I. INTRODUCTION

**\*1** This case is a wrongful death/survival action filed as a result of Bradley McDonough's
("McDonough") death on August 30, 1993. Plaintiffs are Arthur and Linda McDonough, the parents of
the decedent (collectively referred to as "plaintiffs"). Defendants are The National Off-Road Bicycle
Association ("NORBA"), United States Cycling Federation ("Federation"), and the Delaware Trail
Spinners ("Trail Spinners"). The court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).
Presently before the court is defendants' motion for summary judgment. (D.I.66) For the following
reasons, defendants' motion for summary judgment shall be denied.

II. BACKGROUND

In the summer of 1993, Bradley McDonough developed an interest in off-road bicycle competition. In
the spring or early summer of 1993, McDonough acquired an off-road bike (also known as a mountain
bike) and rode with his college friends, Randall Blaker ("Blaker"), Michael Odenwald ("Odenwald"),
and Kenny Steidle ("Steidle"). (D.I. 71 at A51-A52) On August 8, 1993, McDonough, Blaker,
Odenwald and Steidle participated in a NORBA sanctioned event in Windham, New York ("Windham
race"). (D.I. 71 at A51) In all NORBA events, participants are required to obtain a permanent
membership or a one-day trial membership. The application for the one-day membership contains a
section entitled "Agreement and Release of Liability" ("release"). (D.I. 68 at A3) On the day of the
Windham race, McDonough, along with his friends, paid for a one-day trial membership and signed
the release. (D.I. 71 at A 54-55; D.I. 68 at A5) In signing the release, Blaker stated that he did not
really read it, but simply skimmed through it. (D.I. 71 at A54) Blaker stated that he assumed it was a
release "to some degree and we understood that we were involved in a sport." (D.I. 71 at A54-A55)

The Windham race course was basically a two lap course. (D.I. 71 at A56) McDonough and Steidle
quit after one lap because they were tired. (D.I. 71 at A56) Blaker, who was behind McDonough and
Steidle, also stopped after the first lap since his friends had stopped. (D.I. 71 at A56) Odenwald did
not complete the race either, because his bicycle broke. (D.I. 71 at A56) All four friends had water
bottles on their bikes during the race. (D.I. 71 at A54)

On August 15, 1993, McDonough and Blaker participated in another NORBA sanctioned event in Delaware, called the C & D Canal Classic ("C & D race"). (D.I. 84 at A109) The C & D race consisted of three race levels: (1) Beginners'; (2) Sport; and (3) Pro/Expert. (D.I. 71 at A22) McDonough and Blaker both entered the Beginners' level. (D.I. 71 at A23 and A59) The Beginners' course was a 14 mile course "over the local terrain which included steep and gradual hills, open gravel and dirt roads, and wooded trails." (D.I. 71 at A23) The Sport and Pro/Expert courses also used the same 14 miles designated for the Beginners' course. (D.I. 71 at A38)

**\*2** The Beginners' course was difficult because of its layout. (D.I. 71 at A38) The terrain on the Beginners' course made it difficult for riders to access their own water without stopping. (D.I. 71 at A38) Some areas on the course were smoothed out so that riders could stop or ride slowly and access their water bottles. (D.I. 71 at 38) The course, however, did not have any neutral area where water was given out to the race contestants. (D.I. 71 at A38) The only water the race contestants could drink was the water that they brought themselves. (D.I. 71 at A38) No physician was present at the race. (D.I. 71 at A24) There was neither an ambulance nor emergency medical personnel present at the race site. (D.I. 71 at A23) Denise Dowd ("Dowd"), another participant in the Beginners' level, stated that the course was "difficult due to the heat and humidity and layout." (D.I. 71 at A87) Although Dowd is an avid biker and had participated in approximately 20 mountain bike races, it took her over an hour and fifteen minutes to complete the course. (D.I. 71 at A87)

Defendant Trail Spinners, a NORBA club member, received sanctioning from NORBA to promote the C & D race. In order to receive sanctioning, defendant Trail Spinners had to complete a "Pre-Event Planning Checklist" ("Checklist") provided by NORBA. (D.I. 84 at A109-A110) The Checklist contains several questions relating to the safety precautions taken for the event. Trail Spinners, through its race director William Bowen ("Bowen"), represented on the Checklist that there would be, *inter alia*, emergency medical assistance on site and adequate water for the participants and spectators. (D.I. 84 at A110) Bowen specifically represented that there would be an ambulance on site and adequate water or fluids for participants and spectators before, during, and after the event. (D.I. 84 at A110) The Checklist also provided that: "A NORBA Official must be present at your event. The NORBA Official will complete their portion of the checklist before allowing the event to proceed." (D.I. 84 at A109) The Checklist identifies Elizabeth Small ("Small") as the NORBA Official. Small, however, did not complete her portion of the Checklist and did not sign it. (D.I. 84 at A110)

When McDonough arrived at the race site, he again paid for a one-day trial membership and signed the release. (D.I. 68 at A7) Blaker also paid for a one-day trial membership and signed the release. (D.I. 71 at A59) No one at the race site explained the documents to the race participants. (D.I. 71 at A41) The release provides in part:

I acknowledge that cycling is an inherently dangerous sport in which I participate at my own risk and that NORBA is a non-profit corporation formed to advance the sport of cycling, the efforts of which directly benefit me. In consideration of the agreement with NORBA to issue an amateur license to me, hereby on behalf of myself, my heirs, assigns and personal representatives, I release and forever discharge NORBA and the United States Cycling Federation, its employees, agents, members, sponsors, promoters, and affiliates from any and all liability, claim, loss, cost or expense, and waive any such claims against any such person or organization, arising directly or indirectly from or attributable in any legal way to any action or omission to act of any such person or organization in connection with sponsorship, organization or execution of any bicycle racing or sporting event, in which I may participate as a rider, team member or spectator.

**\*3** (D.I. 68 at A5) On the back of the trial membership and release certain "Racing Regulations" are set forth. (D.I. 68 at A8). At section 4.6, NORBA recommends that each participant carry "[a]t least 8 ounces of water." (D.I. 68 at A8) Section 5.6 provides that neutral water will be provided for any race that exceeds 60 minutes in length. (D.I. 68 at A8)

According to James McGroerty ("McGroerty"), the President, officer, and Co-Founder of Trail Spinners, it is commonly understood by those who participate in races that they are required to sign the release. (D.I. 71 at A45) McGroerty stated that: "Most of [his] friends who are avid racers look at the form as you are signing this paper basically saying yes, I am doing this race at my own risk on the

A-15

course. If I get hurt, it's my own fault. It's basically the way we look at it when we sign these forms and compete in an event." (D.I. 71 at A45) Dowd, who also signed the release that day, stated that she understood that the release was intended to protect the defendants from liability. (D.I. 71 at A89) Dowd, however, did not believe that the release was intended to relieve the defendants from providing "common sense safety precautions, particularly on site trained medical personnel with an ambulance." (D.I. 71 at A89) Dowd stated that she would not have signed the release if she had known there was no medical assistance immediately available. (D.I. 71 at A89)

Before the start of the race, McGroerty addressed the race contestants from the hood of his car. (D.I. 71 at A38 and A42) He addressed the participants without a bullhorn. (D.I. 71 at A37) There were approximately 80 to 100 total participants in the group that raced with McDonough and Blaker. (D.I. 71 at A37 and A62) McGroerty told the race contestants that there was no ambulance on site, but that one could be called. (D.I. 71 at A42) McGroerty did not specifically warn the participants about heat exhaustion. (D.I. 71 at A42) Instead, McGroerty told the contestants to be "careful, ⋯ take their time" and not to "ride over your head, which means going beyond your ability." (D.I. 71 at A42) McGroerty also told them to "watch their bodies, make sure they didn't push themselves too hard because it was hot out." (D.I. 71 at A42) Finally, he told them that "[i]f they felt dizzy or nauseous, to back off, stay cool and keep from going too hard." (D.I. 71 at A42) McGroerty did not get any questions after he addressed the participants. (D.I. 71 at A37) McGroerty testified that he does not have Red Cross, CPR or EMT certification of any kind. (D.I. 71 at A43) He also does not know the signs of exertional heat stroke. (D.I. 71 at A43)

At approximately 9:00 a.m., McDonough and Blaker left the starting line with other contestants. (D.I. 71 at A23 and A62) Both McDonough and Blaker had brought water bottles with them. (D.I. 71 at A61) The temperature on that day was "extremely hot [ ] with high humidity." (D.I. 71 at A85) Although McDonough and Blaker began the race together, they were separated because Blaker had a flat tire. (D.I. 71 at A63) After Blaker changed his flat tire, he continued in the race and eventually completed the course. (D.I. 71 at A64) McDonough, however, did not. (D.I. 71 at A64)

*4 McGroerty found McDonough when he went to investigate whether some participants had accidently or deliberately missed the course markings. (D.I. 71 at A44) McGroerty first saw McDonough's bike. As he approached the bike, he saw McDonough who was about five or six feet from his bike. (D.I. 71 at A44) According to McGroerty, other participants would not have seen McDonough since he was off to the side of the course, but could have seen his bike. (D.I. 71 at A44)

When McGroerty found McDonough, he was on the ground lying on his side and his breathing was heavy and labored. (D.I. 71 at A44) McDonough appeared to have trouble breathing and was not responsive. (D.I. 71 at A44) According to McGroerty, McDonough appeared to be unconscious. (D.I. 71 at A44) Based on these observations, McGroerty called 911 from his cellular phone. (D.I. 71 at A44) After calling 911, McGroerty went to the start/finish area and sought assistance. (D.I. 71 at A42 and A87) He led two people back to where McDonough was found and they administered CPR until an ambulance arrived. (D.I. 71 at A42 and A87-A88) According to Dowd, one of the two people who administered CPR, no one gave McDonough any water before the ambulance arrived because no water was provided. (D.I. 71 at A88) Blaker, however, testified that when McDonough's bike was brought back from where McDonough had been found, it still had a water bottle attached to it that was half full. (D.I. 71 at A65)

Dowd stated that the race was "generally disorganized" and that there was a lot of confusion. (D.I. 71 at A86) According to Dowd, the race was delayed for 30 minutes and no maps of the course were given to the participants or posted. (D.I. 71 at A87-A88) Small, the NORBA official on duty at the race, reported to NORBA that the "[r]ace director [Bowen] was 'light' in the emergency medical area." (D.I. 84 at A110) Small also reported that no course maps were available, but that the course was adequately marked. (D.I. 84 at A110) Overall, Small stated that mistakes were made since no water was provided, no emergency medical personnel were on site, and the course was too long. (D.I. 84 at A114)

Dowd stated that it took her about 5 minutes to reach McDonough and that the ambulance arrived 10 to 15 minutes after she began administering CPR. (D.I. 71 at A88) When the ambulance arrived,

A-16

~~McDonough was treated by paramedics and helicoptered to the Medical Center of Delaware in Christiana, Delaware. (D.I. 71 at A23) Although hospitalized, McDonough died of heat stroke on~~ August 30, 1993. (D.I. 70 at 1)

## III. DISCUSSION

### 1. Summary Judgment Standard

Summary judgment should be granted only if a court concludes that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact is in dispute. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once the moving party has carried its initial burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.' " Id. at 587. "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n. 1 (3d Cir.1995) (citations omitted). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that factual issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This court, however, must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir.1995) (citation omitted).

### 2. Express or Primary Assumption of Risk

*5 Since Delaware adopted a comparative negligence statute,[FN1] it has become necessary to distinguish between primary and secondary assumption of the risk. Koutoufaris v. Dick, 604 A.2d 390, 397 (Del.1992); cf. Bib v. Merlonghi, 252 A.2d 548, 550 (Del.1969) Primary assumption, sometimes referred to as express assumption of risk, "involves the express consent to relieve the defendant of any obligation of care while secondary assumption [of risk] consists of voluntarily encountering a known unreasonable risk which is out of proportion to the advantage gained." Koutoufaris, 604 A.2d at 397-398. With the adoption of the comparative negligence statute in Delaware, secondary assumption of risk became "totally subsumed within comparative negligence." Id. at 398. Primary assumption of risk, however, still exists as a complete bar to recovery. See id. (stating that primary assumption of risk "might well constitute a complete bar to recovery, as a matter of law, even in a comparative negligence jurisdiction") (citation omitted); see also Patton v. Simone, 626 A.2d 844, 852 (Del.Super.Ct.1992); see also Staats v. Lawrence, 576 A.2d 663, 668 (Del.Super.Ct.1990).

> FN1. In 1984, Delaware adopted a modified comparative negligence statute, which allows a jury to apportion liability where both parties are negligent only if the plaintiff's negligence is less than fifty percent. 10 Del. C. § 8132 (1984).

Defendants argue that plaintiffs' action is barred, as a matter of law, because McDonough expressly assumed the risks inherent in an off-road bicycle race when he signed the release. Defendants contend that the release, in plain and unambiguous language, is intended to protect defendants from all liability arising out of any hazards encountered in an off-road bike race. (D.I. 78 at 9) Defendants assert that McDonough, as a college graduate and former participant in a NORBA event, must have had an understanding of the these inherent dangers when he signed the release. As further support, defendants note that McDonough signed an identical Agreement and Release just one week prior to

A-17

the C & D race. Based on these facts, defendants assert that summary judgment is appropriate.

In considering the facts and making all reasonable inferences in plaintiffs' favor, the court finds to the contrary. A release will not be set aside if the language is clear and unambiguous. _Hallman v. Dover Downs, Inc.,_ Civ.A. No. 85-618 CMW, 1986 WL 535 at *2 (D.Del., Dec.31, 1986) (citing _Chakov v. Outboard Marine Corp.,_ 429 A.2d 984, 985 (Del.1981); _see Bennett v. United States Cycling Federation,_ 193 Cal.App.3d 1485, 239 Cal.Rptr. 55, 58 (Cal.Ct.App.1987). Where the language of a release is ambiguous, it must be construed strongly against the party who drafted it. _Hallman,_ 1986 WL 535 at *2; _Bennett,_ 239 Cal.Rptr. at 58. In an express agreement to assume a risk, a plaintiff may undertake to assume all risks of a particular relation or situation, whether they are known or unknown to him. _Restatement (Second) of Torts,_ § 496D, cmt. a, (1965). However, for the release to be effective, it must appear that the plaintiff understood the terms of the agreement, or that a reasonable person in his position would have understood the terms. _Bennett,_ 239 Cal.Rptr. at 58. As the _Bennett_ court stated, "[t]here is little doubt that a subscriber of a bicycle release ··· must be held to have waived any hazards relating to bicycle racing that are obvious or that might reasonably have been foreseen." _Id._ These hazards include "collisions with other riders, negligently maintained equipment, bicycles which were unfit for racing but nevertheless passed by organizers, [and] bad road surfaces····" _Id._ Thus, the understanding of the parties when the release was executed, in light of all the facts and circumstances, is paramount in determining whether the language is clear and unambiguous. _Hallman, 1986 WL 535 at *2._ The evidence must establish that the parties intended the release to apply to the particular conduct of the defendant which has caused the harm. _Restatement (Second) of Torts,_ § 496B, cmt. d, (1965).

**\*6** In the present case, plaintiffs assert that a genuine issue of material fact exists as to whether McDonough understood that the release included a waiver against the hazards created by defendants' alleged negligent and reckless conduct in promoting the race. The court agrees.

IV. CONCLUSION

For the reasons stated above, the court shall deny defendants' motion for summary judgment. An order will issue consistent with this memorandum opinion.

Copr. (C) West 2006 No Claim to Orig. U.S. Govt. Works D.Del.,1997.
McDonough v. National Off-Road Bicycle Assn.
Not Reported in F.Supp., 1997 WL 309503 (D.Del.)


Motions, Pleadings and Filings (Back to top)

• 1:95cv00504 (Docket) (Aug. 14, 1995)
END OF DOCUMENT

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-18

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DELBERT E. ROLLISON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-159 SLR |
| | ) | |
| NEAL SHOEMAKER, an individual, | ) | TRIAL BY JURY DEMANDED |
| BLUE DIAMOND, LLC, a Delaware | ) | |
| corporation, HOUGHTONS | ) | |
| AMUSEMENT PARK, LLC, a | ) | |
| Delaware corporation JACK | ) | |
| BRADY, individually and d/b/a | ) | |
| KSR MOTOR SPORTS, BENCHMARK | ) | |
| BUILDERS, INC. a Delaware | ) | |
| corporation, and PARKWAY | ) | |
| GRAVEL, a Delaware | ) | |
| corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I, **HEREBY CERTIFY** that on this 27th day of November, 2006, a copy of **APPENDIX TO OPENING BRIEF OF DEFENDANTS BLUE DIAMOND, LLC AND PARKWAY GRAVEL, INC. IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** was mailed first class to the following party:

Jack Brady
P.O. Box 1701
Paoli, PA 19301

and was electronically filed with the Clerk of the Court using CM/ECF which will send notifications of such filing(s) to counsel listed below: served via Lexis/Nexis File upon the following counsel:

Arthur M. Krawitz, Esquire
Matthew R. Fogg, Esquire
Doroshow, Pasquale,
Krawitz & Bhaya
1202 Kirkwood Highway
Wilmington, DE 19805

Colin M. Shalk, Esquire
Casarino, Christman & Shalk
800 North King Street
Suite 200
P.O. Box 1276
Wilmington, DE 19899

Sherry R. Fallon, Esquire
Tybout, Redfearn & Pell
750 South Madison Street
Suite 400
Wilmington, DE 19801

**AKIN & HEBRON, P.A.**
/s/Roger A. Akin
Roger A. Akin, Esquire
Bar No. 395
1220 N. Market Street, Suite 300
P.O. Box 25047
Wilmington, DE 19899
(302) 427-6987
Attorney for Defendants
Blue Diamond, LLC and
Parkway Gravel, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DELBERT E. ROLLISON,                      )
                                          )
        Plaintiff,                        )
                                          )
        v.                                )    C.A. No. 06-159 SLR
                                          )
NEAL SHOEMAKER, an individual,)               TRIAL BY JURY DEMANDED
BLUE DIAMOND, LLC, a Delaware )
corporation, HOUGHTONS        )
AMUSEMENT PARK, LLC, a        )
Delaware corporation JACK     )
BRADY, individually and d/b/a )
KSR MOTOR SPORTS, BENCHMARK   )
BUILDERS, INC. a Delaware     )
corporation, and PARKWAY      )
GRAVEL, a Delaware            )
corporation,                  )
                              )
        Defendants.           )

### CERTIFICATE OF SERVICE

I, **HEREBY CERTIFY** that on this 27th day of November, 2006, a copy of **APPENDIX TO OPENING BRIEF OF DEFENDANTS BLUE DIAMOND, LLC AND PARKWAY GRAVEL, INC. IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** was mailed first class to the following party:

Jack Brady
P.O. Box 1701
Paoli, PA 19301

and was electronically filed with the Clerk of the Court using CM/ECF which will send notifications of such filing(s) to counsel listed below: served via Lexis/Nexis File upon the following counsel:

Arthur M. Krawitz, Esquire
Matthew R. Fogg, Esquire
Doroshow, Pasquale,
Krawitz & Bhaya
1202 Kirkwood Highway
Wilmington, DE 19805

Colin M. Shalk, Esquire
Casarino, Christman & Shalk
800 North King Street
Suite 200
P.O. Box 1276
Wilmington, DE 19899

Sherry R. Fallon, Esquire
Tybout, Redfearn & Pell
750 South Madison Street
Suite 400
Wilmington, DE 19801

**AKIN & HEBRON, P.A.**
/s/Roger A. Akin
Roger A. Akin, Esquire
Bar No. 395
1220 N. Market Street, Suite 300
P.O. Box 25047
Wilmington, DE 19899
(302) 427-6987
Attorney for Defendants
Blue Diamond, LLC and
Parkway Gravel, Inc.